# Exhibit A

 CT Corporation

**TO:**    Jenny Kazmar
MLV & CO. LLC
1301 6th Ave Fl 43
New York, NY 10019-6399

**RE:**    **Process Served in Delaware**

**FOR:**    MLV & CO. LLC  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Kenneth Gaynor, Individually and on Behalf of all others similarly situated, Pltf. vs. Deloy Miller, et al., Dfts. // To: MLV & CO. LLC |
| **DOCUMENT(S) SERVED:** | Summons, Return, Complaint, Demand, Certificate(s), First Request(s) for Production, |
| **COURT/AGENCY:** | Morgan County Circuit Court, AL Case # 2015CV34 |
| **NATURE OF ACTION:** | Awarding compensatory damages in favor of Plaintiff and the other class members against all the defendants for all the damages sustained as a result of defendant's wrongdoing |
| **ON WHOM PROCESS WAS SERVED:** | The Corporation Trust Company, Wilmington, DE |
| **DATE AND HOUR OF SERVICE:** | By Certified Mail on 11/23/2015 postmarked on 11/16/2015 |
| **JURISDICTION SERVED :** | Delaware |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days from the date this summons is served upon you (replace w/answer date) (Document(s) may contain additional answer dates) |
| **ATTORNEY(S) / SENDER(S):** | Jerry E. Martin Barrett Johnston Martin & Garrison, LLC 414 Union Street Suite 900 Nashville, TN 37219 615-244-2202 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via Fed Ex 2 Day , 781784291873 |
| **SIGNED:** | The Corporation Trust Company |
| **ADDRESS:** | 1209 N Orange St Wilmington, DE 19801-1120 |
| **TELEPHONE:** | 302-658-7581 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.



UNITED STATES POSTAGE

PITNEY BOWES

$ 009.21⁰

02 1P
0001957404 NOV 16 2015
MAILED FROM ZIP CODE 37219

7015 0640 0004 9840 5564

BARRETT JOHNSTON
MARTIN & GARRISON LLC

TO: MLV & CO LLC
Registered Agent
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

BANK OF AMERICA PLAZA
414 UNION STREET, SUITE 900, NASHVILLE, TN 37219
PHONE: 615-244-2202 FAX: 615-252-3798

11/2009

| STATE OF TENNESSEE<br>9TH JUDICIAL DISTRICT<br>CIRCUIT COURT | **SUMMONS** | CASE FILE NUMBER<br>2015- CV- 34 |
|---|---|---|

| PLAINTIFF<br>KENNETH GAYNOR, Individually and on Behalf of All Others Similarly Situated, | DEFENDANT<br>DELOY MILLER, SCOTT M. BORUFF, DAVID J. VOYTICKY, CATHERINE A. RECTOR, DAVID M. HALL, MERRILL A. McPEAK, GERALD HANNAHS, CHARLES M. STIVERS, DON A. TURKLESON, BOB G. GOWER, JOSEPH T. LEARY, WILLIAM B. RICHARDSON, MARCEAU N. SCHLUMBERGER, PAUL W. BOYD, MLV & CO. LLC, WILLIAMS FINANCIAL GROUP, MAXIM GROUP LLC, NATIONAL SECURITIES CORPORATION, AEGIS CAPITAL CORP., NORTHLAND CAPITAL MARKETS, DOMINICK & DOMINICK, LLC, LADENBURG THALMANN & CO. INC. and I-BANKERS SECURITIES, INC., |
|---|---|

**TO:    (NAME AND ADDRESS OF DEFENDANT)**

**MLV & CO. LLC**
Registered Agent:
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

Method of Service:
G   Morgan Co. Sheriff
G   Certified Mail
G   *Comm. Of Insurance
G   *Secretary of State
G   *Out of County Sheriff
G   Private Process Server
G   Other

List each defendant on a separate summons.                              *Attach Required Fees

YOU ARE SUMMONED TO DEFEND A CIVIL ACTION FILED AGAINST YOU IN CIRCUIT COURT, MORGAN COUNTY, TENNESSEE. YOUR DEFENSE MUST BE MADE WITHIN THIRTY (30) DAYS FROM THE DATE THIS SUMMONS IS SERVED UPON YOU. YOU MUST FILE YOUR DEFENSE WITH THE CLERK OF THE COURT AND SEND A COPY TO THE PLAINTIFF'S ATTORNEY AT THE ADDRESS LISTED BELOW. IF YOU FAIL TO DEFEND THIS ACTION BY THE ABOVE DATE, JUDGMENT BY DEFAULT CAN BE RENDERED AGAINST YOU FOR THE RELIEF SOUGHT IN THE COMPLAINT.

| Attorney for plaintiff or plaintiff if filing Pro Se:<br>(Name, address & telephone number)<br><br>Jerry E. Martin<br>Barrett Johnston Martin & Garrison, LLC<br>Bank of America Plaza<br>414 Union Street, Suite 900<br>Nashville, TN 37219<br>(615) 244 - 2202 | FILED, ISSUED & ATTESTED<br><br>*November 12, 2015*<br>PAM KECK, Circuit Court Clerk<br>By:    415 N. Kingston    P.O. Box 324<br>            Wartburg, TN 37887-0163<br>*Barbara Cox*<br><br>ADA<br>FOR ASSISTANCE CALL<br>423-346-3503 |
|---|---|

The disposition date of this case is twelve months from date of filing. The case must be resolved or set for trial by this date or it will be dismissed by the Court for failure to prosecute pursuant to T.R.C.P. 41.02.

If you think the case will require more than one year to resolve or set for trial, you must send a letter to the Circuit Court Clerk at the earliest practicable date asking for an extension of the disposition date and stating your reasons. Extensions will be granted only when exceptional circumstances exist.

FILED 2:00
AM NOV 0 9 2015 PM
PK/Bc
MORGAN CO. CIRCUIT CLERK

| TO THE SHERIFF: | DATE RECEIVED |
|---|---|
| | **Sheriff** |

## RETURN ON SERVICE OF SUMMONS

I hereby return this summons as follows: (Name of Party Served) _____

☐ Served _____   ☐ Not Found _____
☐ Not Served _____   ☐ Other _____

| DATE OF RETURN: | By: |
|---|---|
| | Sheriff/or other authorized person to serve process |

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify and return that on the _____ day of _____, 20___, I sent, postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in case _____ to the defendant _____. On the _____ day of _____, 20___, I received the return receipt, which had been signed by _____ on the _____ day of _____, 20___. The return receipt is attached to this original summons to be filed by the Circuit Court Clerk.

| **Sworn to and subscribed before me on this _____ day of _____ _____, 20___.** Signature of _____ Notary Public or _____ Deputy Clerk<br><br>My Commission Expires: | Signature of plaintiff, plaintiff's attorney or other person authorized by statute to serve process. |
|---|---|
| | ATTACH RETURN RECEIPT HERE (IF APPLICABLE) |

IN THE CIRCUIT COURT FOR MORGAN COUNTY
9TH JUDICIAL DISTRICT
THE STATE OF TENNESSEE

| | |
|---|---|
| KENNETH GAYNOR, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>  vs.<br><br>DELOY MILLER, SCOTT M. BORUFF, DAVID J. VOYTICKY, CATHERINE A. RECTOR, DAVID M. HALL, MERRILL A. McPEAK, GERALD HANNAHS, CHARLES M. STIVERS, DON A. TURKLESON, BOB G. GOWER, JOSEPH T. LEARY, WILLIAM B. RICHARDSON, MARCEAU N. SCHLUMBERGER, PAUL W. BOYD, MLV & CO. LLC, WILLIAMS FINANCIAL GROUP, MAXIM GROUP LLC, NATIONAL SECURITIES CORPORATION, AEGIS CAPITAL CORP., NORTHLAND CAPITAL MARKETS, DOMINICK & DOMINICK, LLC, LADENBURG THALMANN & CO. INC. and I-BANKERS SECURITIES, INC.,<br><br>    Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Case No.  2015- CV- 34

<u>CLASS ACTION</u>

COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS

<u>DEMAND FOR JURY TRIAL</u>

FILED  2:00
AM  NOV 0 9 2015  PM
    PK/BC
MORGAN CO. CIRCUIT CLERK

Plaintiff Kenneth Gaynor ("Plaintiff") alleges the following based upon the investigation of Plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Miller Energy Resources, Inc. ("Miller" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, the SEC's Order Instituting Public Administrative and Cease-and-Desist Proceedings Pursuant to Section 8a of the Securities Act of 1933, Sections 4c and 21c of the Securities Exchange Act of 1934, and Rule 102(e) of the Commission's Rules of Practice, *In the Matter of Miller Resources, Inc., et al.*, SEC Admin. Proc. File No. 3-16729 (August 6, 2015), filings in *In re Miller Energy Resources, Inc., et al.*, No. 15-00313 (D. Alaska Bankr. Ct.), and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act") on behalf of all purchasers of Miller preferred shares traceable to the Registration Statement and Prospectuses issued in connection with the following public offerings of Miller's 10.75% Series C Cumulative Preferred Stock ("Series C") and 10.5% Series D Fixed Rate/Floating Rate Cumulative Redeemable Preferred Stock ("Series D") (collectively, the "Offerings"):

| DATE | PREFERRED SHARES | PRICE | OFFERING NAME |
|------|------------------|-------|---------------|
| Feb. 13, 2013 | Series C | $22.90 | "2/13/13-Series C" |
| May 8, 2013 | Series C | $22.25 | "5/8/13-Series C" |
| June 28, 2013 | Series C | $21.50 | "6/28/13-Series C" |
| Sept. 26, 2013 | Series D | $25.00 | "9/26/13-Series D" |

| Oct. 17, 2013 | Series D | At Market | "10/17/13-Series D" |
| Aug. 21, 2014 | Series D | $24.50 | "8/21/14-Series D" |

2.      The action is brought against several current and former executive officers and directors of Miller and the investment banking firms that underwrote the Offerings. On October 1, 2015, Miller sought bankruptcy protection and, therefore, is not named as a defendant herein.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over the causes of action asserted herein pursuant to Tenn. Code Ann. §16-10-101, because this case is a cause not given by statute to another tribunal in this State. This action is not removable. The claims alleged herein arise under §§11 and 15 of the Securities Act, 15 U.S.C. §§77k and 77o. Jurisdiction is conferred by §22 of the Securities Act and venue is proper pursuant to §22 of the Securities Act, 15 U.S.C. §77v. Section 22 of the Securities Act explicitly states that "[e]xcept as provided in section 16(c), no case arising under this title and brought in any State court of competent jurisdiction shall be removed to any court of the United States." Section 16(c) refers to "covered class actions," which are defined as lawsuits brought as class actions or brought on behalf of more than 50 persons asserting claims under state or common law. *See* 15 U.S.C. §77p(c) and (f)(2). This is an action asserting federal law claims. Thus, it does not fall within the definition of a "covered class action" under §16(b)-(c) and therefore is not removable to federal court. *See Kircher v. Putnam Funds Trust*, 547 U.S. 633, 636 n.1, 644 (2006) (an "action is not precluded" under the Securities Litigation Uniform Reform Act ("SLUSA") where it is not "'based upon the statutory or common law of any State,'" citing 15 U.S.C. §77p(b), and "the proper course is to remand to the state

court that can deal with it"); *Atkinson v. Morgan Asset Mgmt.*, 658 F.3d 549, 552 (6th Cir. 2011) (same: SLUSA precludes only "class actions that . . . assert state-law claims," citing 15 U.S.C. §77p(b), (f)(2)(A), (f)(3)); *see generally Luther v. Countrywide Home Loans Servicing LP*, 533 F.3d 1031, 1032 (9th Cir. 2008) ("Section 22(a) of the Securities Act of 1933 creates concurrent jurisdiction in state and federal courts over claims arising under the Act. It also specifically provides that such claims brought in state court are not subject to removal to federal court."); *Luther v. Countrywide Fin. Corp.*, 195 Cal. App. 4th 789, 792 (2011) ("The federal Securities Act of 1933 of 1998 . . . as amended by [SLUSA], provides for concurrent jurisdiction for cases asserting claims under the 1933 Act . . . ."). As detailed in Miller's bankruptcy petition, one of the Company's "Locations of Principal Assets of Business" is in "Morgan County, Tennessee."

4.    This Court has personal jurisdiction over each of the defendants named herein because they conducted substantial business in, were citizens of and/or orchestrated the Offerings out of Tennessee at the time of the Offerings (including Miller, which maintained its principal place of business and offices throughout this State at the time of the Offerings). The violations of law complained of herein occurred in Tennessee, including the preparation and dissemination of the materially false and misleading Registration Statement complained of herein, which was disseminated into this State.

## PARTIES AND RELEVANT NON-PARTIES

5.    Plaintiff Kenneth Gaynor purchased Miller preferred shares traceable to the Offerings, and was damaged thereby.

6.    Non-party Miller Energy Resources, Inc. (f/k/a Miller Petroleum, Inc.) is an independent exploration and production company that explores for, develops, and operates

- 3 -

oil and gas wells in south-central Alaska and in Tennessee. At all times relevant to this action, Miller common stock traded on the NYSE under the ticker symbol "MILL"; the Series C traded on the NYSE under the ticker symbol "MILLP"; and the Series D traded on the NYSE under the ticker symbol "MILLO." As of September 29, 2015, Miller had approximately 46.7 million shares of common stock, 3.25 million shares of Series C and 3.5 million shares of Series D issued and outstanding. On September 11, 2015, Miller caused its common stock, Series C and Series D to be delisted from the NYSE. On October 1, 2015, Miller filed a petition seeking relief under the federal bankruptcy statutes. In light of the automatic stay in the bankruptcy proceedings, Miller is not named as a defendant herein.

7.    Defendant Deloy Miller founded Miller and served as the Chairman of its Board of Directors (the "Board") until September 14, 2014.

8.    Defendant Scott M. Boruff ("Boruff") has served as the Executive Chairman of the Board since September 14, 2014. Previously, defendant Boruff served as Miller's Chief Executive Officer ("CEO") from August 6, 2008 to September 14, 2014 and as its President from June 2010 until June 9, 2011.

9.    Defendant David J. Voyticky served as the President of Miller from June 9, 2011 until August 12, 2014, as its Acting Chief Financial Officer ("CFO") from September 2011 until February 2014, and was a director from April 2010 to April 2014.

10.    Defendant Catherine A. Rector served as the Vice President and Chief Accounting Officer of Miller between July 2012 and October 2013.

11.     Defendant David M. Hall ("Hall") served as the Chief Operating Officer ("COO") of Miller from July 18, 2013 until August 6, 2015. Defendant Hall also served as a member of the Board from December 10, 2009 until April 16, 2015.

12.     Defendants Merrill A. McPeak, Gerald Hannahs, Charles M. Stivers and Don A. Turkleson served as directors of Miller as of September 6, 2012 and signed the Registration Statement used to conduct the Offerings.

13.     Defendants Bob G. Gower, Joseph T. Leary, William B. Richardson and Marceau N. Schlumberger served as directors of Miller at the time of certain of the Offerings.

14.     Defendant Paul W. Boyd ("Boyd") served as the CFO and Treasurer of Miller from 2008 to 2011 and as Miller's Director of Risk Management from 2011 until 2014.

15.     The defendants named in ¶¶8-15 are all liable under the Securities Act and are referred to herein as the "Individual Defendants." The Individual Defendants named in ¶¶8-13 each signed the Registration Statement used to conduct the Offerings. The Individual Defendants named in ¶14 were directors of Miller at the time of certain of the Offerings.

16.     Non-party Carlton W. Vogt, III ("Vogt") was the audit team leader at the Company's former independent outside auditing firm, non-party Sherb & Co., LLP ("Sherb & Co."), a now defunct CPA firm that was suspended by the SEC in 2013 for improper professional conduct unrelated to its work for Miller, which had served as the Company's outside audit firm since 2008. Vogt led the Sherb & Co. audit team that audited Miller's financial statements for the 2009 and 2010 fiscal years.

17.    Defendants MLV & Co. LLC ("MLV"), Williams Financial Group ("WFG"), Maxim Group LLC ("MXG"), National Securities Corporation ("NSC"), Aegis Capital Corp. ("ACC"), Northland Capital Markets ("NCM"), Dominick & Dominick, LLC ("D&D"), Ladenburg Thalmann & Co. Inc. ("LTC") and I-Bankers Securities, Inc. ("IBS") (collectively the "Underwriter Defendants") are investment banking firms that acted as underwriters of the Offerings, helping to draft and disseminate the offering documents. Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

(a)    The Underwriter Defendants are investment banking houses that specialize, *inter alia*, in underwriting public offerings of securities. They served as the underwriters of the Offerings and shared upwards of $7.5 million in fees collectively.[1] The Underwriter Defendants determined that in return for their share of the proceeds of the Offerings, they were willing to merchandize Miller preferred shares in the Offerings. The Underwriter Defendants arranged multi-city roadshows prior to the Offerings during which they, and representatives from Miller, met with potential investors and presented highly favorable information about the Company, its operation and its financial prospects.

(b)    The Underwriter Defendants also demanded and obtained agreements from Miller that Miller would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also made certain that Miller had purchased millions of dollars in directors' and officers' liability insurance.

---

[1]    As indicated below at note 2, one of the Offerings was conducted "at market" prices and/or on a "best efforts" basis and the Prospectus does not indicate the prices, dates of sales or number of shares sold in that Offering. Where required, the underwriting fees were estimated based on all shares being sold at $25.

(c)     Representatives of the Underwriter Defendants also assisted Miller and the Individual Defendants in planning the Offerings, and purportedly conducted adequate and reasonable investigations into the business and operations of Miller, an undertaking known as a "due diligence" investigation. The due diligence investigations were required of the Underwriter Defendants in order to engage in each of the Offerings. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Miller's operations and financial prospects.

(d)     In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with Miller's lawyers, management and top executives and engaged in "drafting sessions" between September 2012 and August 2014. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the Offerings; (ii) the terms of the Offerings, including the price at which Miller preferred shares would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Miller would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Miller management and top executives, the Underwriter Defendants knew, or should have known, of Miller's existing problems as detailed herein.

(e)     The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with offers and sales thereof, including to Plaintiff and the Class (as defined below).

## SUBSTANTIVE ALLEGATIONS

18.    Defendant Miller is an independent oil and natural gas exploration, production and drilling company operating in multiple exploration and production basins in North America founded in 1967. The Company, whose focus was originally on Tennessee's Appalachian Basin, first became a publicly traded company in connection with a reverse merger in 1996.

19.    Between early 2002 and December 2009, Miller's stock price regularly traded below one dollar per share, falling to a low of $0.04 per share in December 2007. In August 2008, Miller named a new CEO. Soon thereafter, the Company began acquiring additional oil and gas properties.

20.    In the fall of 2009, Miller became aware of certain oil and gas properties in Alaska that were in the process of being "abandoned" as part of the bankruptcy proceedings of California-based Pacific Energy Resources ("PER"). PER had been unable to service its heavy debt and pay the significant monthly costs required to operate its operating assets and had unsuccessfully sought for almost a year to sell them.

21.    Beginning in December 2008, months before it filed for bankruptcy, PER, with the help of one of the world's leading financial advisory and asset management firms, marketed PER's operating assets in Alaska to 40 potential buyers. This process failed to attract any bidders, and the assets were auctioned by the bankruptcy court in July 2009, with the winning bidder agreeing to a total purchase price of $8 million for the assets. A second entity, who bid $7 million, was designated as the back-up purchaser. Neither bid ultimately closed.

22.	As a result, PER sought in August 2009, and was granted in September, an order from the bankruptcy court allowing it to abandon title to the assets due to a lack of interest.

23.	Due to renewed interest in the assets from Miller following their abandonment, the bankruptcy court permitted PER to reacquire its Alaska assets and sell them to Miller's operating subsidiary, Cook Inlet Energy ("CIE"), in a competitive auction for $2.25 million in cash and the assumption of certain limited liabilities. The transaction closed on December 10, 2009.

24.	The Company then claimed the assets it had purchased through the bankruptcy were valued at more than $479 million, including oil and gas assets that included onshore and offshore production facilities, $215 million in proven energy reserves, $122 million in probable energy reserves, and $31 million in possible energy reserves, providing total reserves of $368 million (the "Alaska Assets").

25.	Until August 2015, the Company valued the Alaska Assets based on a reserve estimates report prepared for it by an engineering firm, Ralph E. Davis & Associates (the "Reserve Report"). Beginning on March 22, 2010, and subsequently repeated in numerous filings with the SEC Miller made through August 2015, the Company claimed in its quarterly report filed on Form 10-Q for its fiscal third quarter ended January 31, 2010 ("3Q 2010") a reported a value of the Alaska Assets of $480 million, which amount comprised $368 million for oil and gas properties and $110 million for fixed assets. Miller also reported an after-tax $277 million "bargain purchase gain," which boosted its reported net

income for the quarter to $272 million – an enormous increase over the $556,097 loss reported for the same period the year before.

26.     The newly booked value of the Alaska Assets, which resulted in a nearly 5,000% increase in Miller's total assets, had a significant impact on the market price of Miller common stock. On December 10, 2009, the date of the transaction, Miller common stock closed at $0.61 per share. Following the acquisition of the Alaska Assets, by March 31, 2010, Miller common stock closed 982% higher at $6.60 per share. Weeks later, the listing of Miller stock was moved to the NASDAQ and, after moving to the NYSE a year later, reached an all-time high price on December 9, 2013 of $8.83 per share.

## THE FALSE AND MISLEADING REGISTRATION STATEMENT

27.     On or about September 6, 2012, Miller filed with the SEC a Form S-3 registration statement and prospectus using a "shelf" registration, or continuous offering process. Under the shelf registration, Miller would sell securities described in various future prospectus supplements in one or more offerings. The prospectus supplements would form part of the registration statement for each offering. The securities were to be issued by Miller. This Form S-3, which would later be utilized for all of the Offerings, expressly incorporated by reference certain filings Miller had previously made with the SEC and all future filings until any offering conducted under the shelf registration statement was completed.

28.     The SEC declared the shelf registration statement effective on September 18, 2012.

29.     On or about the date of each of the following Offerings, Miller and the following Underwriter Defendants priced the Offerings and filed the final Prospectuses for

those Offerings, which formed part of the Registration Statement (collectively, the "Registration Statement"), pursuant to which Miller sold the following preferred shares to the public:

| Offering | Underwriters | Price | Shares | Gross Proceeds[2] |
|---|---|---|---|---|
| 2/13/13-Series C | MLV, MXG, NSC, ACC, WFG | $22.90 | 625,000 | $14,312,500 |
| 5/8/13-Series C | MLV, MXG, NSC, ACC | $22.25 | 500,000 | $11,125,000 |
| 6/28/13 Series C | MLV, ACC, MXG, NSC, NCM | $21.50 | 335,000 | $7,202,500 |
| 9/26/13-Series D | MLV, MXG, NSC, ACC, D&D, LTC, NCM | $25.00 | 1,000,000 | $25,000,000 |
| 10/17/13-Series D | MLV | Market | 3,000,000 | $75,000,000 |
| 8/21/14-Series D | MLV, MXG, ACC, IBS, LTC, NSC, NCM | $24.50 | 750,000 | $18,375,000 |

30.     The Registration Statement, including the materials incorporated therein by reference (which expressly incorporated Miller's Annual Report on Form 10-K for the year ended April 30, 2012, as well as various Current Reports on Form 8-K), and the final Prospectuses, which would include the Forms 10-K, 10-Q and 8-K filed prior to each Offering, were negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation.

31.     All of the Company's interim and annual financial reports issued between 2010 and 2015, relying upon the Reserve Report, overstated the value of the Alaska Assets by hundreds of millions of dollars by failing to record the Alaska Assets at fair value as required by Accounting Standards Codification ("ASC") 805, *Business Combinations*, and the federal securities laws, because they "used as fair value a reserve report that was prepared by a

---

[2]     Where an Offering was conducted "at market" price and/or on a "best efforts" basis and the dates, prices and number of shares sold were not disclosed in the Prospectus, gross proceeds were estimated using the total shares that could have been sold at $25 each.

petroleum engineer firm using the rules for supplemental oil and gas disclosures," "the reserve report . . . expressly disclaimed that the numbers therein represented the engineer firm's opinion of fair value," "[t]he reserve report . . . also contained expense numbers that were knowingly understated," and the Reserve Report "double counted $110 million of certain fixed assets that were already included in the reserve report." As a result, all of Miller's interim and fiscal financial reports issued between 2010 and 2015, the Form S-3 filed on September 6, 2012, and each of the final Prospectuses used to conduct the Offerings were false and misleading.[3]

### A.   Under Generally Accepted Accounting Principles, Miller Energy Was Required to Record the Alaska Assets Acquisition at Fair Value

32.   ASC 805, *Business Combinations* – formerly Statement of Financial Accounting Standards ("SFAS") 141(R) – became effective in December 2008. Among its principal revisions, ASC 805 requires acquisitions that result in a "bargain purchase," *e.g.*, entities purchased at fire sales prices in non-orderly transactions, to be measured at fair value, with any resulting gain recorded on the income statement.

33.   ASC 820, *Fair Value Measurements* (formerly SFAS 157), provides the framework for measuring fair value. "Fair value" is defined in ASC 820 as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." A reporting entity must determine an

---

[3]   Miller's false and misleading reports filed with SEC included: Forms 10-Q for the 3Q 2010 and all interim quarters for 2011-2015; Forms 10-K for 2010 - 2014; the Form S-1 filed on August 8, 2010; the Forms S-3 filed on September 6, 2012 and October 5, 2012; and prospectuses filed between August 25, 2010 through August 21, 2014 pursuant to Rule 424; and 15 Forms 8-K filed between March 2010 through at least December 2014.

appropriate fair value using one or more of the valuation techniques described in accounting literature.

34. ASC 820 outlines three broad approaches to measuring fair value: the market approach, income approach, and cost approach. Under the market approach, prices and other relevant information generated by market transactions involving identical or comparable assets or liabilities are used to measure fair value. The income approach utilizes valuation techniques to convert future amounts to a single discounted present value amount. Finally, the cost approach is based on the amount that currently would be required to replace the assets in service, *i.e.*, current replacement cost.

35. ASC 820 emphasizes that fair value is a market-based measurement, not an entity specific measurement, and should be determined based on the assumptions market participants would use in pricing the asset or liability.

36. ASC 820 emphasizes that when a price for an identical asset or liability is not observable, entities should use a "valuation technique that maximizes the use of relevant observable inputs and minimizes the use of unobservable inputs" and entities may not ignore assumptions market participants would use.[4]

37. When computing their estimate of fair value, defendants Miller and Boyd failed to consider the existence of numerous, readily apparent data points strongly indicating that the Alaska Assets were worth substantially less than the $480 million value Miller

---

[4] ASC 820 defines "unobservable inputs" as "inputs that reflect the reporting entity's own assumptions about the assumptions market participants would use in pricing the asset or liability developed based on the best information available in the circumstances," and "observable inputs" as "inputs that reflect the assumptions market participants would use in pricing the asset or liability developed based on market data obtained from sources independent of the reporting entity."

recorded. In failing to do so, defendants Miller and Boyd materially overstated the value of the newly acquired Alaska Assets. As described detailed below, Miller purported to value the Alaska Assets using the income approach for the oil and gas reserves and the cost approach for certain fixed assets.

**B.     The Valuation of the Acquired Oil and Gas Properties Was Based Upon a Reserve Report that Does Not Represent Fair Value**

38.     To record the value of the acquired oil and gas properties, defendants Miller and Boyd requested and improperly used the Reserve Report prepared by an independent petroleum engineering firm.[5]

39.     Reserve reports are commonly used in the oil and gas industry to estimate quantities of oil and gas (the reserves) expected to be recovered from existing properties. Generally, these reports list reserves in categories based on a minimum estimated percentage probability of eventual recovery and production, *i.e.*, proved, probable and possible.

---

[5]     Oil and gas reporting companies are subject to two principal authoritative pronouncements governing financial accounting and reporting for oil and gas activities: Rule 4-10 of Regulation S-X (17 C.F.R. 210.4-10), *Financial Accounting and Reporting for Oil and Gas Producing Activities Pursuant to the Federal Securities Laws and the Energy Policy and Conservation Act of 1975* ("Rule 4-10"); and ASC 932-235-50-29 through 33 (formerly SFAS 19, *Financial Accounting and Reporting by Oil and Gas Producing Companies*, and SFAS 69, *Disclosures About Oil and Gas Producing Activities*). ASC 932 establishes disclosure requirements for significant oil and gas activities, including disclosure of the "standardized measure," which is the future after-tax net cash flows discounted at 10%.

A non-U.S. Generally Accepted Accounting Principles ("GAAP") measure, known as "PV-10," is similar to the standardized measure but is typically presented on a pretax basis. The Financial Accounting Standards Board has noted that the standardized measure supplies investors with useful information, however, they also noted their concern "that users of financial statements understand that it is neither fair market value nor the present value of future cash flows. It is a rough surrogate for such measures, a tool to allow for a reasonable comparison of mineral reserves and changes through the use of a standardized method that recognizes qualitative, quantitative, geographic, and temporal characteristics." Paragraph 83 of the Basis for Conclusions of SFAS 69.

Information in reserve reports that are prepared in accordance with SEC regulations is frequently used, among other purposes, to satisfy supplemental accounting disclosure requirements concerning estimates of future oil and gas production. However, the numbers used in reserve reports for this purpose are expressly not considered "an estimate of fair market value."[6]

40.     Shortly after the acquisition, defendant Boyd asked defendant Hall – a non-accountant with no formal accounting training – to obtain a reserve report for the Alaska Assets in order to determine the fair value of the acquired assets to be reported on Miller's Form 10-Q for the quarter ended January 31, 2010.

41.     On January 5, 2010, defendant Hall hired a petroleum engineering firm to prepare a reserve report using a pretax present value of net cash flows discounted at 10% ("PV-10"), which, while appropriate with further adjustments for SEC supplemental disclosures, was not indicative of fair value.

42.     The petroleum engineering firm did not know Miller intended to use the report for fair value purposes and believed that the purpose of the report was for use as supplemental data in the Company's SEC disclosures. Indeed, the two-page engagement letter with the engineering firm included no language about "fair value," "fair market value" or authoritative accounting literature.

43.     The Reserve Report was finalized in February 2010 and reflected PV-10 of $368 million.

---

[6]     *See* Paragraph 77 of the Basis for Conclusion of SFAS 69 ("Although it cannot be considered an estimate of fair market value, the standardized measure of discounted net cash flows should be responsive to some of the key variables that affect fair market value, namely, changes in reserve quantities, selling prices, production costs, and tax rates.").

44.     Upon receiving the Reserve Report, defendant Boyd, without undertaking any additional analysis, merely recorded as the fair value of the acquired oil and gas properties the sum of the PV-10 estimates for 100% of the proved, probable and possible reserves, which increased the book value of Miller's oil and gas properties on its balance sheet by $368 million.

45.     The Reserve Report itself clearly stated that the numbers therein were not an estimate of fair market value. Specifically, on page three of the report it stated that "[t]he discounted values shown are for your information and should not be construed as our estimate of fair market value."

46.     Defendant Boyd never reviewed or questioned any of the Reserve Report's assumptions or calculations, nor did he communicate with the engineering firm about the Reserve Report.

47.     The use of the PV-10 numbers as fair value conflicted with contemporaneous representations Miller made to investors in its filings with the SEC, including those incorporated by reference into the Registration Statement used to conduct the Offerings. Specifically, in its fiscal 2010 Form 10-K, which was the first annual report that included the inflated values, and as would be repeated in all filings through August 2015, Miller expressly told investors that "[o]ur PV-10 measure and the standardized measure of discounted future net cash flows do not purport to present the fair value of our natural gas and oil reserves." Despite that disclosure, Miller had actually used its PV-10 measure in that very same report as the fair value of its acquired properties.

48.    The $368 million Reserve Report value did not represent fair value for several reasons.

49.    Despite showing years of net profit that market participants would expect to be taxable, the Reserve Report did not make any adjustments for income taxes.

50.    At Miller's request, the Reserve Report used a 10% discount rate that was inappropriate under GAAP for determining fair value. In a discounted cash flow model, a discount rate is used to account for the uncertainties associated with risk and the time value of money. A discount rate is the required rate of return that an investor would demand – based on the risks associated with the benefit stream under consideration – to induce the investor to make an investment. By failing to consider the discount rate using assumptions market participants would use, Miller materially overstated the value of the acquired oil and gas properties.

51.    The valuation also overstated cash flows from certain categories of reserve estimates (*e.g.*, "probable" and "possible" reserves) by failing to apply any risk weight to such reserves and the resulting cash flows. Given the high degree of uncertainty associated with cash flows from these reserve estimate categories, they are required to be risk weighted in order to reflect an appropriate valuation.

52.    The Reserve Report did not include amounts for certain asset retirement obligations, *i.e.*, the legal obligations associated with the retirement of tangible long-lived assets.

53.     Finally, the $237 million of projected operating and capital expenses in the Reserve Report, which were provided by defendants Miller and Hall, were intentionally understated, resulting in an overstated valuation.

54.     In fact, one petroleum engineering firm contacted but not used by Miller thought that the expected level of expenses made a significant portion of the acquisition unprofitable. Initially, defendant Hall contacted the petroleum engineering firm who had previously provided the past two owners of the properties with reserve reports, and thus had unfettered access to past operating data, and requested a quote for "updating" a prior reserve report. That firm told defendant Hall that it would not assign any value to one of the largest fields acquired, the Redoubt Shoal field, because it was uneconomical – *i.e.*, expected future expenses exceeded expected future cash flows – and explained that it would not put its "name on a report that implies value exists where it likely does not."[7]

55.     Defendant Boyd was aware that Miller chose the new firm because the prior firm would not assign any value to the Redoubt Shoal field. The Redoubt Shoal field – which represented $291 million of the $368 million in fair value recorded by Miller – showed positive future cash flows in the Reserve Report primarily because defendant Hall gave the new engineering firm understated and unsubstantiated expense numbers. Defendant Boyd had previously been advised by non-party Vogt that the lack of any controls over defendant Hall's expense estimates was a "concerning void."

---

[7]     Unique among the oil and gas properties purchased by Miller, Redoubt Shoal is an offshore field in Cook Inlet, Alaska, which requires the use of an offshore platform that sits in seventy feet of water, is accessible only by boat or helicopter, and drills to depths in excess of 12,000 feet. Offshore drilling presents risks and costs not associated with onshore operations.

56.    Defendants Miller and Hall provided expense projections that, in many cases, were significantly lower than past actual experience.  For example, internal documents maintained by defendant Hall indicated that the cost to drill a new well in the Redoubt Shoal field was roughly $13 million.  However, defendant Hall told the engineering firm to use a cost of $4.6 million per well in its reserve report.  And instead of using recent expense data, defendant Hall gave the engineering firm nearly three-year-old operating expense data, which he revised downward on the pretext that Miller could run a leaner operation than the former operators of the properties.  By way of example, defendant Hall told the engineering firm that the offshore Redoubt Shoal field would cost $399,000 per month to operate when it actually cost the seller more than $600,000 per month, and internal estimates show that defendants Miller and Hall expected the field to cost more than $800,000 per month once it was fully operational.  Additionally, in some years, the Reserve Report included zero expenses for operating the facilities in the Redoubt Shoal and another field.

57.    Overall, the Reserve Report implied operating expenses of $4 per barrel of oil equivalent ("boe") for all categories of reserves.  That level of operating expenses was unreasonable in light of the previous owner's actual operating expenses of $32.50/boe in 2008 and $55.42/boe in the first half of 2009 before the wells were shut-in.

58.    By understating the expense numbers, Miller overvalued the oil and gas properties by tens of millions of dollars.

**C.    The Fair Value of the Acquired Fixed Assets Was Double Counted and Overstated**

59.    In addition to the $368 million value recorded for the oil and gas properties, defendant Miller also erroneously recorded a separate value of $110 million for acquired fixed assets, such as facilities and pipelines ancillary to the oil and gas reserves.

60.    In a February 8, 2010 email, defendant Boyd informed defendant Hall that he needed an amount to use as fair value for the fixed assets obtained as part of the Alaska Assets acquisition. He noted that, ideally, the value should be what a willing buyer would pay for the assets, but "[i]n the absence of that, replacement values or something similar would probably work." Two days later, defendant Boyd was sent an "asset replacement cost study," purportedly provided by an independent insurance broker, which appeared to list the replacement cost for the assets as $110 million. The "study" was dated September 5, 2008, but "revised" on February 9, 2010.

61.    Without any additional analysis, defendant Boyd recorded the amount in the revised insurance study on Miller's balance sheet.

62.    The recording of assets at a value of $110 million was improper for several reasons.

63.    Miller's use of the values in the insurance study resulted in counting the value of the fixed assets twice, thereby overstating the value of such assets. The Reserve Report, which Miller relied on to value the acquired oil and gas properties, used a discounted cash flow model. Valuation specialists use such models to estimate the value of an enterprise's "operating assets" – *i.e.*, the assets employed to generate future cash flows – by converting future benefit streams into a net present value. In Miller's case, the fixed assets in the

- 20 -

insurance study were the very same operating assets that were expected to generate the future cash flows in the Reserve Report. Accordingly, they should not have been separately valued.

64.     Prior to the acquisition, all of the production from the offshore Redoubt Shoal field ran through the Osprey platform, which had no processing facilities or power generating capability of its own. Power was sent from generators housed within the Kustatan Production Facility to the platform via a subsea line, which was connected to an underground power grid that ran throughout all of the acquired properties. Moreover, production from the offshore platform was sent onshore for processing through pipes to the Kustatan Production Facility. Absent the platform, there would have been no way to obtain oil and gas from the Redoubt Shoal field without incurring upfront capital expenditures to replace the platform and its related infrastructure. Similarly, without the other production facilities, the platform would have lacked power and somewhere to process its oil and gas.

65.     The Reserve Report Miller used for the valuation recognized the interconnectedness of the properties, as it expressly listed the facilities and the offshore platform as assets used to generate the future cash flows.

66.     In short, because the fixed assets were integral to the operations of the acquired properties, their values were captured in the Reserve Report's cash flows. Consequently, by separately valuing the same operating assets, Miller overstated the value of the Alaska Assets by as much as $110 million.

67.     The insurance study also did not reflect fair value because the version of the insurance study used by defendant Boyd purported to show "asset replacement cost." Absent further adjustments, replacement cost new does not qualify as fair value under GAAP.

68. Miller, at the direction of defendants Boyd and Hall, also refashioned a preexisting insurance study to make it appear that its own value of $110 million derived from a third party. The numbers in the fixed asset study were given to the insurance broker, and its predecessor, by its clients (*i.e.*, Miller and the previous owners of the fixed assets) as far back as 2007 and were used as starting points for other types of estimates, such as estimates for possible losses resulting from fire or natural disasters. The two employees at the insurance broker who were most familiar with the original "Loss Estimates Study," including the engineer who authored it, confirmed to the SEC that no one at the broker ever tested or in any way double checked the values given to them.

69. Defendants Boyd and Hall knew or knowingly disregarded the fact that the insurance study did not reflect fair value or any analysis by the insurance broker.

70. On February 8, 2010, defendant Hall directed Alaska personnel to contact the insurance broker and another oil and gas consulting company to ask them for a report reflecting fair value or replacement cost. The insurance broker responded on February 9, 2010, and told Miller in an email copied to defendant Hall that it could not provide a report showing replacement costs.

71. Miller also contacted a separate consulting firm and sent it the insurance broker's original 2008 insurance report. Late on February 8, 2010, the consulting firm informed Miller that the insurance study it sent was a "good reference" but the report did not state "value or replacement cost." The firm offered to conduct its own analysis, but advised that the estimate would take "approximately 2-3 weeks to complete" and "cost around $15,000-$18,000."

72.     Upon hearing the news that a new report might take two to three weeks, Alaska personnel, including defendant Hall, called defendant Boyd. According to one participant on this call, defendant Boyd said he could not wait weeks for a new report. He "needed it quickly and he needed to base it on something . . . a professional had to sign off on it, not us, some third party." During the call, defendants Boyd and Hall decided to rely on numbers in the insurance report as replacement costs, despite defendant Hall having been told by the broker that it could not provide Miller with replacement costs.

73.     With the aim of making the report appear as though it reflected replacement costs, defendant Hall provided a subordinate with edits to the 2008 insurance report that significantly altered its appearance, including changing its name from "Loss Estimates Study" to "Asset replacement cost study." The revised report, which Miller gave to Sherb & Co., omitted the insurance broker's methodology and analysis. As a result, the only numbers reflected in the revised report were the ones provided to the broker by defendant Miller and its predecessors.

74.     As a result of the foregoing, Miller overvalued the Alaska Assets by more than $400 million.

75.     As a result of the fraudulent valuation, Miller filed with the SEC financial reports that materially misstated the value of its assets, including the SEC filings incorporated by reference in the Registration Statement used to conduct the Offerings.

76.     Under the rules and regulations governing the preparation of the Registration Statement, Miller was required to disclose at the time of the Offerings that the value of the Alaska Assets was materially overstated in its financial statements. The Registration

Statement, however, contained no such disclosures. Pursuant to Item 303 of Regulation S-K (17 C.F.R. §229.303) and the SEC's related interpretive releases thereto, issuers are required to disclose events or uncertainties, including any known trends, that have had or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results. This is particularly true for issuers utilizing shelf registration statements, which require continuous updating and incorporate those continuous disclosures into the registration statement.

77.    At the time of each of the Offerings, the Alaska Assets were materially overstated in the Company's financial statements, which materially understated its true expenses and materially overstated its profits. The adverse events and uncertainties associated with these declining trends were reasonably likely to have a material impact on Miller's profitability, and, therefore, were required to be disclosed in the Registration Statement.

78.    The Offerings were successful for the Company and the Underwriter Defendants who sold upwards of 6.21 million Series C and D shares, raising an estimated $151.015 million in gross proceeds in the Offerings, as follows[8]:

| OFFERING | UNDERWRITERS | PRICE | SHARES | GROSS PROCEEDS |
|---|---|---|---|---|
| 2/13/13-Series C | MLV, MXG, NSC, ACC, WFG | $22.90 | 625,000 | $14,312,500 |
| 5/8/13-Series C | MLV, MXG, NSC, ACC | $22.25 | 500,000 | $11,125,000 |
| 6/28/13-Series C | MLV, ACC, MXG, NSC, NCM | $21.50 | 335,000 | $7,202,500 |
| 9/26/13-Series D | MLV, MXG, NSC, ACC, D&D, LTC, NCM | $25.00 | 1,000,000 | $25,000,000 |
| 10/17/13-Series D | MLV | Market | 3,000,000 | $75,000,000 |
| 8/21/14-Series D | MLV, MXG, ACC, IBS, LTC, NSC, NCM | $24.50 | 750,000 | $18,375,000 |

---

[8]    As indicated in notes 1 and 2 above, this is an estimated figure based on information provided in the Prospectuses.

## MILLER WRITES DOWN THE VALUE OF THE ALASKA ASSETS

79.     Following the Offerings, the following series of disclosures revealed that the Registration Statement was false and misleading in that it overstated the value of the Alaska Assets on the Company's books by hundreds of millions of dollars at the time each of the Offerings was conducted.

80.     On December 10, 2014, Miller disclosed that it was taking a $265.3 million impairment charge on the Alaska Assets, specifically the Redoubt Shoal field.

81.     On March 12, 2014, Miller disclosed that it was taking another $150 million impairment charge on the Alaska Assets.

82.     On April 29, 2015, Miller disclosed that the SEC had notified it that the agency staff had made a preliminary determination to recommend civil action against the Company related to its accounting for the 2009 Alaska Asset acquisition.

83.     On May 6, 2015, Miller disclosed that it would "defer" the dividend payments on the Series C and D shares.

84.     On May 12, 2015, Miller disclosed that the NYSE had notified the Company that its shares were subject to delisting due to its having failed to maintain listing requirements.

85.     On July 14, 2015, Miller included a "going concern" disclosure in its 2014 Annual Report filed with the SEC on Form 10-K.

86.     On July 30, 2015, Miller disclosed that its common stock would be delisted from the NYSE.

87.     Then, on August 6, 2015, the SEC initiated civil administrative proceedings against Miller (the "SEC Enforcement Action") accusing the Company and defendants Boyd

and Hall of knowingly artificially inflating the value of the Alaska Assets acquired in 2009

and then knowingly misstating Miller's financial statements for the ensuing five-plus year

period through and including July 2015 when the Company's stock was delisted. Non-party

Vogt was also charged in the SEC Enforcement Action.

88.     In its Order Instituting Public Administrative and Cease-and-Desist

Proceedings filed that day, the SEC's Division of Enforcement alleged that after acquiring

the Alaska Assets in late 2009, Miller overstated their value by more than $400 million,

boosting the Company's net income and total assets. According to the SEC, the allegedly

inflated valuation had a significant impact, turning a penny-stock company into one that was

eventually listed on the NYSE, where its common stock had reached a 2013 high of nearly

$9 per share. In a statement issued that day, William P. Hicks, Associate Regional Director

of the SEC's Atlanta office, stated in pertinent part as follows:

> "Financial statement information is the cornerstone of investment
> decisions. We've charged that Miller Energy falsified financial statement
> information and grossly overstated the value of its Alaska assets and that the
> company's independent auditor failed to conduct an audit that complied with
> professional standards . . . . The SEC will aggressively prosecute such
> conduct."

89.     According to the SEC, Miller had paid $2.25 million and assumed certain

liabilities to purchase the Alaska Assets. It later reported them at a value of $480 million.

While accounting standards required the Company to record the properties at "fair value,"

then-CFO defendant Boyd allegedly relied on the Reserve Report, which did not reflect fair

value for the assets, and he also was alleged to have double counted $110 million of fixed

assets already included in the Reserve Report. The Reserve Report allegedly contained

expense numbers that were knowingly understated by defendant Hall, then serving as the

- 26 -

CEO of Miller's Alaska subsidiary, CIE, and as Miller's COO since July 2013. Defendant Hall was also alleged to have altered a second report to make it appear as though it reflected an outside party's estimate of value.

90.     The SEC alleged that the fiscal 2010 audit of Miller's financial statements was deficient due to the failure of non-party Vogt, the Sherb & Co. partner in charge of the Miller audits, who issued an unqualified opinion of Miller's 2010 annual report and was alleged to have falsely stated that the audit was conducted in accordance with the standards of the Public Company Accounting Oversight Board and that Miller's financial statements were presented fairly and conformed with GAAP.

91.     As a result of the forgoing misconduct, the SEC alleged that:

- Defendant Miller violated §17(a) of the Securities Act, §10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, which prohibit fraudulent conduct in the offer or sale of securities and in connection with the purchase or sale of securities;

- Defendant Boyd willfully aided and abetted and caused, and defendant Hall caused, Miller's violations of §17(a) of the Securities Act, §10(b) of the Exchange Act and Rule 10b-5 thereunder;

- Defendant Boyd willfully violated, and defendant Hall violated, §17(a) of the Securities Act, §10(b) of the Exchange Act and Rule 10b-5 thereunder, which prohibit fraudulent conduct in the offer or sale of securities and in connection with the purchase or sale of securities;

- Defendant Miller violated §13(a) of the Exchange Act and Rules 13a-1, 13a-11 and 13a-13 thereunder, which require that every issuer of a security registered pursuant to §12 of the Exchange Act file with the SEC, among other things, annual, current, and quarterly reports as the SEC may require;

- Defendant Boyd willfully aided and abetted and caused, and defendant Hall caused, Miller's violations of §13(a) of the Exchange Act and Rules 13a-1, 13a-11 and 13a-13 thereunder;

- Defendant Miller violated §13(b)(2)(A) of the Exchange Act, which requires reporting companies to make and keep books, records and accounts which, in

reasonable detail, accurately and fairly reflect their transactions and dispositions of their assets;

- Defendant Boyd willfully aided and abetted and caused, and defendant Hall caused, Miller's violations of §13(b)(2)(A) of the Exchange Act;

- Defendant Miller violated §13(b)(2)(B) of the Exchange Act, which requires all reporting companies to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP;

- Defendant Boyd willfully aided and abetted and caused, and defendant Hall caused, Miller's violations of §13(b)(2)(B) of the Exchange Act;

- Defendant Boyd willfully violated, and defendant Hall violated, §13(b)(5) of the Exchange Act, which prohibits any person from knowingly circumventing or knowingly failing to implement a system of internal accounting controls or knowingly falsifying any book, record, or account described in §13(b)(2) of the Exchange Act;

- Defendant Miller violated Rule 12b-20 under the Exchange Act which requires that, in addition to the information expressly required to be included in a statement or report filed with the SEC, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made not misleading;

- Defendant Boyd willfully aided and abetted and caused, and defendant Hall caused, defendant Miller's violations of Rule 12b-20 under the Exchange Act; and

- Defendant Boyd willfully violated Rule 13a-14 of the Exchange Act, which requires that an issuer's principal executive and principal financial officers certify each periodic report.

92.    The SEC sought and obtained, among other things, cease-and-desist orders, civil monetary penalties, and return of alleged ill-gotten gains from defendants Miller, Boyd and Hall.

93.    During August 2015, various of Miller's creditors called for the Company to file bankruptcy.

94.    On August 20, 2015, Miller disclosed that it had settled with the SEC, agreeing to pay a $5 million fine and to restate all periodic financial reports back to 2010. Miller's restatement of its previously reported financial results was an admission that those results were false when filed.

95.    On October 1, 2015, Miller filed for protection under Chapter 11 of the federal bankruptcy statutes, citing in large part the filing of the SEC Enforcement Action, which Miller's senior executives stated had torpedoed its ability to obtain $165 million in outside financing, along with the filing of an involuntary bankruptcy petition against its subsidiary CIE in August 2015 by creditors Baker Hughes Oilfield Operations Inc. and Schlumberger Technology Corp., with total claims of $2.79 million, which filing Miller said was precipitated by the SEC Enforcement Action.

96.    By the time of the filing of this action, Miller Series C and D shares have been delisted after the market price of each had plummeted to approximately $0.30 per share, a more than 98% decline from the prices the shares were marketed at in the Offerings.

## CLASS ACTION ALLEGATIONS

97.    Plaintiff brings this action as a class action on behalf of a class consisting of all those who purchased Miller preferred shares traceable to the Registration Statement issued in connection with the Offerings (the "Class"). Excluded from the Class are defendants and their families, the officers and directors and affiliates of defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

98.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time

and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Miller or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

99.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

100.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

101.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether defendants violated the Securities Act;

(b)    whether the Registration Statement was negligently prepared and contained inaccurate statements of material fact and omitted material information required to be stated therein; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

102.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small,

the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## FIRST CAUSE OF ACTION

### For Violation of §11 of the Securities Act
### Against All Defendants (Except Boyd)

103. Plaintiff incorporates ¶¶1-103 by reference.

104. This Cause of Action is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants except Boyd.

105. The Registration Statement for the Offerings was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary in order to make the statements made not misleading, and omitted to state material facts required to be stated therein.

106. The defendants named in the Cause of Action are strictly liable to Plaintiff and the Class for the misstatements and omissions.

107. None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

108. By reason of the conduct herein alleged, each of these defendants violated, and/or controlled a person who violated, §11 of the Securities Act.

109. Plaintiff acquired Miller preferred shares traceable to the Offerings.

110. Plaintiff and the Class have sustained damages.

111.    At the time of their purchases of Miller preferred shares, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiff commenced this action. Less than three years has elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time Plaintiff commenced this action.

## SECOND CAUSE OF ACTION

### For Violation of §15 of the Securities Act
### Against the Company and the Individual Defendants

112.    Plaintiff incorporates ¶¶1-112 by reference.

113.    This Cause of Action is brought pursuant to §15 of the Securities Act against the Company and the Individual Defendants.

114.    The Individual Defendants each were control persons of Miller by virtue of their positions as directors and/or senior officers of Miller. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Miller. The Company controlled the Individual Defendants and all of Miller's employees.

115.    The Individual Defendants each were culpable participants in the violations of §11 of the Securities Act alleged in the Cause of Action above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the Offerings to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action and certifying Plaintiff as a Class representative under Tenn. R. Civ. P. 23 and Plaintiff's counsel as Class Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  November 6, 2015

BARRETT JOHNSTON MARTIN
  & GARRISON, LLC
DOUGLAS S. JOHNSTON, JR., #5782
JERRY E. MARTIN, #20193
TIMOTHY L. MILES, #21605

JERRY E. MARTIN

Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2202
615/252-3798 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHRISTOPHER M. WOOD, #032977
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
MARY K. BLASY
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

LAW OFFICES OF CURTIS V. TRINKO, LLP
CURTIS V. TRINKO
WILLIAM MARGRABE
16 West 46th Street, 7th Floor
New York, NY 10036
Telephone: 212/490-9550
212/986-0158 (fax)

Attorneys for Plaintiff

| | | |
|---|---|---|
| KENNETH GAYNOR, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Case No. 2015-cv-34 |
| | ) | Judge Michael Pemberton |
| Plaintiff, | ) ) | CLASS ACTION |
| vs. | ) ) | DEMAND FOR JURY TRIAL |
| DELOY MILLER, *et al.* | ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS MLV & CO. LLC, WILLIAMS FINANCIAL GROUP MAXIM GROUP LLC, NATIONAL SECURITIES CORPORATION, AEGIS CAPITAL CORP., NORTHLAND CAPITAL MARKETS, DOMINICK & DOMINICK, LLC, LADENBURG THALMANN & CO. INC. AND I-BANKERS SECURITIES, INC.

Pursuant to Tenn. R. Civ. P. 34, plaintiff hereby demands MLV & Co. LLC, Williams Financial Group Maxim Group LLC, National Securities Corporation, Aegis Capital Corp., Northland Capital Markets, Dominick & Dominick, LLC, Ladenburg Thalmann & Co. Inc. and I-Bankers Securities, Inc. (collectively "Defendants") to produce the documents described below for inspection and copying at the law offices of Barrett Johnston Martin & Garrison, LLC, 414 Union Street, Suite 900, Nashville, TN 37209, within 45 days after service of complaint, at 10:00 a.m., or at such other location and date upon which the parties may mutually agree.

DEFINITIONS

1.     "You" and "your" refer to the person responding to these Requests.

2.     The term "Individual Defendants" means Deloy Miller, Scott M. Boruff, David J. Voyticky, Catherine A. Rector, David M. Hall, Merrill A. Mcpeak, Gerald Hannahs, Charles M.

Stivers, Don A. Turkleson, Bob G. Gower, Joseph T. Leary, William B. Richardson, Marceau N. Schlumberger and Paul W. Boyd

3.    "Miller" means Miller Energy Resources, Inc. and any of its predecessors, successors, divisions, parents, affiliates, subsidiaries (including, but not limited to, CIE as defined below), directors, employees, agents or anyone acting or purporting to act on its behalf.

4.    "CIE" means Cook Inlet Energy and any of its predecessors, successors, divisions, parents, affiliates, subsidiaries, directors, employees, agents or anyone acting or purporting to act on its behalf.

5.    "PER" means Pacific Energy Resources and any of its predecessors, successors, divisions, parents, affiliates, subsidiaries, directors, employees, agents or anyone acting or purporting to act on its behalf.

6.    "Offerings" means the following public offerings of Miller's 10.75% Series C Cumulative Preferred Stock ("Series C") and 10.5% Series D Fixed Rate/Floating Rate Cumulative Redeemable Preferred Stock ("Series D") (collectively, the "Offerings"):

| DATE | PREFERRED SHARES | PRICE | OFFERING NAME |
|---|---|---|---|
| Feb. 13, 2013 | Series C | $22.90 | "2/13/13-Series C" |
| May 8, 2013 | Series C | $22.25 | "5/8/13-Series C" |
| June 28, 2013 | Series C | $21.50 | "6/28/13-Series C" |
| Sept. 26, 2013 | Series D | $25.00 | "9/26/13-Series D" |
| Oct. 17, 2013 | Series D | At Market | "10/17/13-Series D" |
| Aug. 21, 2014 | Series D | $24.50 | "8/21/14-Series D" |

7.    "Alaska Assets" means certain oil and gas properties in Alaska purchased by Miller's operating subsidiary, CIE for $2.25 million in cash and the assumption of certain limited liabilities and which closed on December 10, 2009.

8.    "Reserve Reports" means the reserve estimates report prepared for Miller by Ralph E. Davis & Associates concerning the Alaska Asserts.

9.     "Person" or "persons" means and refers to natural persons, proprietorships, corporations, partnerships, trusts, joint ventures, groups, associations, organizations and governmental agencies and other agencies.

10.     "Underwriter Defendants means defendants MLV & Co. LLC, Williams Financial Group Maxim Group LLC, National Securities Corporation, Aegis Capital Corp., Northland Capital Markets, Dominick & Dominick, LLC, Ladenburg Thalmann & Co. Inc. and I-Bankers Securities, Inc.

11.     The term "business relationship" refers to any relationship, whether formal, informal, contractual or legal, concerning any employment, occupation, profession, ownership or equity interest for monetary gain, personal gain or livelihood. "Business relationship" shall also include, without limitation, any monetary, financial or labor investment.

12.     The term "document" or "documents" is intended to be interpreted in the broadest possible sense and includes, but is not limited to, all electronic data and all communications which are stored or retrievable or recorded in any manner and also includes, without limitation, any writing or other record of information or images, including, but not limited to, print, handwriting, photographs, film, recordings, memoranda, books, records, accounts, ledgers, vouchers, invoices, drafts, bills, charge slips, letters, electronic mail or "e-mail," compact discs, CD-ROM discs, magnetic tape, videotape, magnetic or optical disks, "floppy disks," "PowerPoint" or other presentation software systems, telegrams, mailgrams, correspondence, notes and minutes of meetings, conversations or telephone calls, resolutions, interoffice memoranda, work papers, reports, projects, tabulations, studies, surveys, legal complaints and other pleadings, affidavits, interrogatories, legal briefs, legal motions, judgments, designs, drawings, schematics, maps, manuals, models, notebooks, contracts, agreements, diaries,

telephone records, desk calendars, appointment books, circulars, charts, transcripts, news releases, trade releases, advertisements, press books, teletype messages, licenses, financial statements, stenographers' notebooks, punchcards, computer printouts and data, telecopier or facsimile transmissions and printouts, letters of credit, stock certificates and securities. The term "document" also includes preliminary drafts or revisions or copies of any such document if the copy is in any way different from the original, now in your possession, custody or control, or in the possession, custody or control of your advisors, agents, employees, servants, representatives, trustees, counsel or other persons acting or purporting to act on your behalf.

13.    The term "electronic data" refers to any original and any non-identical copies (whether non-identical because of notes made on copies or attached comments, annotations, marks, transmission notations, or highlighting of any kind), of mechanical, facsimile, electronic, magnetic, digital or other programs (whether private, commercial, or work-in-progress), programming notes or instructions, activity listings of electronic mail receipts or transmittals, output resulting from the use of any software program, including word processing documents, spreadsheets, database files, charts, graphs and outlines, electronic mail or "e-mail," personal digital assistant ("PDA") messages, instant messenger messages, operating systems, source code of all types, programming languages, linkers and compilers, peripheral drives, PDF files, PRF files, batch files, ASCII files, crosswalks, code keys, pull down tables, logs, file layouts and any and all miscellaneous files or file fragments, regardless of the media on which they reside and regardless of whether said electronic data consists of an active file, deleted file or file fragment. "Electronic data" also includes any and all items stored on computer memory or memories, hard disks, floppy disks, zip drives, CD-ROM discs, Bernoulli Boxes and their equivalents, magnetic tapes of all types and kinds, microfiche, punched cards, punched tape, computer chips (including,

but not limited to, EPROM, PROM, ROM or RAM of any kind) on or in any other vehicle for digital data storage or transmittal, files, folder tabs, or containers and labels appended to or associated with any physical storage device associated with each original and each copy.

14.     The term "Financial Statements" includes, but is not limited to, interim, final, pro forma, actual, projected, complete, or partial, annual, quarterly, monthly, weekly or otherwise, audited or unaudited, budgets, budget plans, balance sheets, schedules of direct costs, schedules of miscellaneous income, schedules of general services, fiscal serviceman administrative services, statements of earnings and earnings per share, income statements, cash flow statements, statement of revenues and statements of expenses, all notes or other commentary concerning any of the foregoing and all underlying work papers and all drafts used in connection with the preparation of any of the foregoing.

15.     The term "telephone records" includes, without limitation, telephone directories, rolodexes, messages, telephone logs, recordings of telephone conversations and telephone bills (local and long distance).

16.     "Communication" or "communications" refers to any exchange of information by any means of transmission, sending or receipt of information of any kind by or through any means including, but not limited to, speech, writings, documents, language (machine, foreign or otherwise) of any kind, computer electronics or electronic data, sound, radio or video signals, telecommunication, telephone, teletype, facsimile, telegram, microfilm, microfiche, photographic film of all types or other media of any kind. The term "communication" also includes, without limitation, all inquiries, discussions, conversations, correspondence, negotiations, agreements, understandings, meetings, notices, requests, responses, demands, complaints, or press, publicity or trade releases.

17.    The term "concerning" shall mean constituting, evidencing, reflecting, referring to, incorporating, effecting, including, or otherwise pertaining or relating, either directly or indirectly, or being in any way logically or factually connected with the subject matter of the inquiry or Request. Requests for "documents concerning" any subject matter include documents concerning communication regarding that subject matter.

18.    "Identify" when used to refer to a natural person, shall mean to set forth that person's: (i) full name and title, if any; (ii) present or last known address; (iii) present or last known business and home telephone number(s); and (iv) present or last known employer.

19.    "Identify" when used to refer to a document, shall mean: (i) the date of each document; (ii) the type of each such document (*i.e.* correspondence, memorandum, business record, etc.); (iii) the identity of the author(s) or preparer(s) of each such document; and (iv) the present location of each such document or copies thereof.

20.    The terms "all" and "each" shall be construed as all/each.

21.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the request all responses that might otherwise be construed to be outside of its scope.

22.    "Roadshow" means any and all presentations made or given by any officer, director, employee, agent, underwriter, investment banker or other person or entity on behalf of Miller, relating to the Offerings.

23.    "SEC" means the Securities and Exchange Commission.

24.    "SEC filings" means all documents filed or prepared for the purpose of filing with the SEC and any other state or federal regulatory agency, including, but not limited to, Forms 8-

K, 10-K, 10-Q, Schedules TO-T, 13-D, 14A, 14D-1 and 14D-9 and any drafts thereof or amendments thereto.

25. "SEC Enforcement Action" means the civil administrative proceedings against Miller initiated by the SEC on August 6, 2015 in *In the Matter of Miller Resources, Inc., et al.*, SEC Admin. Proc. File No. 3-16729.

INSTRUCTIONS

In responding to these document Requests, you shall produce separately all documents available at the time of responding or which can be located or discovered by reasonably diligent efforts, including documents in the possession of your agents and representatives.

References to an individual, partnership, limited liability company or corporation include any and all agents, employees, representatives and attorneys and all other persons or entities acting on your behalf or under your control.

If you claim any form of privilege or any other objection, whether based on statute, common law or otherwise as a ground for not producing any requested document, please furnish a list identifying each document for which the privilege or other objection is claimed together with the following information: date, sender, recipient, persons to whom copies were furnished together with their job titles, subject matter, basis on which privilege or other objection is claimed and the number of each Request to which such document responds. If you claim privilege or any other objection with regard to only part of a document, produce the part to which there is no objection.

If you are aware of any documents or copies thereof that may be responsive to these Requests but are no longer in your possession, custody or control, or have been lost or destroyed, identify each document in detail, including whether: (i) the document is missing, lost or destroyed; (ii) the document has been transferred or delivered to another person and, if so, at

whose request; (iii) who prepared it; (iv) to whom it was prepared for and sent to; (v) when it was prepared or sent; (vi) the content of the document; (vii) the person who destroyed it; and (viii) why it was lost or destroyed.

If any individual Request is ambiguous in any way, please send a letter to the undersigned counsel describing the ambiguity and it will be promptly clarified in a reply letter. If any individual Request (or subpart thereof) is deemed to be unduly burdensome, please send a letter to the undersigned counsel specifying the reasons why the Request is unduly burdensome and stating whatever information and knowledge you have of the information or documents called for in the Request, and (generally) an attempt will be made to rephrase the Request (or subpart thereof) in a reply letter to lessen the burdens of compliance. Any such reply letter may be treated by the parties to whom it is addressed as a modification of the particular Request.

Unless words or terms have been given a specific definition herein, each word or term used herein shall be given its usual and customary dictionary definition except where such words have a specific custom and usage definition in your trade or industry, in which case they shall be interpreted in accordance with such usual custom and usage definition of which you are aware. In construing the Requests herein: (i) the singular shall include the plural and the plural shall include the singular; and (ii) a masculine, feminine or neuter pronoun shall not exclude the other genders, all to the end that the interpretation applied results in the more expansive production.

In making production, produce all documents as kept in the normal course of business and identify the file from which each document was taken.

TIME PERIOD

Unless stated otherwise, the time period to which these Requests refer is January 1, 2009 through the date of production. If a document prepared before this period is necessary for a

correct or complete understanding of any document covered by a Request, you must produce the earlier or subsequent document as well. If any document is undated and the date of its preparation cannot be determined, the document shall be produced if otherwise responsive to the production Request.

DOCUMENTS REQUESTED

REQUEST NO. 1:

All documents and communications concerning each draft or final Offerings prospectuses and registration statements and disclosures incorporated in the Offerings prospectuses, including, but not limited to, any draft that contains edits, comments, questions, or any writing concerning the draft or the Offerings.

REQUEST NO. 2:

All communications to or from you concerning the matters disclosed in the Offerings prospectuses and periodic filings incorporated therein.

REQUEST NO. 3:

All documents and communications concerning the adequacy of, necessity of, expected, or actual, disclosures of information in connection with the Offerings and Offering prospectuses (including prospectuses drafts).

REQUEST NO. 4:

All documents concerning any disagreement between Miller, the Individual Defendants, the Underwriter Defendants, or any Miller officers, directors, employees, consultants, accountants or attorneys concerning any conclusion, statement, observation, disclosure or non-disclosure in any document filed by Miller with the SEC concerning:

    (a)    the Offerings;

    (b)    the Alaska Assets;

(c)      the Reserve Report; and

(d)      Miller's accounting for the Alaska Assets.

REQUEST NO. 5:

All documents and communications prepared, received, or sent by you concerning:

(a)      the Offerings;

(b)      the Alaska Assets;

(c)      the Reserve Report;

(d)      Miller's accounting for the Alaska Assets.

REQUEST NO. 6:

All documents and communications concerning any due diligence performed in connection with the Offerings.

REQUEST NO. 7:

All documents concerning how you conduct due diligence, including, but not limited to, all due diligence checklists and/or procedure manuals.

REQUEST NO. 8:

Any comfort letters prepared or received by you concerning Miller or the Offerings.

REQUEST NO. 9:

All documents and communications concerning any meetings, conference calls, symposiums or conferences at which Miller was discussed, including, but not limited to, any Miller Board of Directors' meetings or Miller Board of Directors' committee meetings. Responsive documents shall include, but not be limited to, materials distributed and notes or transcripts of any meetings and conference calls.

REQUEST NO. 10:

All documents and communications relating to presentations and reports you gave to Miller or any of the Individual Defendants.

REQUEST NO. 11:

All documents and communications concerning any press release, published article, financial analysts' report and/or rating agencies' report relating to or concerning Miller or the Offerings.

REQUEST NO. 12:

All documents and communications concerning any actual or proposed changes in the terms or effective dates of the Offerings or the right or option to terminate, amend or modify the terms of the Offerings, including, but not limited to, any change in the offering price of Miller common stock leading up to the Offerings.

REQUEST NO. 13:

All documents that identify the personnel involved in the Offerings, whether contained in a "Working Group List" or any similar list, from any or all of the following entities: Miller;; the Underwriter Defendants; and any other entities or consultants involved in the Offerings.

REQUEST NO. 13:

All documents concerning fees, expenses, reimbursements, costs, compensation or other remuneration received by you for services rendered relating to the Offerings and/or any other services provided to or on behalf of Miller.

REQUEST NO. 14:

All indemnification and/or hold-harmless agreements and any documents relating to any indemnifications between you and Miller or the Individual Defendants.

REQUEST NO. 15:

All documents and communications concerning any investors in or purchasers of Miller's securities in connection with the Offerings, including, but not limited to, any lists and trading records in your possession, custody or control, and documents identifying any person or entity that purchased Miller securities in the Offerings.

REQUEST NO. 15:

All documents concerning any actual or contemplated investment banking services or consulting services performed for or on behalf of Miller or the Individual Defendants.

REQUEST NO. 16:

All documents concerning your ownership or investment in Miller.

REQUEST NO. 17:

All documents concerning any communication, presentation or meeting (including any scripts, transcripts, tapes or videos prepared in connection with or as a result of) with any potential purchasers of Miller's securities, securities analysts, financial analysts, institutional investors, financial investors, news media, journalists, investment bankers, brokerage firms, market makers, money managers, commercial banks, rating agencies (such as Moody's Investor Service, Inc.) or stock markets or securities exchanges concerning Miller or the Offerings, including, but not limited to, Roadshow presentations.

DATED: November 16, 2015    BARRETT JOHNSTON MARTIN
        & GARRISON, LLC
        DOUGLAS S. JOHNSTON, JR., #5782
        JERRY E. MARTIN, #20193
        TIMOTHY L. MILES, #21605

JERRY E. MARTIN

- 12 -

Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2202
615/252-3798 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHRISTOPHER M. WOOD, #032977
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
MARY K. BLASY
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

LAW OFFICES OF CURTIS V. TRINKO, LLP
CURTIS V. TRINKO
WILLIAM MARGRABE
16 West 46th Street, 7th Floor
New York, NY 10036
Telephone: 212/490-9550
212/986-0158 (fax)

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing *Plaintiff's First Request for Production Of Documents To Defendants MLV & Co. LLC, Williams Financial Group Maxim Group LLC, National Securities Corporation, Aegis Capital Corp., Northland Capital Markets, Dominick & Dominick, LLC, Ladenburg Thalmann & Co. Inc. and I-Bankers Securities, Inc.* has been served on the following via certified U.S. Mail on November 16, 2015:

| | |
|---|---|
| **Deloy Miller**<br>815 South Lake Drive<br>Oneida, TN 97841 | **Scott M. Boruff**<br>5628 Lyons View Pike<br>Knoxville, TN 37919 |
| **David J. Voyticky**<br>41 East Parkway PHA<br>Brooklyn, NY 11238 | **Catherine A. Rector**<br>1519 Pebble Shore Lane<br>Knoxville, TN 37931 |
| **David M. Hall**<br>48110 David Hall Road<br>Kenai, AK 99611 | **Merrill A. McPeak**<br>123 Furnace Street<br>Lake Oswego, OR 97034 |
| **Gerald Hannahs**<br>17710 Leatha Lane<br>Little Rock, AR 72223 | **Charles M. Stivers**<br>118 Richmond Road<br>Manchester, KY 40962 |
| **Don A. Turkleson**<br>6311 Rodrigo Street<br>Houston, TX 77007 | **Bob G. Gower**<br>402 Timberwilde Lane<br>Houston, TX 77024 |
| **Joseph T. Leary**<br>704 East 12th Street<br>Houston, TX 77008 | **William B. Richardson**<br>1058 Encantado Drive<br>Santa Fe, NM 87501 |
| **Marceau N. Schlumberger**<br>18 Dante Street<br>Larchmont, NY 10538 | **Paul W. Boyd**<br>8125 Ainsworth Drive<br>Knoxville, TN 37909 |
| **Williams Financial Group**<br>Registered Agent: Wilson Williams<br>2711 N. Haskell Avenue, Suite 2900<br>Dallas, TX 75204 | **Maxim Group LLC**<br>Edward L. Rose, Esq.<br>99 Sunnyside Boulevard<br>Woodbury, NY 11797 |
| **Northland Capital Markets**<br>45 South 7th Street, Suite 2000<br>Minneapolis, MN 55402 | **Aegis Capital Corp.**<br>810 7th Avenue, 18th Floor<br>New York, NY 10019 |

| National Securities Corporation | Dominick & Dominick LLC |
|---|---|
| Registered Agent: | Registered Agent: |
| Delaware Corporate Services, Inc. | Corporation Service Company |
| 901 North Market Street, Suite 705 | 80 State Street |
| Wilmington, DE 19801 | Albany, NY 12207 |
| **Ladenburg Thalmann & Co. Inc.** | **I-Bankers Securities, Inc.** |
| Registered Agent: | Registered Agent: |
| Corporate Creations Network, Inc. | IBS Holding Corporation |
| 15 North Mill Street | 21550 Oxnard Street, 3rd Floor |
| Nyack, NY 10960 | Woodland Hills, CA 91367 |
| | **MLV & CO. LLC** |
| | Registered Agent: |
| | The Corporation Trust Company |
| | Corporation Trust Center |
| | 1209 Orange Street |
| | Wilmington, DE 19801 |

JERRY E. MARTIN
**BARRETT JOHNSTON MARTIN
& GARRISON, LLC**

IN THE CIRCUIT COURT FOR MORGAN COUNTY
9TH JUDICIAL DISTRICT
THE STATE OF TENNESSEE

| | | |
|---|---|---|
| KENNETH GAYNOR, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Case No. 2015-cv-34 |
| Plaintiff, | ) ) ) | Judge Michael Pemberton |
| vs. | ) ) ) | <u>CLASS ACTION</u> |
| DELOY MILLER, *et al.* | ) ) ) | <u>DEMAND FOR JURY TRIAL</u> |
| Defendants. | ) ) | |

**PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS DELOY MILLER, SCOTT M. BORUFF, DAVID J. VOYTICKY, CATHERINE A. RECTOR, DAVID M. HALL, MERRILL A. MCPEAK, GERALD HANNAHS, CHARLES M. STIVERS, DON A. TURKLESON, BOB G. GOWER, JOSEPH T. LEARY, WILLIAM B. RICHARDSON, MARCEAU N. SCHLUMBERGER AND PAUL W. BOYD**

Pursuant to Tenn. R. Civ. P. 34, plaintiff hereby demands Deloy Miller, Scott M. Boruff, David J. Voyticky, Catherine A. Rector, David M. Hall, Merrill A. Mcpeak, Gerald Hannahs, Charles M. Stivers, Don A. Turkleson, Bob G. Gower, Joseph T. Leary, William B. Richardson, Marceau N. Schlumberger and Paul W. Boyd (collectively "Defendants") to produce the documents described below for inspection and copying at the law offices of Barrett Johnston Martin & Garrison, LLC, 414 Union Street, Suite 900, Nashville, TN 37209, within 45 days after service of complaint, at 10:00 a.m., or at such other location and date upon which the parties may mutually agree.

DEFINITIONS

1.    "You" and "your" refer to the person responding to these Requests.

2.    The term "Individual Defendants" means Deloy Miller, Scott M. Boruff, David J. Voyticky, Catherine A. Rector, David M. Hall, Merrill A. Mcpeak, Gerald Hannahs, Charles M.

Stivers, Don A. Turkleson, Bob G. Gower, Joseph T. Leary, William B. Richardson, Marceau N. Schlumberger and Paul W. Boyd

3.     "Miller" means Miller Energy Resources, Inc. and any of its predecessors, successors, divisions, parents, affiliates, subsidiaries (including, but not limited to, CIE as defined below), directors, employees, agents or anyone acting or purporting to act on its behalf.

4.     "CIE" means Cook Inlet Energy and any of its predecessors, successors, divisions, parents, affiliates, subsidiaries, directors, employees, agents or anyone acting or purporting to act on its behalf.

5.     "PER" means Pacific Energy Resources and any of its predecessors, successors, divisions, parents, affiliates, subsidiaries, directors, employees, agents or anyone acting or purporting to act on its behalf.

6.     "Offerings" means the following public offerings of Miller's 10.75% Series C Cumulative Preferred Stock ("Series C") and 10.5% Series D Fixed Rate/Floating Rate Cumulative Redeemable Preferred Stock ("Series D") (collectively, the "Offerings"):

| DATE | PREFERRED SHARES | PRICE | OFFERING NAME |
|---|---|---|---|
| Feb. 13, 2013 | Series C | $22.90 | "2/13/13-Series C" |
| May 8, 2013 | Series C | $22.25 | "5/8/13-Series C" |
| June 28, 2013 | Series C | $21.50 | "6/28/13-Series C" |
| Sept. 26, 2013 | Series D | $25.00 | "9/26/13-Series D" |
| Oct. 17, 2013 | Series D | At Market | "10/17/13-Series D" |
| Aug. 21, 2014 | Series D | $24.50 | "8/21/14-Series D" |

7.     "Alaska Assets" means certain oil and gas properties in Alaska purchased by Miller's operating subsidiary, CIE for $2.25 million in cash and the assumption of certain limited liabilities and which closed on December 10, 2009.

8.     "Reserve Reports" means the reserve estimates report prepared for Miller by Ralph E. Davis & Associates concerning the Alaska Asserts.

9.     "Person" or "persons" means and refers to natural persons, proprietorships, corporations, partnerships, trusts, joint ventures, groups, associations, organizations and governmental agencies and other agencies.

10.     "Underwriter Defendants means defendants MLV & Co. LLC ("MLV"), Williams Financial Group Maxim Group LLC, National Securities Corporation, Aegis Capital Corp., Northland Capital Markets ("NCM"), Dominick & Dominick, LLC, Ladenburg Thalmann & Co. Inc. and 1-Bankers Securities, Inc.

11.     The term "business relationship" refers to any relationship, whether formal, informal, contractual or legal, concerning any employment, occupation, profession, ownership or equity interest for monetary gain, personal gain or livelihood. "Business relationship" shall also include, without limitation, any monetary, financial or labor investment.

12.     The term "document" or "documents" is intended to be interpreted in the broadest possible sense and includes, but is not limited to, all electronic data and all communications which are stored or retrievable or recorded in any manner and also includes, without limitation, any writing or other record of information or images, including, but not limited to, print, handwriting, photographs, film, recordings, memoranda, books, records, accounts, ledgers, vouchers, invoices, drafts, bills, charge slips, letters, electronic mail or "e-mail," compact discs, CD-ROM discs, magnetic tape, videotape, magnetic or optical disks, "floppy disks," "PowerPoint" or other presentation software systems, telegrams, mailgrams, correspondence, notes and minutes of meetings, conversations or telephone calls, resolutions, interoffice memoranda, work papers, reports, projects, tabulations, studies, surveys, legal complaints and other pleadings, affidavits, interrogatories, legal briefs, legal motions, judgments, designs, drawings, schematics, maps, manuals, models, notebooks, contracts, agreements, diaries,

telephone records, desk calendars, appointment books, circulars, charts, transcripts, news releases, trade releases, advertisements, press books, teletype messages, licenses, financial statements, stenographers' notebooks, punchcards, computer printouts and data, telecopier or facsimile transmissions and printouts, letters of credit, stock certificates and securities. The term "document" also includes preliminary drafts or revisions or copies of any such document if the copy is in any way different from the original, now in your possession, custody or control, or in the possession, custody or control of your advisors, agents, employees, servants, representatives, trustees, counsel or other persons acting or purporting to act on your behalf.

13.    The term "electronic data" refers to any original and any non-identical copies (whether non-identical because of notes made on copies or attached comments, annotations, marks, transmission notations, or highlighting of any kind), of mechanical, facsimile, electronic, magnetic, digital or other programs (whether private, commercial, or work-in-progress), programming notes or instructions, activity listings of electronic mail receipts or transmittals, output resulting from the use of any software program, including word processing documents, spreadsheets, database files, charts, graphs and outlines, electronic mail or "e-mail," personal digital assistant ("PDA") messages, instant messenger messages, operating systems, source code of all types, programming languages, linkers and compilers, peripheral drives, PDF files, PRF files, batch files, ASCII files, crosswalks, code keys, pull down tables, logs, file layouts and any and all miscellaneous files or file fragments, regardless of the media on which they reside and regardless of whether said electronic data consists of an active file, deleted file or file fragment. "Electronic data" also includes any and all items stored on computer memory or memories, hard disks, floppy disks, zip drives, CD-ROM discs, Bernoulli Boxes and their equivalents, magnetic tapes of all types and kinds, microfiche, punched cards, punched tape, computer chips (including,

but not limited to, EPROM, PROM, ROM or RAM of any kind) on or in any other vehicle for digital data storage or transmittal, files, folder tabs, or containers and labels appended to or associated with any physical storage device associated with each original and each copy.

14. The term "Financial Statements" includes, but is not limited to, interim, final, pro forma, actual, projected, complete, or partial, annual, quarterly, monthly, weekly or otherwise, audited or unaudited, budgets, budget plans, balance sheets, schedules of direct costs, schedules of miscellaneous income, schedules of general services, fiscal serviceman administrative services, statements of earnings and earnings per share, income statements, cash flow statements, statement of revenues and statements of expenses, all notes or other commentary concerning any of the foregoing and all underlying work papers and all drafts used in connection with the preparation of any of the foregoing.

15. The term "telephone records" includes, without limitation, telephone directories, rolodexes, messages, telephone logs, recordings of telephone conversations and telephone bills (local and long distance).

16. "Communication" or "communications" refers to any exchange of information by any means of transmission, sending or receipt of information of any kind by or through any means including, but not limited to, speech, writings, documents, language (machine, foreign or otherwise) of any kind, computer electronics or electronic data, sound, radio or video signals, telecommunication, telephone, teletype, facsimile, telegram, microfilm, microfiche, photographic film of all types or other media of any kind. The term "communication" also includes, without limitation, all inquiries, discussions, conversations, correspondence, negotiations, agreements, understandings, meetings, notices, requests, responses, demands, complaints, or press, publicity or trade releases.

17.     The term "concerning" shall mean constituting, evidencing, reflecting, referring to, incorporating, effecting, including, or otherwise pertaining or relating, either directly or indirectly, or being in any way logically or factually connected with the subject matter of the inquiry or Request. Requests for "documents concerning" any subject matter include documents concerning communication regarding that subject matter.

18.     "Identify" when used to refer to a natural person, shall mean to set forth that person's: (i) full name and title, if any; (ii) present or last known address; (iii) present or last known business and home telephone number(s); and (iv) present or last known employer.

19.     "Identify" when used to refer to a document, shall mean: (i) the date of each document; (ii) the type of each such document (*i.e.* correspondence, memorandum, business record, etc.); (iii) the identity of the author(s) or preparer(s) of each such document; and (iv) the present location of each such document or copies thereof.

20.     The terms "all" and "each" shall be construed as all/each.

21.     The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the request all responses that might otherwise be construed to be outside of its scope.

22.     "Roadshow" means any and all presentations made or given by any officer, director, employee, agent, underwriter, investment banker or other person or entity on behalf of Miller, relating to the Offerings.

23.     "SEC" means the Securities and Exchange Commission.

24.     "SEC filings" means all documents filed or prepared for the purpose of filing with the SEC and any other state or federal regulatory agency, including, but not limited to, Forms 8-

K, 10-K, 10-Q, Schedules TO-T, 13-D, 14A, 14D-1 and 14D-9 and any drafts thereof or amendments thereto.

25. "SEC Enforcement Action" means the civil administrative proceedings against Miller initiated by the SEC on August 6, 2015 in *In the Matter of Miller Resources, Inc., et al.,* SEC Admin. Proc. File No. 3-16729.

INSTRUCTIONS

In responding to these document Requests, you shall produce separately all documents available at the time of responding or which can be located or discovered by reasonably diligent efforts, including documents in the possession of your agents and representatives.

References to an individual, partnership, limited liability company or corporation include any and all agents, employees, representatives and attorneys and all other persons or entities acting on your behalf or under your control.

If you claim any form of privilege or any other objection, whether based on statute, common law or otherwise as a ground for not producing any requested document, please furnish a list identifying each document for which the privilege or other objection is claimed together with the following information: date, sender, recipient, persons to whom copies were furnished together with their job titles, subject matter, basis on which privilege or other objection is claimed and the number of each Request to which such document responds. If you claim privilege or any other objection with regard to only part of a document, produce the part to which there is no objection.

If you are aware of any documents or copies thereof that may be responsive to these Requests but are no longer in your possession, custody or control, or have been lost or destroyed, identify each document in detail, including whether: (i) the document is missing, lost or destroyed; (ii) the document has been transferred or delivered to another person and, if so, at

whose request; (iii) who prepared it; (iv) to whom it was prepared for and sent to; (v) when it was prepared or sent; (vi) the content of the document; (vii) the person who destroyed it; and (viii) why it was lost or destroyed.

If any individual Request is ambiguous in any way, please send a letter to the undersigned counsel describing the ambiguity and it will be promptly clarified in a reply letter. If any individual Request (or subpart thereof) is deemed to be unduly burdensome, please send a letter to the undersigned counsel specifying the reasons why the Request is unduly burdensome and stating whatever information and knowledge you have of the information or documents called for in the Request, and (generally) an attempt will be made to rephrase the Request (or subpart thereof) in a reply letter to lessen the burdens of compliance. Any such reply letter may be treated by the parties to whom it is addressed as a modification of the particular Request.

Unless words or terms have been given a specific definition herein, each word or term used herein shall be given its usual and customary dictionary definition except where such words have a specific custom and usage definition in your trade or industry, in which case they shall be interpreted in accordance with such usual custom and usage definition of which you are aware. In construing the Requests herein: (i) the singular shall include the plural and the plural shall include the singular; and (ii) a masculine, feminine or neuter pronoun shall not exclude the other genders, all to the end that the interpretation applied results in the more expansive production.

In making production, produce all documents as kept in the normal course of business and identify the file from which each document was taken.

TIME PERIOD

Unless stated otherwise, the time period to which these Requests refer is January 1, 2009 through the date of production. If a document prepared before this period is necessary for a

- 8 -

correct or complete understanding of any document covered by a Request, you must produce the earlier or subsequent document as well. If any document is undated and the date of its preparation cannot be determined, the document shall be produced if otherwise responsive to the production Request.

DOCUMENTS REQUESTED

REQUEST NO. 1:

All documents concerning the Offerings, including without limitation all documents provided to the SEC in connection with the SEC Enforcement Action, or any other government representative, agency or entity concerning the Offerings.

REQUEST NO. 2:

All documents concerning any communication, presentation or meeting (including any scripts, transcripts, tapes or videos prepared in connection with or as a result of) with any potential purchasers of HCA's securities, securities analysts, financial analysts, institutional investors, financial investors, news media, journalists, investment bankers, brokerage firms, market makers, money managers, commercial banks, rating agencies (such as Moody's Investor Service, Inc.) or stock markets or securities exchanges concerning Miller or the Offerings, including, but not limited to, Roadshow presentations.

REQUEST NO. 3:

All documents provided to or received from PER concerning the purchase of the Alaska Assets.

REQUEST NO. 4:

All minutes (with exhibits/attachments) of all meetings of the Board of Directors of Miller or any committee or subcommittee thereof, including all drafts thereof, including but not limited to, where there was discussion of the Alaska Asserts, Reserve Report and/or the

Offerings, including, without limitation, the minutes (with exhibits/attachments) of other meetings referenced therein, including all drafts thereof.

REQUEST NO. 5:

All documents reviewed by the Individual Defendants or reviewed by any officer, executive or financial advisor of Miller concerning the Offerings, the Reserve Report and/or the Alaska Assets.

REQUEST NO. 6:

All documents concerning the Offerings, the Reserve Report and/or the Alaska Assets including, but not limited to, all documents provided to the Underwriter Defendants concerning the Offerings, the Reserve Report and/or the Alaska Assets.

REQUEST NO. 7:

All documents concerning communications concerning the Offerings, the Reserve Report and/or the Alaska Assets including, without limitation:

(a)     all internal communications of Miller or between Miller and the Underwriter Defendants including, without limitation, executive summaries, memoranda or electronic mail;

(b)     all internal communications of Miller or between Miller and the Ralph E. Davis & Associates including, without limitation, executive summaries, memoranda or electronic mail;

(c)     all internal communications of Miller or between Miller and PER including, without limitation, executive summaries, memoranda or electronic mail;

(d)     all communications between any of the Individual Defendants, including, without limitation, electronic mail, faxes or letters transmitted outside the office;

(e)     all communications between any of the Individual Defendants and the Underwriter Defendants;

(f)     all communications between any of the Individual Defendants and the Ralph E. Davis & Associates

(g)     all communications between any of the Individual Defendants and PER.

(h)     all communications sent to, or prepared to be sent to, any person on behalf of Miller.

REQUEST NO. 8:

All documents concerning the engagement or retention of the Underwriter Defendants, Ralph E. Davis & Associates or any financial institution, accounting firm, auditing firm, engineering firm consulting firm, insurance firm or investment banking firm to provide services concerning the Offerings, the Reserve Report and/or the acquisition of and the subsequent accounting for the Alaska Assets.

REQUEST NO. 9:

All personal files, expense reports or logs, diaries, notebooks, notes, date books, calendars, appointment books, address books or Telephone Records maintained by or for the Individual Defendants or by or for any Miller officer or executive concerning the Offerings, the Reserve Report and/or the Alaska Assets

REQUEST NO. 10:

All documents provided by Miller and/or the Individual Defendants to any financial institution, accounting firm, engineering firm, consulting firm, insurance firm, auditing firm,

investment banking firm or advisor concerning the Offerings, the Reserve Report and/or the Alaska Assets .

REQUEST NO. 11:

All documents provided by any financial institution, accounting firm, auditing firm, engineering firm, investment banking firm or advisor to Miller and/or the Individual Defendants concerning the Offerings, the Reserve Report and/or the Alaska Assets

REQUEST NO. 12:

All documents concerning the business relationship between Miller, any of its affiliates or subsidiaries, and/or its outside auditors and any of its affiliates or subsidiaries and the Underwriter Defendants and any of their affiliates or subsidiaries (including the Individual Defendants) including, without limitation, any management agreements, consulting agreements, or any other agreements without regard to the Time Period.

REQUEST NO. 13:

All documents identifying any business affiliations between any of the Individual Defendants and the Underwriter Defendants including, without limitation, any management agreements, consulting agreements, or any other agreements. (This request is made without regard to the "Time Period" limitation set forth at Section III herein.)

REQUEST NO. 14:

All indemnification agreements entered into between Miller and any of the Individual Defendants, and between Miller and any of its outside auditors, which may be invoked in connection with this action. (This request is made without regard to the "Time Period" limitation set forth at Section III herein.)

<u>REQUEST NO. 15</u>:

All documents identifying any business affiliations between Miller's outside auditing firm and the Underwriter Defendants including, without limitation, any management agreements, consulting agreements, or any other agreements. (This request is made without regard to the "Time Period" limitation set forth at Section III herein.)

<u>REQUEST NO. 16</u>:

All documents concerning any presentations made by or on behalf of any investment banking institution, financial institution, financial advisor, appraiser, tax advisor or accountant to any defendant concerning the Offerings, the Reserve Report and/or the Alaska Assets.

<u>REQUEST NO. 17</u>:

All documents concerning press releases, published articles, financial analysts' reports and rating agencies' reports, and all drafts thereof, concerning Miller.

<u>REQUEST NO. 18</u>:

All documents concerning SEC filings concerning the Offerings, the Reserve Report and/or the Alaska Assets including, without limitation, drafts of past filings, drafts of documents to be filed with the SEC, all SEC comment letters and responses thereto, all other communications with the SEC regarding the materials to be filed in connection with the Offerings.

<u>REQUEST NO. 19</u>:

All documents concerning any policy, procedure or practice concerning the preservation or destruction of the documents or electronic data or types of documents or electronic data sought herein.

REQUEST NO. 20:

All documents concerning communications between Miller, any of its executives or representatives, and its outside audit firm concerning the Reserve Report, the accounting for the Alaska Asset acquisition and/or any SEC investigation or inquiry.

REQUEST NO. 21:

All documents concerning insurance polices or indemnification agreements that may provide coverage to any Individual Defendants individually or collectively, for any claims or causes of action asserted in this action or that may provide reimbursement for payments made in defense of this action, including, without limitation, loss mitigation insurance or liability-sharing arrangements, including options to purchase such insurance or sharing arrangements, whether acquired before or after the initiation of the litigation.

REQUEST NO. 22:

All documents concerning any communication, presentation or meeting (including any scripts, transcripts, tapes or videos prepared in connection with or as a result of) with any potential purchasers of Miller's securities, securities analysts, financial analysts, institutional investors, financial investors, news media, journalists, investment bankers, brokerage firms, market makers, money managers, commercial banks, rating agencies (such as Moody's Investor Service, Inc.) or stock markets or securities exchanges concerning Miller or the Offerings, including, but not limited to, Roadshow presentations.

DATED: November 16, 2015      BARRETT JOHNSTON MARTIN
                                            & GARRISON, LLC
                                            DOUGLAS S. JOHNSTON, JR., #5782
                                            JERRY E. MARTIN, #20193
                                            TIMOTHY L. MILES, #21605

                                            JERRY E. MARTIN

- 14 -

Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2202
615/252-3798 (fax)

ROBBINS GELLER RUDMAN
   & DOWD LLP
CHRISTOPHER M. WOOD, #032977
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN
MARY K. BLASY
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

LAW OFFICES OF CURTIS V. TRINKO, LLP
CURTIS V. TRINKO
WILLIAM MARGRABE
16 West 46th Street, 7th Floor
New York, NY 10036
Telephone: 212/490-9550
212/986-0158 (fax)

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing *Plaintiff's First Request For Production Of Documents To Defendants Deloy Miller, Scott M. Boruff, David J. Voyticky, Catherine A. Rector, David M. Hall, Merrill A. Mcpeak, Gerald Hannahs, Charles M. Stivers, Don A. Turkleson, Bob G. Gower, Joseph T. Leary, William B. Richardson, Marceau N. Schlumberger And Paul W. Boyd* has been served on the following via certified U.S. Mail on November 16, 2015:

| | |
|---|---|
| **Deloy Miller**<br>815 South Lake Drive<br>Oneida, TN 97841 | **Scott M. Boruff**<br>5628 Lyons View Pike<br>Knoxville, TN 37919 |
| **David J. Voyticky**<br>41 East Parkway PHA<br>Brooklyn, NY 11238 | **Catherine A. Rector**<br>1519 Pebble Shore Lane<br>Knoxville, TN 37931 |
| **David M. Hall**<br>48110 David Hall Road<br>Kenai, AK 99611 | **Merrill A. McPeak**<br>123 Furnace Street<br>Lake Oswego, OR 97034 |
| **Gerald Hannahs**<br>17710 Leatha Lane<br>Little Rock, AR 72223 | **Charles M. Stivers**<br>118 Richmond Road<br>Manchester, KY 40962 |
| **Don A. Turkleson**<br>6311 Rodrigo Street<br>Houston, TX 77007 | **Bob G. Gower**<br>402 Timberwilde Lane<br>Houston, TX 77024 |
| **Joseph T. Leary**<br>704 East 12th Street<br>Houston, TX 77008 | **William B. Richardson**<br>1058 Encantado Drive<br>Santa Fe, NM 87501 |
| **Marceau N. Schlumberger**<br>18 Dante Street<br>Larchmont, NY 10538 | **Paul W. Boyd**<br>8125 Ainsworth Drive<br>Knoxville, TN 37909 |
| **Williams Financial Group**<br>Registered Agent: Wilson Williams<br>2711 N. Haskell Avenue, Suite 2900<br>Dallas, TX 75204 | **Maxim Group LLC**<br>Edward L. Rose, Esq.<br>99 Sunnyside Boulevard<br>Woodbury, NY 11797 |
| **Northland Capital Markets**<br>45 South 7th Street, Suite 2000<br>Minneapolis, MN 55402 | **Aegis Capital Corp.**<br>810 7th Avenue, 18th Floor<br>New York, NY 10019 |

| National Securities Corporation | Dominick & Dominick LLC |
|---|---|
| Registered Agent: | Registered Agent: |
| Delaware Corporate Services, Inc. | Corporation Service Company |
| 901 North Market Street, Suite 705 | 80 State Street |
| Wilmington, DE 19801 | Albany, NY 12207 |
| **Ladenburg Thalmann & Co. Inc.** | **I-Bankers Securities, Inc.** |
| Registered Agent: | Registered Agent: |
| Corporate Creations Network, Inc. | IBS Holding Corporation |
| 15 North Mill Street | 21550 Oxnard Street, 3rd Floor |
| Nyack, NY 10960 | Woodland Hills, CA 91367 |
| | **MLV & CO. LLC** |
| | Registered Agent: |
| | The Corporation Trust Company |
| | Corporation Trust Center |
| | 1209 Orange Street |
| | Wilmington, DE 19801 |

JERRY E. MARTIN
**BARRETT JOHNSTON MARTIN
& GARRISON, LLC**

IN THE CIRCUIT COURT FOR MORGAN COUNTY
9TH JUDICIAL DISTRICT
THE STATE OF TENNESSEE

| | |
|---|---|
| KENNETH GAYNOR, Individually and on) Behalf of All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>    vs. )<br><br>DELOY MILLER, SCOTT M. BORUFF, ) DAVID J. VOYTICKY, CATHERINE A. ) RECTOR, DAVID M. HALL, MERRILL ) A. McPEAK, GERALD HANNAHS, ) CHARLES M. STIVERS, DON A. ) TURKLESON, BOB G. GOWER, ) JOSEPH T. LEARY, WILLIAM B. ) RICHARDSON, MARCEAU N. ) SCHLUMBERGER, PAUL W. BOYD, ) MLV & CO. LLC, WILLIAMS ) FINANCIAL GROUP, MAXIM GROUP ) LLC, NATIONAL SECURITIES ) CORPORATION, AEGIS CAPITAL ) CORP., NORTHLAND CAPITAL ) MARKETS, DOMINICK & DOMINICK, ) LLC, LADENBURG THALMANN & CO. ) INC. and I-BANKERS SECURITIES, ) INC., )<br><br>Defendants. )<br>_____ ) | Case No.  2015- CV-34<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><br><br><br><br><br><br><br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

FILED  2:00
AM  NOV 0 9 2015  PM
MKIBC
MORGAN CO. CIRCUIT CLERK

Plaintiff Kenneth Gaynor ("Plaintiff") alleges the following based upon the investigation of Plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Miller Energy Resources, Inc. ("Miller" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, the SEC's Order Instituting Public Administrative and Cease-and-Desist Proceedings Pursuant to Section 8a of the Securities Act of 1933, Sections 4c and 21c of the Securities Exchange Act of 1934, and Rule 102(e) of the Commission's Rules of Practice, *In the Matter of Miller Resources, Inc., et al.*, SEC Admin. Proc. File No. 3-16729 (August 6, 2015), filings in *In re Miller Energy Resources, Inc., et al.*, No. 15-00313 (D. Alaska Bankr. Ct.), and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act") on behalf of all purchasers of Miller preferred shares traceable to the Registration Statement and Prospectuses issued in connection with the following public offerings of Miller's 10.75% Series C Cumulative Preferred Stock ("Series C") and 10.5% Series D Fixed Rate/Floating Rate Cumulative Redeemable Preferred Stock ("Series D") (collectively, the "Offerings"):

| DATE | PREFERRED SHARES | PRICE | OFFERING NAME |
|------|------------------|-------|---------------|
| Feb. 13, 2013 | Series C | $22.90 | "2/13/13-Series C" |
| May 8, 2013 | Series C | $22.25 | "5/8/13-Series C" |
| June 28, 2013 | Series C | $21.50 | "6/28/13-Series C" |
| Sept. 26, 2013 | Series D | $25.00 | "9/26/13-Series D" |

| Oct. 17, 2013 | Series D | At Market | "10/17/13-Series D" |
| Aug. 21, 2014 | Series D | $24.50 | "8/21/14-Series D" |

2.     The action is brought against several current and former executive officers and directors of Miller and the investment banking firms that underwrote the Offerings. On October 1, 2015, Miller sought bankruptcy protection and, therefore, is not named as a defendant herein.

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over the causes of action asserted herein pursuant to Tenn. Code Ann. §16-10-101, because this case is a cause not given by statute to another tribunal in this State. This action is not removable. The claims alleged herein arise under §§11 and 15 of the Securities Act, 15 U.S.C. §§77k and 77o. Jurisdiction is conferred by §22 of the Securities Act and venue is proper pursuant to §22 of the Securities Act, 15 U.S.C. §77v. Section 22 of the Securities Act explicitly states that "[e]xcept as provided in section 16(c), no case arising under this title and brought in any State court of competent jurisdiction shall be removed to any court of the United States." Section 16(c) refers to "covered class actions," which are defined as lawsuits brought as class actions or brought on behalf of more than 50 persons asserting claims under state or common law. *See* 15 U.S.C. §77p(c) and (f)(2). This is an action asserting federal law claims. Thus, it does not fall within the definition of a "covered class action" under §16(b)-(c) and therefore is not removable to federal court. *See Kircher v. Putnam Funds Trust*, 547 U.S. 633, 636 n.1, 644 (2006) (an "action is not precluded" under the Securities Litigation Uniform Reform Act ("SLUSA") where it is not "'based upon the statutory or common law of any State,'" citing 15 U.S.C. §77p(b), and "the proper course is to remand to the state

court that can deal with it"); *Atkinson v. Morgan Asset Mgmt.*, 658 F.3d 549, 552 (6th Cir. 2011) (same: SLUSA precludes only "class actions that . . . assert state-law claims," citing 15 U.S.C. §77p(b), (f)(2)(A), (f)(3)); *see generally Luther v. Countrywide Home Loans Servicing LP*, 533 F.3d 1031, 1032 (9th Cir. 2008) ("Section 22(a) of the Securities Act of 1933 creates concurrent jurisdiction in state and federal courts over claims arising under the Act. It also specifically provides that such claims brought in state court are not subject to removal to federal court."); *Luther v. Countrywide Fin. Corp.*, 195 Cal. App. 4th 789, 792 (2011) ("The federal Securities Act of 1933 of 1998 . . . as amended by [SLUSA], provides for concurrent jurisdiction for cases asserting claims under the 1933 Act . . . ."). As detailed in Miller's bankruptcy petition, one of the Company's "Locations of Principal Assets of Business" is in "Morgan County, Tennessee."

4.      This Court has personal jurisdiction over each of the defendants named herein because they conducted substantial business in, were citizens of and/or orchestrated the Offerings out of Tennessee at the time of the Offerings (including Miller, which maintained its principal place of business and offices throughout this State at the time of the Offerings). The violations of law complained of herein occurred in Tennessee, including the preparation and dissemination of the materially false and misleading Registration Statement complained of herein, which was disseminated into this State.

## PARTIES AND RELEVANT NON-PARTIES

5.      Plaintiff Kenneth Gaynor purchased Miller preferred shares traceable to the Offerings, and was damaged thereby.

6.      Non-party Miller Energy Resources, Inc. (f/k/a Miller Petroleum, Inc.) is an independent exploration and production company that explores for, develops, and operates

oil and gas wells in south-central Alaska and in Tennessee. At all times relevant to this action, Miller common stock traded on the NYSE under the ticker symbol "MILL"; the Series C traded on the NYSE under the ticker symbol "MILLP"; and the Series D traded on the NYSE under the ticker symbol "MILLO." As of September 29, 2015, Miller had approximately 46.7 million shares of common stock, 3.25 million shares of Series C and 3.5 million shares of Series D issued and outstanding. On September 11, 2015, Miller caused its common stock, Series C and Series D to be delisted from the NYSE. On October 1, 2015, Miller filed a petition seeking relief under the federal bankruptcy statutes. In light of the automatic stay in the bankruptcy proceedings, Miller is not named as a defendant herein.

7.     Defendant Deloy Miller founded Miller and served as the Chairman of its Board of Directors (the "Board") until September 14, 2014.

8.     Defendant Scott M. Boruff ("Boruff") has served as the Executive Chairman of the Board since September 14, 2014. Previously, defendant Boruff served as Miller's Chief Executive Officer ("CEO") from August 6, 2008 to September 14, 2014 and as its President from June 2010 until June 9, 2011.

9.     Defendant David J. Voyticky served as the President of Miller from June 9, 2011 until August 12, 2014, as its Acting Chief Financial Officer ("CFO") from September 2011 until February 2014, and was a director from April 2010 to April 2014.

10.     Defendant Catherine A. Rector served as the Vice President and Chief Accounting Officer of Miller between July 2012 and October 2013.

11.     Defendant David M. Hall ("Hall") served as the Chief Operating Officer ("COO") of Miller from July 18, 2013 until August 6, 2015. Defendant Hall also served as a member of the Board from December 10, 2009 until April 16, 2015.

12.     Defendants Merrill A. McPeak, Gerald Hannahs, Charles M. Stivers and Don A. Turkleson served as directors of Miller as of September 6, 2012 and signed the Registration Statement used to conduct the Offerings.

13.     Defendants Bob G. Gower, Joseph T. Leary, William B. Richardson and Marceau N. Schlumberger served as directors of Miller at the time of certain of the Offerings.

14.     Defendant Paul W. Boyd ("Boyd") served as the CFO and Treasurer of Miller from 2008 to 2011 and as Miller's Director of Risk Management from 2011 until 2014.

15.     The defendants named in ¶¶8-15 are all liable under the Securities Act and are referred to herein as the "Individual Defendants." The Individual Defendants named in ¶¶8-13 each signed the Registration Statement used to conduct the Offerings. The Individual Defendants named in ¶14 were directors of Miller at the time of certain of the Offerings.

16.     Non-party Carlton W. Vogt, III ("Vogt") was the audit team leader at the Company's former independent outside auditing firm, non-party Sherb & Co., LLP ("Sherb & Co."), a now defunct CPA firm that was suspended by the SEC in 2013 for improper professional conduct unrelated to its work for Miller, which had served as the Company's outside audit firm since 2008. Vogt led the Sherb & Co. audit team that audited Miller's financial statements for the 2009 and 2010 fiscal years.

17.     Defendants MLV & Co. LLC ("MLV"), Williams Financial Group ("WFG"), Maxim Group LLC ("MXG"), National Securities Corporation ("NSC"), Aegis Capital Corp. ("ACC"), Northland Capital Markets ("NCM"), Dominick & Dominick, LLC ("D&D"), Ladenburg Thalmann & Co. Inc. ("LTC") and I-Bankers Securities, Inc. ("IBS") (collectively the "Underwriter Defendants") are investment banking firms that acted as underwriters of the Offerings, helping to draft and disseminate the offering documents. Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

(a)     The Underwriter Defendants are investment banking houses that specialize, *inter alia*, in underwriting public offerings of securities. They served as the underwriters of the Offerings and shared upwards of $7.5 million in fees collectively.[1] The Underwriter Defendants determined that in return for their share of the proceeds of the Offerings, they were willing to merchandize Miller preferred shares in the Offerings. The Underwriter Defendants arranged multi-city roadshows prior to the Offerings during which they, and representatives from Miller, met with potential investors and presented highly favorable information about the Company, its operation and its financial prospects.

(b)     The Underwriter Defendants also demanded and obtained agreements from Miller that Miller would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also made certain that Miller had purchased millions of dollars in directors' and officers' liability insurance.

---

[1]     As indicated below at note 2, one of the Offerings was conducted "at market" prices and/or on a "best efforts" basis and the Prospectus does not indicate the prices, dates of sales or number of shares sold in that Offering. Where required, the underwriting fees were estimated based on all shares being sold at $25.

(c)     Representatives of the Underwriter Defendants also assisted Miller and the Individual Defendants in planning the Offerings, and purportedly conducted adequate and reasonable investigations into the business and operations of Miller, an undertaking known as a "due diligence" investigation. The due diligence investigations were required of the Underwriter Defendants in order to engage in each of the Offerings. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Miller's operations and financial prospects.

(d)     In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with Miller's lawyers, management and top executives and engaged in "drafting sessions" between September 2012 and August 2014. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the Offerings; (ii) the terms of the Offerings, including the price at which Miller preferred shares would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Miller would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Miller management and top executives, the Underwriter Defendants knew, or should have known, of Miller's existing problems as detailed herein.

(e)     The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with offers and sales thereof, including to Plaintiff and the Class (as defined below).

## SUBSTANTIVE ALLEGATIONS

18.     Defendant Miller is an independent oil and natural gas exploration, production and drilling company operating in multiple exploration and production basins in North America founded in 1967. The Company, whose focus was originally on Tennessee's Appalachian Basin, first became a publicly traded company in connection with a reverse merger in 1996.

19.     Between early 2002 and December 2009, Miller's stock price regularly traded below one dollar per share, falling to a low of $0.04 per share in December 2007. In August 2008, Miller named a new CEO. Soon thereafter, the Company began acquiring additional oil and gas properties.

20.     In the fall of 2009, Miller became aware of certain oil and gas properties in Alaska that were in the process of being "abandoned" as part of the bankruptcy proceedings of California-based Pacific Energy Resources ("PER"). PER had been unable to service its heavy debt and pay the significant monthly costs required to operate its operating assets and had unsuccessfully sought for almost a year to sell them.

21.     Beginning in December 2008, months before it filed for bankruptcy, PER, with the help of one of the world's leading financial advisory and asset management firms, marketed PER's operating assets in Alaska to 40 potential buyers. This process failed to attract any bidders, and the assets were auctioned by the bankruptcy court in July 2009, with the winning bidder agreeing to a total purchase price of $8 million for the assets. A second entity, who bid $7 million, was designated as the back-up purchaser. Neither bid ultimately closed.

22.     As a result, PER sought in August 2009, and was granted in September, an order from the bankruptcy court allowing it to abandon title to the assets due to a lack of interest.

23.     Due to renewed interest in the assets from Miller following their abandonment, the bankruptcy court permitted PER to reacquire its Alaska assets and sell them to Miller's operating subsidiary, Cook Inlet Energy ("CIE"), in a competitive auction for $2.25 million in cash and the assumption of certain limited liabilities. The transaction closed on December 10, 2009.

24.     The Company then claimed the assets it had purchased through the bankruptcy were valued at more than $479 million, including oil and gas assets that included onshore and offshore production facilities, $215 million in proven energy reserves, $122 million in probable energy reserves, and $31 million in possible energy reserves, providing total reserves of $368 million (the "Alaska Assets").

25.     Until August 2015, the Company valued the Alaska Assets based on a reserve estimates report prepared for it by an engineering firm, Ralph E. Davis & Associates (the "Reserve Report"). Beginning on March 22, 2010, and subsequently repeated in numerous filings with the SEC Miller made through August 2015, the Company claimed in its quarterly report filed on Form 10-Q for its fiscal third quarter ended January 31, 2010 ("3Q 2010") a reported a value of the Alaska Assets of $480 million, which amount comprised $368 million for oil and gas properties and $110 million for fixed assets. Miller also reported an after-tax $277 million "bargain purchase gain," which boosted its reported net

income for the quarter to $272 million – an enormous increase over the $556,097 loss reported for the same period the year before.

26.     The newly booked value of the Alaska Assets, which resulted in a nearly 5,000% increase in Miller's total assets, had a significant impact on the market price of Miller common stock. On December 10, 2009, the date of the transaction, Miller common stock closed at $0.61 per share. Following the acquisition of the Alaska Assets, by March 31, 2010, Miller common stock closed 982% higher at $6.60 per share. Weeks later, the listing of Miller stock was moved to the NASDAQ and, after moving to the NYSE a year later, reached an all-time high price on December 9, 2013 of $8.83 per share.

## THE FALSE AND MISLEADING REGISTRATION STATEMENT

27.     On or about September 6, 2012, Miller filed with the SEC a Form S-3 registration statement and prospectus using a "shelf" registration, or continuous offering process. Under the shelf registration, Miller would sell securities described in various future prospectus supplements in one or more offerings. The prospectus supplements would form part of the registration statement for each offering. The securities were to be issued by Miller. This Form S-3, which would later be utilized for all of the Offerings, expressly incorporated by reference certain filings Miller had previously made with the SEC and all future filings until any offering conducted under the shelf registration statement was completed.

28.     The SEC declared the shelf registration statement effective on September 18, 2012.

29.     On or about the date of each of the following Offerings, Miller and the following Underwriter Defendants priced the Offerings and filed the final Prospectuses for

those Offerings, which formed part of the Registration Statement (collectively, the "Registration Statement"), pursuant to which Miller sold the following preferred shares to the public:

| Offering | Underwriters | Price | Shares | Gross Proceeds[2] |
|---|---|---|---|---|
| 2/13/13-Series C | MLV, MXG, NSC, ACC, WFG | $22.90 | 625,000 | $14,312,500 |
| 5/8/13-Series C | MLV, MXG, NSC, ACC | $22.25 | 500,000 | $11,125,000 |
| 6/28/13-Series C | MLV, ACC, MXG, NSC, NCM | $21.50 | 335,000 | $7,202,500 |
| 9/26/13-Series D | MLV, MXG, NSC, ACC, D&D, LTC, NCM | $25.00 | 1,000,000 | $25,000,000 |
| 10/17/13-Series D | MLV | Market | 3,000,000 | $75,000,000 |
| 8/21/14-Series D | MLV, MXG, ACC, IBS, LTC, NSC, NCM | $24.50 | 750,000 | $18,375,000 |

30.     The Registration Statement, including the materials incorporated therein by reference (which expressly incorporated Miller's Annual Report on Form 10-K for the year ended April 30, 2012, as well as various Current Reports on Form 8-K), and the final Prospectuses, which would include the Forms 10-K, 10-Q and 8-K filed prior to each Offering, were negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation.

31.     All of the Company's interim and annual financial reports issued between 2010 and 2015, relying upon the Reserve Report, overstated the value of the Alaska Assets by hundreds of millions of dollars by failing to record the Alaska Assets at fair value as required by Accounting Standards Codification ("ASC") 805, *Business Combinations*, and the federal securities laws, because they "used as fair value a reserve report that was prepared by a

---

[2]     Where an Offering was conducted "at market" price and/or on a "best efforts" basis and the dates, prices and number of shares sold were not disclosed in the Prospectus, gross proceeds were estimated using the total shares that could have been sold at $25 each.

petroleum engineer firm using the rules for supplemental oil and gas disclosures," "the reserve report . . . expressly disclaimed that the numbers therein represented the engineer firm's opinion of fair value," "[t]he reserve report . . . also contained expense numbers that were knowingly understated," and the Reserve Report "double counted $110 million of certain fixed assets that were already included in the reserve report." As a result, all of Miller's interim and fiscal financial reports issued between 2010 and 2015, the Form S-3 filed on September 6, 2012, and each of the final Prospectuses used to conduct the Offerings were false and misleading.[3]

## A. Under Generally Accepted Accounting Principles, Miller Energy Was Required to Record the Alaska Assets Acquisition at Fair Value

32. ASC 805, *Business Combinations* – formerly Statement of Financial Accounting Standards ("SFAS") 141(R) – became effective in December 2008. Among its principal revisions, ASC 805 requires acquisitions that result in a "bargain purchase," *e.g.*, entities purchased at fire sales prices in non-orderly transactions, to be measured at fair value, with any resulting gain recorded on the income statement.

33. ASC 820, *Fair Value Measurements* (formerly SFAS 157), provides the framework for measuring fair value. "Fair value" is defined in ASC 820 as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." A reporting entity must determine an

---

[3]    Miller's false and misleading reports filed with SEC included: Forms 10-Q for the 3Q 2010 and all interim quarters for 2011-2015; Forms 10-K for 2010 - 2014; the Form S-1 filed on August 8, 2010; the Forms S-3 filed on September 6, 2012 and October 5, 2012; and prospectuses filed between August 25, 2010 through August 21, 2014 pursuant to Rule 424; and 15 Forms 8-K filed between March 2010 through at least December 2014.

appropriate fair value using one or more of the valuation techniques described in accounting literature.

34. ASC 820 outlines three broad approaches to measuring fair value: the market approach, income approach, and cost approach. Under the market approach, prices and other relevant information generated by market transactions involving identical or comparable assets or liabilities are used to measure fair value. The income approach utilizes valuation techniques to convert future amounts to a single discounted present value amount. Finally, the cost approach is based on the amount that currently would be required to replace the assets in service, *i.e.*, current replacement cost.

35. ASC 820 emphasizes that fair value is a market-based measurement, not an entity specific measurement, and should be determined based on the assumptions market participants would use in pricing the asset or liability.

36. ASC 820 emphasizes that when a price for an identical asset or liability is not observable, entities should use a "valuation technique that maximizes the use of relevant observable inputs and minimizes the use of unobservable inputs" and entities may not ignore assumptions market participants would use.[4]

37. When computing their estimate of fair value, defendants Miller and Boyd failed to consider the existence of numerous, readily apparent data points strongly indicating that the Alaska Assets were worth substantially less than the $480 million value Miller

---

[4] ASC 820 defines "unobservable inputs" as "inputs that reflect the reporting entity's own assumptions about the assumptions market participants would use in pricing the asset or liability developed based on the best information available in the circumstances," and "observable inputs" as "inputs that reflect the assumptions market participants would use in pricing the asset or liability developed based on market data obtained from sources independent of the reporting entity."

recorded. In failing to do so, defendants Miller and Boyd materially overstated the value of the newly acquired Alaska Assets. As described detailed below, Miller purported to value the Alaska Assets using the income approach for the oil and gas reserves and the cost approach for certain fixed assets.

**B.     The Valuation of the Acquired Oil and Gas Properties Was Based Upon a Reserve Report that Does Not Represent Fair Value**

38.     To record the value of the acquired oil and gas properties, defendants Miller and Boyd requested and improperly used the Reserve Report prepared by an independent petroleum engineering firm.[5]

39.     Reserve reports are commonly used in the oil and gas industry to estimate quantities of oil and gas (the reserves) expected to be recovered from existing properties. Generally, these reports list reserves in categories based on a minimum estimated percentage probability of eventual recovery and production, *i.e.*, proved, probable and possible.

---

[5]     Oil and gas reporting companies are subject to two principal authoritative pronouncements governing financial accounting and reporting for oil and gas activities: Rule 4-10 of Regulation S-X (17 C.F.R. 210.4-10), *Financial Accounting and Reporting for Oil and Gas Producing Activities Pursuant to the Federal Securities Laws and the Energy Policy and Conservation Act of 1975* ("Rule 4-10"); and ASC 932-235-50-29 through 33 (formerly SFAS 19, *Financial Accounting and Reporting by Oil and Gas Producing Companies*, and SFAS 69, *Disclosures About Oil and Gas Producing Activities*). ASC 932 establishes disclosure requirements for significant oil and gas activities, including disclosure of the "standardized measure," which is the future after-tax net cash flows discounted at 10%.

A non-U.S. Generally Accepted Accounting Principles ("GAAP") measure, known as "PV-10," is similar to the standardized measure but is typically presented on a pretax basis. The Financial Accounting Standards Board has noted that the standardized measure supplies investors with useful information, however, they also noted their concern "that users of financial statements understand that it is neither fair market value nor the present value of future cash flows. It is a rough surrogate for such measures, a tool to allow for a reasonable comparison of mineral reserves and changes through the use of a standardized method that recognizes qualitative, quantitative, geographic, and temporal characteristics." Paragraph 83 of the Basis for Conclusions of SFAS 69.

Information in reserve reports that are prepared in accordance with SEC regulations is frequently used, among other purposes, to satisfy supplemental accounting disclosure requirements concerning estimates of future oil and gas production. However, the numbers used in reserve reports for this purpose are expressly not considered "an estimate of fair market value."[6]

40. Shortly after the acquisition, defendant Boyd asked defendant Hall – a non-accountant with no formal accounting training – to obtain a reserve report for the Alaska Assets in order to determine the fair value of the acquired assets to be reported on Miller's Form 10-Q for the quarter ended January 31, 2010.

41. On January 5, 2010, defendant Hall hired a petroleum engineering firm to prepare a reserve report using a pretax present value of net cash flows discounted at 10% ("PV-10"), which, while appropriate with further adjustments for SEC supplemental disclosures, was not indicative of fair value.

42. The petroleum engineering firm did not know Miller intended to use the report for fair value purposes and believed that the purpose of the report was for use as supplemental data in the Company's SEC disclosures. Indeed, the two-page engagement letter with the engineering firm included no language about "fair value," "fair market value" or authoritative accounting literature.

43. The Reserve Report was finalized in February 2010 and reflected PV-10 of $368 million.

---

[6] *See* Paragraph 77 of the Basis for Conclusion of SFAS 69 ("Although it cannot be considered an estimate of fair market value, the standardized measure of discounted net cash flows should be responsive to some of the key variables that affect fair market value, namely, changes in reserve quantities, selling prices, production costs, and tax rates.").

44.    Upon receiving the Reserve Report, defendant Boyd, without undertaking any additional analysis, merely recorded as the fair value of the acquired oil and gas properties the sum of the PV-10 estimates for 100% of the proved, probable and possible reserves, which increased the book value of Miller's oil and gas properties on its balance sheet by $368 million.

45.    The Reserve Report itself clearly stated that the numbers therein were not an estimate of fair market value. Specifically, on page three of the report it stated that "[t]he discounted values shown are for your information and should not be construed as our estimate of fair market value."

46.    Defendant Boyd never reviewed or questioned any of the Reserve Report's assumptions or calculations, nor did he communicate with the engineering firm about the Reserve Report.

47.    The use of the PV-10 numbers as fair value conflicted with contemporaneous representations Miller made to investors in its filings with the SEC, including those incorporated by reference into the Registration Statement used to conduct the Offerings. Specifically, in its fiscal 2010 Form 10-K, which was the first annual report that included the inflated values, and as would be repeated in all filings through August 2015, Miller expressly told investors that "[o]ur PV-10 measure and the standardized measure of discounted future net cash flows do not purport to present the fair value of our natural gas and oil reserves." Despite that disclosure, Miller had actually used its PV-10 measure in that very same report as the fair value of its acquired properties.

48.     The $368 million Reserve Report value did not represent fair value for several reasons.

49.     Despite showing years of net profit that market participants would expect to be taxable, the Reserve Report did not make any adjustments for income taxes.

50.     At Miller's request, the Reserve Report used a 10% discount rate that was inappropriate under GAAP for determining fair value. In a discounted cash flow model, a discount rate is used to account for the uncertainties associated with risk and the time value of money. A discount rate is the required rate of return that an investor would demand – based on the risks associated with the benefit stream under consideration – to induce the investor to make an investment. By failing to consider the discount rate using assumptions market participants would use, Miller materially overstated the value of the acquired oil and gas properties.

51.     The valuation also overstated cash flows from certain categories of reserve estimates (*e.g.*, "probable" and "possible" reserves) by failing to apply any risk weight to such reserves and the resulting cash flows. Given the high degree of uncertainty associated with cash flows from these reserve estimate categories, they are required to be risk weighted in order to reflect an appropriate valuation.

52.     The Reserve Report did not include amounts for certain asset retirement obligations, *i.e.*, the legal obligations associated with the retirement of tangible long-lived assets.

53.     Finally, the $237 million of projected operating and capital expenses in the Reserve Report, which were provided by defendants Miller and Hall, were intentionally understated, resulting in an overstated valuation.

54.     In fact, one petroleum engineering firm contacted but not used by Miller thought that the expected level of expenses made a significant portion of the acquisition unprofitable. Initially, defendant Hall contacted the petroleum engineering firm who had previously provided the past two owners of the properties with reserve reports, and thus had unfettered access to past operating data, and requested a quote for "updating" a prior reserve report. That firm told defendant Hall that it would not assign any value to one of the largest fields acquired, the Redoubt Shoal field, because it was uneconomical – i.e., expected future expenses exceeded expected future cash flows – and explained that it would not put its "name on a report that implies value exists where it likely does not."[7]

55.     Defendant Boyd was aware that Miller chose the new firm because the prior firm would not assign any value to the Redoubt Shoal field. The Redoubt Shoal field – which represented $291 million of the $368 million in fair value recorded by Miller – showed positive future cash flows in the Reserve Report primarily because defendant Hall gave the new engineering firm understated and unsubstantiated expense numbers. Defendant Boyd had previously been advised by non-party Vogt that the lack of any controls over defendant Hall's expense estimates was a "concerning void."

---

[7]     Unique among the oil and gas properties purchased by Miller, Redoubt Shoal is an offshore field in Cook Inlet, Alaska, which requires the use of an offshore platform that sits in seventy feet of water, is accessible only by boat or helicopter, and drills to depths in excess of 12,000 feet. Offshore drilling presents risks and costs not associated with onshore operations.

56.     Defendants Miller and Hall provided expense projections that, in many cases, were significantly lower than past actual experience. For example, internal documents maintained by defendant Hall indicated that the cost to drill a new well in the Redoubt Shoal field was roughly $13 million. However, defendant Hall told the engineering firm to use a cost of $4.6 million per well in its reserve report. And instead of using recent expense data, defendant Hall gave the engineering firm nearly three-year-old operating expense data, which he revised downward on the pretext that Miller could run a leaner operation than the former operators of the properties. By way of example, defendant Hall told the engineering firm that the offshore Redoubt Shoal field would cost $399,000 per month to operate when it actually cost the seller more than $600,000 per month, and internal estimates show that defendants Miller and Hall expected the field to cost more than $800,000 per month once it was fully operational. Additionally, in some years, the Reserve Report included zero expenses for operating the facilities in the Redoubt Shoal and another field.

57.     Overall, the Reserve Report implied operating expenses of $4 per barrel of oil equivalent ("boe") for all categories of reserves. That level of operating expenses was unreasonable in light of the previous owner's actual operating expenses of $32.50/boe in 2008 and $55.42/boe in the first half of 2009 before the wells were shut-in.

58.     By understating the expense numbers, Miller overvalued the oil and gas properties by tens of millions of dollars.

C.     The Fair Value of the Acquired Fixed Assets Was Double Counted and Overstated

59.     In addition to the $368 million value recorded for the oil and gas properties, defendant Miller also erroneously recorded a separate value of $110 million for acquired fixed assets, such as facilities and pipelines ancillary to the oil and gas reserves.

60.     In a February 8, 2010 email, defendant Boyd informed defendant Hall that he needed an amount to use as fair value for the fixed assets obtained as part of the Alaska Assets acquisition. He noted that, ideally, the value should be what a willing buyer would pay for the assets, but "[i]n the absence of that, replacement values or something similar would probably work." Two days later, defendant Boyd was sent an "asset replacement cost study," purportedly provided by an independent insurance broker, which appeared to list the replacement cost for the assets as $110 million. The "study" was dated September 5, 2008, but "revised" on February 9, 2010.

61.     Without any additional analysis, defendant Boyd recorded the amount in the revised insurance study on Miller's balance sheet.

62.     The recording of assets at a value of $110 million was improper for several reasons.

63.     Miller's use of the values in the insurance study resulted in counting the value of the fixed assets twice, thereby overstating the value of such assets. The Reserve Report, which Miller relied on to value the acquired oil and gas properties, used a discounted cash flow model. Valuation specialists use such models to estimate the value of an enterprise's "operating assets" – *i.e.*, the assets employed to generate future cash flows – by converting future benefit streams into a net present value. In Miller's case, the fixed assets in the

insurance study were the very same operating assets that were expected to generate the future cash flows in the Reserve Report. Accordingly, they should not have been separately valued.

64.     Prior to the acquisition, all of the production from the offshore Redoubt Shoal field ran through the Osprey platform, which had no processing facilities or power generating capability of its own. Power was sent from generators housed within the Kustatan Production Facility to the platform via a subsea line, which was connected to an underground power grid that ran throughout all of the acquired properties. Moreover, production from the offshore platform was sent onshore for processing through pipes to the Kustatan Production Facility. Absent the platform, there would have been no way to obtain oil and gas from the Redoubt Shoal field without incurring upfront capital expenditures to replace the platform and its related infrastructure. Similarly, without the other production facilities, the platform would have lacked power and somewhere to process its oil and gas.

65.     The Reserve Report Miller used for the valuation recognized the interconnectedness of the properties, as it expressly listed the facilities and the offshore platform as assets used to generate the future cash flows.

66.     In short, because the fixed assets were integral to the operations of the acquired properties, their values were captured in the Reserve Report's cash flows. Consequently, by separately valuing the same operating assets, Miller overstated the value of the Alaska Assets by as much as $110 million.

67.     The insurance study also did not reflect fair value because the version of the insurance study used by defendant Boyd purported to show "asset replacement cost." Absent further adjustments, replacement cost new does not qualify as fair value under GAAP.

68.     Miller, at the direction of defendants Boyd and Hall, also refashioned a preexisting insurance study to make it appear that its own value of $110 million derived from a third party. The numbers in the fixed asset study were given to the insurance broker, and its predecessor, by its clients (*i.e.*, Miller and the previous owners of the fixed assets) as far back as 2007 and were used as starting points for other types of estimates, such as estimates for possible losses resulting from fire or natural disasters. The two employees at the insurance broker who were most familiar with the original "Loss Estimates Study," including the engineer who authored it, confirmed to the SEC that no one at the broker ever tested or in any way double checked the values given to them.

69.     Defendants Boyd and Hall knew or knowingly disregarded the fact that the insurance study did not reflect fair value or any analysis by the insurance broker.

70.     On February 8, 2010, defendant Hall directed Alaska personnel to contact the insurance broker and another oil and gas consulting company to ask them for a report reflecting fair value or replacement cost. The insurance broker responded on February 9, 2010, and told Miller in an email copied to defendant Hall that it could not provide a report showing replacement costs.

71.     Miller also contacted a separate consulting firm and sent it the insurance broker's original 2008 insurance report. Late on February 8, 2010, the consulting firm informed Miller that the insurance study it sent was a "good reference" but the report did not state "value or replacement cost." The firm offered to conduct its own analysis, but advised that the estimate would take "approximately 2-3 weeks to complete" and "cost around $15,000-$18,000."

72.     Upon hearing the news that a new report might take two to three weeks, Alaska personnel, including defendant Hall, called defendant Boyd. According to one participant on this call, defendant Boyd said he could not wait weeks for a new report. He "needed it quickly and he needed to base it on something . . . a professional had to sign off on it, not us, some third party." During the call, defendants Boyd and Hall decided to rely on numbers in the insurance report as replacement costs, despite defendant Hall having been told by the broker that it could not provide Miller with replacement costs.

73.     With the aim of making the report appear as though it reflected replacement costs, defendant Hall provided a subordinate with edits to the 2008 insurance report that significantly altered its appearance, including changing its name from "Loss Estimates Study" to "Asset replacement cost study." The revised report, which Miller gave to Sherb & Co., omitted the insurance broker's methodology and analysis. As a result, the only numbers reflected in the revised report were the ones provided to the broker by defendant Miller and its predecessors.

74.     As a result of the foregoing, Miller overvalued the Alaska Assets by more than $400 million.

75.     As a result of the fraudulent valuation, Miller filed with the SEC financial reports that materially misstated the value of its assets, including the SEC filings incorporated by reference in the Registration Statement used to conduct the Offerings.

76.     Under the rules and regulations governing the preparation of the Registration Statement, Miller was required to disclose at the time of the Offerings that the value of the Alaska Assets was materially overstated in its financial statements. The Registration

Statement, however, contained no such disclosures. Pursuant to Item 303 of Regulation S-K (17 C.F.R. §229.303) and the SEC's related interpretive releases thereto, issuers are required to disclose events or uncertainties, including any known trends, that have had or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results. This is particularly true for issuers utilizing shelf registration statements, which require continuous updating and incorporate those continuous disclosures into the registration statement.

77. At the time of each of the Offerings, the Alaska Assets were materially overstated in the Company's financial statements, which materially understated its true expenses and materially overstated its profits. The adverse events and uncertainties associated with these declining trends were reasonably likely to have a material impact on Miller's profitability, and, therefore, were required to be disclosed in the Registration Statement.

78. The Offerings were successful for the Company and the Underwriter Defendants who sold upwards of 6.21 million Series C and D shares, raising an estimated $151.015 million in gross proceeds in the Offerings, as follows[8]:

| OFFERING | UNDERWRITERS | PRICE | SHARES | GROSS PROCEEDS |
|---|---|---|---|---|
| 2/13/13-Series C | MLV, MXG, NSC, ACC, WFG | $22.90 | 625,000 | $14,312,500 |
| 5/8/13-Series C | MLV, MXG, NSC, ACC | $22.25 | 500,000 | $11,125,000 |
| 6/28/13-Series C | MLV, ACC, MXG, NSC, NCM | $21.50 | 335,000 | $7,202,500 |
| 9/26/13-Series D | MLV, MXG, NSC, ACC, D&D, LTC, NCM | $25.00 | 1,000,000 | $25,000,000 |
| 10/17/13-Series D | MLV | Market | 3,000,000 | $75,000,000 |
| 8/21/14-Series D | MLV, MXG, ACC, IBS, LTC, NSC, NCM | $24.50 | 750,000 | $18,375,000 |

[8] As indicated in notes 1 and 2 above, this is an estimated figure based on information provided in the Prospectuses.

## MILLER WRITES DOWN THE VALUE OF THE ALASKA ASSETS

79.     Following the Offerings, the following series of disclosures revealed that the Registration Statement was false and misleading in that it overstated the value of the Alaska Assets on the Company's books by hundreds of millions of dollars at the time each of the Offerings was conducted.

80.     On December 10, 2014, Miller disclosed that it was taking a $265.3 million impairment charge on the Alaska Assets, specifically the Redoubt Shoal field.

81.     On March 12, 2014, Miller disclosed that it was taking another $150 million impairment charge on the Alaska Assets.

82.     On April 29, 2015, Miller disclosed that the SEC had notified it that the agency staff had made a preliminary determination to recommend civil action against the Company related to its accounting for the 2009 Alaska Asset acquisition.

83.     On May 6, 2015, Miller disclosed that it would "defer" the dividend payments on the Series C and D shares.

84.     On May 12, 2015, Miller disclosed that the NYSE had notified the Company that its shares were subject to delisting due to its having failed to maintain listing requirements.

85.     On July 14, 2015, Miller included a "going concern" disclosure in its 2014 Annual Report filed with the SEC on Form 10-K.

86.     On July 30, 2015, Miller disclosed that its common stock would be delisted from the NYSE.

87.     Then, on August 6, 2015, the SEC initiated civil administrative proceedings against Miller (the "SEC Enforcement Action") accusing the Company and defendants Boyd

and Hall of knowingly artificially inflating the value of the Alaska Assets acquired in 2009 and then knowingly misstating Miller's financial statements for the ensuing five-plus year period through and including July 2015 when the Company's stock was delisted. Non-party Vogt was also charged in the SEC Enforcement Action.

88.    In its Order Instituting Public Administrative and Cease-and-Desist Proceedings filed that day, the SEC's Division of Enforcement alleged that after acquiring the Alaska Assets in late 2009, Miller overstated their value by more than $400 million, boosting the Company's net income and total assets. According to the SEC, the allegedly inflated valuation had a significant impact, turning a penny-stock company into one that was eventually listed on the NYSE, where its common stock had reached a 2013 high of nearly $9 per share. In a statement issued that day, William P. Hicks, Associate Regional Director of the SEC's Atlanta office, stated in pertinent part as follows:

> "Financial statement information is the cornerstone of investment decisions. We've charged that Miller Energy falsified financial statement information and grossly overstated the value of its Alaska assets and that the company's independent auditor failed to conduct an audit that complied with professional standards .... The SEC will aggressively prosecute such conduct."

89.    According to the SEC, Miller had paid $2.25 million and assumed certain liabilities to purchase the Alaska Assets. It later reported them at a value of $480 million. While accounting standards required the Company to record the properties at "fair value," then-CFO defendant Boyd allegedly relied on the Reserve Report, which did not reflect fair value for the assets, and he also was alleged to have double counted $110 million of fixed assets already included in the Reserve Report. The Reserve Report allegedly contained expense numbers that were knowingly understated by defendant Hall, then serving as the

CEO of Miller's Alaska subsidiary, CIE, and as Miller's COO since July 2013. Defendant Hall was also alleged to have altered a second report to make it appear as though it reflected an outside party's estimate of value.

90. The SEC alleged that the fiscal 2010 audit of Miller's financial statements was deficient due to the failure of non-party Vogt, the Sherb & Co. partner in charge of the Miller audits, who issued an unqualified opinion of Miller's 2010 annual report and was alleged to have falsely stated that the audit was conducted in accordance with the standards of the Public Company Accounting Oversight Board and that Miller's financial statements were presented fairly and conformed with GAAP.

91. As a result of the forgoing misconduct, the SEC alleged that:

- Defendant Miller violated §17(a) of the Securities Act, §10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, which prohibit fraudulent conduct in the offer or sale of securities and in connection with the purchase or sale of securities;

- Defendant Boyd willfully aided and abetted and caused, and defendant Hall caused, Miller's violations of §17(a) of the Securities Act, §10(b) of the Exchange Act and Rule 10b-5 thereunder;

- Defendant Boyd willfully violated, and defendant Hall violated, §17(a) of the Securities Act, §10(b) of the Exchange Act and Rule 10b-5 thereunder, which prohibit fraudulent conduct in the offer or sale of securities and in connection with the purchase or sale of securities;

- Defendant Miller violated §13(a) of the Exchange Act and Rules 13a-1, 13a-11 and 13a-13 thereunder, which require that every issuer of a security registered pursuant to §12 of the Exchange Act file with the SEC, among other things, annual, current, and quarterly reports as the SEC may require;

- Defendant Boyd willfully aided and abetted and caused, and defendant Hall caused, Miller's violations of §13(a) of the Exchange Act and Rules 13a-1, 13a-11 and 13a-13 thereunder;

- Defendant Miller violated §13(b)(2)(A) of the Exchange Act, which requires reporting companies to make and keep books, records and accounts which, in

reasonable detail, accurately and fairly reflect their transactions and dispositions of their assets;

- Defendant Boyd willfully aided and abetted and caused, and defendant Hall caused, Miller's violations of §13(b)(2)(A) of the Exchange Act;

- Defendant Miller violated §13(b)(2)(B) of the Exchange Act, which requires all reporting companies to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP;

- Defendant Boyd willfully aided and abetted and caused, and defendant Hall caused, Miller's violations of §13(b)(2)(B) of the Exchange Act;

- Defendant Boyd willfully violated, and defendant Hall violated, §13(b)(5) of the Exchange Act, which prohibits any person from knowingly circumventing or knowingly failing to implement a system of internal accounting controls or knowingly falsifying any book, record, or account described in §13(b)(2) of the Exchange Act;

- Defendant Miller violated Rule 12b-20 under the Exchange Act which requires that, in addition to the information expressly required to be included in a statement or report filed with the SEC, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made not misleading;

- Defendant Boyd willfully aided and abetted and caused, and defendant Hall caused, defendant Miller's violations of Rule 12b-20 under the Exchange Act; and

- Defendant Boyd willfully violated Rule 13a-14 of the Exchange Act, which requires that an issuer's principal executive and principal financial officers certify each periodic report.

92. The SEC sought and obtained, among other things, cease-and-desist orders, civil monetary penalties, and return of alleged ill-gotten gains from defendants Miller, Boyd and Hall.

93. During August 2015, various of Miller's creditors called for the Company to file bankruptcy.

94.     On August 20, 2015, Miller disclosed that it had settled with the SEC, agreeing to pay a $5 million fine and to restate all periodic financial reports back to 2010. Miller's restatement of its previously reported financial results was an admission that those results were false when filed.

95.     On October 1, 2015, Miller filed for protection under Chapter 11 of the federal bankruptcy statutes, citing in large part the filing of the SEC Enforcement Action, which Miller's senior executives stated had torpedoed its ability to obtain $165 million in outside financing, along with the filing of an involuntary bankruptcy petition against its subsidiary CIE in August 2015 by creditors Baker Hughes Oilfield Operations Inc. and Schlumberger Technology Corp., with total claims of $2.79 million, which filing Miller said was precipitated by the SEC Enforcement Action.

96.     By the time of the filing of this action, Miller Series C and D shares have been delisted after the market price of each had plummeted to approximately $0.30 per share, a more than 98% decline from the prices the shares were marketed at in the Offerings.

## CLASS ACTION ALLEGATIONS

97.     Plaintiff brings this action as a class action on behalf of a class consisting of all those who purchased Miller preferred shares traceable to the Registration Statement issued in connection with the Offerings (the "Class"). Excluded from the Class are defendants and their families, the officers and directors and affiliates of defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

98.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time

and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Miller or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

99.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

100.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

101.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether defendants violated the Securities Act;

(b)     whether the Registration Statement was negligently prepared and contained inaccurate statements of material fact and omitted material information required to be stated therein; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

102.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small,

the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## FIRST CAUSE OF ACTION

### For Violation of §11 of the Securities Act
### Against All Defendants (Except Boyd)

103. Plaintiff incorporates ¶¶1-103 by reference.

104. This Cause of Action is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants except Boyd.

105. The Registration Statement for the Offerings was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary in order to make the statements made not misleading, and omitted to state material facts required to be stated therein.

106. The defendants named in the Cause of Action are strictly liable to Plaintiff and the Class for the misstatements and omissions.

107. None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

108. By reason of the conduct herein alleged, each of these defendants violated, and/or controlled a person who violated, §11 of the Securities Act.

109. Plaintiff acquired Miller preferred shares traceable to the Offerings.

110. Plaintiff and the Class have sustained damages.

111.     At the time of their purchases of Miller preferred shares, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.  Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiff commenced this action.  Less than three years has elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time Plaintiff commenced this action.

## SECOND CAUSE OF ACTION

### For Violation of §15 of the Securities Act
### Against the Company and the Individual Defendants

112.     Plaintiff incorporates ¶¶1-112 by reference.

113.     This Cause of Action is brought pursuant to §15 of the Securities Act against the Company and the Individual Defendants.

114.     The Individual Defendants each were control persons of Miller by virtue of their positions as directors and/or senior officers of Miller.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Miller.  The Company controlled the Individual Defendants and all of Miller's employees.

115.     The Individual Defendants each were culpable participants in the violations of §11 of the Securities Act alleged in the Cause of Action above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the Offerings to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying Plaintiff as a Class representative under Tenn. R. Civ. P. 23 and Plaintiff's counsel as Class Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: November 6, 2015

BARRETT JOHNSTON MARTIN
&amp; GARRISON, LLC
DOUGLAS S. JOHNSTON, JR., #5782
JERRY E. MARTIN, #20193
TIMOTHY L. MILES, #21605

JERRY E. MARTIN

Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2202
615/252-3798 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHRISTOPHER M. WOOD, #032977
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
MARY K. BLASY
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

LAW OFFICES OF CURTIS V. TRINKO, LLP
CURTIS V. TRINKO
WILLIAM MARGRABE
16 West 46th Street, 7th Floor
New York, NY 10036
Telephone: 212/490-9550
212/986-0158 (fax)

Attorneys for Plaintiff

| | | |
|---|---|---|
| KENNETH GAYNOR, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Case No. 2015-cv-34 |
| | ) | Judge Michael Pemberton |
| Plaintiff, | ) ) | |
| | ) | CLASS ACTION |
| vs. | ) ) | |
| | ) | DEMAND FOR JURY TRIAL |
| DELOY MILLER, *et al.* | ) ) | |
| Defendants. | ) ) | |

**PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS MLV & CO. LLC, WILLIAMS FINANCIAL GROUP MAXIM GROUP LLC, NATIONAL SECURITIES CORPORATION, AEGIS CAPITAL CORP., NORTHLAND CAPITAL MARKETS, DOMINICK & DOMINICK, LLC, LADENBURG THALMANN & CO. INC. AND I-BANKERS SECURITIES, INC.**

Pursuant to Tenn. R. Civ. P. 34, plaintiff hereby demands MLV & CO. LLC, Williams Financial Group Maxim Group LLC, National Securities Corporation, Aegis Capital Corp., Northland Capital Markets, Dominick & Dominick, LLC, Ladenburg Thalmann & Co. Inc. and I-Bankers Securities, Inc. (collectively "Defendants") to produce the documents described below for inspection and copying at the law offices of Barrett Johnston Martin & Garrison, LLC, 414 Union Street, Suite 900, Nashville, TN 37209, within 45 days after service of complaint, at 10:00 a.m., or at such other location and date upon which the parties may mutually agree.

DEFINITIONS

1.      "You" and "your" refer to the person responding to these Requests.

2.      The term "Individual Defendants" means Deloy Miller, Scott M. Boruff, David J. Voyticky, Catherine A. Rector, David M. Hall, Merrill A. Mcpeak, Gerald Hannahs, Charles M.

Stivers, Don A. Turkleson, Bob G. Gower, Joseph T. Leary, William B. Richardson, Marceau N. Schlumberger and Paul W. Boyd

3.     "Miller" means Miller Energy Resources, Inc. and any of its predecessors, successors, divisions, parents, affiliates, subsidiaries (including, but not limited to, CIE as defined below), directors, employees, agents or anyone acting or purporting to act on its behalf.

4.     "CIE" means Cook Inlet Energy and any of its predecessors, successors, divisions, parents, affiliates, subsidiaries, directors, employees, agents or anyone acting or purporting to act on its behalf.

5.     "PER" means Pacific Energy Resources and any of its predecessors, successors, divisions, parents, affiliates, subsidiaries, directors, employees, agents or anyone acting or purporting to act on its behalf.

6.     "Offerings" means the following public offerings of Miller's 10.75% Series C Cumulative Preferred Stock ("Series C") and 10.5% Series D Fixed Rate/Floating Rate Cumulative Redeemable Preferred Stock ("Series D") (collectively, the "Offerings"):

| DATE | PREFERRED SHARES | PRICE | OFFERING NAME |
|---|---|---|---|
| Feb. 13, 2013 | Series C | $22.90 | "2/13/13-Series C" |
| May 8, 2013 | Series C | $22.25 | "5/8/13-Series C" |
| June 28, 2013 | Series C | $21.50 | "6/28/13-Series C" |
| Sept. 26, 2013 | Series D | $25.00 | "9/26/13-Series D" |
| Oct. 17, 2013 | Series D | At Market | "10/17/13-Series D" |
| Aug. 21, 2014 | Series D | $24.50 | "8/21/14-Series D" |

7.     "Alaska Assets" means certain oil and gas properties in Alaska purchased by Miller's operating subsidiary, CIE for $2.25 million in cash and the assumption of certain limited liabilities and which closed on December 10, 2009.

8.     "Reserve Reports" means the reserve estimates report prepared for Miller by Ralph E. Davis & Associates concerning the Alaska Asserts.

9. "Person" or "persons" means and refers to natural persons, proprietorships, corporations, partnerships, trusts, joint ventures, groups, associations, organizations and governmental agencies and other agencies.

10. "Underwriter Defendants means defendants MLV & Co. LLC, Williams Financial Group Maxim Group LLC, National Securities Corporation, Aegis Capital Corp., Northland Capital Markets, Dominick & Dominick, LLC, Ladenburg Thalmann & Co. Inc. and I-Bankers Securities, Inc.

11. The term "business relationship" refers to any relationship, whether formal, informal, contractual or legal, concerning any employment, occupation, profession, ownership or equity interest for monetary gain, personal gain or livelihood. "Business relationship" shall also include, without limitation, any monetary, financial or labor investment.

12. The term "document" or "documents" is intended to be interpreted in the broadest possible sense and includes, but is not limited to, all electronic data and all communications which are stored or retrievable or recorded in any manner and also includes, without limitation, any writing or other record of information or images, including, but not limited to, print, handwriting, photographs, film, recordings, memoranda, books, records, accounts, ledgers, vouchers, invoices, drafts, bills, charge slips, letters, electronic mail or "e-mail," compact discs, CD-ROM discs, magnetic tape, videotape, magnetic or optical disks, "floppy disks," "PowerPoint" or other presentation software systems, telegrams, mailgrams, correspondence, notes and minutes of meetings, conversations or telephone calls, resolutions, interoffice memoranda, work papers, reports, projects, tabulations, studies, surveys, legal complaints and other pleadings, affidavits, interrogatories, legal briefs, legal motions, judgments, designs, drawings, schematics, maps, manuals, models, notebooks, contracts, agreements, diaries,

telephone records, desk calendars, appointment books, circulars, charts, transcripts, news releases, trade releases, advertisements, press books, teletype messages, licenses, financial statements, stenographers' notebooks, punchcards, computer printouts and data, telecopier or facsimile transmissions and printouts, letters of credit, stock certificates and securities. The term "document" also includes preliminary drafts or revisions or copies of any such document if the copy is in any way different from the original, now in your possession, custody or control, or in the possession, custody or control of your advisors, agents, employees, servants, representatives, trustees, counsel or other persons acting or purporting to act on your behalf.

13.     The term "electronic data" refers to any original and any non-identical copies (whether non-identical because of notes made on copies or attached comments, annotations, marks, transmission notations, or highlighting of any kind), of mechanical, facsimile, electronic, magnetic, digital or other programs (whether private, commercial, or work-in-progress), programming notes or instructions, activity listings of electronic mail receipts or transmittals, output resulting from the use of any software program, including word processing documents, spreadsheets, database files, charts, graphs and outlines, electronic mail or "e-mail," personal digital assistant ("PDA") messages, instant messenger messages, operating systems, source code of all types, programming languages, linkers and compilers, peripheral drives, PDF files, PRF files, batch files, ASCII files, crosswalks, code keys, pull down tables, logs, file layouts and any and all miscellaneous files or file fragments, regardless of the media on which they reside and regardless of whether said electronic data consists of an active file, deleted file or file fragment. "Electronic data" also includes any and all items stored on computer memory or memories, hard disks, floppy disks, zip drives, CD-ROM discs, Bernoulli Boxes and their equivalents, magnetic tapes of all types and kinds, microfiche, punched cards, punched tape, computer chips (including,

but not limited to, EPROM, PROM, ROM or RAM of any kind) on or in any other vehicle for digital data storage or transmittal, files, folder tabs, or containers and labels appended to or associated with any physical storage device associated with each original and each copy.

14. The term "Financial Statements" includes, but is not limited to, interim, final, pro forma, actual, projected, complete, or partial, annual, quarterly, monthly, weekly or otherwise, audited or unaudited, budgets, budget plans, balance sheets, schedules of direct costs, schedules of miscellaneous income, schedules of general services, fiscal serviceman administrative services, statements of earnings and earnings per share, income statements, cash flow statements, statement of revenues and statements of expenses, all notes or other commentary concerning any of the foregoing and all underlying work papers and all drafts used in connection with the preparation of any of the foregoing.

15. The term "telephone records" includes, without limitation, telephone directories, rolodexes, messages, telephone logs, recordings of telephone conversations and telephone bills (local and long distance).

16. "Communication" or "communications" refers to any exchange of information by any means of transmission, sending or receipt of information of any kind by or through any means including, but not limited to, speech, writings, documents, language (machine, foreign or otherwise) of any kind, computer electronics or electronic data, sound, radio or video signals, telecommunication, telephone, teletype, facsimile, telegram, microfilm, microfiche, photographic film of all types or other media of any kind. The term "communication" also includes, without limitation, all inquiries, discussions, conversations, correspondence, negotiations, agreements, understandings, meetings, notices, requests, responses, demands, complaints, or press, publicity or trade releases.

17. The term "concerning" shall mean constituting, evidencing, reflecting, referring to, incorporating, effecting, including, or otherwise pertaining or relating, either directly or indirectly, or being in any way logically or factually connected with the subject matter of the inquiry or Request. Requests for "documents concerning" any subject matter include documents concerning communication regarding that subject matter.

18. "Identify" when used to refer to a natural person, shall mean to set forth that person's: (i) full name and title, if any; (ii) present or last known address; (iii) present or last known business and home telephone number(s); and (iv) present or last known employer.

19. "Identify" when used to refer to a document, shall mean: (i) the date of each document; (ii) the type of each such document (*i.e.* correspondence, memorandum, business record, etc.); (iii) the identity of the author(s) or preparer(s) of each such document; and (iv) the present location of each such document or copies thereof.

20. The terms "all" and "each" shall be construed as all/each.

21. The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the request all responses that might otherwise be construed to be outside of its scope.

22. "Roadshow" means any and all presentations made or given by any officer, director, employee, agent, underwriter, investment banker or other person or entity on behalf of Miller, relating to the Offerings.

23. "SEC" means the Securities and Exchange Commission.

24. "SEC filings" means all documents filed or prepared for the purpose of filing with the SEC and any other state or federal regulatory agency, including, but not limited to, Forms 8-

K, 10-K, 10-Q, Schedules TO-T, 13-D, 14A, 14D-1 and 14D-9 and any drafts thereof or amendments thereto.

25. "SEC Enforcement Action" means the civil administrative proceedings against Miller initiated by the SEC on August 6, 2015 in *In the Matter of Miller Resources, Inc., et al.*, SEC Admin. Proc. File No. 3-16729.

INSTRUCTIONS

In responding to these document Requests, you shall produce separately all documents available at the time of responding or which can be located or discovered by reasonably diligent efforts, including documents in the possession of your agents and representatives.

References to an individual, partnership, limited liability company or corporation include any and all agents, employees, representatives and attorneys and all other persons or entities acting on your behalf or under your control.

If you claim any form of privilege or any other objection, whether based on statute, common law or otherwise as a ground for not producing any requested document, please furnish a list identifying each document for which the privilege or other objection is claimed together with the following information: date, sender, recipient, persons to whom copies were furnished together with their job titles, subject matter, basis on which privilege or other objection is claimed and the number of each Request to which such document responds. If you claim privilege or any other objection with regard to only part of a document, produce the part to which there is no objection.

If you are aware of any documents or copies thereof that may be responsive to these Requests but are no longer in your possession, custody or control, or have been lost or destroyed, identify each document in detail, including whether: (i) the document is missing, lost or destroyed; (ii) the document has been transferred or delivered to another person and, if so, at

whose request; (iii) who prepared it; (iv) to whom it was prepared for and sent to; (v) when it was prepared or sent; (vi) the content of the document; (vii) the person who destroyed it; and (viii) why it was lost or destroyed.

If any individual Request is ambiguous in any way, please send a letter to the undersigned counsel describing the ambiguity and it will be promptly clarified in a reply letter. If any individual Request (or subpart thereof) is deemed to be unduly burdensome, please send a letter to the undersigned counsel specifying the reasons why the Request is unduly burdensome and stating whatever information and knowledge you have of the information or documents called for in the Request, and (generally) an attempt will be made to rephrase the Request (or subpart thereof) in a reply letter to lessen the burdens of compliance. Any such reply letter may be treated by the parties to whom it is addressed as a modification of the particular Request.

Unless words or terms have been given a specific definition herein, each word or term used herein shall be given its usual and customary dictionary definition except where such words have a specific custom and usage definition in your trade or industry, in which case they shall be interpreted in accordance with such usual custom and usage definition of which you are aware. In construing the Requests herein: (i) the singular shall include the plural and the plural shall include the singular; and (ii) a masculine, feminine or neuter pronoun shall not exclude the other genders, all to the end that the interpretation applied results in the more expansive production.

In making production, produce all documents as kept in the normal course of business and identify the file from which each document was taken.

TIME PERIOD

Unless stated otherwise, the time period to which these Requests refer is January 1, 2009 through the date of production. If a document prepared before this period is necessary for a

correct or complete understanding of any document covered by a Request, you must produce the earlier or subsequent document as well. If any document is undated and the date of its preparation cannot be determined, the document shall be produced if otherwise responsive to the production Request.

DOCUMENTS REQUESTED

REQUEST NO. 1:

All documents and communications concerning each draft or final Offerings prospectuses and registration statements and disclosures incorporated in the Offerings prospectuses, including, but not limited to, any draft that contains edits, comments, questions, or any writing concerning the draft or the Offerings.

REQUEST NO. 2:

All communications to or from you concerning the matters disclosed in the Offerings prospectuses and periodic filings incorporated therein.

REQUEST NO. 3:

All documents and communications concerning the adequacy of, necessity of, expected, or actual, disclosures of information in connection with the Offerings and Offering prospectuses (including prospectuses drafts).

REQUEST NO. 4:

All documents concerning any disagreement between Miller, the Individual Defendants, the Underwriter Defendants, or any Miller officers, directors, employees, consultants, accountants or attorneys concerning any conclusion, statement, observation, disclosure or non-disclosure in any document filed by Miller with the SEC concerning:

(a)    the Offerings;

(b)    the Alaska Assets;

(c)     the Reserve Report; and

(d)     Miller's accounting for the Alaska Assets.

REQUEST NO. 5:

All documents and communications prepared, received, or sent by you concerning:

(a)     the Offerings;

(b)     the Alaska Assets;

(c)     the Reserve Report;

(d)     Miller's accounting for the Alaska Assets.

REQUEST NO. 6:

All documents and communications concerning any due diligence performed in connection with the Offerings.

REQUEST NO. 7:

All documents concerning how you conduct due diligence, including, but not limited to, all due diligence checklists and/or procedure manuals.

REQUEST NO. 8:

Any comfort letters prepared or received by you concerning Miller or the Offerings.

REQUEST NO. 9:

All documents and communications concerning any meetings, conference calls, symposiums or conferences at which Miller was discussed, including, but not limited to, any Miller Board of Directors' meetings or Miller Board of Directors' committee meetings. Responsive documents shall include, but not be limited to, materials distributed and notes or transcripts of any meetings and conference calls.

REQUEST NO. 10:

All documents and communications relating to presentations and reports you gave to Miller or any of the Individual Defendants.

REQUEST NO. 11:

All documents and communications concerning any press release, published article, financial analysts' report and/or rating agencies' report relating to or concerning Miller or the Offerings.

REQUEST NO. 12:

All documents and communications concerning any actual or proposed changes in the terms or effective dates of the Offerings or the right or option to terminate, amend or modify the terms of the Offerings, including, but not limited to, any change in the offering price of Miller common stock leading up to the Offerings.

REQUEST NO. 13:

All documents that identify the personnel involved in the Offerings, whether contained in a "Working Group List" or any similar list, from any or all of the following entities: Miller;; the Underwriter Defendants; and any other entities or consultants involved in the Offerings.

REQUEST NO. 13:

All documents concerning fees, expenses, reimbursements, costs, compensation or other remuneration received by you for services rendered relating to the Offerings and/or any other services provided to or on behalf of Miller.

REQUEST NO. 14:

All indemnification and/or hold-harmless agreements and any documents relating to any indemnifications between you and Miller or the Individual Defendants.

REQUEST NO. 15:

All documents and communications concerning any investors in or purchasers of Miller's securities in connection with the Offerings, including, but not limited to, any lists and trading records in your possession, custody or control, and documents identifying any person or entity that purchased Miller securities in the Offerings.

REQUEST NO. 15:

All documents concerning any actual or contemplated investment banking services or consulting services performed for or on behalf of Miller or the Individual Defendants.

REQUEST NO. 16:

All documents concerning your ownership or investment in Miller.

REQUEST NO. 17:

All documents concerning any communication, presentation or meeting (including any scripts, transcripts, tapes or videos prepared in connection with or as a result of) with any potential purchasers of Miller's securities, securities analysts, financial analysts, institutional investors, financial investors, news media, journalists, investment bankers, brokerage firms, market makers, money managers, commercial banks, rating agencies (such as Moody's Investor Service, Inc.) or stock markets or securities exchanges concerning Miller or the Offerings, including, but not limited to, Roadshow presentations.

DATED: November 16, 2015       BARRETT JOHNSTON MARTIN
           & GARRISON, LLC
           DOUGLAS S. JOHNSTON, JR., #5782
           JERRY E. MARTIN, #20193
           TIMOTHY L. MILES, #21605

                     JERRY E. MARTIN

Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2202
615/252-3798 (fax)

ROBBINS GELLER RUDMAN
   & DOWD LLP
CHRISTOPHER M. WOOD, #032977
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN
MARY K. BLASY
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

LAW OFFICES OF CURTIS V. TRINKO, LLP
CURTIS V. TRINKO
WILLIAM MARGRABE
16 West 46th Street, 7th Floor
New York, NY 10036
Telephone: 212/490-9550
212/986-0158 (fax)

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing *Plaintiff's First Request for Production Of Documents To Defendants MLV & Co. LLC, Williams Financial Group Maxim Group LLC, National Securities Corporation, Aegis Capital Corp., Northland Capital Markets, Dominick & Dominick, LLC, Ladenburg Thalmann & Co. Inc. and I-Bankers Securities, Inc.* has been served on the following via certified U.S. Mail on November 16, 2015:

| | |
|---|---|
| **Deloy Miller**<br>815 South Lake Drive<br>Oneida, TN 97841 | **Scott M. Boruff**<br>5628 Lyons View Pike<br>Knoxville, TN 37919 |
| **David J. Voyticky**<br>41 East Parkway PHA<br>Brooklyn, NY 11238 | **Catherine A. Rector**<br>1519 Pebble Shore Lane<br>Knoxville, TN 37931 |
| **David M. Hall**<br>48110 David Hall Road<br>Kenai, AK 99611 | **Merrill A. McPeak**<br>123 Furnace Street<br>Lake Oswego, OR 97034 |
| **Gerald Hannahs**<br>17710 Leatha Lane<br>Little Rock, AR 72223 | **Charles M. Stivers**<br>118 Richmond Road<br>Manchester, KY 40962 |
| **Don A. Turkleson**<br>6311 Rodrigo Street<br>Houston, TX 77007 | **Bob G. Gower**<br>402 Timberwilde Lane<br>Houston, TX 77024 |
| **Joseph T. Leary**<br>704 East 12th Street<br>Houston, TX 77008 | **William B. Richardson**<br>1058 Encantado Drive<br>Santa Fe, NM 87501 |
| **Marceau N. Schlumberger**<br>18 Dante Street<br>Larchmont, NY 10538 | **Paul W. Boyd**<br>8125 Ainsworth Drive<br>Knoxville, TN 37909 |
| **Williams Financial Group**<br>Registered Agent: Wilson Williams<br>2711 N. Haskell Avenue, Suite 2900<br>Dallas, TX 75204 | **Maxim Group LLC**<br>Edward L. Rose, Esq.<br>99 Sunnyside Boulevard<br>Woodbury, NY 11797 |
| **Northland Capital Markets**<br>45 South 7th Street, Suite 2000<br>Minneapolis, MN 55402 | **Aegis Capital Corp.**<br>810 7th Avenue, 18th Floor<br>New York, NY 10019 |

| | |
|---|---|
| **National Securities Corporation** <br> Registered Agent: <br> Delaware Corporate Services, Inc. <br> 901 North Market Street, Suite 705 <br> Wilmington, DE 19801 | **Dominick & Dominick LLC** <br> Registered Agent: <br> Corporation Service Company <br> 80 State Street <br> Albany, NY 12207 |
| **Ladenburg Thalmann & Co. Inc.** <br> Registered Agent: <br> Corporate Creations Network, Inc. <br> 15 North Mill Street <br> Nyack, NY 10960 | **I-Bankers Securities, Inc.** <br> Registered Agent: <br> IBS Holding Corporation <br> 21550 Oxnard Street, 3rd Floor <br> Woodland Hills, CA 91367 |
| | **MLV & CO. LLC** <br> Registered Agent: <br> The Corporation Trust Company <br> Corporation Trust Center <br> 1209 Orange Street <br> Wilmington, DE 19801 |

JERRY E. MARTIN
**BARRETT JOHNSTON MARTIN
& GARRISON, LLC**

| | | |
|---|---|---|
| KENNETH GAYNOR, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Case No. 2015-cv-34 |
| | ) | Judge Michael Pemberton |
| Plaintiff, | ) ) | |
| | ) | <u>CLASS ACTION</u> |
| vs. | ) ) | |
| | ) | <u>DEMAND FOR JURY TRIAL</u> |
| DELOY MILLER, *et al.* | ) ) | |
| | ) | |
| Defendants. | ) ) | |

### PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS DELOY MILLER, SCOTT M. BORUFF, DAVID J. VOYTICKY, CATHERINE A. RECTOR, DAVID M. HALL, MERRILL A. MCPEAK, GERALD HANNAHS, CHARLES M. STIVERS, DON A. TURKLESON, BOB G. GOWER, JOSEPH T. LEARY, WILLIAM B. RICHARDSON, MARCEAU N. SCHLUMBERGER AND PAUL W. BOYD

Pursuant to Tenn. R. Civ. P. 34, plaintiff hereby demands Deloy Miller, Scott M. Boruff, David J. Voyticky, Catherine A. Rector, David M. Hall, Merrill A. Mcpeak, Gerald Hannahs, Charles M. Stivers, Don A. Turkleson, Bob G. Gower, Joseph T. Leary, William B. Richardson, Marceau N. Schlumberger and Paul W. Boyd (collectively "Defendants") to produce the documents described below for inspection and copying at the law offices of Barrett Johnston Martin & Garrison, LLC, 414 Union Street, Suite 900, Nashville, TN 37209, within 45 days after service of complaint, at 10:00 a.m., or at such other location and date upon which the parties may mutually agree.

DEFINITIONS

1.    "You" and "your" refer to the person responding to these Requests.

2.    The term "Individual Defendants" means Deloy Miller, Scott M. Boruff, David J. Voyticky, Catherine A. Rector, David M. Hall, Merrill A. Mcpeak, Gerald Hannahs, Charles M.

Stivers, Don A. Turkleson, Bob G. Gower, Joseph T. Leary, William B. Richardson, Marceau N. Schlumberger and Paul W. Boyd

3. "Miller" means Miller Energy Resources, Inc. and any of its predecessors, successors, divisions, parents, affiliates, subsidiaries (including, but not limited to, CIE as defined below), directors, employees, agents or anyone acting or purporting to act on its behalf.

4. "CIE" means Cook Inlet Energy and any of its predecessors, successors, divisions, parents, affiliates, subsidiaries, directors, employees, agents or anyone acting or purporting to act on its behalf.

5. "PER" means Pacific Energy Resources and any of its predecessors, successors, divisions, parents, affiliates, subsidiaries, directors, employees, agents or anyone acting or purporting to act on its behalf.

6. "Offerings" means the following public offerings of Miller's 10.75% Series C Cumulative Preferred Stock ("Series C") and 10.5% Series D Fixed Rate/Floating Rate Cumulative Redeemable Preferred Stock ("Series D") (collectively, the "Offerings"):

| DATE | PREFERRED SHARES | PRICE | OFFERING NAME |
|------|------------------|-------|----------------|
| Feb. 13, 2013 | Series C | $22.90 | "2/13/13-Series C" |
| May 8, 2013 | Series C | $22.25 | "5/8/13-Series C" |
| June 28, 2013 | Series C | $21.50 | "6/28/13-Series C" |
| Sept. 26, 2013 | Series D | $25.00 | "9/26/13-Series D" |
| Oct. 17, 2013 | Series D | At Market | "10/17/13-Series D" |
| Aug. 21, 2014 | Series D | $24.50 | "8/21/14-Series D" |

7. "Alaska Assets" means certain oil and gas properties in Alaska purchased by Miller's operating subsidiary, CIE for $2.25 million in cash and the assumption of certain limited liabilities and which closed on December 10, 2009.

8. "Reserve Reports" means the reserve estimates report prepared for Miller by Ralph E. Davis & Associates concerning the Alaska Asserts.

9.     "Person" or "persons" means and refers to natural persons, proprietorships, corporations, partnerships, trusts, joint ventures, groups, associations, organizations and governmental agencies and other agencies.

10.    "Underwriter Defendants means defendants MLV & Co. LLC ("MLV"), Williams Financial Group Maxim Group LLC, National Securities Corporation, Aegis Capital Corp., Northland Capital Markets ("NCM"), Dominick & Dominick, LLC, Ladenburg Thalmann & Co. Inc. and I-Bankers Securities, Inc.

11.    The term "business relationship" refers to any relationship, whether formal, informal, contractual or legal, concerning any employment, occupation, profession, ownership or equity interest for monetary gain, personal gain or livelihood. "Business relationship" shall also include, without limitation, any monetary, financial or labor investment.

12.    The term "document" or "documents" is intended to be interpreted in the broadest possible sense and includes, but is not limited to, all electronic data and all communications which are stored or retrievable or recorded in any manner and also includes, without limitation, any writing or other record of information or images, including, but not limited to, print, handwriting, photographs, film, recordings, memoranda, books, records, accounts, ledgers, vouchers, invoices, drafts, bills, charge slips, letters, electronic mail or "e-mail," compact discs, CD-ROM discs, magnetic tape, videotape, magnetic or optical disks, "floppy disks," "PowerPoint" or other presentation software systems, telegrams, mailgrams, correspondence, notes and minutes of meetings, conversations or telephone calls, resolutions, interoffice memoranda, work papers, reports, projects, tabulations, studies, surveys, legal complaints and other pleadings, affidavits, interrogatories, legal briefs, legal motions, judgments, designs, drawings, schematics, maps, manuals, models, notebooks, contracts, agreements, diaries,

telephone records, desk calendars, appointment books, circulars, charts, transcripts, news releases, trade releases, advertisements, press books, teletype messages, licenses, financial statements, stenographers' notebooks, punchcards, computer printouts and data, telecopier or facsimile transmissions and printouts, letters of credit, stock certificates and securities. The term "document" also includes preliminary drafts or revisions or copies of any such document if the copy is in any way different from the original, now in your possession, custody or control, or in the possession, custody or control of your advisors, agents, employees, servants, representatives, trustees, counsel or other persons acting or purporting to act on your behalf.

13.    The term "electronic data" refers to any original and any non-identical copies (whether non-identical because of notes made on copies or attached comments, annotations, marks, transmission notations, or highlighting of any kind), of mechanical, facsimile, electronic, magnetic, digital or other programs (whether private, commercial, or work-in-progress), programming notes or instructions, activity listings of electronic mail receipts or transmittals, output resulting from the use of any software program, including word processing documents, spreadsheets, database files, charts, graphs and outlines, electronic mail or "e-mail," personal digital assistant ("PDA") messages, instant messenger messages, operating systems, source code of all types, programming languages, linkers and compilers, peripheral drives, PDF files, PRF files, batch files, ASCII files, crosswalks, code keys, pull down tables, logs, file layouts and any and all miscellaneous files or file fragments, regardless of the media on which they reside and regardless of whether said electronic data consists of an active file, deleted file or file fragment. "Electronic data" also includes any and all items stored on computer memory or memories, hard disks, floppy disks, zip drives, CD-ROM discs, Bernoulli Boxes and their equivalents, magnetic tapes of all types and kinds, microfiche, punched cards, punched tape, computer chips (including,

but not limited to, EPROM, PROM, ROM or RAM of any kind) on or in any other vehicle for digital data storage or transmittal, files, folder tabs, or containers and labels appended to or associated with any physical storage device associated with each original and each copy.

14.    The term "Financial Statements" includes, but is not limited to, interim, final, pro forma, actual, projected, complete, or partial, annual, quarterly, monthly, weekly or otherwise, audited or unaudited, budgets, budget plans, balance sheets, schedules of direct costs, schedules of miscellaneous income, schedules of general services, fiscal serviceman administrative services, statements of earnings and earnings per share, income statements, cash flow statements, statement of revenues and statements of expenses, all notes or other commentary concerning any of the foregoing and all underlying work papers and all drafts used in connection with the preparation of any of the foregoing.

15.    The term "telephone records" includes, without limitation, telephone directories, rolodexes, messages, telephone logs, recordings of telephone conversations and telephone bills (local and long distance).

16.    "Communication" or "communications" refers to any exchange of information by any means of transmission, sending or receipt of information of any kind by or through any means including, but not limited to, speech, writings, documents, language (machine, foreign or otherwise) of any kind, computer electronics or electronic data, sound, radio or video signals, telecommunication, telephone, teletype, facsimile, telegram, microfilm, microfiche, photographic film of all types or other media of any kind.  The term "communication" also includes, without limitation, all inquiries, discussions, conversations, correspondence, negotiations, agreements, understandings, meetings, notices, requests, responses, demands, complaints, or press, publicity or trade releases.

17. The term "concerning" shall mean constituting, evidencing, reflecting, referring to, incorporating, effecting, including, or otherwise pertaining or relating, either directly or indirectly, or being in any way logically or factually connected with the subject matter of the inquiry or Request. Requests for "documents concerning" any subject matter include documents concerning communication regarding that subject matter.

18. "Identify" when used to refer to a natural person, shall mean to set forth that person's: (i) full name and title, if any; (ii) present or last known address; (iii) present or last known business and home telephone number(s); and (iv) present or last known employer.

19. "Identify" when used to refer to a document, shall mean: (i) the date of each document; (ii) the type of each such document (*i.e.* correspondence, memorandum, business record, etc.); (iii) the identity of the author(s) or preparer(s) of each such document; and (iv) the present location of each such document or copies thereof.

20. The terms "all" and "each" shall be construed as all/each.

21. The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the request all responses that might otherwise be construed to be outside of its scope.

22. "Roadshow" means any and all presentations made or given by any officer, director, employee, agent, underwriter, investment banker or other person or entity on behalf of Miller, relating to the Offerings.

23. "SEC" means the Securities and Exchange Commission.

24. "SEC filings" means all documents filed or prepared for the purpose of filing with the SEC and any other state or federal regulatory agency, including, but not limited to, Forms 8-

K, 10-K, 10-Q, Schedules TO-T, 13-D, 14A, 14D-1 and 14D-9 and any drafts thereof or amendments thereto.

25.     "SEC Enforcement Action" means the civil administrative proceedings against Miller initiated by the SEC on August 6, 2015 in *In the Matter of Miller Resources, Inc., et al.*, SEC Admin. Proc. File No. 3-16729.

INSTRUCTIONS

In responding to these document Requests, you shall produce separately all documents available at the time of responding or which can be located or discovered by reasonably diligent efforts, including documents in the possession of your agents and representatives.

References to an individual, partnership, limited liability company or corporation include any and all agents, employees, representatives and attorneys and all other persons or entities acting on your behalf or under your control.

If you claim any form of privilege or any other objection, whether based on statute, common law or otherwise as a ground for not producing any requested document, please furnish a list identifying each document for which the privilege or other objection is claimed together with the following information: date, sender, recipient, persons to whom copies were furnished together with their job titles, subject matter, basis on which privilege or other objection is claimed and the number of each Request to which such document responds. If you claim privilege or any other objection with regard to only part of a document, produce the part to which there is no objection.

If you are aware of any documents or copies thereof that may be responsive to these Requests but are no longer in your possession, custody or control, or have been lost or destroyed, identify each document in detail, including whether: (i) the document is missing, lost or destroyed; (ii) the document has been transferred or delivered to another person and, if so, at

whose request; (iii) who prepared it; (iv) to whom it was prepared for and sent to; (v) when it was prepared or sent; (vi) the content of the document; (vii) the person who destroyed it; and (viii) why it was lost or destroyed.

If any individual Request is ambiguous in any way, please send a letter to the undersigned counsel describing the ambiguity and it will be promptly clarified in a reply letter. If any individual Request (or subpart thereof) is deemed to be unduly burdensome, please send a letter to the undersigned counsel specifying the reasons why the Request is unduly burdensome and stating whatever information and knowledge you have of the information or documents called for in the Request, and (generally) an attempt will be made to rephrase the Request (or subpart thereof) in a reply letter to lessen the burdens of compliance. Any such reply letter may be treated by the parties to whom it is addressed as a modification of the particular Request.

Unless words or terms have been given a specific definition herein, each word or term used herein shall be given its usual and customary dictionary definition except where such words have a specific custom and usage definition in your trade or industry, in which case they shall be interpreted in accordance with such usual custom and usage definition of which you are aware. In construing the Requests herein: (i) the singular shall include the plural and the plural shall include the singular; and (ii) a masculine, feminine or neuter pronoun shall not exclude the other genders, all to the end that the interpretation applied results in the more expansive production.

In making production, produce all documents as kept in the normal course of business and identify the file from which each document was taken.

TIME PERIOD

Unless stated otherwise, the time period to which these Requests refer is January 1, 2009 through the date of production. If a document prepared before this period is necessary for a

correct or complete understanding of any document covered by a Request, you must produce the earlier or subsequent document as well. If any document is undated and the date of its preparation cannot be determined, the document shall be produced if otherwise responsive to the production Request.

DOCUMENTS REQUESTED

REQUEST NO. 1:

All documents concerning the Offerings, including without limitation all documents provided to the SEC in connection with the SEC Enforcement Action, or any other government representative, agency or entity concerning the Offerings.

REQUEST NO. 2:

All documents concerning any communication, presentation or meeting (including any scripts, transcripts, tapes or videos prepared in connection with or as a result of) with any potential purchasers of HCA's securities, securities analysts, financial analysts, institutional investors, financial investors, news media, journalists, investment bankers, brokerage firms, market makers, money managers, commercial banks, rating agencies (such as Moody's Investor Service, Inc.) or stock markets or securities exchanges concerning Miller or the Offerings, including, but not limited to, Roadshow presentations.

REQUEST NO. 3:

All documents provided to or received from PER concerning the purchase of the Alaska Assets.

REQUEST NO. 4:

All minutes (with exhibits/attachments) of all meetings of the Board of Directors of Miller or any committee or subcommittee thereof, including all drafts thereof, including but not limited to, where there was discussion of the Alaska Asserts, Reserve Report and/or the

Offerings, including, without limitation, the minutes (with exhibits/attachments) of other meetings referenced therein, including all drafts thereof.

REQUEST NO. 5:

All documents reviewed by the Individual Defendants or reviewed by any officer, executive or financial advisor of Miller concerning the Offerings, the Reserve Report and/or the Alaska Assets.

REQUEST NO. 6:

All documents concerning the Offerings, the Reserve Report and/or the Alaska Assets including, but not limited to, all documents provided to the Underwriter Defendants concerning the Offerings, the Reserve Report and/or the Alaska Assets.

REQUEST NO. 7:

All documents concerning communications concerning the Offerings, the Reserve Report and/or the Alaska Assets including, without limitation:

(a) all internal communications of Miller or between Miller and the Underwriter Defendants including, without limitation, executive summaries, memoranda or electronic mail;

(b) all internal communications of Miller or between Miller and the Ralph E. Davis & Associates including, without limitation, executive summaries, memoranda or electronic mail;

(c) all internal communications of Miller or between Miller and PER including, without limitation, executive summaries, memoranda or electronic mail;

(d)     all communications between any of the Individual Defendants, including, without limitation, electronic mail, faxes or letters transmitted outside the office;

(e)     all communications between any of the Individual Defendants and the Underwriter Defendants;

(f)     all communications between any of the Individual Defendants and the Ralph E. Davis & Associates

(g)     all communications between any of the Individual Defendants and PER.

(h)     all communications sent to, or prepared to be sent to, any person on behalf of Miller.

REQUEST NO. 8:

All documents concerning the engagement or retention of the Underwriter Defendants, Ralph E. Davis & Associates or any financial institution, accounting firm, auditing firm, engineering firm consulting firm, insurance firm or investment banking firm to provide services concerning the Offerings, the Reserve Report and/or the acquisition of and the subsequent accounting for the Alaska Assets.

REQUEST NO. 9:

All personal files, expense reports or logs, diaries, notebooks, notes, date books, calendars, appointment books, address books or Telephone Records maintained by or for the Individual Defendants or by or for any Miller officer or executive concerning the Offerings, the Reserve Report and/or the Alaska Assets

REQUEST NO. 10:

All documents provided by Miller and/or the Individual Defendants to any financial institution, accounting firm, engineering firm, consulting firm, insurance firm, auditing firm,

investment banking firm or advisor concerning the Offerings, the Reserve Report and/or the Alaska Assets

REQUEST NO. 11:

All documents provided by any financial institution, accounting firm, auditing firm, engineering firm, investment banking firm or advisor to Miller and/or the Individual Defendants concerning the Offerings, the Reserve Report and/or the Alaska Assets

REQUEST NO. 12:

All documents concerning the business relationship between Miller, any of its affiliates or subsidiaries, and/or its outside auditors and any of its affiliates or subsidiaries and the Underwriter Defendants and any of their affiliates or subsidiaries (including the Individual Defendants) including, without limitation, any management agreements, consulting agreements, or any other agreements without regard to the Time Period.

REQUEST NO. 13:

All documents identifying any business affiliations between any of the Individual Defendants and the Underwriter Defendants including, without limitation, any management agreements, consulting agreements, or any other agreements. (This request is made without regard to the "Time Period" limitation set forth at Section III herein.)

REQUEST NO. 14:

All indemnification agreements entered into between Miller and any of the Individual Defendants, and between Miller and any of its outside auditors, which may be invoked in connection with this action. (This request is made without regard to the "Time Period" limitation set forth at Section III herein.)

REQUEST NO. 15:

All documents identifying any business affiliations between Miller's outside auditing firm and the Underwriter Defendants including, without limitation, any management agreements, consulting agreements, or any other agreements. (This request is made without regard to the "Time Period" limitation set forth at Section III herein.)

REQUEST NO. 16:

All documents concerning any presentations made by or on behalf of any investment banking institution, financial institution, financial advisor, appraiser, tax advisor or accountant to any defendant concerning the Offerings, the Reserve Report and/or the Alaska Assets.

REQUEST NO. 17:

All documents concerning press releases, published articles, financial analysts' reports and rating agencies' reports, and all drafts thereof, concerning Miller.

REQUEST NO. 18:

All documents concerning SEC filings concerning the Offerings, the Reserve Report and/or the Alaska Assets including, without limitation, drafts of past filings, drafts of documents to be filed with the SEC, all SEC comment letters and responses thereto, all other communications with the SEC regarding the materials to be filed in connection with the Offerings.

REQUEST NO. 19:

All documents concerning any policy, procedure or practice concerning the preservation or destruction of the documents or electronic data or types of documents or electronic data sought herein.

REQUEST NO. 20:

All documents concerning communications between Miller, any of its executives or representatives, and its outside audit firm concerning the Reserve Report, the accounting for the Alaska Asset acquisition and/or any SEC investigation or inquiry.

REQUEST NO. 21:

All documents concerning insurance polices or indemnification agreements that may provide coverage to any Individual Defendants individually or collectively, for any claims or causes of action asserted in this action or that may provide reimbursement for payments made in defense of this action, including, without limitation, loss mitigation insurance or liability-sharing arrangements, including options to purchase such insurance or sharing arrangements, whether acquired before or after the initiation of the litigation.

REQUEST NO. 22:

All documents concerning any communication, presentation or meeting (including any scripts, transcripts, tapes or videos prepared in connection with or as a result of) with any potential purchasers of Miller's securities, securities analysts, financial analysts, institutional investors, financial investors, news media, journalists, investment bankers, brokerage firms, market makers, money managers, commercial banks, rating agencies (such as Moody's Investor Service, Inc.) or stock markets or securities exchanges concerning Miller or the Offerings, including, but not limited to, Roadshow presentations.

DATED: November 16, 2015

BARRETT JOHNSTON MARTIN
  & GARRISON, LLC
DOUGLAS S. JOHNSTON, JR., #5782
JERRY E. MARTIN, #20193
TIMOTHY L. MILES, #21605

_____
JERRY E. MARTIN

- 14 -

Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN  37219
Telephone:  615/244-2202
615/252-3798 (fax)

ROBBINS GELLER RUDMAN
   & DOWD LLP
CHRISTOPHER M. WOOD, #032977
414 Union Street, Suite 900
Nashville, TN  37219
Telephone:  615/244-2203
615/252-3798 (fax)

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN
MARY K. BLASY
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

LAW OFFICES OF CURTIS V. TRINKO, LLP
CURTIS V. TRINKO
WILLIAM MARGRABE
16 West 46th Street, 7th Floor
New York, NY  10036
Telephone:  212/490-9550
212/986-0158 (fax)

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing *Plaintiff's First Request For Production Of Documents To Defendants Deloy Miller, Scott M. Boruff, David J. Voyticky, Catherine A. Rector, David M. Hall, Merrill A. Mcpeak, Gerald Hannahs, Charles M. Stivers, Don A. Turkleson, Bob G. Gower, Joseph T. Leary, William B. Richardson, Marceau N. Schlumberger And Paul W. Boyd* has been served on the following via certified U.S. Mail on November 16, 2015:

| | |
|---|---|
| **Deloy Miller**<br>815 South Lake Drive<br>Oneida, TN 97841 | **Scott M. Boruff**<br>5628 Lyons View Pike<br>Knoxville, TN 37919 |
| **David J. Voyticky**<br>41 East Parkway PHA<br>Brooklyn, NY 11238 | **Catherine A. Rector**<br>1519 Pebble Shore Lane<br>Knoxville, TN 37931 |
| **David M. Hall**<br>48110 David Hall Road<br>Kenai, AK 99611 | **Merrill A. McPeak**<br>123 Furnace Street<br>Lake Oswego, OR 97034 |
| **Gerald Hannahs**<br>17710 Leatha Lane<br>Little Rock, AR 72223 | **Charles M. Stivers**<br>118 Richmond Road<br>Manchester, KY 40962 |
| **Don A. Turkleson**<br>6311 Rodrigo Street<br>Houston, TX 77007 | **Bob G. Gower**<br>402 Timberwilde Lane<br>Houston, TX 77024 |
| **Joseph T. Leary**<br>704 East 12th Street<br>Houston, TX 77008 | **William B. Richardson**<br>1058 Encantado Drive<br>Santa Fe, NM 87501 |
| **Marceau N. Schlumberger**<br>18 Dante Street<br>Larchmont, NY 10538 | **Paul W. Boyd**<br>8125 Ainsworth Drive<br>Knoxville, TN 37909 |
| **Williams Financial Group**<br>Registered Agent: Wilson Williams<br>2711 N. Haskell Avenue, Suite 2900<br>Dallas, TX 75204 | **Maxim Group LLC**<br>Edward L. Rose, Esq.<br>99 Sunnyside Boulevard<br>Woodbury, NY 11797 |
| **Northland Capital Markets**<br>45 South 7th Street, Suite 2000<br>Minneapolis, MN 55402 | **Aegis Capital Corp**.<br>810 7th Avenue, 18th Floor<br>New York, NY 10019 |

| | |
|---|---|
| **National Securities Corporation**<br>Registered Agent:<br>Delaware Corporate Services, Inc.<br>901 North Market Street, Suite 705<br>Wilmington, DE 19801 | **Dominick & Dominick LLC**<br>Registered Agent:<br>Corporation Service Company<br>80 State Street<br>Albany, NY 12207 |
| **Ladenburg Thalmann & Co. Inc.**<br>Registered Agent:<br>Corporate Creations Network, Inc.<br>15 North Mill Street<br>Nyack, NY 10960 | **I-Bankers Securities, Inc.**<br>Registered Agent:<br>IBS Holding Corporation<br>21550 Oxnard Street, 3rd Floor<br>Woodland Hills, CA 91367 |
| | **MLV & CO. LLC**<br>Registered Agent:<br>The Corporation Trust Company<br>Corporation Trust Center<br>1209 Orange Street<br>Wilmington, DE 19801 |

JERRY E. MARTIN
BARRETT JOHNSTON MARTIN
& GARRISON, LLC

| STATE OF TENNESSEE<br>9TH JUDICIAL DISTRICT<br>CIRCUIT COURT | SUMMONS | CASE FILE NUMBER<br>2015-CV-34 |
|---|---|---|

| PLAINTIFF | DEFENDANT |
|---|---|
| KENNETH GAYNOR, Individually and on Behalf of All Others Similarly Situated, | DELOY MILLER, SCOTT M. BORUFF, DAVID J. VOYTICKY, CATHERINE A. RECTOR, DAVID M. HALL, MERRILL A. McPEAK, GERALD HANNAHS, CHARLES M. STIVERS, DON A. TURKLESON, BOB G. GOWER, JOSEPH T. LEARY, WILLIAM B. RICHARDSON, MARCEAU N. SCHLUMBERGER, PAUL W. BOYD, MLV & CO. LLC, WILLIAMS FINANCIAL GROUP, MAXIM GROUP LLC, NATIONAL SECURITIES CORPORATION, AEGIS CAPITAL CORP., NORTHLAND CAPITAL MARKETS, DOMINICK & DOMINICK, LLC, LADENBURG THALMANN & CO. INC. and I-BANKERS SECURITIES, INC., |

TO: (NAME AND ADDRESS OF DEFENDANT)

**Aegis Capital Corp.,**
810 7th Avenue, 18th Floor
New York, NY 10019

Method of Service:
G  Morgan Co. Sheriff
G  Certified Mail
G  *Comm. Of Insurance
G  *Secretary of State
G  *Out of County Sheriff
G  Private Process Server
G  Other

List each defendant on a separate summons.      *Attach Required Fees

**YOU ARE SUMMONED TO DEFEND A CIVIL ACTION FILED AGAINST YOU IN CIRCUIT COURT, MORGAN COUNTY, TENNESSEE. YOUR DEFENSE MUST BE MADE WITHIN THIRTY (30) DAYS FROM THE DATE THIS SUMMONS IS SERVED UPON YOU. YOU MUST FILE YOUR DEFENSE WITH THE CLERK OF THE COURT AND SEND A COPY TO THE PLAINTIFF'S ATTORNEY AT THE ADDRESS LISTED BELOW. IF YOU FAIL TO DEFEND THIS ACTION BY THE ABOVE DATE, JUDGMENT BY DEFAULT CAN BE RENDERED AGAINST YOU FOR THE RELIEF SOUGHT IN THE COMPLAINT.**

| Attorney for plaintiff or plaintiff if filing Pro Se:<br>(Name, address & telephone number)<br><br>Jerry E. Martin<br>Barrett Johnston Martin & Garrison, LLC<br>Bank of America Plaza<br>414 Union Street, Suite 900<br>Nashville, TN 37219<br>(615) 244 - 2202 | FILED, ISSUED & ATTESTED<br><br>*November 12, 2015*<br>**PAM KECK, Circuit Court Clerk**<br>By:       415 N. Kingston  P.O. Box 324<br>*Barbara Cox*  Wartburg, TN 37887-0165<br><br>ADA<br>FOR ASSISTANCE CALL<br>423-346-3503 |

The disposition date of this case is twelve months from date of filing. The case must be resolved or set for trial by this date or it will be dismissed by the Court for failure to prosecute pursuant to T.R.C.P. 41.02.

If you think the case will require more than one year to resolve or set for trial, you must send a letter to the Circuit Court Clerk at the earliest practicable date asking for an extension of the disposition date and stating your reasons. Extensions will be granted only when exceptional circumstances exist.

FILED
2:00
AM NOV 0 9 2015 PM
PK/BC

| TO THE SHERIFF: | DATE RECEIVED |
| --- | --- |
| | **Sheriff** |

## RETURN ON SERVICE OF SUMMONS

I hereby return this summons as follows:  (Name of Party Served) _____

☐  Served _____     ☐  Not Found _____

☐  Not Served _____     ☐  Other _____

| DATE OF RETURN: | By: |
| --- | --- |
| | Sheriff/or other authorized person to serve process |

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify and return that on the _____ day of _____, 20___, I sent, postage prepaid, by registered return

receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in case _____ to

the defendant _____.  On the _____ day of _____, 20___, I received the return

receipt, which had been signed by _____ on the _____ day of _____, 20___.

The return receipt is attached to this original summons to be filed by the Circuit Court Clerk.

| **Sworn to and subscribed before me on this _____ day of _____ _____, 20___.** <br><br> Signature of _____ Notary Public or _____ Deputy Clerk <br><br> My Commission Expires: | Signature of plaintiff, plaintiff's attorney or other person authorized by statute to serve process. <br><br><br><br><br><br><br><br> ATTACH <br> RETURN <br> RECEIPT <br> HERE <br> (IF APPLICABLE) |
| --- | --- |

IN THE CIRCUIT COURT FOR MORGAN COUNTY
9TH JUDICIAL DISTRICT
THE STATE OF TENNESSEE

KENNETH GAYNOR, Individually and on )
Behalf of All Others Similarly Situated, )
                                             )
                  Plaintiff, )
                                             )
vs.                                        )
                                             )
DELOY MILLER, SCOTT M. BORUFF, )
DAVID J. VOYTICKY, CATHERINE A. )
RECTOR, DAVID M. HALL, MERRILL )
A. McPEAK, GERALD HANNAHS, )
CHARLES M. STIVERS, DON A. )
TURKLESON, BOB G. GOWER, )
JOSEPH T. LEARY, WILLIAM B. )
RICHARDSON, MARCEAU N. )
SCHLUMBERGER, PAUL W. BOYD, )
MLV & CO. LLC, WILLIAMS )
FINANCIAL GROUP, MAXIM GROUP )
LLC, NATIONAL SECURITIES )
CORPORATION, AEGIS CAPITAL )
CORP., NORTHLAND CAPITAL )
MARKETS, DOMINICK & DOMINICK, )
LLC, LADENBURG THALMANN & CO. )
INC. and I-BANKERS SECURITIES, )
INC., )
                                             )
                  Defendants. )

Case No.   2015- CV- 34

CLASS ACTION

COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

FILED
2:00
AM NOV 0 9 2015 PM
PK/BC
MORGAN CO. CIRCUIT CLERK

Plaintiff Kenneth Gaynor ("Plaintiff") alleges the following based upon the investigation of Plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Miller Energy Resources, Inc. ("Miller" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, the SEC's Order Instituting Public Administrative and Cease-and-Desist Proceedings Pursuant to Section 8a of the Securities Act of 1933, Sections 4c and 21c of the Securities Exchange Act of 1934, and Rule 102(e) of the Commission's Rules of Practice, *In the Matter of Miller Resources, Inc., et al.*, SEC Admin. Proc. File No. 3-16729 (August 6, 2015), filings in *In re Miller Energy Resources, Inc., et al.*, No. 15-00313 (D. Alaska Bankr. Ct.), and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.　　This is a securities class action seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act") on behalf of all purchasers of Miller preferred shares traceable to the Registration Statement and Prospectuses issued in connection with the following public offerings of Miller's 10.75% Series C Cumulative Preferred Stock ("Series C") and 10.5% Series D Fixed Rate/Floating Rate Cumulative Redeemable Preferred Stock ("Series D") (collectively, the "Offerings"):

| Date | Preferred Shares | Price | Offering Name |
|---|---|---|---|
| Feb. 13, 2013 | Series C | $22.90 | "2/13/13-Series C" |
| May 8, 2013 | Series C | $22.25 | "5/8/13-Series C" |
| June 28, 2013 | Series C | $21.50 | "6/28/13-Series C" |
| Sept. 26, 2013 | Series D | $25.00 | "9/26/13-Series D" |

| Oct. 17, 2013 | Series D | At Market | "10/17/13-Series D" |
| Aug. 21, 2014 | Series D | $24.50 | "8/21/14-Series D" |

2.      The action is brought against several current and former executive officers and directors of Miller and the investment banking firms that underwrote the Offerings. On October 1, 2015, Miller sought bankruptcy protection and, therefore, is not named as a defendant herein.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over the causes of action asserted herein pursuant to Tenn. Code Ann. §16-10-101, because this case is a cause not given by statute to another tribunal in this State. This action is not removable. The claims alleged herein arise under §§11 and 15 of the Securities Act, 15 U.S.C. §§77k and 77o. Jurisdiction is conferred by §22 of the Securities Act and venue is proper pursuant to §22 of the Securities Act, 15 U.S.C. §77v. Section 22 of the Securities Act explicitly states that "[e]xcept as provided in section 16(c), no case arising under this title and brought in any State court of competent jurisdiction shall be removed to any court of the United States." Section 16(c) refers to "covered class actions," which are defined as lawsuits brought as class actions or brought on behalf of more than 50 persons asserting claims under state or common law. *See* 15 U.S.C. §77p(c) and (f)(2). This is an action asserting federal law claims. Thus, it does not fall within the definition of a "covered class action" under §16(b)-(c) and therefore is not removable to federal court. *See Kircher v. Putnam Funds Trust*, 547 U.S. 633, 636 n.1, 644 (2006) (an "action is not precluded" under the Securities Litigation Uniform Reform Act ("SLUSA") where it is not "'based upon the statutory or common law of any State,'" citing 15 U.S.C. §77p(b), and "the proper course is to remand to the state

court that can deal with it"); *Atkinson v. Morgan Asset Mgmt.*, 658 F.3d 549, 552 (6th Cir. 2011) (same: SLUSA precludes only "class actions that . . . assert state-law claims," citing 15 U.S.C. §77p(b), (f)(2)(A), (f)(3)); *see generally Luther v. Countrywide Home Loans Servicing LP*, 533 F.3d 1031, 1032 (9th Cir. 2008) ("Section 22(a) of the Securities Act of 1933 creates concurrent jurisdiction in state and federal courts over claims arising under the Act. It also specifically provides that such claims brought in state court are not subject to removal to federal court."); *Luther v. Countrywide Fin. Corp.*, 195 Cal. App. 4th 789, 792 (2011) ("The federal Securities Act of 1933 of 1998 . . . as amended by [SLUSA], provides for concurrent jurisdiction for cases asserting claims under the 1933 Act . . . ."). As detailed in Miller's bankruptcy petition, one of the Company's "Locations of Principal Assets of Business" is in "Morgan County, Tennessee."

4.      This Court has personal jurisdiction over each of the defendants named herein because they conducted substantial business in, were citizens of and/or orchestrated the Offerings out of Tennessee at the time of the Offerings (including Miller, which maintained its principal place of business and offices throughout this State at the time of the Offerings). The violations of law complained of herein occurred in Tennessee, including the preparation and dissemination of the materially false and misleading Registration Statement complained of herein, which was disseminated into this State.

## PARTIES AND RELEVANT NON-PARTIES

5.      Plaintiff Kenneth Gaynor purchased Miller preferred shares traceable to the Offerings, and was damaged thereby.

6.      Non-party Miller Energy Resources, Inc. (f/k/a Miller Petroleum, Inc.) is an independent exploration and production company that explores for, develops, and operates

oil and gas wells in south-central Alaska and in Tennessee. At all times relevant to this action, Miller common stock traded on the NYSE under the ticker symbol "MILL"; the Series C traded on the NYSE under the ticker symbol "MILLP"; and the Series D traded on the NYSE under the ticker symbol "MILLO." As of September 29, 2015, Miller had approximately 46.7 million shares of common stock, 3.25 million shares of Series C and 3.5 million shares of Series D issued and outstanding. On September 11, 2015, Miller caused its common stock, Series C and Series D to be delisted from the NYSE. On October 1, 2015, Miller filed a petition seeking relief under the federal bankruptcy statutes. In light of the automatic stay in the bankruptcy proceedings, Miller is not named as a defendant herein.

7.      Defendant Deloy Miller founded Miller and served as the Chairman of its Board of Directors (the "Board") until September 14, 2014.

8.      Defendant Scott M. Boruff ("Boruff") has served as the Executive Chairman of the Board since September 14, 2014. Previously, defendant Boruff served as Miller's Chief Executive Officer ("CEO") from August 6, 2008 to September 14, 2014 and as its President from June 2010 until June 9, 2011.

9.      Defendant David J. Voyticky served as the President of Miller from June 9, 2011 until August 12, 2014, as its Acting Chief Financial Officer ("CFO") from September 2011 until February 2014, and was a director from April 2010 to April 2014.

10.      Defendant Catherine A. Rector served as the Vice President and Chief Accounting Officer of Miller between July 2012 and October 2013.

11.     Defendant David M. Hall ("Hall") served as the Chief Operating Officer ("COO") of Miller from July 18, 2013 until August 6, 2015. Defendant Hall also served as a member of the Board from December 10, 2009 until April 16, 2015.

12.     Defendants Merrill A. McPeak, Gerald Hannahs, Charles M. Stivers and Don A. Turkleson served as directors of Miller as of September 6, 2012 and signed the Registration Statement used to conduct the Offerings.

13.     Defendants Bob G. Gower, Joseph T. Leary, William B. Richardson and Marceau N. Schlumberger served as directors of Miller at the time of certain of the Offerings.

14.     Defendant Paul W. Boyd ("Boyd") served as the CFO and Treasurer of Miller from 2008 to 2011 and as Miller's Director of Risk Management from 2011 until 2014.

15.     The defendants named in ¶¶8-15 are all liable under the Securities Act and are referred to herein as the "Individual Defendants." The Individual Defendants named in ¶¶8-13 each signed the Registration Statement used to conduct the Offerings. The Individual Defendants named in ¶14 were directors of Miller at the time of certain of the Offerings.

16.     Non-party Carlton W. Vogt, III ("Vogt") was the audit team leader at the Company's former independent outside auditing firm, non-party Sherb & Co., LLP ("Sherb & Co."), a now defunct CPA firm that was suspended by the SEC in 2013 for improper professional conduct unrelated to its work for Miller, which had served as the Company's outside audit firm since 2008. Vogt led the Sherb & Co. audit team that audited Miller's financial statements for the 2009 and 2010 fiscal years.

17.     Defendants MLV & Co. LLC ("MLV"), Williams Financial Group ("WFG"), Maxim Group LLC ("MXG"), National Securities Corporation ("NSC"), Aegis Capital Corp. ("ACC"), Northland Capital Markets ("NCM"), Dominick & Dominick, LLC ("D&D"), Ladenburg Thalmann & Co. Inc. ("LTC") and I-Bankers Securities, Inc. ("IBS") (collectively the "Underwriter Defendants") are investment banking firms that acted as underwriters of the Offerings, helping to draft and disseminate the offering documents. Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

(a)     The Underwriter Defendants are investment banking houses that specialize, *inter alia*, in underwriting public offerings of securities. They served as the underwriters of the Offerings and shared upwards of $7.5 million in fees collectively.[1] The Underwriter Defendants determined that in return for their share of the proceeds of the Offerings, they were willing to merchandize Miller preferred shares in the Offerings. The Underwriter Defendants arranged multi-city roadshows prior to the Offerings during which they, and representatives from Miller, met with potential investors and presented highly favorable information about the Company, its operation and its financial prospects.

(b)     The Underwriter Defendants also demanded and obtained agreements from Miller that Miller would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also made certain that Miller had purchased millions of dollars in directors' and officers' liability insurance.

---

[1]     As indicated below at note 2, one of the Offerings was conducted "at market" prices and/or on a "best efforts" basis and the Prospectus does not indicate the prices, dates of sales or number of shares sold in that Offering. Where required, the underwriting fees were estimated based on all shares being sold at $25.

(c)     Representatives of the Underwriter Defendants also assisted Miller and the Individual Defendants in planning the Offerings, and purportedly conducted adequate and reasonable investigations into the business and operations of Miller, an undertaking known as a "due diligence" investigation. The due diligence investigations were required of the Underwriter Defendants in order to engage in each of the Offerings. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Miller's operations and financial prospects.

(d)     In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with Miller's lawyers, management and top executives and engaged in "drafting sessions" between September 2012 and August 2014. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the Offerings; (ii) the terms of the Offerings, including the price at which Miller preferred shares would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Miller would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Miller management and top executives, the Underwriter Defendants knew, or should have known, of Miller's existing problems as detailed herein.

(e)     The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with offers and sales thereof, including to Plaintiff and the Class (as defined below).

## SUBSTANTIVE ALLEGATIONS

18.     Defendant Miller is an independent oil and natural gas exploration, production and drilling company operating in multiple exploration and production basins in North America founded in 1967. The Company, whose focus was originally on Tennessee's Appalachian Basin, first became a publicly traded company in connection with a reverse merger in 1996.

19.     Between early 2002 and December 2009, Miller's stock price regularly traded below one dollar per share, falling to a low of $0.04 per share in December 2007. In August 2008, Miller named a new CEO. Soon thereafter, the Company began acquiring additional oil and gas properties.

20.     In the fall of 2009, Miller became aware of certain oil and gas properties in Alaska that were in the process of being "abandoned" as part of the bankruptcy proceedings of California-based Pacific Energy Resources ("PER"). PER had been unable to service its heavy debt and pay the significant monthly costs required to operate its operating assets and had unsuccessfully sought for almost a year to sell them.

21.     Beginning in December 2008, months before it filed for bankruptcy, PER, with the help of one of the world's leading financial advisory and asset management firms, marketed PER's operating assets in Alaska to 40 potential buyers. This process failed to attract any bidders, and the assets were auctioned by the bankruptcy court in July 2009, with the winning bidder agreeing to a total purchase price of $8 million for the assets. A second entity, who bid $7 million, was designated as the back-up purchaser. Neither bid ultimately closed.

22. As a result, PER sought in August 2009, and was granted in September, an order from the bankruptcy court allowing it to abandon title to the assets due to a lack of interest.

23. Due to renewed interest in the assets from Miller following their abandonment, the bankruptcy court permitted PER to reacquire its Alaska assets and sell them to Miller's operating subsidiary, Cook Inlet Energy ("CIE"), in a competitive auction for $2.25 million in cash and the assumption of certain limited liabilities. The transaction closed on December 10, 2009.

24. The Company then claimed the assets it had purchased through the bankruptcy were valued at more than $479 million, including oil and gas assets that included onshore and offshore production facilities, $215 million in proven energy reserves, $122 million in probable energy reserves, and $31 million in possible energy reserves, providing total reserves of $368 million (the "Alaska Assets").

25. Until August 2015, the Company valued the Alaska Assets based on a reserve estimates report prepared for it by an engineering firm, Ralph E. Davis & Associates (the "Reserve Report"). Beginning on March 22, 2010, and subsequently repeated in numerous filings with the SEC Miller made through August 2015, the Company claimed in its quarterly report filed on Form 10-Q for its fiscal third quarter ended January 31, 2010 ("3Q 2010") a reported a value of the Alaska Assets of $480 million, which amount comprised $368 million for oil and gas properties and $110 million for fixed assets. Miller also reported an after-tax $277 million "bargain purchase gain," which boosted its reported net

income for the quarter to $272 million – an enormous increase over the $556,097 loss reported for the same period the year before.

26. The newly booked value of the Alaska Assets, which resulted in a nearly 5,000% increase in Miller's total assets, had a significant impact on the market price of Miller common stock. On December 10, 2009, the date of the transaction, Miller common stock closed at $0.61 per share. Following the acquisition of the Alaska Assets, by March 31, 2010, Miller common stock closed 982% higher at $6.60 per share. Weeks later, the listing of Miller stock was moved to the NASDAQ and, after moving to the NYSE a year later, reached an all-time high price on December 9, 2013 of $8.83 per share.

## THE FALSE AND MISLEADING REGISTRATION STATEMENT

27. On or about September 6, 2012, Miller filed with the SEC a Form S-3 registration statement and prospectus using a "shelf" registration, or continuous offering process. Under the shelf registration, Miller would sell securities described in various future prospectus supplements in one or more offerings. The prospectus supplements would form part of the registration statement for each offering. The securities were to be issued by Miller. This Form S-3, which would later be utilized for all of the Offerings, expressly incorporated by reference certain filings Miller had previously made with the SEC and all future filings until any offering conducted under the shelf registration statement was completed.

28. The SEC declared the shelf registration statement effective on September 18, 2012.

29. On or about the date of each of the following Offerings, Miller and the following Underwriter Defendants priced the Offerings and filed the final Prospectuses for

those Offerings, which formed part of the Registration Statement (collectively, the "Registration Statement"), pursuant to which Miller sold the following preferred shares to the public:

| Offering | Underwriters | Price | Shares | Gross Proceeds[2] |
|---|---|---|---|---|
| 2/13/13-Series C | MLV, MXG, NSC, ACC, WFG | $22.90 | 625,000 | $14,312,500 |
| 5/8/13-Series C | MLV, MXG, NSC, ACC | $22.25 | 500,000 | $11,125,000 |
| 6/28/13-Series C | MLV, ACC, MXG, NSC, NCM | $21.50 | 335,000 | $7,202,500 |
| 9/26/13-Series D | MLV, MXG, NSC, ACC, D&D, LTC, NCM | $25.00 | 1,000,000 | $25,000,000 |
| 10/17/13-Series D | MLV | Market | 3,000,000 | $75,000,000 |
| 8/21/14-Series D | MLV, MXG, ACC, IBS, LTC, NSC, NCM | $24.50 | 750,000 | $18,375,000 |

30.     The Registration Statement, including the materials incorporated therein by reference (which expressly incorporated Miller's Annual Report on Form 10-K for the year ended April 30, 2012, as well as various Current Reports on Form 8-K), and the final Prospectuses, which would include the Forms 10-K, 10-Q and 8-K filed prior to each Offering, were negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation.

31.     All of the Company's interim and annual financial reports issued between 2010 and 2015, relying upon the Reserve Report, overstated the value of the Alaska Assets by hundreds of millions of dollars by failing to record the Alaska Assets at fair value as required by Accounting Standards Codification ("ASC") 805, *Business Combinations*, and the federal securities laws, because they "used as fair value a reserve report that was prepared by a

---

[2] Where an Offering was conducted "at market" price and/or on a "best efforts" basis and the dates, prices and number of shares sold were not disclosed in the Prospectus, gross proceeds were estimated using the total shares that could have been sold at $25 each.

petroleum engineer firm using the rules for supplemental oil and gas disclosures," "the reserve report . . . expressly disclaimed that the numbers therein represented the engineer firm's opinion of fair value," "[t]he reserve report . . . also contained expense numbers that were knowingly understated," and the Reserve Report "double counted $110 million of certain fixed assets that were already included in the reserve report." As a result, all of Miller's interim and fiscal financial reports issued between 2010 and 2015, the Form S-3 filed on September 6, 2012, and each of the final Prospectuses used to conduct the Offerings were false and misleading.[3]

### A. Under Generally Accepted Accounting Principles, Miller Energy Was Required to Record the Alaska Assets Acquisition at Fair Value

32.    ASC 805, *Business Combinations* – formerly Statement of Financial Accounting Standards ("SFAS") 141(R) – became effective in December 2008. Among its principal revisions, ASC 805 requires acquisitions that result in a "bargain purchase," *e.g.*, entities purchased at fire sales prices in non-orderly transactions, to be measured at fair value, with any resulting gain recorded on the income statement.

33.    ASC 820, *Fair Value Measurements* (formerly SFAS 157), provides the framework for measuring fair value. "Fair value" is defined in ASC 820 as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." A reporting entity must determine an

---

[3]    Miller's false and misleading reports filed with SEC included: Forms 10-Q for the 3Q 2010 and all interim quarters for 2011-2015; Forms 10-K for 2010 - 2014; the Form S-1 filed on August 8, 2010; the Forms S-3 filed on September 6, 2012 and October 5, 2012; and prospectuses filed between August 25, 2010 through August 21, 2014 pursuant to Rule 424; and 15 Forms 8-K filed between March 2010 through at least December 2014.

appropriate fair value using one or more of the valuation techniques described in accounting literature.

34. ASC 820 outlines three broad approaches to measuring fair value: the market approach, income approach, and cost approach. Under the market approach, prices and other relevant information generated by market transactions involving identical or comparable assets or liabilities are used to measure fair value. The income approach utilizes valuation techniques to convert future amounts to a single discounted present value amount. Finally, the cost approach is based on the amount that currently would be required to replace the assets in service, *i.e.*, current replacement cost.

35. ASC 820 emphasizes that fair value is a market-based measurement, not an entity specific measurement, and should be determined based on the assumptions market participants would use in pricing the asset or liability.

36. ASC 820 emphasizes that when a price for an identical asset or liability is not observable, entities should use a "valuation technique that maximizes the use of relevant observable inputs and minimizes the use of unobservable inputs" and entities may not ignore assumptions market participants would use.[4]

37. When computing their estimate of fair value, defendants Miller and Boyd failed to consider the existence of numerous, readily apparent data points strongly indicating that the Alaska Assets were worth substantially less than the $480 million value Miller

---

[4] ASC 820 defines "unobservable inputs" as "inputs that reflect the reporting entity's own assumptions about the assumptions market participants would use in pricing the asset or liability developed based on the best information available in the circumstances," and "observable inputs" as "inputs that reflect the assumptions market participants would use in pricing the asset or liability developed based on market data obtained from sources independent of the reporting entity."

recorded. In failing to do so, defendants Miller and Boyd materially overstated the value of the newly acquired Alaska Assets. As described detailed below, Miller purported to value the Alaska Assets using the income approach for the oil and gas reserves and the cost approach for certain fixed assets.

**B.    The Valuation of the Acquired Oil and Gas Properties Was Based Upon a Reserve Report that Does Not Represent Fair Value**

38.    To record the value of the acquired oil and gas properties, defendants Miller and Boyd requested and improperly used the Reserve Report prepared by an independent petroleum engineering firm.[5]

39.    Reserve reports are commonly used in the oil and gas industry to estimate quantities of oil and gas (the reserves) expected to be recovered from existing properties. Generally, these reports list reserves in categories based on a minimum estimated percentage probability of eventual recovery and production, *i.e.*, proved, probable and possible.

---

[5]    Oil and gas reporting companies are subject to two principal authoritative pronouncements governing financial accounting and reporting for oil and gas activities: Rule 4-10 of Regulation S-X (17 C.F.R. 210.4-10), *Financial Accounting and Reporting for Oil and Gas Producing Activities Pursuant to the Federal Securities Laws and the Energy Policy and Conservation Act of 1975* ("Rule 4-10"); and ASC 932-235-50-29 through 33 (formerly SFAS 19, *Financial Accounting and Reporting by Oil and Gas Producing Companies*, and SFAS 69, *Disclosures About Oil and Gas Producing Activities*). ASC 932 establishes disclosure requirements for significant oil and gas activities, including disclosure of the "standardized measure," which is the future after-tax net cash flows discounted at 10%.

A non-U.S. Generally Accepted Accounting Principles ("GAAP") measure, known as "PV-10," is similar to the standardized measure but is typically presented on a pretax basis. The Financial Accounting Standards Board has noted that the standardized measure supplies investors with useful information, however, they also noted their concern "that users of financial statements understand that it is neither fair market value nor the present value of future cash flows. It is a rough surrogate for such measures, a tool to allow for a reasonable comparison of mineral reserves and changes through the use of a standardized method that recognizes qualitative, quantitative, geographic, and temporal characteristics." Paragraph 83 of the Basis for Conclusions of SFAS 69.

Information in reserve reports that are prepared in accordance with SEC regulations is frequently used, among other purposes, to satisfy supplemental accounting disclosure requirements concerning estimates of future oil and gas production. However, the numbers used in reserve reports for this purpose are expressly not considered "an estimate of fair market value."[6]

40.    Shortly after the acquisition, defendant Boyd asked defendant Hall – a non-accountant with no formal accounting training – to obtain a reserve report for the Alaska Assets in order to determine the fair value of the acquired assets to be reported on Miller's Form 10-Q for the quarter ended January 31, 2010.

41.    On January 5, 2010, defendant Hall hired a petroleum engineering firm to prepare a reserve report using a pretax present value of net cash flows discounted at 10% ("PV-10"), which, while appropriate with further adjustments for SEC supplemental disclosures, was not indicative of fair value.

42.    The petroleum engineering firm did not know Miller intended to use the report for fair value purposes and believed that the purpose of the report was for use as supplemental data in the Company's SEC disclosures. Indeed, the two-page engagement letter with the engineering firm included no language about "fair value," "fair market value" or authoritative accounting literature.

43.    The Reserve Report was finalized in February 2010 and reflected PV-10 of $368 million.

---

[6]    *See* Paragraph 77 of the Basis for Conclusion of SFAS 69 ("Although it cannot be considered an estimate of fair market value, the standardized measure of discounted net cash flows should be responsive to some of the key variables that affect fair market value, namely, changes in reserve quantities, selling prices, production costs, and tax rates.").

44.     Upon receiving the Reserve Report, defendant Boyd, without undertaking any additional analysis, merely recorded as the fair value of the acquired oil and gas properties the sum of the PV-10 estimates for 100% of the proved, probable and possible reserves, which increased the book value of Miller's oil and gas properties on its balance sheet by $368 million.

45.     The Reserve Report itself clearly stated that the numbers therein were not an estimate of fair market value. Specifically, on page three of the report it stated that "[t]he discounted values shown are for your information and should not be construed as our estimate of fair market value."

46.     Defendant Boyd never reviewed or questioned any of the Reserve Report's assumptions or calculations, nor did he communicate with the engineering firm about the Reserve Report.

47.     The use of the PV-10 numbers as fair value conflicted with contemporaneous representations Miller made to investors in its filings with the SEC, including those incorporated by reference into the Registration Statement used to conduct the Offerings. Specifically, in its fiscal 2010 Form 10-K, which was the first annual report that included the inflated values, and as would be repeated in all filings through August 2015, Miller expressly told investors that "[o]ur PV-10 measure and the standardized measure of discounted future net cash flows do not purport to present the fair value of our natural gas and oil reserves." Despite that disclosure, Miller had actually used its PV-10 measure in that very same report as the fair value of its acquired properties.

48.     The $368 million Reserve Report value did not represent fair value for several reasons.

49.     Despite showing years of net profit that market participants would expect to be taxable, the Reserve Report did not make any adjustments for income taxes.

50.     At Miller's request, the Reserve Report used a 10% discount rate that was inappropriate under GAAP for determining fair value. In a discounted cash flow model, a discount rate is used to account for the uncertainties associated with risk and the time value of money. A discount rate is the required rate of return that an investor would demand – based on the risks associated with the benefit stream under consideration – to induce the investor to make an investment. By failing to consider the discount rate using assumptions market participants would use, Miller materially overstated the value of the acquired oil and gas properties.

51.     The valuation also overstated cash flows from certain categories of reserve estimates (e.g., "probable" and "possible" reserves) by failing to apply any risk weight to such reserves and the resulting cash flows. Given the high degree of uncertainty associated with cash flows from these reserve estimate categories, they are required to be risk weighted in order to reflect an appropriate valuation.

52.     The Reserve Report did not include amounts for certain asset retirement obligations, i.e., the legal obligations associated with the retirement of tangible long-lived assets.

53. Finally, the $237 million of projected operating and capital expenses in the Reserve Report, which were provided by defendants Miller and Hall, were intentionally understated, resulting in an overstated valuation.

54. In fact, one petroleum engineering firm contacted but not used by Miller thought that the expected level of expenses made a significant portion of the acquisition unprofitable. Initially, defendant Hall contacted the petroleum engineering firm who had previously provided the past two owners of the properties with reserve reports, and thus had unfettered access to past operating data, and requested a quote for "updating" a prior reserve report. That firm told defendant Hall that it would not assign any value to one of the largest fields acquired, the Redoubt Shoal field, because it was uneconomical – *i.e.*, expected future expenses exceeded expected future cash flows – and explained that it would not put its "name on a report that implies value exists where it likely does not."[7]

55. Defendant Boyd was aware that Miller chose the new firm because the prior firm would not assign any value to the Redoubt Shoal field. The Redoubt Shoal field – which represented $291 million of the $368 million in fair value recorded by Miller – showed positive future cash flows in the Reserve Report primarily because defendant Hall gave the new engineering firm understated and unsubstantiated expense numbers. Defendant Boyd had previously been advised by non-party Vogt that the lack of any controls over defendant Hall's expense estimates was a "concerning void."

---

[7]    Unique among the oil and gas properties purchased by Miller, Redoubt Shoal is an offshore field in Cook Inlet, Alaska, which requires the use of an offshore platform that sits in seventy feet of water, is accessible only by boat or helicopter, and drills to depths in excess of 12,000 feet. Offshore drilling presents risks and costs not associated with onshore operations.

56.     Defendants Miller and Hall provided expense projections that, in many cases, were significantly lower than past actual experience.  For example, internal documents maintained by defendant Hall indicated that the cost to drill a new well in the Redoubt Shoal field was roughly $13 million.  However, defendant Hall told the engineering firm to use a cost of $4.6 million per well in its reserve report.  And instead of using recent expense data, defendant Hall gave the engineering firm nearly three-year-old operating expense data, which he revised downward on the pretext that Miller could run a leaner operation than the former operators of the properties.  By way of example, defendant Hall told the engineering firm that the offshore Redoubt Shoal field would cost $399,000 per month to operate when it actually cost the seller more than $600,000 per month, and internal estimates show that defendants Miller and Hall expected the field to cost more than $800,000 per month once it was fully operational.  Additionally, in some years, the Reserve Report included zero expenses for operating the facilities in the Redoubt Shoal and another field.

57.     Overall, the Reserve Report implied operating expenses of $4 per barrel of oil equivalent ("boe") for all categories of reserves.  That level of operating expenses was unreasonable in light of the previous owner's actual operating expenses of $32.50/boe in 2008 and $55.42/boe in the first half of 2009 before the wells were shut-in.

58.     By understating the expense numbers, Miller overvalued the oil and gas properties by tens of millions of dollars.

C.    **The Fair Value of the Acquired Fixed Assets Was Double Counted and Overstated**

59.    In addition to the $368 million value recorded for the oil and gas properties, defendant Miller also erroneously recorded a separate value of $110 million for acquired fixed assets, such as facilities and pipelines ancillary to the oil and gas reserves.

60.    In a February 8, 2010 email, defendant Boyd informed defendant Hall that he needed an amount to use as fair value for the fixed assets obtained as part of the Alaska Assets acquisition. He noted that, ideally, the value should be what a willing buyer would pay for the assets, but "[i]n the absence of that, replacement values or something similar would probably work." Two days later, defendant Boyd was sent an "asset replacement cost study," purportedly provided by an independent insurance broker, which appeared to list the replacement cost for the assets as $110 million. The "study" was dated September 5, 2008, but "revised" on February 9, 2010.

61.    Without any additional analysis, defendant Boyd recorded the amount in the revised insurance study on Miller's balance sheet.

62.    The recording of assets at a value of $110 million was improper for several reasons.

63.    Miller's use of the values in the insurance study resulted in counting the value of the fixed assets twice, thereby overstating the value of such assets. The Reserve Report, which Miller relied on to value the acquired oil and gas properties, used a discounted cash flow model. Valuation specialists use such models to estimate the value of an enterprise's "operating assets" – *i.e.*, the assets employed to generate future cash flows – by converting future benefit streams into a net present value. In Miller's case, the fixed assets in the

insurance study were the very same operating assets that were expected to generate the future cash flows in the Reserve Report. Accordingly, they should not have been separately valued.

64.     Prior to the acquisition, all of the production from the offshore Redoubt Shoal field ran through the Osprey platform, which had no processing facilities or power generating capability of its own. Power was sent from generators housed within the Kustatan Production Facility to the platform via a subsea line, which was connected to an underground power grid that ran throughout all of the acquired properties. Moreover, production from the offshore platform was sent onshore for processing through pipes to the Kustatan Production Facility. Absent the platform, there would have been no way to obtain oil and gas from the Redoubt Shoal field without incurring upfront capital expenditures to replace the platform and its related infrastructure. Similarly, without the other production facilities, the platform would have lacked power and somewhere to process its oil and gas.

65.     The Reserve Report Miller used for the valuation recognized the interconnectedness of the properties, as it expressly listed the facilities and the offshore platform as assets used to generate the future cash flows.

66.     In short, because the fixed assets were integral to the operations of the acquired properties, their values were captured in the Reserve Report's cash flows. Consequently, by separately valuing the same operating assets, Miller overstated the value of the Alaska Assets by as much as $110 million.

67.     The insurance study also did not reflect fair value because the version of the insurance study used by defendant Boyd purported to show "asset replacement cost." Absent further adjustments, replacement cost new does not qualify as fair value under GAAP.

68. Miller, at the direction of defendants Boyd and Hall, also refashioned a preexisting insurance study to make it appear that its own value of $110 million derived from a third party. The numbers in the fixed asset study were given to the insurance broker, and its predecessor, by its clients (*i.e.*, Miller and the previous owners of the fixed assets) as far back as 2007 and were used as starting points for other types of estimates, such as estimates for possible losses resulting from fire or natural disasters. The two employees at the insurance broker who were most familiar with the original "Loss Estimates Study," including the engineer who authored it, confirmed to the SEC that no one at the broker ever tested or in any way double checked the values given to them.

69. Defendants Boyd and Hall knew or knowingly disregarded the fact that the insurance study did not reflect fair value or any analysis by the insurance broker.

70. On February 8, 2010, defendant Hall directed Alaska personnel to contact the insurance broker and another oil and gas consulting company to ask them for a report reflecting fair value or replacement cost. The insurance broker responded on February 9, 2010, and told Miller in an email copied to defendant Hall that it could not provide a report showing replacement costs.

71. Miller also contacted a separate consulting firm and sent it the insurance broker's original 2008 insurance report. Late on February 8, 2010, the consulting firm informed Miller that the insurance study it sent was a "good reference" but the report did not state "value or replacement cost." The firm offered to conduct its own analysis, but advised that the estimate would take "approximately 2-3 weeks to complete" and "cost around $15,000-$18,000."

72.     Upon hearing the news that a new report might take two to three weeks, Alaska personnel, including defendant Hall, called defendant Boyd. According to one participant on this call, defendant Boyd said he could not wait weeks for a new report. He "needed it quickly and he needed to base it on something . . . a professional had to sign off on it, not us, some third party." During the call, defendants Boyd and Hall decided to rely on numbers in the insurance report as replacement costs, despite defendant Hall having been told by the broker that it could not provide Miller with replacement costs.

73.     With the aim of making the report appear as though it reflected replacement costs, defendant Hall provided a subordinate with edits to the 2008 insurance report that significantly altered its appearance, including changing its name from "Loss Estimates Study" to "Asset replacement cost study." The revised report, which Miller gave to Sherb & Co., omitted the insurance broker's methodology and analysis. As a result, the only numbers reflected in the revised report were the ones provided to the broker by defendant Miller and its predecessors.

74.     As a result of the foregoing, Miller overvalued the Alaska Assets by more than $400 million.

75.     As a result of the fraudulent valuation, Miller filed with the SEC financial reports that materially misstated the value of its assets, including the SEC filings incorporated by reference in the Registration Statement used to conduct the Offerings.

76.     Under the rules and regulations governing the preparation of the Registration Statement, Miller was required to disclose at the time of the Offerings that the value of the Alaska Assets was materially overstated in its financial statements. The Registration

Statement, however, contained no such disclosures. Pursuant to Item 303 of Regulation S-K (17 C.F.R. §229.303) and the SEC's related interpretive releases thereto, issuers are required to disclose events or uncertainties, including any known trends, that have had or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results. This is particularly true for issuers utilizing shelf registration statements, which require continuous updating and incorporate those continuous disclosures into the registration statement.

77.     At the time of each of the Offerings, the Alaska Assets were materially overstated in the Company's financial statements, which materially understated its true expenses and materially overstated its profits. The adverse events and uncertainties associated with these declining trends were reasonably likely to have a material impact on Miller's profitability, and, therefore, were required to be disclosed in the Registration Statement.

78.     The Offerings were successful for the Company and the Underwriter Defendants who sold upwards of 6.21 million Series C and D shares, raising an estimated $151.015 million in gross proceeds in the Offerings, as follows[8]:

| OFFERING | UNDERWRITERS | PRICE | SHARES | GROSS PROCEEDS |
|---|---|---|---|---|
| 2/13/13-Series C | MLV, MXG, NSC, ACC, WFG | $22.90 | 625,000 | $14,312,500 |
| 5/8/13-Series C | MLV, MXG, NSC, ACC | $22.25 | 500,000 | $11,125,000 |
| 6/28/13-Series C | MLV, ACC, MXG, NSC, NCM | $21.50 | 335,000 | $7,202,500 |
| 9/26/13-Series D | MLV, MXG, NSC, ACC, D&D, LTC, NCM | $25.00 | 1,000,000 | $25,000,000 |
| 10/17/13-Series D | MLV | Market | 3,000,000 | $75,000,000 |
| 8/21/14-Series D | MLV, MXG, ACC, IBS, LTC, NSC, NCM | $24.50 | 750,000 | $18,375,000 |

[8]     As indicated in notes 1 and 2 above, this is an estimated figure based on information provided in the Prospectuses.

## MILLER WRITES DOWN THE VALUE OF THE ALASKA ASSETS

79. Following the Offerings, the following series of disclosures revealed that the Registration Statement was false and misleading in that it overstated the value of the Alaska Assets on the Company's books by hundreds of millions of dollars at the time each of the Offerings was conducted.

80. On December 10, 2014, Miller disclosed that it was taking a $265.3 million impairment charge on the Alaska Assets, specifically the Redoubt Shoal field.

81. On March 12, 2014, Miller disclosed that it was taking another $150 million impairment charge on the Alaska Assets.

82. On April 29, 2015, Miller disclosed that the SEC had notified it that the agency staff had made a preliminary determination to recommend civil action against the Company related to its accounting for the 2009 Alaska Asset acquisition.

83. On May 6, 2015, Miller disclosed that it would "defer" the dividend payments on the Series C and D shares.

84. On May 12, 2015, Miller disclosed that the NYSE had notified the Company that its shares were subject to delisting due to its having failed to maintain listing requirements.

85. On July 14, 2015, Miller included a "going concern" disclosure in its 2014 Annual Report filed with the SEC on Form 10-K.

86. On July 30, 2015, Miller disclosed that its common stock would be delisted from the NYSE.

87. Then, on August 6, 2015, the SEC initiated civil administrative proceedings against Miller (the "SEC Enforcement Action") accusing the Company and defendants Boyd

and Hall of knowingly artificially inflating the value of the Alaska Assets acquired in 2009 and then knowingly misstating Miller's financial statements for the ensuing five-plus year period through and including July 2015 when the Company's stock was delisted. Non-party Vogt was also charged in the SEC Enforcement Action.

88.     In its Order Instituting Public Administrative and Cease-and-Desist Proceedings filed that day, the SEC's Division of Enforcement alleged that after acquiring the Alaska Assets in late 2009, Miller overstated their value by more than $400 million, boosting the Company's net income and total assets. According to the SEC, the allegedly inflated valuation had a significant impact, turning a penny-stock company into one that was eventually listed on the NYSE, where its common stock had reached a 2013 high of nearly $9 per share. In a statement issued that day, William P. Hicks, Associate Regional Director of the SEC's Atlanta office, stated in pertinent part as follows:

> "Financial statement information is the cornerstone of investment decisions. We've charged that Miller Energy falsified financial statement information and grossly overstated the value of its Alaska assets and that the company's independent auditor failed to conduct an audit that complied with professional standards . . . . The SEC will aggressively prosecute such conduct."

89.     According to the SEC, Miller had paid $2.25 million and assumed certain liabilities to purchase the Alaska Assets. It later reported them at a value of $480 million. While accounting standards required the Company to record the properties at "fair value," then-CFO defendant Boyd allegedly relied on the Reserve Report, which did not reflect fair value for the assets, and he also was alleged to have double counted $110 million of fixed assets already included in the Reserve Report. The Reserve Report allegedly contained expense numbers that were knowingly understated by defendant Hall, then serving as the

CEO of Miller's Alaska subsidiary, CIE, and as Miller's COO since July 2013. Defendant Hall was also alleged to have altered a second report to make it appear as though it reflected an outside party's estimate of value.

90. The SEC alleged that the fiscal 2010 audit of Miller's financial statements was deficient due to the failure of non-party Vogt, the Sherb & Co. partner in charge of the Miller audits, who issued an unqualified opinion of Miller's 2010 annual report and was alleged to have falsely stated that the audit was conducted in accordance with the standards of the Public Company Accounting Oversight Board and that Miller's financial statements were presented fairly and conformed with GAAP.

91. As a result of the forgoing misconduct, the SEC alleged that:

- Defendant Miller violated §17(a) of the Securities Act, §10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, which prohibit fraudulent conduct in the offer or sale of securities and in connection with the purchase or sale of securities;

- Defendant Boyd willfully aided and abetted and caused, and defendant Hall caused, Miller's violations of §17(a) of the Securities Act, §10(b) of the Exchange Act and Rule 10b-5 thereunder;

- Defendant Boyd willfully violated, and defendant Hall violated, §17(a) of the Securities Act, §10(b) of the Exchange Act and Rule 10b-5 thereunder, which prohibit fraudulent conduct in the offer or sale of securities and in connection with the purchase or sale of securities;

- Defendant Miller violated §13(a) of the Exchange Act and Rules 13a-1, 13a-11 and 13a-13 thereunder, which require that every issuer of a security registered pursuant to §12 of the Exchange Act file with the SEC, among other things, annual, current, and quarterly reports as the SEC may require;

- Defendant Boyd willfully aided and abetted and caused, and defendant Hall caused, Miller's violations of §13(a) of the Exchange Act and Rules 13a-1, 13a-11 and 13a-13 thereunder;

- Defendant Miller violated §13(b)(2)(A) of the Exchange Act, which requires reporting companies to make and keep books, records and accounts which, in

reasonable detail, accurately and fairly reflect their transactions and dispositions of their assets;

- Defendant Boyd willfully aided and abetted and caused, and defendant Hall caused, Miller's violations of §13(b)(2)(A) of the Exchange Act;

- Defendant Miller violated §13(b)(2)(B) of the Exchange Act, which requires all reporting companies to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP;

- Defendant Boyd willfully aided and abetted and caused, and defendant Hall caused, Miller's violations of §13(b)(2)(B) of the Exchange Act;

- Defendant Boyd willfully violated, and defendant Hall violated, §13(b)(5) of the Exchange Act, which prohibits any person from knowingly circumventing or knowingly failing to implement a system of internal accounting controls or knowingly falsifying any book, record, or account described in §13(b)(2) of the Exchange Act;

- Defendant Miller violated Rule 12b-20 under the Exchange Act which requires that, in addition to the information expressly required to be included in a statement or report filed with the SEC, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made not misleading;

- Defendant Boyd willfully aided and abetted and caused, and defendant Hall caused, defendant Miller's violations of Rule 12b-20 under the Exchange Act; and

- Defendant Boyd willfully violated Rule 13a-14 of the Exchange Act, which requires that an issuer's principal executive and principal financial officers certify each periodic report.

92.     The SEC sought and obtained, among other things, cease-and-desist orders, civil monetary penalties, and return of alleged ill-gotten gains from defendants Miller, Boyd and Hall.

93.     During August 2015, various of Miller's creditors called for the Company to file bankruptcy.

94.     On August 20, 2015, Miller disclosed that it had settled with the SEC, agreeing to pay a $5 million fine and to restate all periodic financial reports back to 2010. Miller's restatement of its previously reported financial results was an admission that those results were false when filed.

95.     On October 1, 2015, Miller filed for protection under Chapter 11 of the federal bankruptcy statutes, citing in large part the filing of the SEC Enforcement Action, which Miller's senior executives stated had torpedoed its ability to obtain $165 million in outside financing, along with the filing of an involuntary bankruptcy petition against its subsidiary CIE in August 2015 by creditors Baker Hughes Oilfield Operations Inc. and Schlumberger Technology Corp., with total claims of $2.79 million, which filing Miller said was precipitated by the SEC Enforcement Action.

96.     By the time of the filing of this action, Miller Series C and D shares have been delisted after the market price of each had plummeted to approximately $0.30 per share, a more than 98% decline from the prices the shares were marketed at in the Offerings.

## CLASS ACTION ALLEGATIONS

97.     Plaintiff brings this action as a class action on behalf of a class consisting of all those who purchased Miller preferred shares traceable to the Registration Statement issued in connection with the Offerings (the "Class"). Excluded from the Class are defendants and their families, the officers and directors and affiliates of defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

98.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time

and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Miller or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

99.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

100.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

101.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

       (a)     whether defendants violated the Securities Act;

       (b)     whether the Registration Statement was negligently prepared and contained inaccurate statements of material fact and omitted material information required to be stated therein; and

       (c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

102.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small,

the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## FIRST CAUSE OF ACTION

### For Violation of §11 of the Securities Act
### Against All Defendants (Except Boyd)

103. Plaintiff incorporates ¶¶1-103 by reference.

104. This Cause of Action is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants except Boyd.

105. The Registration Statement for the Offerings was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary in order to make the statements made not misleading, and omitted to state material facts required to be stated therein.

106. The defendants named in the Cause of Action are strictly liable to Plaintiff and the Class for the misstatements and omissions.

107. None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

108. By reason of the conduct herein alleged, each of these defendants violated, and/or controlled a person who violated, §11 of the Securities Act.

109. Plaintiff acquired Miller preferred shares traceable to the Offerings.

110. Plaintiff and the Class have sustained damages.

111. At the time of their purchases of Miller preferred shares, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiff commenced this action. Less than three years has elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time Plaintiff commenced this action.

## SECOND CAUSE OF ACTION

### For Violation of §15 of the Securities Act
### Against the Company and the Individual Defendants

112. Plaintiff incorporates ¶¶1-112 by reference.

113. This Cause of Action is brought pursuant to §15 of the Securities Act against the Company and the Individual Defendants.

114. The Individual Defendants each were control persons of Miller by virtue of their positions as directors and/or senior officers of Miller. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Miller. The Company controlled the Individual Defendants and all of Miller's employees.

115. The Individual Defendants each were culpable participants in the violations of §11 of the Securities Act alleged in the Cause of Action above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the Offerings to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action and certifying Plaintiff as a Class representative under Tenn. R. Civ. P. 23 and Plaintiff's counsel as Class Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: November 6, 2015

BARRETT JOHNSTON MARTIN
   & GARRISON, LLC
DOUGLAS S. JOHNSTON, JR., #5782
JERRY E. MARTIN, #20193
TIMOTHY L. MILES, #21605

JERRY E. MARTIN

Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2202
615/252-3798 (fax)

- 33 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHRISTOPHER M. WOOD, #032977
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
MARY K. BLASY
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

LAW OFFICES OF CURTIS V. TRINKO, LLP
CURTIS V. TRINKO
WILLIAM MARGRABE
16 West 46th Street, 7th Floor
New York, NY 10036
Telephone: 212/490-9550
212/986-0158 (fax)

Attorneys for Plaintiff

| STATE OF TENNESSEE 9TH JUDICIAL DISTRICT CIRCUIT COURT | SUMMONS | CASE FILE NUMBER 2015-CV-34 |
|---|---|---|

| PLAINTIFF | DEFENDANT |
|---|---|
| KENNETH GAYNOR, Individually and on Behalf of All Others Similarly Situated, | DELOY MILLER, SCOTT M. BORUFF, DAVID J. VOYTICKY, CATHERINE A. RECTOR, DAVID M. HALL, MERRILL A. McPEAK, GERALD HANNAHS, CHARLES M. STIVERS, DON A. TURKLESON, BOB G. GOWER, JOSEPH T. LEARY, WILLIAM B. RICHARDSON, MARCEAU N. SCHLUMBERGER, PAUL W. BOYD, MLV & CO. LLC, WILLIAMS FINANCIAL GROUP, MAXIM GROUP LLC, NATIONAL SECURITIES CORPORATION, AEGIS CAPITAL CORP., NORTHLAND CAPITAL MARKETS, DOMINICK & DOMINICK, LLC, LADENBURG THALMANN & CO. INC. and I-BANKERS SECURITIES, INC., |

| TO: (NAME AND ADDRESS OF DEFENDANT) | |
|---|---|
| **Northland Capital Markets** 45 South 7th Street, Suite 2000 Minneapolis, MN 55402 | Method of Service: G   Morgan Co. Sheriff G   Certified Mail G   *Comm. Of Insurance G   *Secretary of State G   *Out of County Sheriff G   Private Process Server G   Other |
| List each defendant on a separate summons. | *Attach Required Fees |

YOU ARE SUMMONED TO DEFEND A CIVIL ACTION FILED AGAINST YOU IN CIRCUIT COURT, MORGAN COUNTY, TENNESSEE. YOUR DEFENSE MUST BE MADE WITHIN THIRTY (30) DAYS FROM THE DATE THIS SUMMONS IS SERVED UPON YOU. YOU MUST FILE YOUR DEFENSE WITH THE CLERK OF THE COURT AND SEND A COPY TO THE PLAINTIFF'S ATTORNEY AT THE ADDRESS LISTED BELOW. IF YOU FAIL TO DEFEND THIS ACTION BY THE ABOVE DATE, JUDGMENT BY DEFAULT CAN BE RENDERED AGAINST YOU FOR THE RELIEF SOUGHT IN THE COMPLAINT.

| Attorney for plaintiff or plaintiff if filing Pro Se: (Name, address & telephone number) | FILED, ISSUED & ATTESTED |
|---|---|
| Jerry E. Martin Barrett Johnston Martin & Garrison, LLC Bank of America Plaza 414 Union Street, Suite 900 Nashville, TN 37219 (615) 244 - 2202 | November 12 2015 PAM KECK, Circuit Court Clerk By:   P.O. Box 324 Barbara Cox   415 N. Kingston Wartburg, TN 37887-0163 ADA FOR ASSISTANCE CALL 423-346-3503 |

The disposition date of this case is twelve months from date of filing. The case must be resolved or set for trial by this date or it will be dismissed by the Court for failure to prosecute pursuant to T.R.C.P. 41.02.

If you think the case will require more than one year to resolve or set for trial, you must send a letter to the Circuit Court Clerk at the earliest practicable date asking for an extension of the disposition date and stating your reasons. Extensions will be granted only when exceptional circumstances exist.

FILED
2:00
AM NOV 0 9 2015 PM
PK/BC
MORGAN CO. CIRCUIT CLERK

| **TO THE SHERIFF:** | **DATE RECEIVED** |
|---|---|
| | **Sheriff** |

## RETURN ON SERVICE OF SUMMONS

I hereby return this summons as follows:  (Name of Party Served) _____

☐ Served _____

☐ Not Served _____

☐ Not Found _____

☐ Other _____

| DATE OF RETURN: | By: _____ |
|---|---|
| | Sheriff/or other authorized person to serve process |

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify and return that on the _____ day of _____, 20___, I sent, postage prepaid, by registered return

receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in case _____ to

the defendant _____.  On the _____ day of _____, 20___, I received the return

receipt, which had been signed by _____ on the _____ day of _____, 20___.

The return receipt is attached to this original summons to be filed by the Circuit Court Clerk.

| **Sworn to and subscribed before me on this _____ day of _____<br>_____, 20___.**<br>Signature of _____ Notary Public or _____ Deputy Clerk<br><br>My Commission Expires: | Signature of plaintiff, plaintiff's attorney or other person authorized by statute to serve process. |
|---|---|
| | ATTACH<br>RETURN<br>RECEIPT<br>HERE<br>(IF APPLICABLE) |

IN THE CIRCUIT COURT FOR MORGAN COUNTY
9TH JUDICIAL DISTRICT
THE STATE OF TENNESSEE

| | | |
|---|---|---|
| KENNETH GAYNOR, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Case No. 2015-cv-34 |
| Plaintiff, | ) ) | Judge Michael Pemberton |
| vs. | ) ) ) | CLASS ACTION |
| DELOY MILLER, *et al.* | ) ) ) | DEMAND FOR JURY TRIAL |
| Defendants. | ) ) | |

**PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS MLV & CO. LLC, WILLIAMS FINANCIAL GROUP MAXIM GROUP LLC, NATIONAL SECURITIES CORPORATION, AEGIS CAPITAL CORP., NORTHLAND CAPITAL MARKETS, DOMINICK & DOMINICK, LLC, LADENBURG THALMANN & CO. INC. AND I-BANKERS SECURITIES, INC.**

Pursuant to Tenn. R. Civ. P. 34, plaintiff hereby demands MLV & Co. LLC, Williams Financial Group Maxim Group LLC, National Securities Corporation, Aegis Capital Corp., Northland Capital Markets, Dominick & Dominick, LLC, Ladenburg Thalmann & Co. Inc. and I-Bankers Securities, Inc. (collectively "Defendants") to produce the documents described below for inspection and copying at the law offices of Barrett Johnston Martin & Garrison, LLC, 414 Union Street, Suite 900, Nashville, TN 37209, within 45 days after service of complaint, at 10:00 a.m., or at such other location and date upon which the parties may mutually agree.

DEFINITIONS

1.     "You" and "your" refer to the person responding to these Requests.

2.     The term "Individual Defendants" means Deloy Miller, Scott M. Boruff, David J. Voyticky, Catherine A. Rector, David M. Hall, Merrill A. Mcpeak, Gerald Hannahs, Charles M.

Stivers, Don A. Turkleson, Bob G. Gower, Joseph T. Leary, William B. Richardson, Marceau N. Schlumberger and Paul W. Boyd

3. "Miller" means Miller Energy Resources, Inc. and any of its predecessors, successors, divisions, parents, affiliates, subsidiaries (including, but not limited to, CIE as defined below), directors, employees, agents or anyone acting or purporting to act on its behalf.

4. "CIE" means Cook Inlet Energy and any of its predecessors, successors, divisions, parents, affiliates, subsidiaries, directors, employees, agents or anyone acting or purporting to act on its behalf.

5. "PER" means Pacific Energy Resources and any of its predecessors, successors, divisions, parents, affiliates, subsidiaries, directors, employees, agents or anyone acting or purporting to act on its behalf.

6. "Offerings" means the following public offerings of Miller's 10.75% Series C Cumulative Preferred Stock ("Series C") and 10.5% Series D Fixed Rate/Floating Rate Cumulative Redeemable Preferred Stock ("Series D") (collectively, the "Offerings"):

| Date | Preferred Shares | Price | Offering Name |
|---|---|---|---|
| Feb. 13, 2013 | Series C | $22.90 | "2/13/13-Series C" |
| May 8, 2013 | Series C | $22.25 | "5/8/13-Series C" |
| June 28, 2013 | Series C | $21.50 | "6/28/13-Series C" |
| Sept. 26, 2013 | Series D | $25.00 | "9/26/13-Series D" |
| Oct. 17, 2013 | Series D | At Market | "10/17/13-Series D" |
| Aug. 21, 2014 | Series D | $24.50 | "8/21/14-Series D" |

7. "Alaska Assets" means certain oil and gas properties in Alaska purchased by Miller's operating subsidiary, CIE for $2.25 million in cash and the assumption of certain limited liabilities and which closed on December 10, 2009.

8. "Reserve Reports" means the reserve estimates report prepared for Miller by Ralph E. Davis & Associates concerning the Alaska Asserts.

- 2 -

9. "Person" or "persons" means and refers to natural persons, proprietorships, corporations, partnerships, trusts, joint ventures, groups, associations, organizations and governmental agencies and other agencies.

10. "Underwriter Defendants means defendants MLV & Co. LLC, Williams Financial Group Maxim Group LLC, National Securities Corporation, Aegis Capital Corp., Northland Capital Markets, Dominick & Dominick, LLC, Ladenburg Thalmann & Co. Inc. and I-Bankers Securities, Inc.

11. The term "business relationship" refers to any relationship, whether formal, informal, contractual or legal, concerning any employment, occupation, profession, ownership or equity interest for monetary gain, personal gain or livelihood. "Business relationship" shall also include, without limitation, any monetary, financial or labor investment.

12. The term "document" or "documents" is intended to be interpreted in the broadest possible sense and includes, but is not limited to, all electronic data and all communications which are stored or retrievable or recorded in any manner and also includes, without limitation, any writing or other record of information or images, including, but not limited to, print, handwriting, photographs, film, recordings, memoranda, books, records, accounts, ledgers, vouchers, invoices, drafts, bills, charge slips, letters, electronic mail or "e-mail," compact discs, CD-ROM discs, magnetic tape, videotape, magnetic or optical disks, "floppy disks," "PowerPoint" or other presentation software systems, telegrams, mailgrams, correspondence, notes and minutes of meetings, conversations or telephone calls, resolutions, interoffice memoranda, work papers, reports, projects, tabulations, studies, surveys, legal complaints and other pleadings, affidavits, interrogatories, legal briefs, legal motions, judgments, designs, drawings, schematics, maps, manuals, models, notebooks, contracts, agreements, diaries,

telephone records, desk calendars, appointment books, circulars, charts, transcripts, news releases, trade releases, advertisements, press books, teletype messages, licenses, financial statements, stenographers' notebooks, punchcards, computer printouts and data, telecopier or facsimile transmissions and printouts, letters of credit, stock certificates and securities. The term "document" also includes preliminary drafts or revisions or copies of any such document if the copy is in any way different from the original, now in your possession, custody or control, or in the possession, custody or control of your advisors, agents, employees, servants, representatives, trustees, counsel or other persons acting or purporting to act on your behalf.

13.    The term "electronic data" refers to any original and any non-identical copies (whether non-identical because of notes made on copies or attached comments, annotations, marks, transmission notations, or highlighting of any kind), of mechanical, facsimile, electronic, magnetic, digital or other programs (whether private, commercial, or work-in-progress), programming notes or instructions, activity listings of electronic mail receipts or transmittals, output resulting from the use of any software program, including word processing documents, spreadsheets, database files, charts, graphs and outlines, electronic mail or "e-mail," personal digital assistant ("PDA") messages, instant messenger messages, operating systems, source code of all types, programming languages, linkers and compilers, peripheral drives, PDF files, PRF files, batch files, ASCII files, crosswalks, code keys, pull down tables, logs, file layouts and any and all miscellaneous files or file fragments, regardless of the media on which they reside and regardless of whether said electronic data consists of an active file, deleted file or file fragment. "Electronic data" also includes any and all items stored on computer memory or memories, hard disks, floppy disks, zip drives, CD-ROM discs, Bernoulli Boxes and their equivalents, magnetic tapes of all types and kinds, microfiche, punched cards, punched tape, computer chips (including,

but not limited to, EPROM, PROM, ROM or RAM of any kind) on or in any other vehicle for digital data storage or transmittal, files, folder tabs, or containers and labels appended to or associated with any physical storage device associated with each original and each copy.

14.     The term "Financial Statements" includes, but is not limited to, interim, final, pro forma, actual, projected, complete, or partial, annual, quarterly, monthly, weekly or otherwise, audited or unaudited, budgets, budget plans, balance sheets, schedules of direct costs, schedules of miscellaneous income, schedules of general services, fiscal serviceman administrative services, statements of earnings and earnings per share, income statements, cash flow statements, statement of revenues and statements of expenses, all notes or other commentary concerning any of the foregoing and all underlying work papers and all drafts used in connection with the preparation of any of the foregoing.

15.     The term "telephone records" includes, without limitation, telephone directories, rolodexes, messages, telephone logs, recordings of telephone conversations and telephone bills (local and long distance).

16.     "Communication" or "communications" refers to any exchange of information by any means of transmission, sending or receipt of information of any kind by or through any means including, but not limited to, speech, writings, documents, language (machine, foreign or otherwise) of any kind, computer electronics or electronic data, sound, radio or video signals, telecommunication, telephone, teletype, facsimile, telegram, microfilm, microfiche, photographic film of all types or other media of any kind. The term "communication" also includes, without limitation, all inquiries, discussions, conversations, correspondence, negotiations, agreements, understandings, meetings, notices, requests, responses, demands, complaints, or press, publicity or trade releases.

17.    The term "concerning" shall mean constituting, evidencing, reflecting, referring to, incorporating, effecting, including, or otherwise pertaining or relating, either directly or indirectly, or being in any way logically or factually connected with the subject matter of the inquiry or Request. Requests for "documents concerning" any subject matter include documents concerning communication regarding that subject matter.

18.    "Identify" when used to refer to a natural person, shall mean to set forth that person's: (i) full name and title, if any; (ii) present or last known address; (iii) present or last known business and home telephone number(s); and (iv) present or last known employer.

19.    "Identify" when used to refer to a document, shall mean: (i) the date of each document; (ii) the type of each such document (*i.e.* correspondence, memorandum, business record, etc.); (iii) the identity of the author(s) or preparer(s) of each such document; and (iv) the present location of each such document or copies thereof.

20.    The terms "all" and "each" shall be construed as all/each.

21.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the request all responses that might otherwise be construed to be outside of its scope.

22.    "Roadshow" means any and all presentations made or given by any officer, director, employee, agent, underwriter, investment banker or other person or entity on behalf of Miller, relating to the Offerings.

23.    "SEC" means the Securities and Exchange Commission.

24.    "SEC filings" means all documents filed or prepared for the purpose of filing with the SEC and any other state or federal regulatory agency, including, but not limited to, Forms 8-

K, 10-K, 10-Q, Schedules TO-T, 13-D, 14A, 14D-1 and 14D-9 and any drafts thereof or amendments thereto.

25. "SEC Enforcement Action" means the civil administrative proceedings against Miller initiated by the SEC on August 6, 2015 in *In the Matter of Miller Resources, Inc., et al.*, SEC Admin. Proc. File No. 3-16729.

INSTRUCTIONS

In responding to these document Requests, you shall produce separately all documents available at the time of responding or which can be located or discovered by reasonably diligent efforts, including documents in the possession of your agents and representatives.

References to an individual, partnership, limited liability company or corporation include any and all agents, employees, representatives and attorneys and all other persons or entities acting on your behalf or under your control.

If you claim any form of privilege or any other objection, whether based on statute, common law or otherwise as a ground for not producing any requested document, please furnish a list identifying each document for which the privilege or other objection is claimed together with the following information: date, sender, recipient, persons to whom copies were furnished together with their job titles, subject matter, basis on which privilege or other objection is claimed and the number of each Request to which such document responds. If you claim privilege or any other objection with regard to only part of a document, produce the part to which there is no objection.

If you are aware of any documents or copies thereof that may be responsive to these Requests but are no longer in your possession, custody or control, or have been lost or destroyed, identify each document in detail, including whether: (i) the document is missing, lost or destroyed; (ii) the document has been transferred or delivered to another person and, if so, at

whose request; (iii) who prepared it; (iv) to whom it was prepared for and sent to; (v) when it was prepared or sent; (vi) the content of the document; (vii) the person who destroyed it; and (viii) why it was lost or destroyed.

If any individual Request is ambiguous in any way, please send a letter to the undersigned counsel describing the ambiguity and it will be promptly clarified in a reply letter. If any individual Request (or subpart thereof) is deemed to be unduly burdensome, please send a letter to the undersigned counsel specifying the reasons why the Request is unduly burdensome and stating whatever information and knowledge you have of the information or documents called for in the Request, and (generally) an attempt will be made to rephrase the Request (or subpart thereof) in a reply letter to lessen the burdens of compliance. Any such reply letter may be treated by the parties to whom it is addressed as a modification of the particular Request.

Unless words or terms have been given a specific definition herein, each word or term used herein shall be given its usual and customary dictionary definition except where such words have a specific custom and usage definition in your trade or industry, in which case they shall be interpreted in accordance with such usual custom and usage definition of which you are aware. In construing the Requests herein: (i) the singular shall include the plural and the plural shall include the singular; and (ii) a masculine, feminine or neuter pronoun shall not exclude the other genders, all to the end that the interpretation applied results in the more expansive production.

In making production, produce all documents as kept in the normal course of business and identify the file from which each document was taken.

TIME PERIOD

Unless stated otherwise, the time period to which these Requests refer is January 1, 2009 through the date of production. If a document prepared before this period is necessary for a

correct or complete understanding of any document covered by a Request, you must produce the earlier or subsequent document as well. If any document is undated and the date of its preparation cannot be determined, the document shall be produced if otherwise responsive to the production Request.

DOCUMENTS REQUESTED

REQUEST NO. 1:

All documents and communications concerning each draft or final Offerings prospectuses and registration statements and disclosures incorporated in the Offerings prospectuses, including, but not limited to, any draft that contains edits, comments, questions, or any writing concerning the draft or the Offerings.

REQUEST NO. 2:

All communications to or from you concerning the matters disclosed in the Offerings prospectuses and periodic filings incorporated therein.

REQUEST NO. 3:

All documents and communications concerning the adequacy of, necessity of, expected, or actual, disclosures of information in connection with the Offerings and Offering prospectuses (including prospectuses drafts).

REQUEST NO. 4:

All documents concerning any disagreement between Miller, the Individual Defendants, the Underwriter Defendants, or any Miller officers, directors, employees, consultants, accountants or attorneys concerning any conclusion, statement, observation, disclosure or non-disclosure in any document filed by Miller with the SEC concerning:

(a)    the Offerings;

(b)    the Alaska Assets;

(c)     the Reserve Report; and

(d)     Miller's accounting for the Alaska Assets.

REQUEST NO. 5:

All documents and communications prepared, received, or sent by you concerning:

(a)     the Offerings;

(b)     the Alaska Assets;

(c)     the Reserve Report;

(d)     Miller's accounting for the Alaska Assets.

REQUEST NO. 6:

All documents and communications concerning any due diligence performed in connection with the Offerings.

REQUEST NO. 7:

All documents concerning how you conduct due diligence, including, but not limited to, all due diligence checklists and/or procedure manuals.

REQUEST NO. 8:

Any comfort letters prepared or received by you concerning Miller or the Offerings.

REQUEST NO. 9:

All documents and communications concerning any meetings, conference calls, symposiums or conferences at which Miller was discussed, including, but not limited to, any Miller Board of Directors' meetings or Miller Board of Directors' committee meetings. Responsive documents shall include, but not be limited to, materials distributed and notes or transcripts of any meetings and conference calls.

REQUEST NO. 10:

All documents and communications relating to presentations and reports you gave to Miller or any of the Individual Defendants.

REQUEST NO. 11:

All documents and communications concerning any press release, published article, financial analysts' report and/or rating agencies' report relating to or concerning Miller or the Offerings.

REQUEST NO. 12:

All documents and communications concerning any actual or proposed changes in the terms or effective dates of the Offerings or the right or option to terminate, amend or modify the terms of the Offerings, including, but not limited to, any change in the offering price of Miller common stock leading up to the Offerings.

REQUEST NO. 13:

All documents that identify the personnel involved in the Offerings, whether contained in a "Working Group List" or any similar list, from any or all of the following entities: Miller;; the Underwriter Defendants; and any other entities or consultants involved in the Offerings.

REQUEST NO. 13:

All documents concerning fees, expenses, reimbursements, costs, compensation or other remuneration received by you for services rendered relating to the Offerings and/or any other services provided to or on behalf of Miller.

REQUEST NO. 14:

All indemnification and/or hold-harmless agreements and any documents relating to any indemnifications between you and Miller or the Individual Defendants.

REQUEST NO. 15:

All documents and communications concerning any investors in or purchasers of Miller's securities in connection with the Offerings, including, but not limited to, any lists and trading records in your possession, custody or control, and documents identifying any person or entity that purchased Miller securities in the Offerings.

REQUEST NO. 15:

All documents concerning any actual or contemplated investment banking services or consulting services performed for or on behalf of Miller or the Individual Defendants.

REQUEST NO. 16:

All documents concerning your ownership or investment in Miller.

REQUEST NO. 17:

All documents concerning any communication, presentation or meeting (including any scripts, transcripts, tapes or videos prepared in connection with or as a result of) with any potential purchasers of Miller's securities, securities analysts, financial analysts, institutional investors, financial investors, news media, journalists, investment bankers, brokerage firms, market makers, money managers, commercial banks, rating agencies (such as Moody's Investor Service, Inc.) or stock markets or securities exchanges concerning Miller or the Offerings, including, but not limited to, Roadshow presentations.

DATED: November 16, 2015       BARRETT JOHNSTON MARTIN
                                        & GARRISON, LLC
                                        DOUGLAS S. JOHNSTON, JR., #5782
                                        JERRY E. MARTIN, #20193
                                        TIMOTHY L. MILES, #21605

JERRY E. MARTIN

- 12 -

Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2202
615/252-3798 (fax)

ROBBINS GELLER RUDMAN
& DOWD LLP
CHRISTOPHER M. WOOD, #032977
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
MARY K. BLASY
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

LAW OFFICES OF CURTIS V. TRINKO, LLP
CURTIS V. TRINKO
WILLIAM MARGRABE
16 West 46th Street, 7th Floor
New York, NY 10036
Telephone: 212/490-9550
212/986-0158 (fax)

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing *Plaintiff's First Request for Production Of Documents To Defendants MLV & Co. LLC, Williams Financial Group Maxim Group LLC, National Securities Corporation, Aegis Capital Corp., Northland Capital Markets, Dominick & Dominick, LLC, Ladenburg Thalmann & Co. Inc. and I-Bankers Securities, Inc.* has been served on the following via certified U.S. Mail on November 16, 2015:

| | |
|---|---|
| **Deloy Miller**<br>815 South Lake Drive<br>Oneida, TN 97841 | **Scott M. Boruff**<br>5628 Lyons View Pike<br>Knoxville, TN 37919 |
| **David J. Voyticky**<br>41 East Parkway PHA<br>Brooklyn, NY 11238 | **Catherine A. Rector**<br>1519 Pebble Shore Lane<br>Knoxville, TN 37931 |
| **David M. Hall**<br>48110 David Hall Road<br>Kenai, AK 99611 | **Merrill A. McPeak**<br>123 Furnace Street<br>Lake Oswego, OR 97034 |
| **Gerald Hannahs**<br>17710 Leatha Lane<br>Little Rock, AR 72223 | **Charles M. Stivers**<br>118 Richmond Road<br>Manchester, KY 40962 |
| **Don A. Turkleson**<br>6311 Rodrigo Street<br>Houston, TX 77007 | **Bob G. Gower**<br>402 Timberwilde Lane<br>Houston, TX 77024 |
| **Joseph T. Leary**<br>704 East 12th Street<br>Houston, TX 77008 | **William B. Richardson**<br>1058 Encantado Drive<br>Santa Fe, NM 87501 |
| **Marceau N. Schlumberger**<br>18 Dante Street<br>Larchmont, NY 10538 | **Paul W. Boyd**<br>8125 Ainsworth Drive<br>Knoxville, TN 37909 |
| **Williams Financial Group**<br>Registered Agent: Wilson Williams<br>2711 N. Haskell Avenue, Suite 2900<br>Dallas, TX 75204 | **Maxim Group LLC**<br>Edward L. Rose, Esq.<br>99 Sunnyside Boulevard<br>Woodbury, NY 11797 |
| **Northland Capital Markets**<br>45 South 7th Street, Suite 2000<br>Minneapolis, MN 55402 | **Aegis Capital Corp.**<br>810 7th Avenue, 18th Floor<br>New York, NY 10019 |

| National Securities Corporation | Dominick & Dominick LLC |
|---|---|
| Registered Agent: | Registered Agent: |
| Delaware Corporate Services, Inc. | Corporation Service Company |
| 901 North Market Street, Suite 705 | 80 State Street |
| Wilmington, DE 19801 | Albany, NY 12207 |
| **Ladenburg Thalmann & Co. Inc.** | **I-Bankers Securities, Inc.** |
| Registered Agent: | Registered Agent: |
| Corporate Creations Network, Inc. | IBS Holding Corporation |
| 15 North Mill Street | 21550 Oxnard Street, 3rd Floor |
| Nyack, NY 10960 | Woodland Hills, CA 91367 |
| | **MLV & CO. LLC** |
| | Registered Agent: |
| | The Corporation Trust Company |
| | Corporation Trust Center |
| | 1209 Orange Street |
| | Wilmington, DE 19801 |

JERRY E. MARTIN
BARRETT JOHNSTON MARTIN
& GARRISON, LLC

Ladenburg Thalmann & Co. Inc.
Joe Giovanniello, Jr. Senior VP and General Counsel
Ladenburg Thalmann & Co. Inc.
570 Lexington Avenue, 11th floor
NEW YORK NY 10022

# SERVICE OF PROCESS NOTICE

The following is a courtesy summary of the enclosed document(s). **ALL information should be verified by you.**

Note: Any questions regarding the substance of the matter described below, including the status or to whom or where to respond, should be directed to the person set forth in line 12 below or to the court or government agency where the matter is being heard.

**Item:** 2015-5

| | | |
|---|---|---|
| 1. | **Client Entity:** | Ladenburg Thalmann & Co. Inc. |
| 2. | **Title of Action:** | Kenneth Gaynor vs. Deloy Miller, Scott M. Boruff, David J. Voyticky, et al. |
| 3. | **Document(s) Served:** | Summons<br>Complaint for Federal Violation of The Federal Securities Law<br>Plaintiff's First Request for Production of Documents to, etc. |
| 4. | **Court/Agency:** | Morgan County 9th Judicial District Court |
| 5. | **State Served:** | New York |
| 6. | **Case Number:** | 2015- CV-34 |
| 7. | **Case Type:** | Violation of The Federal Securities Law |
| 8. | **Method of Service:** | Certified Mail |
| 9. | **Date Received:** | Monday 11/23/2015 |
| 10. | **Date to Client:** | Tuesday 11/24/2015 |
| 11. | **# Days When Answer Due:** 30<br>**Answer Due Date:** 12/23/2015 | **CAUTION:** Client is solely responsible for verifying the accuracy of the estimated Answer Due Date. To avoid missing a crucial deadline, we recommend immediately confirming in writing with opposing counsel that the date of service in their records matches the Date Received. |
| 12. | **SOP Sender:**<br>(Name, Address and Phone Number) | Jerry E. Martin<br>Nashville, TN<br>615-244-2202 |
| 13. | **Shipped to Client By:** | Regular Mail and Email with PDF Link |
| 14. | **Tracking Number:** | Not Applicable |
| 15. | **Handled By:** | 331 |
| 16. | **Notes:** | None. |

NOTE: This notice and the information above is provided for general informational purposes only and should not be considered a legal opinion. The client and their legal counsel are solely responsible for reviewing the service of process and verifying the accuracy of all information. At Corporate Creations, we take pride in developing systems that effectively manage risk so our clients feel comfortable with the reliability of our service. We always deliver service of process so our clients avoid the risk of a default judgment. As registered agent, our role is to receive and forward service of process. To decrease risk for our clients, it is not our role to determine the merits of whether service of process is valid and effective. It is the role of legal counsel to assess whether service of process is invalid or defective. Registered agent services are provided by Corporate Creations Network Inc.

| STATE OF TENNESSEE 9TH JUDICIAL DISTRICT CIRCUIT COURT | SUMMONS | CASE FILE NUMBER 2015-CV-34 |
|---|---|---|

| PLAINTIFF | DEFENDANT |
|---|---|
| KENNETH GAYNOR, Individually and on Behalf of All Others Similarly Situated, | DELOY MILLER, SCOTT M. BORUFF, DAVID J. VOYTICKY, CATHERINE A. RECTOR, DAVID M. HALL, MERRILL A. McPEAK, GERALD HANNAHS, CHARLES M. STIVERS, DON A. TURKLESON, BOB G. GOWER, JOSEPH T. LEARY, WILLIAM B. RICHARDSON, MARCEAU N. SCHLUMBERGER, PAUL W. BOYD, MLV & CO. LLC, WILLIAMS FINANCIAL GROUP, MAXIM GROUP LLC, NATIONAL SECURITIES CORPORATION, AEGIS CAPITAL CORP., NORTHLAND CAPITAL MARKETS, DOMINICK & DOMINICK, LLC, LADENBURG THALMANN & CO. INC. and I-BANKERS SECURITIES, INC., |

TO: (NAME AND ADDRESS OF DEFENDANT)

**Ladenburg Thalmann & Co. Inc.**
Registered Agent:
Corporate Creations Network, Inc.
15 North Mill Street
Nyack, NY 10960

Method of Service:
              G  Morgan Co. Sheriff
G  Certified Mail
G  *Comm. Of Insurance
G  *Secretary of State
G  *Out of County Sheriff
G  Private Process Server
G  Other

List each defendant on a separate summons.

              *Attach Required Fees

**YOU ARE SUMMONED TO DEFEND A CIVIL ACTION FILED AGAINST YOU IN CIRCUIT COURT, MORGAN COUNTY, TENNESSEE. YOUR DEFENSE MUST BE MADE WITHIN THIRTY (30) DAYS FROM THE DATE THIS SUMMONS IS SERVED UPON YOU. YOU MUST FILE YOUR DEFENSE WITH THE CLERK OF THE COURT AND SEND A COPY TO THE PLAINTIFF'S ATTORNEY AT THE ADDRESS LISTED BELOW. IF YOU FAIL TO DEFEND THIS ACTION BY THE ABOVE DATE, JUDGMENT BY DEFAULT CAN BE RENDERED AGAINST YOU FOR THE RELIEF SOUGHT IN THE COMPLAINT.**

| Attorney for plaintiff or plaintiff if filing Pro Se: (Name, address & telephone number) | FILED, ISSUED & ATTESTED |
|---|---|
| Jerry E. Martin Barrett Johnston Martin & Garrison, LLC Bank of America Plaza 414 Union Street, Suite 900 Nashville, TN 37219 (615) 244 - 2202 | *November 12, 2015* PAM KECK, Circuit Court Clerk By: *Barbara Cox* 415 N. Kingston *P.O. Box 324* Wartburg, TN 37887-0162 ADA FOR ASSISTANCE CALL 423-346-3503 |

The disposition date of this case is twelve months from date of filing. The case must be resolved or set for trial by this date or it will be dismissed by the Court for failure to prosecute pursuant to T.R.C.P. 41.02.

If you think the case will require more than one year to resolve or set for trial, you must send a letter to the Circuit Court Clerk at the earliest practicable date asking for an extension of the disposition date and stating your reasons. Extensions will be granted only when exceptional circumstances exist.

| TO THE SHERIFF: | DATE RECEIVED |
| --- | --- |
| | **Sheriff** |

## RETURN ON SERVICE OF SUMMONS

I hereby return this summons as follows: (Name of Party Served) _____

□ Served _____

□ Not Served _____

□ Not Found _____

□ Other _____

| DATE OF RETURN: | By: |
| --- | --- |
| | Sheriff/or other authorized person to serve process |

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify and return that on the _____ day of _____, 20___, I sent, postage prepaid, by registered return

receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in case _____ to

the defendant _____. On the _____ day of _____, 20___, I received the return

receipt, which had been signed by _____ on the _____ day of _____, 20___.

The return receipt is attached to this original summons to be filed by the Circuit Court Clerk.

| **Sworn to and subscribed before me on this _____ day of _____ _____, 20 ___.** Signature of _____ Notary Public or _____ Deputy Clerk  My Commission Expires: | Signature of plaintiff, plaintiff's attorney or other person authorized by statute to serve process. |
| --- | --- |
| | ATTACH RETURN RECEIPT HERE (IF APPLICABLE) |

IN THE CIRCUIT COURT FOR MORGAN COUNTY
9TH JUDICIAL DISTRICT
THE STATE OF TENNESSEE

| | |
|---|---|
| KENNETH GAYNOR, Individually and on) Behalf of All Others Similarly Situated, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>DELOY MILLER, SCOTT M. BORUFF, )<br>DAVID J. VOYTICKY, CATHERINE A. )<br>RECTOR, DAVID M. HALL, MERRILL )<br>A. McPEAK, GERALD HANNAHS, )<br>CHARLES M. STIVERS, DON A. )<br>TURKLESON, BOB G. GOWER, )<br>JOSEPH T. LEARY, WILLIAM B. )<br>RICHARDSON, MARCEAU N. )<br>SCHLUMBERGER, PAUL W. BOYD, )<br>MLV & CO. LLC, WILLIAMS )<br>FINANCIAL GROUP, MAXIM GROUP )<br>LLC, NATIONAL SECURITIES )<br>CORPORATION, AEGIS CAPITAL )<br>CORP., NORTHLAND CAPITAL )<br>MARKETS, DOMINICK & DOMINICK, )<br>LLC, LADENBURG THALMANN & CO. )<br>INC. and I-BANKERS SECURITIES, )<br>INC., )<br>)<br>Defendants. )<br>_____ ) | Case No.  2015- CV- 34<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATION OF<br>THE FEDERAL SECURITIES LAWS<br><br><br><br><br><br><br><br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

FILED  2:00
AM  NOV 0 9 2015  PM
MORGAN CO. CIRCUIT CLERK

Plaintiff Kenneth Gaynor ("Plaintiff") alleges the following based upon the investigation of Plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Miller Energy Resources, Inc. ("Miller" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, the SEC's Order Instituting Public Administrative and Cease-and-Desist Proceedings Pursuant to Section 8a of the Securities Act of 1933, Sections 4c and 21c of the Securities Exchange Act of 1934, and Rule 102(e) of the Commission's Rules of Practice, *In the Matter of Miller Resources, Inc., et al.*, SEC Admin. Proc. File No. 3-16729 (August 6, 2015), filings in *In re Miller Energy Resources, Inc., et al.*, No. 15-00313 (D. Alaska Bankr. Ct.), and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act") on behalf of all purchasers of Miller preferred shares traceable to the Registration Statement and Prospectuses issued in connection with the following public offerings of Miller's 10.75% Series C Cumulative Preferred Stock ("Series C") and 10.5% Series D Fixed Rate/Floating Rate Cumulative Redeemable Preferred Stock ("Series D") (collectively, the "Offerings"):

| DATE | PREFERRED SHARES | PRICE | OFFERING NAME |
|---|---|---|---|
| Feb. 13, 2013 | Series C | $22.90 | "2/13/13-Series C" |
| May 8, 2013 | Series C | $22.25 | "5/8/13-Series C" |
| June 28, 2013 | Series C | $21.50 | "6/28/13-Series C" |
| Sept. 26, 2013 | Series D | $25.00 | "9/26/13-Series D" |

| Oct. 17, 2013 | Series D | At Market | "10/17/13-Series D" |
| Aug. 21, 2014 | Series D | $24.50 | "8/21/14-Series D" |

2.      The action is brought against several current and former executive officers and directors of Miller and the investment banking firms that underwrote the Offerings.  On October 1, 2015, Miller sought bankruptcy protection and, therefore, is not named as a defendant herein.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over the causes of action asserted herein pursuant to Tenn. Code Ann. §16-10-101, because this case is a cause not given by statute to another tribunal in this State.  This action is not removable.  The claims alleged herein arise under §§11 and 15 of the Securities Act, 15 U.S.C. §§77k and 77o.  Jurisdiction is conferred by §22 of the Securities Act and venue is proper pursuant to §22 of the Securities Act, 15 U.S.C. §77v.  Section 22 of the Securities Act explicitly states that "[e]xcept as provided in section 16(c), no case arising under this title and brought in any State court of competent jurisdiction shall be removed to any court of the United States."  Section 16(c) refers to "covered class actions," which are defined as lawsuits brought as class actions or brought on behalf of more than 50 persons asserting claims under state or common law.  *See* 15 U.S.C. §77p(c) and (f)(2).  This is an action asserting federal law claims.  Thus, it does not fall within the definition of a "covered class action" under §16(b)-(c) and therefore is not removable to federal court.  *See Kircher v. Putnam Funds Trust*, 547 U.S. 633, 636 n.1, 644 (2006) (an "action is not precluded" under the Securities Litigation Uniform Reform Act ("SLUSA") where it is not "'based upon the statutory or common law of any State.'" citing 15 U.S.C. §77p(b), and "the proper course is to remand to the state

court that can deal with it"); *Atkinson v. Morgan Asset Mgmt.*, 658 F.3d 549, 552 (6th Cir. 2011) (same: SLUSA precludes only "class actions that . . . assert state-law claims," citing 15 U.S.C. §77p(b), (f)(2)(A), (f)(3)); *see generally Luther v. Countrywide Home Loans Servicing LP*, 533 F.3d 1031, 1032 (9th Cir. 2008) ("Section 22(a) of the Securities Act of 1933 creates concurrent jurisdiction in state and federal courts over claims arising under the Act. It also specifically provides that such claims brought in state court are not subject to removal to federal court."); *Luther v. Countrywide Fin. Corp.*, 195 Cal. App. 4th 789, 792 (2011) ("The federal Securities Act of 1933 of 1998 . . . as amended by [SLUSA], provides for concurrent jurisdiction for cases asserting claims under the 1933 Act . . . ."). As detailed in Miller's bankruptcy petition, one of the Company's "Locations of Principal Assets of Business" is in "Morgan County, Tennessee."

4.     This Court has personal jurisdiction over each of the defendants named herein because they conducted substantial business in, were citizens of and/or orchestrated the Offerings out of Tennessee at the time of the Offerings (including Miller, which maintained its principal place of business and offices throughout this State at the time of the Offerings). The violations of law complained of herein occurred in Tennessee, including the preparation and dissemination of the materially false and misleading Registration Statement complained of herein, which was disseminated into this State.

## PARTIES AND RELEVANT NON-PARTIES

5.     Plaintiff Kenneth Gaynor purchased Miller preferred shares traceable to the Offerings, and was damaged thereby.

6.     Non-party Miller Energy Resources, Inc. (f/k/a Miller Petroleum, Inc.) is an independent exploration and production company that explores for, develops, and operates

oil and gas wells in south-central Alaska and in Tennessee. At all times relevant to this action, Miller common stock traded on the NYSE under the ticker symbol "MILL"; the Series C traded on the NYSE under the ticker symbol "MILLP"; and the Series D traded on the NYSE under the ticker symbol "MILLO." As of September 29, 2015, Miller had approximately 46.7 million shares of common stock, 3.25 million shares of Series C and 3.5 million shares of Series D issued and outstanding. On September 11, 2015, Miller caused its common stock, Series C and Series D to be delisted from the NYSE. On October 1, 2015, Miller filed a petition seeking relief under the federal bankruptcy statutes. In light of the automatic stay in the bankruptcy proceedings, Miller is not named as a defendant herein.

7.      Defendant Deloy Miller founded Miller and served as the Chairman of its Board of Directors (the "Board") until September 14, 2014.

8.      Defendant Scott M. Boruff ("Boruff") has served as the Executive Chairman of the Board since September 14, 2014. Previously, defendant Boruff served as Miller's Chief Executive Officer ("CEO") from August 6, 2008 to September 14, 2014 and as its President from June 2010 until June 9, 2011.

9.      Defendant David J. Voyticky served as the President of Miller from June 9, 2011 until August 12, 2014, as its Acting Chief Financial Officer ("CFO") from September 2011 until February 2014, and was a director from April 2010 to April 2014.

10.      Defendant Catherine A. Rector served as the Vice President and Chief Accounting Officer of Miller between July 2012 and October 2013.

11.     Defendant David M. Hall ("Hall") served as the Chief Operating Officer ("COO") of Miller from July 18, 2013 until August 6, 2015. Defendant Hall also served as a member of the Board from December 10, 2009 until April 16, 2015.

12.     Defendants Merrill A. McPeak, Gerald Hannahs, Charles M. Stivers and Don A. Turkleson served as directors of Miller as of September 6, 2012 and signed the Registration Statement used to conduct the Offerings.

13.     Defendants Bob G. Gower, Joseph T. Leary, William B. Richardson and Marceau N. Schlumberger served as directors of Miller at the time of certain of the Offerings.

14.     Defendant Paul W. Boyd ("Boyd") served as the CFO and Treasurer of Miller from 2008 to 2011 and as Miller's Director of Risk Management from 2011 until 2014.

15.     The defendants named in ¶¶8-15 are all liable under the Securities Act and are referred to herein as the "Individual Defendants." The Individual Defendants named in ¶¶8-13 each signed the Registration Statement used to conduct the Offerings. The Individual Defendants named in ¶14 were directors of Miller at the time of certain of the Offerings.

16.     Non-party Carlton W. Vogt, III ("Vogt") was the audit team leader at the Company's former independent outside auditing firm, non-party Sherb & Co., LLP ("Sherb & Co."), a now defunct CPA firm that was suspended by the SEC in 2013 for improper professional conduct unrelated to its work for Miller, which had served as the Company's outside audit firm since 2008. Vogt led the Sherb & Co. audit team that audited Miller's financial statements for the 2009 and 2010 fiscal years.

17. Defendants MLV & Co. LLC ("MLV"), Williams Financial Group ("WFG"), Maxim Group LLC ("MXG"), National Securities Corporation ("NSC"), Aegis Capital Corp. ("ACC"), Northland Capital Markets ("NCM"), Dominick & Dominick, LLC ("D&D"), Ladenburg Thalmann & Co. Inc. ("LTC") and I-Bankers Securities, Inc. ("IBS") (collectively the "Underwriter Defendants") are investment banking firms that acted as underwriters of the Offerings, helping to draft and disseminate the offering documents. Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

(a) The Underwriter Defendants are investment banking houses that specialize, *inter alia*, in underwriting public offerings of securities. They served as the underwriters of the Offerings and shared upwards of $7.5 million in fees collectively.[1] The Underwriter Defendants determined that in return for their share of the proceeds of the Offerings, they were willing to merchandize Miller preferred shares in the Offerings. The Underwriter Defendants arranged multi-city roadshows prior to the Offerings during which they, and representatives from Miller, met with potential investors and presented highly favorable information about the Company, its operation and its financial prospects.

(b) The Underwriter Defendants also demanded and obtained agreements from Miller that Miller would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also made certain that Miller had purchased millions of dollars in directors' and officers' liability insurance.

---

[1] As indicated below at note 2, one of the Offerings was conducted "at market" prices and/or on a "best efforts" basis and the Prospectus does not indicate the prices, dates of sales or number of shares sold in that Offering. Where required, the underwriting fees were estimated based on all shares being sold at $25.

(c)     Representatives of the Underwriter Defendants also assisted Miller and the Individual Defendants in planning the Offerings, and purportedly conducted adequate and reasonable investigations into the business and operations of Miller, an undertaking known as a "due diligence" investigation. The due diligence investigations were required of the Underwriter Defendants in order to engage in each of the Offerings. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Miller's operations and financial prospects.

(d)     In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with Miller's lawyers, management and top executives and engaged in "drafting sessions" between September 2012 and August 2014. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the Offerings; (ii) the terms of the Offerings, including the price at which Miller preferred shares would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Miller would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Miller management and top executives, the Underwriter Defendants knew, or should have known, of Miller's existing problems as detailed herein.

(e)     The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with offers and sales thereof, including to Plaintiff and the Class (as defined below).

## SUBSTANTIVE ALLEGATIONS

18.     Defendant Miller is an independent oil and natural gas exploration, production and drilling company operating in multiple exploration and production basins in North America founded in 1967. The Company, whose focus was originally on Tennessee's Appalachian Basin, first became a publicly traded company in connection with a reverse merger in 1996.

19.     Between early 2002 and December 2009, Miller's stock price regularly traded below one dollar per share, falling to a low of $0.04 per share in December 2007. In August 2008, Miller named a new CEO. Soon thereafter, the Company began acquiring additional oil and gas properties.

20.     In the fall of 2009, Miller became aware of certain oil and gas properties in Alaska that were in the process of being "abandoned" as part of the bankruptcy proceedings of California-based Pacific Energy Resources ("PER"). PER had been unable to service its heavy debt and pay the significant monthly costs required to operate its operating assets and had unsuccessfully sought for almost a year to sell them.

21.     Beginning in December 2008, months before it filed for bankruptcy, PER, with the help of one of the world's leading financial advisory and asset management firms, marketed PER's operating assets in Alaska to 40 potential buyers. This process failed to attract any bidders, and the assets were auctioned by the bankruptcy court in July 2009, with the winning bidder agreeing to a total purchase price of $8 million for the assets. A second entity, who bid $7 million, was designated as the back-up purchaser. Neither bid ultimately closed.

22.     As a result, PER sought in August 2009, and was granted in September, an order from the bankruptcy court allowing it to abandon title to the assets due to a lack of interest.

23.     Due to renewed interest in the assets from Miller following their abandonment, the bankruptcy court permitted PER to reacquire its Alaska assets and sell them to Miller's operating subsidiary, Cook Inlet Energy ("CIE"), in a competitive auction for $2.25 million in cash and the assumption of certain limited liabilities. The transaction closed on December 10, 2009.

24.     The Company then claimed the assets it had purchased through the bankruptcy were valued at more than $479 million, including oil and gas assets that included onshore and offshore production facilities, $215 million in proven energy reserves, $122 million in probable energy reserves, and $31 million in possible energy reserves, providing total reserves of $368 million (the "Alaska Assets").

25.     Until August 2015, the Company valued the Alaska Assets based on a reserve estimates report prepared for it by an engineering firm, Ralph E. Davis & Associates (the "Reserve Report"). Beginning on March 22, 2010, and subsequently repeated in numerous filings with the SEC Miller made through August 2015, the Company claimed in its quarterly report filed on Form 10-Q for its fiscal third quarter ended January 31, 2010 ("3Q 2010") a reported a value of the Alaska Assets of $480 million, which amount comprised $368 million for oil and gas properties and $110 million for fixed assets. Miller also reported an after-tax $277 million "bargain purchase gain," which boosted its reported net

income for the quarter to $272 million – an enormous increase over the $556,097 loss reported for the same period the year before.

26.     The newly booked value of the Alaska Assets, which resulted in a nearly 5,000% increase in Miller's total assets, had a significant impact on the market price of Miller common stock.  On December 10, 2009, the date of the transaction, Miller common stock closed at $0.61 per share.  Following the acquisition of the Alaska Assets, by March 31, 2010, Miller common stock closed 982% higher at $6.60 per share.  Weeks later, the listing of Miller stock was moved to the NASDAQ and, after moving to the NYSE a year later, reached an all-time high price on December 9, 2013 of $8.83 per share.

## THE FALSE AND MISLEADING REGISTRATION STATEMENT

27.     On or about September 6, 2012, Miller filed with the SEC a Form S-3 registration statement and prospectus using a "shelf" registration, or continuous offering process.  Under the shelf registration, Miller would sell securities described in various future prospectus supplements in one or more offerings.  The prospectus supplements would form part of the registration statement for each offering.  The securities were to be issued by Miller.  This Form S-3, which would later be utilized for all of the Offerings, expressly incorporated by reference certain filings Miller had previously made with the SEC and all future filings until any offering conducted under the shelf registration statement was completed.

28.     The SEC declared the shelf registration statement effective on September 18, 2012.

29.     On or about the date of each of the following Offerings, Miller and the following Underwriter Defendants priced the Offerings and filed the final Prospectuses for

- 10 -

those Offerings, which formed part of the Registration Statement (collectively, the "Registration Statement"), pursuant to which Miller sold the following preferred shares to the public:

| Offering | Underwriters | Price | Shares | Gross Proceeds[2] |
|---|---|---|---|---|
| 2/13/13-Series C | MLV, MXG, NSC, ACC, WFG | $22.90 | 625,000 | $14,312,500 |
| 5/8/13-Series C | MLV, MXG, NSC, ACC | $22.25 | 500,000 | $11,125,000 |
| 6/28/13-Series C | MLV, ACC, MXG, NSC, NCM | $21.50 | 335,000 | $7,202,500 |
| 9/26/13-Series D | MLV, MXG, NSC, ACC, D&D, LTC, NCM | $25.00 | 1,000,000 | $25,000,000 |
| 10/17/13-Series D | MLV | Market | 3,000,000 | $75,000,000 |
| 8/21/14-Series D | MLV, MXG, ACC, IBS, LTC, NSC, NCM | $24.50 | 750,000 | $18,375,000 |

30. The Registration Statement, including the materials incorporated therein by reference (which expressly incorporated Miller's Annual Report on Form 10-K for the year ended April 30, 2012, as well as various Current Reports on Form 8-K), and the final Prospectuses, which would include the Forms 10-K, 10-Q and 8-K filed prior to each Offering, were negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation.

31. All of the Company's interim and annual financial reports issued between 2010 and 2015, relying upon the Reserve Report, overstated the value of the Alaska Assets by hundreds of millions of dollars by failing to record the Alaska Assets at fair value as required by Accounting Standards Codification ("ASC") 805, *Business Combinations*, and the federal securities laws, because they "used as fair value a reserve report that was prepared by a

---

[2] Where an Offering was conducted "at market" price and/or on a "best efforts" basis and the dates, prices and number of shares sold were not disclosed in the Prospectus, gross proceeds were estimated using the total shares that could have been sold at $25 each.

petroleum engineer firm using the rules for supplemental oil and gas disclosures," "the reserve report . . . expressly disclaimed that the numbers therein represented the engineer firm's opinion of fair value," "[t]he reserve report . . . also contained expense numbers that were knowingly understated," and the Reserve Report "double counted $110 million of certain fixed assets that were already included in the reserve report." As a result, all of Miller's interim and fiscal financial reports issued between 2010 and 2015, the Form S-3 filed on September 6, 2012, and each of the final Prospectuses used to conduct the Offerings were false and misleading.[3]

## A. Under Generally Accepted Accounting Principles, Miller Energy Was Required to Record the Alaska Assets Acquisition at Fair Value

32. ASC 805, *Business Combinations* – formerly Statement of Financial Accounting Standards ("SFAS") 141(R) – became effective in December 2008. Among its principal revisions, ASC 805 requires acquisitions that result in a "bargain purchase," *e.g.*, entities purchased at fire sales prices in non-orderly transactions, to be measured at fair value, with any resulting gain recorded on the income statement.

33. ASC 820, *Fair Value Measurements* (formerly SFAS 157), provides the framework for measuring fair value. "Fair value" is defined in ASC 820 as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." A reporting entity must determine an

---

[3] Miller's false and misleading reports filed with SEC included: Forms 10-Q for the 3Q 2010 and all interim quarters for 2011-2015; Forms 10-K for 2010 - 2014; the Form S-1 filed on August 8, 2010; the Forms S-3 filed on September 6, 2012 and October 5, 2012; and prospectuses filed between August 25, 2010 through August 21, 2014 pursuant to Rule 424; and 15 Forms 8-K filed between March 2010 through at least December 2014.

appropriate fair value using one or more of the valuation techniques described in accounting literature.

34.    ASC 820 outlines three broad approaches to measuring fair value: the market approach, income approach, and cost approach. Under the market approach, prices and other relevant information generated by market transactions involving identical or comparable assets or liabilities are used to measure fair value. The income approach utilizes valuation techniques to convert future amounts to a single discounted present value amount. Finally, the cost approach is based on the amount that currently would be required to replace the assets in service, *i.e.*, current replacement cost.

35.    ASC 820 emphasizes that fair value is a market-based measurement, not an entity specific measurement, and should be determined based on the assumptions market participants would use in pricing the asset or liability.

36.    ASC 820 emphasizes that when a price for an identical asset or liability is not observable, entities should use a "valuation technique that maximizes the use of relevant observable inputs and minimizes the use of unobservable inputs" and entities may not ignore assumptions market participants would use.[4]

37.    When computing their estimate of fair value, defendants Miller and Boyd failed to consider the existence of numerous, readily apparent data points strongly indicating that the Alaska Assets were worth substantially less than the $480 million value Miller

---

[4]    ASC 820 defines "unobservable inputs" as "inputs that reflect the reporting entity's own assumptions about the assumptions market participants would use in pricing the asset or liability developed based on the best information available in the circumstances," and "observable inputs" as "inputs that reflect the assumptions market participants would use in pricing the asset or liability developed based on market data obtained from sources independent of the reporting entity."

recorded. In failing to do so, defendants Miller and Boyd materially overstated the value of the newly acquired Alaska Assets. As described detailed below, Miller purported to value the Alaska Assets using the income approach for the oil and gas reserves and the cost approach for certain fixed assets.

## B. The Valuation of the Acquired Oil and Gas Properties Was Based Upon a Reserve Report that Does Not Represent Fair Value

38.     To record the value of the acquired oil and gas properties, defendants Miller and Boyd requested and improperly used the Reserve Report prepared by an independent petroleum engineering firm.[5]

39.     Reserve reports are commonly used in the oil and gas industry to estimate quantities of oil and gas (the reserves) expected to be recovered from existing properties. Generally, these reports list reserves in categories based on a minimum estimated percentage probability of eventual recovery and production, *i.e.*, proved, probable and possible.

---

[5]     Oil and gas reporting companies are subject to two principal authoritative pronouncements governing financial accounting and reporting for oil and gas activities: Rule 4-10 of Regulation S-X (17 C.F.R. 210.4-10), *Financial Accounting and Reporting for Oil and Gas Producing Activities Pursuant to the Federal Securities Laws and the Energy Policy and Conservation Act of 1975* ("Rule 4-10"); and ASC 932-235-50-29 through 33 (formerly SFAS 19, *Financial Accounting and Reporting by Oil and Gas Producing Companies*, and SFAS 69, *Disclosures About Oil and Gas Producing Activities*). ASC 932 establishes disclosure requirements for significant oil and gas activities, including disclosure of the "standardized measure," which is the future after-tax net cash flows discounted at 10%.

A non-U.S. Generally Accepted Accounting Principles ("GAAP") measure, known as "PV-10," is similar to the standardized measure but is typically presented on a pretax basis. The Financial Accounting Standards Board has noted that the standardized measure supplies investors with useful information, however, they also noted their concern "that users of financial statements understand that it is neither fair market value nor the present value of future cash flows. It is a rough surrogate for such measures, a tool to allow for a reasonable comparison of mineral reserves and changes through the use of a standardized method that recognizes qualitative, quantitative, geographic, and temporal characteristics." Paragraph 83 of the Basis for Conclusions of SFAS 69.

Information in reserve reports that are prepared in accordance with SEC regulations is frequently used, among other purposes, to satisfy supplemental accounting disclosure requirements concerning estimates of future oil and gas production. However, the numbers used in reserve reports for this purpose are expressly not considered "an estimate of fair market value."[6]

40.     Shortly after the acquisition, defendant Boyd asked defendant Hall – a non-accountant with no formal accounting training – to obtain a reserve report for the Alaska Assets in order to determine the fair value of the acquired assets to be reported on Miller's Form 10-Q for the quarter ended January 31, 2010.

41.     On January 5, 2010, defendant Hall hired a petroleum engineering firm to prepare a reserve report using a pretax present value of net cash flows discounted at 10% ("PV-10"), which, while appropriate with further adjustments for SEC supplemental disclosures, was not indicative of fair value.

42.     The petroleum engineering firm did not know Miller intended to use the report for fair value purposes and believed that the purpose of the report was for use as supplemental data in the Company's SEC disclosures. Indeed, the two-page engagement letter with the engineering firm included no language about "fair value," "fair market value" or authoritative accounting literature.

43.     The Reserve Report was finalized in February 2010 and reflected PV-10 of $368 million.

---

[6]     *See* Paragraph 77 of the Basis for Conclusion of SFAS 69 ("Although it cannot be considered an estimate of fair market value, the standardized measure of discounted net cash flows should be responsive to some of the key variables that affect fair market value, namely, changes in reserve quantities, selling prices, production costs, and tax rates.").

44.     Upon receiving the Reserve Report, defendant Boyd, without undertaking any additional analysis, merely recorded as the fair value of the acquired oil and gas properties the sum of the PV-10 estimates for 100% of the proved, probable and possible reserves, which increased the book value of Miller's oil and gas properties on its balance sheet by $368 million.

45.     The Reserve Report itself clearly stated that the numbers therein were not an estimate of fair market value. Specifically, on page three of the report it stated that "[t]he discounted values shown are for your information and should not be construed as our estimate of fair market value."

46.     Defendant Boyd never reviewed or questioned any of the Reserve Report's assumptions or calculations, nor did he communicate with the engineering firm about the Reserve Report.

47.     The use of the PV-10 numbers as fair value conflicted with contemporaneous representations Miller made to investors in its filings with the SEC, including those incorporated by reference into the Registration Statement used to conduct the Offerings. Specifically, in its fiscal 2010 Form 10-K, which was the first annual report that included the inflated values, and as would be repeated in all filings through August 2015, Miller expressly told investors that "[o]ur PV-10 measure and the standardized measure of discounted future net cash flows do not purport to present the fair value of our natural gas and oil reserves." Despite that disclosure, Miller had actually used its PV-10 measure in that very same report as the fair value of its acquired properties.

48.    The $368 million Reserve Report value did not represent fair value for several reasons.

49.    Despite showing years of net profit that market participants would expect to be taxable, the Reserve Report did not make any adjustments for income taxes.

50.    At Miller's request, the Reserve Report used a 10% discount rate that was inappropriate under GAAP for determining fair value. In a discounted cash flow model, a discount rate is used to account for the uncertainties associated with risk and the time value of money. A discount rate is the required rate of return that an investor would demand – based on the risks associated with the benefit stream under consideration – to induce the investor to make an investment. By failing to consider the discount rate using assumptions market participants would use, Miller materially overstated the value of the acquired oil and gas properties.

51.    The valuation also overstated cash flows from certain categories of reserve estimates (*e.g.*, "probable" and "possible" reserves) by failing to apply any risk weight to such reserves and the resulting cash flows. Given the high degree of uncertainty associated with cash flows from these reserve estimate categories, they are required to be risk weighted in order to reflect an appropriate valuation.

52.    The Reserve Report did not include amounts for certain asset retirement obligations, *i.e.*, the legal obligations associated with the retirement of tangible long-lived assets.

53. Finally, the $237 million of projected operating and capital expenses in the Reserve Report, which were provided by defendants Miller and Hall, were intentionally understated, resulting in an overstated valuation.

54. In fact, one petroleum engineering firm contacted but not used by Miller thought that the expected level of expenses made a significant portion of the acquisition unprofitable. Initially, defendant Hall contacted the petroleum engineering firm who had previously provided the past two owners of the properties with reserve reports, and thus had unfettered access to past operating data, and requested a quote for "updating" a prior reserve report. That firm told defendant Hall that it would not assign any value to one of the largest fields acquired, the Redoubt Shoal field, because it was uneconomical – *i.e.*, expected future expenses exceeded expected future cash flows – and explained that it would not put its "name on a report that implies value exists where it likely does not."[7]

55. Defendant Boyd was aware that Miller chose the new firm because the prior firm would not assign any value to the Redoubt Shoal field. The Redoubt Shoal field – which represented $291 million of the $368 million in fair value recorded by Miller – showed positive future cash flows in the Reserve Report primarily because defendant Hall gave the new engineering firm understated and unsubstantiated expense numbers. Defendant Boyd had previously been advised by non-party Vogt that the lack of any controls over defendant Hall's expense estimates was a "concerning void."

---

[7] Unique among the oil and gas properties purchased by Miller, Redoubt Shoal is an offshore field in Cook Inlet, Alaska, which requires the use of an offshore platform that sits in seventy feet of water, is accessible only by boat or helicopter, and drills to depths in excess of 12,000 feet. Offshore drilling presents risks and costs not associated with onshore operations.

56.     Defendants Miller and Hall provided expense projections that, in many cases, were significantly lower than past actual experience. For example, internal documents maintained by defendant Hall indicated that the cost to drill a new well in the Redoubt Shoal field was roughly $13 million. However, defendant Hall told the engineering firm to use a cost of $4.6 million per well in its reserve report. And instead of using recent expense data, defendant Hall gave the engineering firm nearly three-year-old operating expense data, which he revised downward on the pretext that Miller could run a leaner operation than the former operators of the properties. By way of example, defendant Hall told the engineering firm that the offshore Redoubt Shoal field would cost $399,000 per month to operate when it actually cost the seller more than $600,000 per month, and internal estimates show that defendants Miller and Hall expected the field to cost more than $800,000 per month once it was fully operational. Additionally, in some years, the Reserve Report included zero expenses for operating the facilities in the Redoubt Shoal and another field.

57.     Overall, the Reserve Report implied operating expenses of $4 per barrel of oil equivalent ("boe") for all categories of reserves. That level of operating expenses was unreasonable in light of the previous owner's actual operating expenses of $32.50/boe in 2008 and $55.42/boe in the first half of 2009 before the wells were shut-in.

58.     By understating the expense numbers, Miller overvalued the oil and gas properties by tens of millions of dollars.

## C. The Fair Value of the Acquired Fixed Assets Was Double Counted and Overstated

59.     In addition to the $368 million value recorded for the oil and gas properties, defendant Miller also erroneously recorded a separate value of $110 million for acquired fixed assets, such as facilities and pipelines ancillary to the oil and gas reserves.

60.     In a February 8, 2010 email, defendant Boyd informed defendant Hall that he needed an amount to use as fair value for the fixed assets obtained as part of the Alaska Assets acquisition. He noted that, ideally, the value should be what a willing buyer would pay for the assets, but "[i]n the absence of that, replacement values or something similar would probably work." Two days later, defendant Boyd was sent an "asset replacement cost study," purportedly provided by an independent insurance broker, which appeared to list the replacement cost for the assets as $110 million. The "study" was dated September 5, 2008, but "revised" on February 9, 2010.

61.     Without any additional analysis, defendant Boyd recorded the amount in the revised insurance study on Miller's balance sheet.

62.     The recording of assets at a value of $110 million was improper for several reasons.

63.     Miller's use of the values in the insurance study resulted in counting the value of the fixed assets twice, thereby overstating the value of such assets. The Reserve Report, which Miller relied on to value the acquired oil and gas properties, used a discounted cash flow model. Valuation specialists use such models to estimate the value of an enterprise's "operating assets" – *i.e.*, the assets employed to generate future cash flows – by converting future benefit streams into a net present value. In Miller's case. the fixed assets in the

- 20 -

insurance study were the very same operating assets that were expected to generate the future cash flows in the Reserve Report. Accordingly, they should not have been separately valued.

64.     Prior to the acquisition, all of the production from the offshore Redoubt Shoal field ran through the Osprey platform, which had no processing facilities or power generating capability of its own. Power was sent from generators housed within the Kustatan Production Facility to the platform via a subsea line, which was connected to an underground power grid that ran throughout all of the acquired properties. Moreover, production from the offshore platform was sent onshore for processing through pipes to the Kustatan Production Facility. Absent the platform, there would have been no way to obtain oil and gas from the Redoubt Shoal field without incurring upfront capital expenditures to replace the platform and its related infrastructure. Similarly, without the other production facilities, the platform would have lacked power and somewhere to process its oil and gas.

65.     The Reserve Report Miller used for the valuation recognized the interconnectedness of the properties, as it expressly listed the facilities and the offshore platform as assets used to generate the future cash flows.

66.     In short, because the fixed assets were integral to the operations of the acquired properties, their values were captured in the Reserve Report's cash flows. Consequently, by separately valuing the same operating assets, Miller overstated the value of the Alaska Assets by as much as $110 million.

67.     The insurance study also did not reflect fair value because the version of the insurance study used by defendant Boyd purported to show "asset replacement cost." Absent further adjustments, replacement cost new does not qualify as fair value under GAAP.

68. Miller, at the direction of defendants Boyd and Hall, also refashioned a preexisting insurance study to make it appear that its own value of $110 million derived from a third party. The numbers in the fixed asset study were given to the insurance broker, and its predecessor, by its clients (*i.e.*, Miller and the previous owners of the fixed assets) as far back as 2007 and were used as starting points for other types of estimates, such as estimates for possible losses resulting from fire or natural disasters. The two employees at the insurance broker who were most familiar with the original "Loss Estimates Study," including the engineer who authored it, confirmed to the SEC that no one at the broker ever tested or in any way double checked the values given to them.

69. Defendants Boyd and Hall knew or knowingly disregarded the fact that the insurance study did not reflect fair value or any analysis by the insurance broker.

70. On February 8, 2010, defendant Hall directed Alaska personnel to contact the insurance broker and another oil and gas consulting company to ask them for a report reflecting fair value or replacement cost. The insurance broker responded on February 9, 2010, and told Miller in an email copied to defendant Hall that it could not provide a report showing replacement costs.

71. Miller also contacted a separate consulting firm and sent it the insurance broker's original 2008 insurance report. Late on February 8, 2010, the consulting firm informed Miller that the insurance study it sent was a "good reference" but the report did not state "value or replacement cost." The firm offered to conduct its own analysis, but advised that the estimate would take "approximately 2-3 weeks to complete" and "cost around $15,000-$18,000."

72.    Upon hearing the news that a new report might take two to three weeks, Alaska personnel, including defendant Hall, called defendant Boyd. According to one participant on this call, defendant Boyd said he could not wait weeks for a new report. He "needed it quickly and he needed to base it on something . . . a professional had to sign off on it, not us, some third party." During the call, defendants Boyd and Hall decided to rely on numbers in the insurance report as replacement costs, despite defendant Hall having been told by the broker that it could not provide Miller with replacement costs.

73.    With the aim of making the report appear as though it reflected replacement costs, defendant Hall provided a subordinate with edits to the 2008 insurance report that significantly altered its appearance, including changing its name from "Loss Estimates Study" to "Asset replacement cost study." The revised report, which Miller gave to Sherb & Co., omitted the insurance broker's methodology and analysis. As a result, the only numbers reflected in the revised report were the ones provided to the broker by defendant Miller and its predecessors.

74.    As a result of the foregoing, Miller overvalued the Alaska Assets by more than $400 million.

75.    As a result of the fraudulent valuation, Miller filed with the SEC financial reports that materially misstated the value of its assets, including the SEC filings incorporated by reference in the Registration Statement used to conduct the Offerings.

76.    Under the rules and regulations governing the preparation of the Registration Statement, Miller was required to disclose at the time of the Offerings that the value of the Alaska Assets was materially overstated in its financial statements. The Registration

Statement, however, contained no such disclosures. Pursuant to Item 303 of Regulation S-K (17 C.F.R. §229.303) and the SEC's related interpretive releases thereto, issuers are required to disclose events or uncertainties, including any known trends, that have had or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results. This is particularly true for issuers utilizing shelf registration statements, which require continuous updating and incorporate those continuous disclosures into the registration statement.

77.     At the time of each of the Offerings, the Alaska Assets were materially overstated in the Company's financial statements, which materially understated its true expenses and materially overstated its profits. The adverse events and uncertainties associated with these declining trends were reasonably likely to have a material impact on Miller's profitability, and, therefore, were required to be disclosed in the Registration Statement.

78.     The Offerings were successful for the Company and the Underwriter Defendants who sold upwards of 6.21 million Series C and D shares, raising an estimated $151.015 million in gross proceeds in the Offerings, as follows[8]:

| Offering | Underwriters | Price | Shares | Gross Proceeds |
|---|---|---|---|---|
| 2/13/13-Series C | MLV, MXG, NSC, ACC, WFG | $22.90 | 625,000 | $14,312,500 |
| 5/8/13-Series C | MLV, MXG, NSC, ACC | $22.25 | 500,000 | $11,125,000 |
| 6/28/13-Series C | MLV, ACC, MXG, NSC, NCM | $21.50 | 335,000 | $7,202,500 |
| 9/26/13-Series D | MLV, MXG, NSC, ACC, D&D, LTC, NCM | $25.00 | 1,000,000 | $25,000,000 |
| 10/17/13-Series D | MLV | Market | 3,000,000 | $75,000,000 |
| 8/21/14-Series D | MLV, MXG, ACC, IBS, LTC, NSC, NCM | $24.50 | 750,000 | $18,375,000 |

[8]     As indicated in notes 1 and 2 above, this is an estimated figure based on information provided in the Prospectuses.

## MILLER WRITES DOWN THE VALUE OF THE ALASKA ASSETS

79.     Following the Offerings, the following series of disclosures revealed that the Registration Statement was false and misleading in that it overstated the value of the Alaska Assets on the Company's books by hundreds of millions of dollars at the time each of the Offerings was conducted.

80.     On December 10, 2014, Miller disclosed that it was taking a $265.3 million impairment charge on the Alaska Assets, specifically the Redoubt Shoal field.

81.     On March 12, 2014, Miller disclosed that it was taking another $150 million impairment charge on the Alaska Assets.

82.     On April 29, 2015, Miller disclosed that the SEC had notified it that the agency staff had made a preliminary determination to recommend civil action against the Company related to its accounting for the 2009 Alaska Asset acquisition.

83.     On May 6, 2015, Miller disclosed that it would "defer" the dividend payments on the Series C and D shares.

84.     On May 12, 2015, Miller disclosed that the NYSE had notified the Company that its shares were subject to delisting due to its having failed to maintain listing requirements.

85.     On July 14, 2015, Miller included a "going concern" disclosure in its 2014 Annual Report filed with the SEC on Form 10-K.

86.     On July 30, 2015, Miller disclosed that its common stock would be delisted from the NYSE.

87.     Then, on August 6, 2015, the SEC initiated civil administrative proceedings against Miller (the "SEC Enforcement Action") accusing the Company and defendants Boyd

and Hall of knowingly artificially inflating the value of the Alaska Assets acquired in 2009 and then knowingly misstating Miller's financial statements for the ensuing five-plus year period through and including July 2015 when the Company's stock was delisted. Non-party Vogt was also charged in the SEC Enforcement Action.

88.     In its Order Instituting Public Administrative and Cease-and-Desist Proceedings filed that day, the SEC's Division of Enforcement alleged that after acquiring the Alaska Assets in late 2009, Miller overstated their value by more than $400 million, boosting the Company's net income and total assets. According to the SEC, the allegedly inflated valuation had a significant impact, turning a penny-stock company into one that was eventually listed on the NYSE, where its common stock had reached a 2013 high of nearly $9 per share. In a statement issued that day, William P. Hicks, Associate Regional Director of the SEC's Atlanta office, stated in pertinent part as follows:

> "Financial statement information is the cornerstone of investment decisions. We've charged that Miller Energy falsified financial statement information and grossly overstated the value of its Alaska assets and that the company's independent auditor failed to conduct an audit that complied with professional standards .... The SEC will aggressively prosecute such conduct."

89.     According to the SEC, Miller had paid $2.25 million and assumed certain liabilities to purchase the Alaska Assets. It later reported them at a value of $480 million. While accounting standards required the Company to record the properties at "fair value," then-CFO defendant Boyd allegedly relied on the Reserve Report, which did not reflect fair value for the assets, and he also was alleged to have double counted $110 million of fixed assets already included in the Reserve Report. The Reserve Report allegedly contained expense numbers that were knowingly understated by defendant Hall, then serving as the

CEO of Miller's Alaska subsidiary, CIE, and as Miller's COO since July 2013. Defendant Hall was also alleged to have altered a second report to make it appear as though it reflected an outside party's estimate of value.

90.     The SEC alleged that the fiscal 2010 audit of Miller's financial statements was deficient due to the failure of non-party Vogt, the Sherb & Co. partner in charge of the Miller audits, who issued an unqualified opinion of Miller's 2010 annual report and was alleged to have falsely stated that the audit was conducted in accordance with the standards of the Public Company Accounting Oversight Board and that Miller's financial statements were presented fairly and conformed with GAAP.

91.     As a result of the forgoing misconduct, the SEC alleged that:

- Defendant Miller violated §17(a) of the Securities Act, §10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, which prohibit fraudulent conduct in the offer or sale of securities and in connection with the purchase or sale of securities;

- Defendant Boyd willfully aided and abetted and caused, and defendant Hall caused, Miller's violations of §17(a) of the Securities Act, §10(b) of the Exchange Act and Rule 10b-5 thereunder;

- Defendant Boyd willfully violated, and defendant Hall violated, §17(a) of the Securities Act, §10(b) of the Exchange Act and Rule 10b-5 thereunder, which prohibit fraudulent conduct in the offer or sale of securities and in connection with the purchase or sale of securities;

- Defendant Miller violated §13(a) of the Exchange Act and Rules 13a-1, 13a-11 and 13a-13 thereunder, which require that every issuer of a security registered pursuant to §12 of the Exchange Act file with the SEC, among other things, annual, current, and quarterly reports as the SEC may require;

- Defendant Boyd willfully aided and abetted and caused, and defendant Hall caused, Miller's violations of §13(a) of the Exchange Act and Rules 13a-1, 13a-11 and 13a-13 thereunder;

- Defendant Miller violated §13(b)(2)(A) of the Exchange Act, which requires reporting companies to make and keep books, records and accounts which, in

reasonable detail, accurately and fairly reflect their transactions and dispositions of their assets;

- Defendant Boyd willfully aided and abetted and caused, and defendant Hall caused, Miller's violations of §13(b)(2)(A) of the Exchange Act;

- Defendant Miller violated §13(b)(2)(B) of the Exchange Act, which requires all reporting companies to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP;

- Defendant Boyd willfully aided and abetted and caused, and defendant Hall caused, Miller's violations of §13(b)(2)(B) of the Exchange Act;

- Defendant Boyd willfully violated, and defendant Hall violated, §13(b)(5) of the Exchange Act, which prohibits any person from knowingly circumventing or knowingly failing to implement a system of internal accounting controls or knowingly falsifying any book, record, or account described in §13(b)(2) of the Exchange Act;

- Defendant Miller violated Rule 12b-20 under the Exchange Act which requires that, in addition to the information expressly required to be included in a statement or report filed with the SEC, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made not misleading;

- Defendant Boyd willfully aided and abetted and caused, and defendant Hall caused, defendant Miller's violations of Rule 12b-20 under the Exchange Act; and

- Defendant Boyd willfully violated Rule 13a-14 of the Exchange Act, which requires that an issuer's principal executive and principal financial officers certify each periodic report.

92.    The SEC sought and obtained, among other things, cease-and-desist orders, civil monetary penalties, and return of alleged ill-gotten gains from defendants Miller, Boyd and Hall.

93.    During August 2015, various of Miller's creditors called for the Company to file bankruptcy.

94.     On August 20, 2015, Miller disclosed that it had settled with the SEC, agreeing to pay a $5 million fine and to restate all periodic financial reports back to 2010. Miller's restatement of its previously reported financial results was an admission that those results were false when filed.

95.     On October 1, 2015, Miller filed for protection under Chapter 11 of the federal bankruptcy statutes, citing in large part the filing of the SEC Enforcement Action, which Miller's senior executives stated had torpedoed its ability to obtain $165 million in outside financing, along with the filing of an involuntary bankruptcy petition against its subsidiary CIE in August 2015 by creditors Baker Hughes Oilfield Operations Inc. and Schlumberger Technology Corp., with total claims of $2.79 million, which filing Miller said was precipitated by the SEC Enforcement Action.

96.     By the time of the filing of this action, Miller Series C and D shares have been delisted after the market price of each had plummeted to approximately $0.30 per share, a more than 98% decline from the prices the shares were marketed at in the Offerings.

## CLASS ACTION ALLEGATIONS

97.     Plaintiff brings this action as a class action on behalf of a class consisting of all those who purchased Miller preferred shares traceable to the Registration Statement issued in connection with the Offerings (the "Class"). Excluded from the Class are defendants and their families, the officers and directors and affiliates of defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

98.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time

and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Miller or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

99.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

100.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

101.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether defendants violated the Securities Act;

(b)    whether the Registration Statement was negligently prepared and contained inaccurate statements of material fact and omitted material information required to be stated therein; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

102.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small,

the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## FIRST CAUSE OF ACTION

### For Violation of §11 of the Securities Act
### Against All Defendants (Except Boyd)

103. Plaintiff incorporates ¶¶1-103 by reference.

104. This Cause of Action is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants except Boyd.

105. The Registration Statement for the Offerings was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary in order to make the statements made not misleading, and omitted to state material facts required to be stated therein.

106. The defendants named in the Cause of Action are strictly liable to Plaintiff and the Class for the misstatements and omissions.

107. None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

108. By reason of the conduct herein alleged, each of these defendants violated, and/or controlled a person who violated, §11 of the Securities Act.

109. Plaintiff acquired Miller preferred shares traceable to the Offerings.

110. Plaintiff and the Class have sustained damages.

111.    At the time of their purchases of Miller preferred shares, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiff commenced this action. Less than three years has elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time Plaintiff commenced this action.

## SECOND CAUSE OF ACTION

### For Violation of §15 of the Securities Act
### Against the Company and the Individual Defendants

112.    Plaintiff incorporates ¶¶1-112 by reference.

113.    This Cause of Action is brought pursuant to §15 of the Securities Act against the Company and the Individual Defendants.

114.    The Individual Defendants each were control persons of Miller by virtue of their positions as directors and/or senior officers of Miller. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Miller. The Company controlled the Individual Defendants and all of Miller's employees.

115.    The Individual Defendants each were culpable participants in the violations of §11 of the Securities Act alleged in the Cause of Action above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the Offerings to be successfully completed.

- 32 -

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying Plaintiff as a Class representative under Tenn. R. Civ. P. 23 and Plaintiff's counsel as Class Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  November 6, 2015
        BARRETT JOHNSTON MARTIN
        &amp; GARRISON, LLC
        DOUGLAS S. JOHNSTON, JR., #5782
        JERRY E. MARTIN, #20193
        TIMOTHY L. MILES, #21605

        _____
        JERRY E. MARTIN

        Bank of America Plaza
        414 Union Street, Suite 900
        Nashville, TN 37219
        Telephone: 615/244-2202
        615/252-3798 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHRISTOPHER M. WOOD, #032977
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
MARY K. BLASY
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

LAW OFFICES OF CURTIS V. TRINKO, LLP
CURTIS V. TRINKO
WILLIAM MARGRABE
16 West 46th Street, 7th Floor
New York, NY 10036
Telephone: 212/490-9550
212/986-0158 (fax)

Attorneys for Plaintiff

KENNETH GAYNOR, Individually and on
Behalf of All Others Similarly Situated,

              Plaintiff,

vs.

DELOY MILLER, *et al.*

              Defendants.

)
)
)
)
)
)
)
)
)
)
)

Case No. 2015-cv-34

Judge Michael Pemberton

<u>CLASS ACTION</u>

<u>DEMAND FOR JURY TRIAL</u>

## PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS MLV & CO. LLC, WILLIAMS FINANCIAL GROUP MAXIM GROUP LLC, NATIONAL SECURITIES CORPORATION, AEGIS CAPITAL CORP., NORTHLAND CAPITAL MARKETS, DOMINICK & DOMINICK, LLC, LADENBURG THALMANN & CO. INC. AND I-BANKERS SECURITIES, INC.

Pursuant to Tenn. R. Civ. P. 34, plaintiff hereby demands MLV & Co. LLC, Williams

Financial Group Maxim Group LLC, National Securities Corporation, Aegis Capital Corp.,

Northland Capital Markets, Dominick & Dominick, LLC, Ladenburg Thalmann & Co. Inc. and

I-Bankers Securities, Inc. (collectively "Defendants") to produce the documents described below

for inspection and copying at the law offices of Barrett Johnston Martin & Garrison, LLC, 414

Union Street, Suite 900, Nashville, TN 37209, within 45 days after service of complaint, at

10:00 a.m., or at such other location and date upon which the parties may mutually agree.

DEFINITIONS

    1.     "You" and "your" refer to the person responding to these Requests.

    2.     The term "Individual Defendants" means Deloy Miller, Scott M. Boruff, David J.

Voyticky, Catherine A. Rector, David M. Hall, Merrill A. Mcpeak, Gerald Hannahs, Charles M.

Stivers, Don A. Turkleson, Bob G. Gower, Joseph T. Leary, William B. Richardson, Marceau N. Schlumberger and Paul W. Boyd

3.  "Miller" means Miller Energy Resources, Inc. and any of its predecessors, successors, divisions, parents, affiliates, subsidiaries (including, but not limited to, CIE as defined below), directors, employees, agents or anyone acting or purporting to act on its behalf.

4.  "CIE" means Cook Inlet Energy and any of its predecessors, successors, divisions, parents, affiliates, subsidiaries, directors, employees, agents or anyone acting or purporting to act on its behalf.

5.  "PER" means Pacific Energy Resources and any of its predecessors, successors, divisions, parents, affiliates, subsidiaries, directors, employees, agents or anyone acting or purporting to act on its behalf.

6.  "Offerings" means the following public offerings of Miller's 10.75% Series C Cumulative Preferred Stock ("Series C") and 10.5% Series D Fixed Rate/Floating Rate Cumulative Redeemable Preferred Stock ("Series D") (collectively, the "Offerings"):

| DATE | PREFERRED SHARES | PRICE | OFFERING NAME |
|---|---|---|---|
| Feb. 13, 2013 | Series C | $22.90 | "2/13/13-Series C" |
| May 8, 2013 | Series C | $22.25 | "5/8/13-Series C" |
| June 28, 2013 | Series C | $21.50 | "6/28/13-Series C" |
| Sept. 26, 2013 | Series D | $25.00 | "9/26/13-Series D" |
| Oct. 17, 2013 | Series D | At Market | "10/17/13-Series D" |
| Aug. 21, 2014 | Series D | $24.50 | "8/21/14-Series D" |

7.  "Alaska Assets" means certain oil and gas properties in Alaska purchased by Miller's operating subsidiary, CIE for $2.25 million in cash and the assumption of certain limited liabilities and which closed on December 10, 2009.

8.  "Reserve Reports" means the reserve estimates report prepared for Miller by Ralph E. Davis & Associates concerning the Alaska Asserts.

- 2 -

9.     "Person" or "persons" means and refers to natural persons, proprietorships, corporations, partnerships, trusts, joint ventures, groups, associations, organizations and governmental agencies and other agencies.

10.    "Underwriter Defendants means defendants MLV & Co. LLC, Williams Financial Group Maxim Group LLC, National Securities Corporation, Aegis Capital Corp., Northland Capital Markets, Dominick & Dominick, LLC, Ladenburg Thalmann & Co. Inc. and I-Bankers Securities, Inc.

11.    The term "business relationship" refers to any relationship, whether formal, informal, contractual or legal, concerning any employment, occupation, profession, ownership or equity interest for monetary gain, personal gain or livelihood. "Business relationship" shall also include, without limitation, any monetary, financial or labor investment.

12.    The term "document" or "documents" is intended to be interpreted in the broadest possible sense and includes, but is not limited to, all electronic data and all communications which are stored or retrievable or recorded in any manner and also includes, without limitation, any writing or other record of information or images, including, but not limited to, print, handwriting, photographs, film, recordings, memoranda, books, records, accounts, ledgers, vouchers, invoices, drafts, bills, charge slips, letters, electronic mail or "e-mail," compact discs, CD-ROM discs, magnetic tape, videotape, magnetic or optical disks, "floppy disks," "PowerPoint" or other presentation software systems, telegrams, mailgrams, correspondence, notes and minutes of meetings, conversations or telephone calls, resolutions, interoffice memoranda, work papers, reports, projects, tabulations, studies, surveys, legal complaints and other pleadings, affidavits, interrogatories, legal briefs, legal motions, judgments, designs, drawings, schematics, maps, manuals, models, notebooks, contracts, agreements, diaries,

telephone records, desk calendars, appointment books, circulars, charts, transcripts, news releases, trade releases, advertisements, press books, teletype messages, licenses, financial statements, stenographers' notebooks, punchcards, computer printouts and data, telecopier or facsimile transmissions and printouts, letters of credit, stock certificates and securities. The term "document" also includes preliminary drafts or revisions or copies of any such document if the copy is in any way different from the original, now in your possession, custody or control, or in the possession, custody or control of your advisors, agents, employees, servants, representatives, trustees, counsel or other persons acting or purporting to act on your behalf.

13.    The term "electronic data" refers to any original and any non-identical copies (whether non-identical because of notes made on copies or attached comments, annotations, marks, transmission notations, or highlighting of any kind), of mechanical, facsimile, electronic, magnetic, digital or other programs (whether private, commercial, or work-in-progress), programming notes or instructions, activity listings of electronic mail receipts or transmittals, output resulting from the use of any software program, including word processing documents, spreadsheets, database files, charts, graphs and outlines, electronic mail or "e-mail," personal digital assistant ("PDA") messages, instant messenger messages, operating systems, source code of all types, programming languages, linkers and compilers, peripheral drives, PDF files, PRF files, batch files, ASCII files, crosswalks, code keys, pull down tables, logs, file layouts and any and all miscellaneous files or file fragments, regardless of the media on which they reside and regardless of whether said electronic data consists of an active file, deleted file or file fragment. "Electronic data" also includes any and all items stored on computer memory or memories, hard disks, floppy disks, zip drives, CD-ROM discs, Bernoulli Boxes and their equivalents, magnetic tapes of all types and kinds, microfiche, punched cards, punched tape, computer chips (including,

- 4 -

but not limited to, EPROM, PROM, ROM or RAM of any kind) on or in any other vehicle for digital data storage or transmittal, files, folder tabs, or containers and labels appended to or associated with any physical storage device associated with each original and each copy.

14. The term "Financial Statements" includes, but is not limited to, interim, final, pro forma, actual, projected, complete, or partial, annual, quarterly, monthly, weekly or otherwise, audited or unaudited, budgets, budget plans, balance sheets, schedules of direct costs, schedules of miscellaneous income, schedules of general services, fiscal serviceman administrative services, statements of earnings and earnings per share, income statements, cash flow statements, statement of revenues and statements of expenses, all notes or other commentary concerning any of the foregoing and all underlying work papers and all drafts used in connection with the preparation of any of the foregoing.

15. The term "telephone records" includes, without limitation, telephone directories, rolodexes, messages, telephone logs, recordings of telephone conversations and telephone bills (local and long distance).

16. "Communication" or "communications" refers to any exchange of information by any means of transmission, sending or receipt of information of any kind by or through any means including, but not limited to, speech, writings, documents, language (machine, foreign or otherwise) of any kind, computer electronics or electronic data, sound, radio or video signals, telecommunication, telephone, teletype, facsimile, telegram, microfilm, microfiche, photographic film of all types or other media of any kind. The term "communication" also includes, without limitation, all inquiries, discussions, conversations, correspondence, negotiations, agreements, understandings, meetings, notices, requests, responses, demands, complaints, or press, publicity or trade releases.

17. The term "concerning" shall mean constituting, evidencing, reflecting, referring to, incorporating, effecting, including, or otherwise pertaining or relating, either directly or indirectly, or being in any way logically or factually connected with the subject matter of the inquiry or Request. Requests for "documents concerning" any subject matter include documents concerning communication regarding that subject matter.

18. "Identify" when used to refer to a natural person, shall mean to set forth that person's: (i) full name and title, if any; (ii) present or last known address; (iii) present or last known business and home telephone number(s); and (iv) present or last known employer.

19. "Identify" when used to refer to a document, shall mean: (i) the date of each document; (ii) the type of each such document (*i.e.* correspondence, memorandum, business record, etc.); (iii) the identity of the author(s) or preparer(s) of each such document; and (iv) the present location of each such document or copies thereof.

20. The terms "all" and "each" shall be construed as all/each.

21. The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the request all responses that might otherwise be construed to be outside of its scope.

22. "Roadshow" means any and all presentations made or given by any officer, director, employee, agent, underwriter, investment banker or other person or entity on behalf of Miller, relating to the Offerings.

23. "SEC" means the Securities and Exchange Commission.

24. "SEC filings" means all documents filed or prepared for the purpose of filing with the SEC and any other state or federal regulatory agency, including, but not limited to, Forms 8-

K, 10-K, 10-Q, Schedules TO-T, 13-D, 14A, 14D-1 and 14D-9 and any drafts thereof or amendments thereto.

25. "SEC Enforcement Action" means the civil administrative proceedings against Miller initiated by the SEC on August 6, 2015 in *In the Matter of Miller Resources, Inc., et al.*, SEC Admin. Proc. File No. 3-16729.

## INSTRUCTIONS

In responding to these document Requests, you shall produce separately all documents available at the time of responding or which can be located or discovered by reasonably diligent efforts, including documents in the possession of your agents and representatives.

References to an individual, partnership, limited liability company or corporation include any and all agents, employees, representatives and attorneys and all other persons or entities acting on your behalf or under your control.

If you claim any form of privilege or any other objection, whether based on statute, common law or otherwise as a ground for not producing any requested document, please furnish a list identifying each document for which the privilege or other objection is claimed together with the following information: date, sender, recipient, persons to whom copies were furnished together with their job titles, subject matter, basis on which privilege or other objection is claimed and the number of each Request to which such document responds. If you claim privilege or any other objection with regard to only part of a document, produce the part to which there is no objection.

If you are aware of any documents or copies thereof that may be responsive to these Requests but are no longer in your possession, custody or control, or have been lost or destroyed, identify each document in detail, including whether: (i) the document is missing, lost or destroyed; (ii) the document has been transferred or delivered to another person and, if so, at

whose request; (iii) who prepared it; (iv) to whom it was prepared for and sent to; (v) when it was prepared or sent; (vi) the content of the document; (vii) the person who destroyed it; and (viii) why it was lost or destroyed.

If any individual Request is ambiguous in any way, please send a letter to the undersigned counsel describing the ambiguity and it will be promptly clarified in a reply letter. If any individual Request (or subpart thereof) is deemed to be unduly burdensome, please send a letter to the undersigned counsel specifying the reasons why the Request is unduly burdensome and stating whatever information and knowledge you have of the information or documents called for in the Request, and (generally) an attempt will be made to rephrase the Request (or subpart thereof) in a reply letter to lessen the burdens of compliance. Any such reply letter may be treated by the parties to whom it is addressed as a modification of the particular Request.

Unless words or terms have been given a specific definition herein, each word or term used herein shall be given its usual and customary dictionary definition except where such words have a specific custom and usage definition in your trade or industry, in which case they shall be interpreted in accordance with such usual custom and usage definition of which you are aware. In construing the Requests herein: (i) the singular shall include the plural and the plural shall include the singular; and (ii) a masculine, feminine or neuter pronoun shall not exclude the other genders, all to the end that the interpretation applied results in the more expansive production.

In making production, produce all documents as kept in the normal course of business and identify the file from which each document was taken.

TIME PERIOD

Unless stated otherwise, the time period to which these Requests refer is January 1, 2009 through the date of production. If a document prepared before this period is necessary for a

correct or complete understanding of any document covered by a Request, you must produce the earlier or subsequent document as well. If any document is undated and the date of its preparation cannot be determined, the document shall be produced if otherwise responsive to the production Request.

DOCUMENTS REQUESTED

REQUEST NO. 1:

All documents and communications concerning each draft or final Offerings prospectuses and registration statements and disclosures incorporated in the Offerings prospectuses, including, but not limited to, any draft that contains edits, comments, questions, or any writing concerning the draft or the Offerings.

REQUEST NO. 2:

All communications to or from you concerning the matters disclosed in the Offerings prospectuses and periodic filings incorporated therein.

REQUEST NO. 3:

All documents and communications concerning the adequacy of, necessity of, expected, or actual, disclosures of information in connection with the Offerings and Offering prospectuses (including prospectuses drafts).

REQUEST NO. 4:

All documents concerning any disagreement between Miller, the Individual Defendants, the Underwriter Defendants, or any Miller officers, directors, employees, consultants, accountants or attorneys concerning any conclusion, statement, observation, disclosure or non-disclosure in any document filed by Miller with the SEC concerning:

(a)     the Offerings;

(b)     the Alaska Assets;

(c)    the Reserve Report; and

(d)    Miller's accounting for the Alaska Assets.

## REQUEST NO. 5:

All documents and communications prepared, received, or sent by you concerning:

(a)    the Offerings;

(b)    the Alaska Assets;

(c)    the Reserve Report;

(d)    Miller's accounting for the Alaska Assets.

## REQUEST NO. 6:

All documents and communications concerning any due diligence performed in connection with the Offerings.

## REQUEST NO. 7:

All documents concerning how you conduct due diligence, including, but not limited to, all due diligence checklists and/or procedure manuals.

## REQUEST NO. 8:

Any comfort letters prepared or received by you concerning Miller or the Offerings.

## REQUEST NO. 9:

All documents and communications concerning any meetings, conference calls, symposiums or conferences at which Miller was discussed, including, but not limited to, any Miller Board of Directors' meetings or Miller Board of Directors' committee meetings. Responsive documents shall include, but not be limited to, materials distributed and notes or transcripts of any meetings and conference calls.

## REQUEST NO. 10:

All documents and communications relating to presentations and reports you gave to Miller or any of the Individual Defendants.

REQUEST NO. 11:

All documents and communications concerning any press release, published article, financial analysts' report and/or rating agencies' report relating to or concerning Miller or the Offerings.

REQUEST NO. 12:

All documents and communications concerning any actual or proposed changes in the terms or effective dates of the Offerings or the right or option to terminate, amend or modify the terms of the Offerings, including, but not limited to, any change in the offering price of Miller common stock leading up to the Offerings.

REQUEST NO. 13:

All documents that identify the personnel involved in the Offerings, whether contained in a "Working Group List" or any similar list, from any or all of the following entities: Miller;; the Underwriter Defendants; and any other entities or consultants involved in the Offerings.

REQUEST NO. 13:

All documents concerning fees, expenses, reimbursements, costs, compensation or other remuneration received by you for services rendered relating to the Offerings and/or any other services provided to or on behalf of Miller.

REQUEST NO. 14:

All indemnification and/or hold-harmless agreements and any documents relating to any indemnifications between you and Miller or the Individual Defendants.

REQUEST NO. 15:

All documents and communications concerning any investors in or purchasers of Miller's securities in connection with the Offerings, including, but not limited to, any lists and trading records in your possession, custody or control, and documents identifying any person or entity that purchased Miller securities in the Offerings.

REQUEST NO. 15:

All documents concerning any actual or contemplated investment banking services or consulting services performed for or on behalf of Miller or the Individual Defendants.

REQUEST NO. 16:

All documents concerning your ownership or investment in Miller.

REQUEST NO. 17:

All documents concerning any communication, presentation or meeting (including any scripts, transcripts, tapes or videos prepared in connection with or as a result of) with any potential purchasers of Miller's securities, securities analysts, financial analysts, institutional investors, financial investors, news media, journalists, investment bankers, brokerage firms, market makers, money managers, commercial banks, rating agencies (such as Moody's Investor Service, Inc.) or stock markets or securities exchanges concerning Miller or the Offerings, including, but not limited to, Roadshow presentations.

DATED: November 16, 2015       BARRETT JOHNSTON MARTIN
                                      & GARRISON, LLC
                                      DOUGLAS S. JOHNSTON, JR., #5782
                                      JERRY E. MARTIN, #20193
                                      TIMOTHY L. MILES, #21605

                                      JERRY E. MARTIN

Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2202
615/252-3798 (fax)

ROBBINS GELLER RUDMAN
    & DOWD LLP
CHRISTOPHER M. WOOD, #032977
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)

ROBBINS GELLER RUDMAN
    & DOWD LLP
SAMUEL H. RUDMAN
MARY K. BLASY
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

LAW OFFICES OF CURTIS V. TRINKO, LLP
CURTIS V. TRINKO
WILLIAM MARGRABE
16 West 46th Street, 7th Floor
New York, NY 10036
Telephone: 212/490-9550
212/986-0158 (fax)

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing *Plaintiff's First Request for Production Of Documents To Defendants MLV & Co. LLC, Williams Financial Group Maxim Group LLC, National Securities Corporation, Aegis Capital Corp., Northland Capital Markets, Dominick & Dominick, LLC, Ladenburg Thalmann & Co. Inc. and I-Bankers Securities, Inc.* has been served on the following via certified U.S. Mail on November 16, 2015:

| | |
|---|---|
| **Deloy Miller**<br>815 South Lake Drive<br>Oneida, TN 97841 | **Scott M. Boruff**<br>5628 Lyons View Pike<br>Knoxville, TN 37919 |
| **David J. Voyticky**<br>41 East Parkway PHA<br>Brooklyn, NY 11238 | **Catherine A. Rector**<br>1519 Pebble Shore Lane<br>Knoxville, TN 37931 |
| **David M. Hall**<br>48110 David Hall Road<br>Kenai, AK 99611 | **Merrill A. McPeak**<br>123 Furnace Street<br>Lake Oswego, OR 97034 |
| **Gerald Hannahs**<br>17710 Leatha Lane<br>Little Rock, AR 72223 | **Charles M. Stivers**<br>118 Richmond Road<br>Manchester, KY 40962 |
| **Don A. Turkleson**<br>6311 Rodrigo Street<br>Houston, TX 77007 | **Bob G. Gower**<br>402 Timberwilde Lane<br>Houston, TX 77024 |
| **Joseph T. Leary**<br>704 East 12th Street<br>Houston, TX 77008 | **William B. Richardson**<br>1058 Encantado Drive<br>Santa Fe, NM 87501 |
| **Marceau N. Schlumberger**<br>18 Dante Street<br>Larchmont, NY 10538 | **Paul W. Boyd**<br>8125 Ainsworth Drive<br>Knoxville, TN 37909 |
| **Williams Financial Group**<br>Registered Agent: Wilson Williams<br>2711 N. Haskell Avenue, Suite 2900<br>Dallas, TX 75204 | **Maxim Group LLC**<br>Edward L. Rose, Esq.<br>99 Sunnyside Boulevard<br>Woodbury, NY 11797 |
| **Northland Capital Markets**<br>45 South 7th Street, Suite 2000<br>Minneapolis, MN 55402 | **Aegis Capital Corp.**<br>810 7th Avenue, 18th Floor<br>New York, NY 10019 |

| National Securities Corporation | Dominick & Dominick LLC |
|---|---|
| Registered Agent: | Registered Agent: |
| Delaware Corporate Services, Inc. | Corporation Service Company |
| 901 North Market Street, Suite 705 | 80 State Street |
| Wilmington, DE 19801 | Albany, NY 12207 |
| **Ladenburg Thalmann & Co. Inc.** | **I-Bankers Securities, Inc.** |
| Registered Agent: | Registered Agent: |
| Corporate Creations Network, Inc. | IBS Holding Corporation |
| 15 North Mill Street | 21550 Oxnard Street, 3rd Floor |
| Nyack, NY 10960 | Woodland Hills, CA 91367 |
| | **MLV & CO. LLC** |
| | Registered Agent: |
| | The Corporation Trust Company |
| | Corporation Trust Center |
| | 1209 Orange Street |
| | Wilmington, DE 19801 |

JERRY E. MARTIN
**BARRETT JOHNSTON MARTIN
& GARRISON, LLC**

IN THE CIRCUIT COURT FOR MORGAN COUNTY
9TH JUDICIAL DISTRICT
THE STATE OF TENNESSEE

| | | |
|---|---|---|
| KENNETH GAYNOR, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Case No. 2015-cv-34 |
| | ) | Judge Michael Pemberton |
| Plaintiff, | ) ) | |
| | ) | CLASS ACTION |
| vs. | ) ) | DEMAND FOR JURY TRIAL |
| DELOY MILLER, *et al.* | ) ) | |
| Defendants. | ) ) ) | |

**PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO
DEFENDANTS DELOY MILLER, SCOTT M. BORUFF, DAVID J. VOYTICKY,
CATHERINE A. RECTOR, DAVID M. HALL, MERRILL A. MCPEAK, GERALD
HANNAHS, CHARLES M. STIVERS, DON A. TURKLESON, BOB G. GOWER,
JOSEPH T. LEARY, WILLIAM B. RICHARDSON, MARCEAU N. SCHLUMBERGER
AND PAUL W. BOYD**

Pursuant to Tenn. R. Civ. P. 34, plaintiff hereby demands Deloy Miller, Scott M. Boruff,

David J. Voyticky, Catherine A. Rector, David M. Hall, Merrill A. Mcpeak, Gerald Hannahs,

Charles M. Stivers, Don A. Turkleson, Bob G. Gower, Joseph T. Leary, William B. Richardson,

Marceau N. Schlumberger and Paul W. Boyd (collectively "Defendants") to produce the

documents described below for inspection and copying at the law offices of Barrett Johnston

Martin & Garrison, LLC, 414 Union Street, Suite 900, Nashville, TN 37209, within 45 days

after service of complaint, at 10:00 a.m., or at such other location and date upon which the

parties may mutually agree.

DEFINITIONS

1. "You" and "your" refer to the person responding to these Requests.

2. The term "Individual Defendants" means Deloy Miller, Scott M. Boruff, David J.

Voyticky, Catherine A. Rector, David M. Hall, Merrill A. Mcpeak, Gerald Hannahs, Charles M.

- 1 -

Stivers, Don A. Turkleson, Bob G. Gower, Joseph T. Leary, William B. Richardson, Marceau N. Schlumberger and Paul W. Boyd

3.    "Miller" means Miller Energy Resources, Inc. and any of its predecessors, successors, divisions, parents, affiliates, subsidiaries (including, but not limited to, CIE as defined below), directors, employees, agents or anyone acting or purporting to act on its behalf.

4.    "CIE" means Cook Inlet Energy and any of its predecessors, successors, divisions, parents, affiliates, subsidiaries, directors, employees, agents or anyone acting or purporting to act on its behalf.

5.    "PER" means Pacific Energy Resources and any of its predecessors, successors, divisions, parents, affiliates, subsidiaries, directors, employees, agents or anyone acting or purporting to act on its behalf.

6.    "Offerings" means the following public offerings of Miller's 10.75% Series C Cumulative Preferred Stock ("Series C") and 10.5% Series D Fixed Rate/Floating Rate Cumulative Redeemable Preferred Stock ("Series D") (collectively, the "Offerings"):

| DATE | PREFERRED SHARES | PRICE | OFFERING NAME |
|------|------------------|-------|---------------|
| Feb. 13, 2013 | Series C | $22.90 | "2/13/13-Series C" |
| May 8, 2013 | Series C | $22.25 | "5/8/13-Series C" |
| June 28, 2013 | Series C | $21.50 | "6/28/13-Series C" |
| Sept. 26, 2013 | Series D | $25.00 | "9/26/13-Series D" |
| Oct. 17, 2013 | Series D | At Market | "10/17/13-Series D" |
| Aug. 21, 2014 | Series D | $24.50 | "8/21/14-Series D" |

7.    "Alaska Assets" means certain oil and gas properties in Alaska purchased by Miller's operating subsidiary, CIE for $2.25 million in cash and the assumption of certain limited liabilities and which closed on December 10, 2009.

8.    "Reserve Reports" means the reserve estimates report prepared for Miller by Ralph E. Davis & Associates concerning the Alaska Asserts.

- 2 -

9.     "Person" or "persons" means and refers to natural persons, proprietorships, corporations, partnerships, trusts, joint ventures, groups, associations, organizations and governmental agencies and other agencies.

10.    "Underwriter Defendants means defendants MLV & Co. LLC ("MLV"), Williams Financial Group Maxim Group LLC, National Securities Corporation, Aegis Capital Corp., Northland Capital Markets ("NCM"), Dominick & Dominick, LLC, Ladenburg Thalmann & Co. Inc. and I-Bankers Securities, Inc.

11.    The term "business relationship" refers to any relationship, whether formal, informal, contractual or legal, concerning any employment, occupation, profession, ownership or equity interest for monetary gain, personal gain or livelihood. "Business relationship" shall also include, without limitation, any monetary, financial or labor investment.

12.    The term "document" or "documents" is intended to be interpreted in the broadest possible sense and includes, but is not limited to, all electronic data and all communications which are stored or retrievable or recorded in any manner and also includes, without limitation, any writing or other record of information or images, including, but not limited to, print, handwriting, photographs, film, recordings, memoranda, books, records, accounts, ledgers, vouchers, invoices, drafts, bills, charge slips, letters, electronic mail or "e-mail," compact discs, CD-ROM discs, magnetic tape, videotape, magnetic or optical disks, "floppy disks," "PowerPoint" or other presentation software systems, telegrams, mailgrams, correspondence, notes and minutes of meetings, conversations or telephone calls, resolutions, interoffice memoranda, work papers, reports, projects, tabulations, studies, surveys, legal complaints and other pleadings, affidavits, interrogatories, legal briefs, legal motions, judgments, designs, drawings, schematics, maps, manuals, models, notebooks, contracts, agreements, diaries,

telephone records, desk calendars, appointment books, circulars, charts, transcripts, news releases, trade releases, advertisements, press books, teletype messages, licenses, financial statements, stenographers' notebooks, punchcards, computer printouts and data, telecopier or facsimile transmissions and printouts, letters of credit, stock certificates and securities. The term "document" also includes preliminary drafts or revisions or copies of any such document if the copy is in any way different from the original, now in your possession, custody or control, or in the possession, custody or control of your advisors, agents, employees, servants, representatives, trustees, counsel or other persons acting or purporting to act on your behalf.

13.     The term "electronic data" refers to any original and any non-identical copies (whether non-identical because of notes made on copies or attached comments, annotations, marks, transmission notations, or highlighting of any kind), of mechanical, facsimile, electronic, magnetic, digital or other programs (whether private, commercial, or work-in-progress), programming notes or instructions, activity listings of electronic mail receipts or transmittals, output resulting from the use of any software program, including word processing documents, spreadsheets, database files, charts, graphs and outlines, electronic mail or "e-mail," personal digital assistant ("PDA") messages, instant messenger messages, operating systems, source code of all types, programming languages, linkers and compilers, peripheral drives, PDF files, PRF files, batch files, ASCII files, crosswalks, code keys, pull down tables, logs, file layouts and any and all miscellaneous files or file fragments, regardless of the media on which they reside and regardless of whether said electronic data consists of an active file, deleted file or file fragment. "Electronic data" also includes any and all items stored on computer memory or memories, hard disks, floppy disks, zip drives, CD-ROM discs, Bernoulli Boxes and their equivalents, magnetic tapes of all types and kinds, microfiche, punched cards, punched tape, computer chips (including,

- 4 -

but not limited to, EPROM, PROM, ROM or RAM of any kind) on or in any other vehicle for digital data storage or transmittal, files, folder tabs, or containers and labels appended to or associated with any physical storage device associated with each original and each copy.

14. The term "Financial Statements" includes, but is not limited to, interim, final, pro forma, actual, projected, complete, or partial, annual, quarterly, monthly, weekly or otherwise, audited or unaudited, budgets, budget plans, balance sheets, schedules of direct costs, schedules of miscellaneous income, schedules of general services, fiscal serviceman administrative services, statements of earnings and earnings per share, income statements, cash flow statements, statement of revenues and statements of expenses, all notes or other commentary concerning any of the foregoing and all underlying work papers and all drafts used in connection with the preparation of any of the foregoing.

15. The term "telephone records" includes, without limitation, telephone directories, rolodexes, messages, telephone logs, recordings of telephone conversations and telephone bills (local and long distance).

16. "Communication" or "communications" refers to any exchange of information by any means of transmission, sending or receipt of information of any kind by or through any means including, but not limited to, speech, writings, documents, language (machine, foreign or otherwise) of any kind, computer electronics or electronic data, sound, radio or video signals, telecommunication, telephone, teletype, facsimile, telegram, microfilm, microfiche, photographic film of all types or other media of any kind. The term "communication" also includes, without limitation, all inquiries, discussions, conversations, correspondence, negotiations, agreements, understandings, meetings, notices, requests, responses, demands, complaints, or press, publicity or trade releases.

17.    The term "concerning" shall mean constituting, evidencing, reflecting, referring to, incorporating, effecting, including, or otherwise pertaining or relating, either directly or indirectly, or being in any way logically or factually connected with the subject matter of the inquiry or Request. Requests for "documents concerning" any subject matter include documents concerning communication regarding that subject matter.

18.    "Identify" when used to refer to a natural person, shall mean to set forth that person's: (i) full name and title, if any; (ii) present or last known address; (iii) present or last known business and home telephone number(s); and (iv) present or last known employer.

19.    "Identify" when used to refer to a document, shall mean: (i) the date of each document; (ii) the type of each such document (*i.e.* correspondence, memorandum, business record, etc.); (iii) the identity of the author(s) or preparer(s) of each such document; and (iv) the present location of each such document or copies thereof.

20.    The terms "all" and "each" shall be construed as all/each.

21.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the request all responses that might otherwise be construed to be outside of its scope.

22.    "Roadshow" means any and all presentations made or given by any officer, director, employee, agent, underwriter, investment banker or other person or entity on behalf of Miller, relating to the Offerings.

23.    "SEC" means the Securities and Exchange Commission.

24.    "SEC filings" means all documents filed or prepared for the purpose of filing with the SEC and any other state or federal regulatory agency, including, but not limited to, Forms 8-

K, 10-K, 10-Q, Schedules TO-T, 13-D, 14A, 14D-1 and 14D-9 and any drafts thereof or amendments thereto.

25. "SEC Enforcement Action" means the civil administrative proceedings against Miller initiated by the SEC on August 6, 2015 in *In the Matter of Miller Resources, Inc., et al.*, SEC Admin. Proc. File No. 3-16729.

INSTRUCTIONS

In responding to these document Requests, you shall produce separately all documents available at the time of responding or which can be located or discovered by reasonably diligent efforts, including documents in the possession of your agents and representatives.

References to an individual, partnership, limited liability company or corporation include any and all agents, employees, representatives and attorneys and all other persons or entities acting on your behalf or under your control.

If you claim any form of privilege or any other objection, whether based on statute, common law or otherwise as a ground for not producing any requested document, please furnish a list identifying each document for which the privilege or other objection is claimed together with the following information: date, sender, recipient, persons to whom copies were furnished together with their job titles, subject matter, basis on which privilege or other objection is claimed and the number of each Request to which such document responds. If you claim privilege or any other objection with regard to only part of a document, produce the part to which there is no objection.

If you are aware of any documents or copies thereof that may be responsive to these Requests but are no longer in your possession, custody or control, or have been lost or destroyed, identify each document in detail, including whether: (i) the document is missing, lost or destroyed; (ii) the document has been transferred or delivered to another person and, if so, at

whose request; (iii) who prepared it; (iv) to whom it was prepared for and sent to; (v) when it was prepared or sent; (vi) the content of the document; (vii) the person who destroyed it; and (viii) why it was lost or destroyed.

If any individual Request is ambiguous in any way, please send a letter to the undersigned counsel describing the ambiguity and it will be promptly clarified in a reply letter. If any individual Request (or subpart thereof) is deemed to be unduly burdensome, please send a letter to the undersigned counsel specifying the reasons why the Request is unduly burdensome and stating whatever information and knowledge you have of the information or documents called for in the Request, and (generally) an attempt will be made to rephrase the Request (or subpart thereof) in a reply letter to lessen the burdens of compliance. Any such reply letter may be treated by the parties to whom it is addressed as a modification of the particular Request.

Unless words or terms have been given a specific definition herein, each word or term used herein shall be given its usual and customary dictionary definition except where such words have a specific custom and usage definition in your trade or industry, in which case they shall be interpreted in accordance with such usual custom and usage definition of which you are aware. In construing the Requests herein: (i) the singular shall include the plural and the plural shall include the singular; and (ii) a masculine, feminine or neuter pronoun shall not exclude the other genders, all to the end that the interpretation applied results in the more expansive production.

In making production, produce all documents as kept in the normal course of business and identify the file from which each document was taken.

TIME PERIOD

Unless stated otherwise, the time period to which these Requests refer is January 1, 2009 through the date of production. If a document prepared before this period is necessary for a

correct or complete understanding of any document covered by a Request, you must produce the earlier or subsequent document as well. If any document is undated and the date of its preparation cannot be determined, the document shall be produced if otherwise responsive to the production Request.

DOCUMENTS REQUESTED

REQUEST NO. 1:

All documents concerning the Offerings, including without limitation all documents provided to the SEC in connection with the SEC Enforcement Action, or any other government representative, agency or entity concerning the Offerings.

REQUEST NO. 2:

All documents concerning any communication, presentation or meeting (including any scripts, transcripts, tapes or videos prepared in connection with or as a result of) with any potential purchasers of HCA's securities, securities analysts, financial analysts, institutional investors, financial investors, news media, journalists, investment bankers, brokerage firms, market makers, money managers, commercial banks, rating agencies (such as Moody's Investor Service, Inc.) or stock markets or securities exchanges concerning Miller or the Offerings, including, but not limited to, Roadshow presentations.

REQUEST NO. 3:

All documents provided to or received from PER concerning the purchase of the Alaska Assets.

REQUEST NO. 4:

All minutes (with exhibits/attachments) of all meetings of the Board of Directors of Miller or any committee or subcommittee thereof, including all drafts thereof, including but not limited to, where there was discussion of the Alaska Asserts, Reserve Report and/or the

Offerings, including, without limitation, the minutes (with exhibits/attachments) of other meetings referenced therein, including all drafts thereof.

REQUEST NO. 5:

All documents reviewed by the Individual Defendants or reviewed by any officer, executive or financial advisor of Miller concerning the Offerings, the Reserve Report and/or the Alaska Assets.

REQUEST NO. 6:

All documents concerning the Offerings, the Reserve Report and/or the Alaska Assets including, but not limited to, all documents provided to the Underwriter Defendants concerning the Offerings, the Reserve Report and/or the Alaska Assets.

REQUEST NO. 7:

All documents concerning communications concerning the Offerings, the Reserve Report and/or the Alaska Assets including, without limitation:

(a)    all internal communications of Miller or between Miller and the Underwriter Defendants including, without limitation, executive summaries, memoranda or electronic mail;

(b)    all internal communications of Miller or between Miller and the Ralph E. Davis & Associates including, without limitation, executive summaries, memoranda or electronic mail;

(c)    all internal communications of Miller or between Miller and PER including, without limitation, executive summaries, memoranda or electronic mail;

(d)     all communications between any of the Individual Defendants, including, without limitation, electronic mail, faxes or letters transmitted outside the office;

(e)     all communications between any of the Individual Defendants and the Underwriter Defendants;

(f)     all communications between any of the Individual Defendants and the Ralph E. Davis & Associates

(g)     all communications between any of the Individual Defendants and PER.

(h)     all communications sent to, or prepared to be sent to, any person on behalf of Miller.

REQUEST NO. 8:

All documents concerning the engagement or retention of the Underwriter Defendants, Ralph E. Davis & Associates or any financial institution, accounting firm, auditing firm, engineering firm consulting firm, insurance firm or investment banking firm to provide services concerning the Offerings, the Reserve Report and/or the acquisition of and the subsequent accounting for the Alaska Assets.

REQUEST NO. 9:

All personal files, expense reports or logs, diaries, notebooks, notes, date books, calendars, appointment books, address books or Telephone Records maintained by or for the Individual Defendants or by or for any Miller officer or executive concerning the Offerings, the Reserve Report and/or the Alaska Assets

REQUEST NO. 10:

All documents provided by Miller and/or the Individual Defendants to any financial institution, accounting firm, engineering firm, consulting firm, insurance firm, auditing firm,

investment banking firm or advisor concerning the Offerings, the Reserve Report and/or the Alaska Assets

REQUEST NO. 11:

All documents provided by any financial institution, accounting firm, auditing firm, engineering firm, investment banking firm or advisor to Miller and/or the Individual Defendants concerning the Offerings, the Reserve Report and/or the Alaska Assets

REQUEST NO. 12:

All documents concerning the business relationship between Miller, any of its affiliates or subsidiaries, and/or its outside auditors and any of its affiliates or subsidiaries and the Underwriter Defendants and any of their affiliates or subsidiaries (including the Individual Defendants) including, without limitation, any management agreements, consulting agreements, or any other agreements without regard to the Time Period.

REQUEST NO. 13:

All documents identifying any business affiliations between any of the Individual Defendants and the Underwriter Defendants including, without limitation, any management agreements, consulting agreements, or any other agreements. (This request is made without regard to the "Time Period" limitation set forth at Section III herein.)

REQUEST NO. 14:

All indemnification agreements entered into between Miller and any of the Individual Defendants, and between Miller and any of its outside auditors, which may be invoked in connection with this action. (This request is made without regard to the "Time Period" limitation set forth at Section III herein.)

REQUEST NO. 15:

All documents identifying any business affiliations between Miller's outside auditing firm and the Underwriter Defendants including, without limitation, any management agreements, consulting agreements, or any other agreements. (This request is made without regard to the "Time Period" limitation set forth at Section III herein.)

REQUEST NO. 16:

All documents concerning any presentations made by or on behalf of any investment banking institution, financial institution, financial advisor, appraiser, tax advisor or accountant to any defendant concerning the Offerings, the Reserve Report and/or the Alaska Assets.

REQUEST NO. 17:

All documents concerning press releases, published articles, financial analysts' reports and rating agencies' reports, and all drafts thereof, concerning Miller.

REQUEST NO. 18:

All documents concerning SEC filings concerning the Offerings, the Reserve Report and/or the Alaska Assets including, without limitation, drafts of past filings, drafts of documents to be filed with the SEC, all SEC comment letters and responses thereto, all other communications with the SEC regarding the materials to be filed in connection with the Offerings.

REQUEST NO. 19:

All documents concerning any policy, procedure or practice concerning the preservation or destruction of the documents or electronic data or types of documents or electronic data sought herein.

REQUEST NO. 20:

All documents concerning communications between Miller, any of its executives or representatives, and its outside audit firm concerning the Reserve Report, the accounting for the Alaska Asset acquisition and/or any SEC investigation or inquiry.

REQUEST NO. 21:

All documents concerning insurance polices or indemnification agreements that may provide coverage to any Individual Defendants individually or collectively, for any claims or causes of action asserted in this action or that may provide reimbursement for payments made in defense of this action, including, without limitation, loss mitigation insurance or liability-sharing arrangements, including options to purchase such insurance or sharing arrangements, whether acquired before or after the initiation of the litigation.

REQUEST NO. 22:

All documents concerning any communication, presentation or meeting (including any scripts, transcripts, tapes or videos prepared in connection with or as a result of) with any potential purchasers of Miller's securities, securities analysts, financial analysts, institutional investors, financial investors, news media, journalists, investment bankers, brokerage firms, market makers, money managers, commercial banks, rating agencies (such as Moody's Investor Service, Inc.) or stock markets or securities exchanges concerning Miller or the Offerings, including, but not limited to, Roadshow presentations.

DATED: November 16, 2015  BARRETT JOHNSTON MARTIN
            & GARRISON, LLC
           DOUGLAS S. JOHNSTON, JR., #5782
           JERRY E. MARTIN, #20193
           TIMOTHY L. MILES, #21605

           JERRY E. MARTIN

- 14 -

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing *Plaintiff's First Request For Production Of Documents To Defendants Deloy Miller, Scott M. Boruff, David J. Voyticky, Catherine A. Rector, David M. Hall, Merrill A. Mcpeak, Gerald Hannahs, Charles M. Stivers, Don A. Turkleson, Bob G. Gower, Joseph T. Leary, William B. Richardson, Marceau N. Schlumberger And Paul W. Boyd* has been served on the following via certified U.S. Mail on November 16, 2015:

| | |
|---|---|
| **Deloy Miller**<br>815 South Lake Drive<br>Oneida, TN 97841 | **Scott M. Boruff**<br>5628 Lyons View Pike<br>Knoxville, TN 37919 |
| **David J. Voyticky**<br>41 East Parkway PHA<br>Brooklyn, NY 11238 | **Catherine A. Rector**<br>1519 Pebble Shore Lane<br>Knoxville, TN 37931 |
| **David M. Hall**<br>48110 David Hall Road<br>Kenai, AK 99611 | **Merrill A. McPeak**<br>123 Furnace Street<br>Lake Oswego, OR 97034 |
| **Gerald Hannahs**<br>17710 Leatha Lane<br>Little Rock, AR 72223 | **Charles M. Stivers**<br>118 Richmond Road<br>Manchester, KY 40962 |
| **Don A. Turkleson**<br>6311 Rodrigo Street<br>Houston, TX 77007 | **Bob G. Gower**<br>402 Timberwilde Lane<br>Houston, TX 77024 |
| **Joseph T. Leary**<br>704 East 12th Street<br>Houston, TX 77008 | **William B. Richardson**<br>1058 Encantado Drive<br>Santa Fe, NM 87501 |
| **Marceau N. Schlumberger**<br>18 Dante Street<br>Larchmont, NY 10538 | **Paul W. Boyd**<br>8125 Ainsworth Drive<br>Knoxville, TN 37909 |
| **Williams Financial Group**<br>Registered Agent: Wilson Williams<br>2711 N. Haskell Avenue, Suite 2900<br>Dallas, TX 75204 | **Maxim Group LLC**<br>Edward L. Rose, Esq.<br>99 Sunnyside Boulevard<br>Woodbury, NY 11797 |
| **Northland Capital Markets**<br>45 South 7th Street, Suite 2000<br>Minneapolis, MN 55402 | **Aegis Capital Corp.**<br>810 7th Avenue, 18th Floor<br>New York, NY 10019 |

| National Securities Corporation | Dominick & Dominick LLC |
|---|---|
| Registered Agent: | Registered Agent: |
| Delaware Corporate Services, Inc. | Corporation Service Company |
| 901 North Market Street, Suite 705 | 80 State Street |
| Wilmington, DE 19801 | Albany, NY 12207 |
| **Ladenburg Thalmann & Co. Inc.** | **I-Bankers Securities, Inc.** |
| Registered Agent: | Registered Agent: |
| Corporate Creations Network, Inc. | IBS Holding Corporation |
| 15 North Mill Street | 21550 Oxnard Street, 3rd Floor |
| Nyack, NY 10960 | Woodland Hills, CA 91367 |
| | **MLV & CO. LLC** |
| | Registered Agent: |
| | The Corporation Trust Company |
| | Corporation Trust Center |
| | 1209 Orange Street |
| | Wilmington, DE 19801 |

JERRY E. MARTIN
BARRETT JOHNSTON MARTIN
& GARRISON, LLC

Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2202
615/252-3798 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHRISTOPHER M. WOOD, #032977
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
MARY K. BLASY
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

LAW OFFICES OF CURTIS V. TRINKO, LLP
CURTIS V. TRINKO
WILLIAM MARGRABE
16 West 46th Street, 7th Floor
New York, NY 10036
Telephone: 212/490-9550
212/986-0158 (fax)

Attorneys for Plaintiff

NOV 23 2015