UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

AT KNOXVILLE

| | | |
|---|---|---|
| KENNETH GAYNOR, et al., Individually and on Behalf of All Others Similarly Situated, | § § § | Civil Action No. 3:15-CV-545-TAV-CCS |
| | § | **(Consolidated)** |
| Plaintiffs, | § | |
| | § | <u>CLASS ACTION</u> |
| vs. | § | |
| | § | |
| DELOY MILLER, et al., | § | **JURY DEMAND** |
| | § | |
| Defendants. | § | |
| | § | |
| | § | |

## **MASTER CONSOLIDATED COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.      NATURE OF THE ACTION ......................................................................................1

II.     JURISDICTION AND VENUE ...............................................................................3

III.    PARTIES AND RELEVANT NON-PARTIES .........................................................3

    A.      Plaintiffs .......................................................................................................3

    B.      Relevant Non-Parties .....................................................................................4

    C.      The Individual Defendants .............................................................................5

    D.      The Underwriter Defendants ..........................................................................7

IV.     SUBSTANTIVE ALLEGATIONS ........................................................................10

V.      THE FALSE AND MISLEADING REGISTRATION STATEMENT ............................14

    A.      Under Generally Accepted Accounting Principles, Miller Energy Was
        Required to Record the Alaska Assets Acquisition at Fair Value ........................15

    B.      The Valuation of the Acquired Oil and Gas Properties Was Based Upon a
        Reserve Report that Does Not Represent Fair Value ........................................17

    C.      The Fair Value of the Acquired Fixed Assets Was Double Counted and
        Overstated .....................................................................................................22

VI.     MILLER ENERGY WRITES DOWN THE VALUE OF THE ALASKA
    ASSETS ...............................................................................................................27

VII.    CLASS ACTION ALLEGATIONS .......................................................................37

COUNT I ......................................................................................................................38

COUNT II ......................................................................................................................39

COUNT III ......................................................................................................................41

PRAYER FOR RELIEF ..................................................................................................41

JURY TRIAL DEMAND ...............................................................................................42

Lead Plaintiffs Kenneth Gaynor, Marcia Goldberg, Gabriel R. Hull, and Christopher R. Vorrath ("Plaintiffs") allege the following based upon the investigation of Plaintiffs' counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Miller Energy Resources, Inc. ("Miller Energy" or "Company"), Orders filed by the SEC *In the Matter of Miller Energy Resources, Inc., Paul W. Boyd, CPA, David M. Hall, and Carlton W. Vogt, III CPA*, SEC Admin. Proceeding File No. 3-16729 (August 6, 2015), filings in *In re Miller Energy Resources, Inc., et al.*, No. 15-00313 (D. Alaska Bankr. Ct.), as well as regulatory filings and reports, press releases and other public statements issued by the Company, securities analysts' reports and advisories about the Company, and media reports about the Company. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION

1.     This is a securities class action seeking to pursue remedies under the Securities Act of 1933 ("Securities Act") setting forth strict liability and non-fraud claims against defendants under Sections 11, 12(a)(2), and 15 on behalf of all those who purchased Miller Energy preferred shares traceable to the SEC Form S-3 filed on September 6, 2012 ("Registration Statement", including "Prospectuses") issued in connection with the following public offerings of Miller Energy's 10.75% Series C Cumulative Redeemable Preferred Stock ("Series C") and 10.5% Series D Fixed Rate/Floating Rate Cumulative Redeemable Preferred Stock ("Series D") (collectively, the "Offerings"):

| Date | Preferred Shares | Price | Offering Name |
|---|---|---|---|
| Feb. 13, 2013 | Series C | $22.90 | "2/13/13-Series C" |
| May 8, 2013 | Series C | $22.25 | "5/8/13-Series C" |
| June 28, 2013 | Series C | $21.50 | "6/28/13-Series C" |
| Sept. 26, 2013 | Series D | $25.00 | "9/26/13-Series D" |
| Oct. 17, 2013 | Series D | At Market | "10/17/13-Series D" |
| Aug. 21, 2014 | Series D | $24.50 | "8/21/14-Series D" |

2.      The action is brought against several current and former executive officers and directors of Miller Energy and the investment banking firms that underwrote the Offerings.  Miller Energy sought bankruptcy protection on October 1, 2015, and therefore, is not named as a defendant herein.

3.      The Securities Act claims alleged herein arise out of Miller Energy's false and misleading financial accounting and reporting, as well as audit failures related to the valuation of certain oil and gas assets ("Alaska Assets") acquired by Miller Energy, an oil and gas company headquartered in Knoxville, Tennessee.  Miller Energy purchased these assets, which are located in Alaska, for $2.25 million in cash – along with the assumption of certain liabilities it valued at approximately $2 million – during a competitive bid in a bankruptcy proceeding in December 2009.

4.      The Company subsequently reported those assets at an overstated value of approximately $480 million, and recognized a one-time "bargain purchase" gain of $277 million for its fiscal third quarter ended January 2010 and fiscal year ended April 2010.

5.      Miller Energy repeatedly overstated the value of the Alaska Assets in its financial reports filed with the SEC between 2010 and August 2015, and publicly defended its valuations and financial reports as being correct and complete following acquisition of the Alaska assets.

6.      In fact, Miller Energy continued to overstate the value of the Alaska Assets by hundreds of millions of dollars in its SEC filings despite settling, on February 3, 2015, litigation

brought on behalf of a class of purchasers of Miller Energy's common stock seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") for securities fraud ("Securities Fraud Litigation"). In doing so, Miller Energy denied wrongdoing and continued to maintain that its valuations were valid.

7.      As a result of the false and misleading valuation of the Alaska Assets, the Registration Statement and Prospectuses issued in connection with the Offerings were false and misleading.

## II.      JURISDICTION AND VENUE

8.      The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act, and rules promulgated thereunder by the SEC. 15 U.S.C. §§77k, 77l(a)(2), 77o.

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

10.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §1391(b). Miller Energy maintained a principal place of business in this District, and the acts and conduct complained of herein occurred in substantial part in this District.

11.      In connection with the acts and conduct alleged in this Master Consolidated Complaint ("Complaint"), defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.      PARTIES AND RELEVANT NON-PARTIES

### A.      Plaintiffs

12.      Plaintiff Kenneth Gaynor, as set forth in the his certification previously filed with this Court [Dkt. No. 88-2] and incorporated by reference herein, purchased Miller Energy Series D preferred shares pursuant and/or traceable to the Offerings, and was damaged thereby.

13. Plaintiff Marcia Goldberg, as set forth in the her certification previously filed with this Court [Dkt. No. 88-2] and incorporated by reference herein, purchased Miller Energy Series D preferred shares pursuant and/or traceable to the Offerings, and was damaged thereby.

14. Plaintiff Gabriel R. Hull, as set forth in the his certification previously filed with this Court [Dkt. No. 88-2] and incorporated by reference herein, purchased Miller Energy Series C and Series D preferred shares pursuant and/or traceable to the Offerings, and was damaged thereby.

15. Plaintiff Christopher R. Vorrath, as set forth in the his certification previously filed with this Court [Dkt. No. 88-2] and incorporated by reference herein, purchased Miller Energy Series C preferred shares pursuant and/or traceable to the Offerings, and was damaged thereby.

## B.     Relevant Non-Parties

16. Non-party Miller Energy Resources, Inc. (f/k/a Miller Petroleum, Inc.) is an independent exploration and production company that explores for, develops, and operates oil and gas wells in south-central Alaska and in Tennessee. At all times relevant to this action, Miller Energy's common stock traded on the New York Stock Exchange ("NYSE") under the ticker symbol "MILL"; the Series C traded on the NYSE under the ticker symbol "MILLP"; and the Series D traded on the NYSE under the ticker symbol "MILLO." On September 11, 2015, Miller Energy caused its common stock, Series C and Series D to be delisted from the NYSE. As of September 29, 2015, Miller Energy had approximately 46.7 million shares of common stock, 3.25 million shares of Series C and 3.5 million shares of Series D issued and outstanding. On October 1, 2015, Miller Energy filed a petition seeking relief under the federal bankruptcy statutes and on March 29, 2016, all equity interests in Miller Energy were cancelled.

17. Non-Party Sherb & Co., LLP ("Sherb & Co."), a now-defunct Certified Public Accountant ("CPA") firm that was suspended by the SEC in 2013 for improper professional conduct

unrelated to this matter, audited Miller Energy's financial statements for fiscal 2010, the first annual period in which the Company reported the fair value of the acquired Alaska Assets.

18. Non-party Carlton W. Vogt, III ("Vogt") led the Sherb & Co. audit team that audited Miller Energy's financial statements for the 2009 and 2010 fiscal years. Vogt failed to comply with the Public Company Accounting Oversight Board ("PCAOB") rules and standards in auditing Miller Energy's financial statements that included its accounting for its Alaska Assets. Vogt failed to exercise due professional care and skepticism by not adequately assessing whether the Company's accounting treatment for the acquisition complied with Generally Accepted Accounting Principles ("GAAP"). Vogt also failed to obtain sufficient competent evidential matter for management's assertions regarding the fair value of the Alaska Assets.

### C. The Individual Defendants

19. Defendant Deloy Miller ("Miller") founded Miller Energy in 1978. He served as the Company's Chief Executive Officer ("CEO") from 1967 through August 2008 and thereafter served as the Company's Chief Operating Officer ("COO") for a certain period of time. Miller served as the Chairman of the Board of Directors ("Board") from December 1996 until September 14, 2014.

20. Defendant Scott M. Boruff ("Boruff") has been a member of the Board since August 6, 2008 and has served as the Executive Chairman of the Board since September 14, 2014, until his departure from the Board on March 29, 2016. Previously, defendant Boruff served as Miller Energy's CEO from August 6, 2008 to September 14, 2014 and as its President from June 26, 2010 until June 14, 2011. Boruff is the son-in-law of Miller.

21. Defendant David J. Voyticky served as the President of Miller Energy from June 9, 2011 until August 12, 2014, as its Acting Chief Financial Officer ("CFO") from September 2011 until February 2014, and was a director from April 2010 to April 2014.

22.     Defendant Catherine A. Rector served as the Vice President and Chief Accounting Officer of Miller Energy between July 2012 and October 2013.

23.     Defendant David M. Hall ("Hall") served as the COO of Miller Energy from July 18, 2013 until August 6, 2015.  Hall also served as a member of the Board from December 10, 2009 until April 16, 2015.  Hall had previously served as CEO of Miller Energy's Alaska subsidiary, Cook Inlet Energy ("CIE"), and has worked with the acquired Alaska Assets during the mid-1990s, when Miller Energy's predecessors began compiling the assets.  Prior to joining Miller Energy, Hall served from January 2008 to December 2009 as Vice President and General Manager of Alaska Operations for the immediate past owner of the acquired assets, Pacific Energy Resources, Ltd. ("PER").  In this capacity, Hall was the most senior employee in Alaska responsible for the day-to-day operations of these oil and gas properties.

24.     Defendants Merrill A. McPeak, Gerald Hannahs ("Hannahs"), Charles M. Stivers ("Stivers"), and Don A. Turkleson served as directors of Miller Energy as of September 6, 2012 and signed the Registration Statement used to conduct the Offerings.

25.     Defendants Bob G. Gower ("Gower"), Joseph T. Leary, William B. Richardson ("Richardson"), and Marceau N. Schlumberger served as directors of Miller Energy at the time of certain of the Offerings.

26.     Defendant Paul W. Boyd ("Boyd") served as the CFO and Treasurer of Miller Energy, and as its principal accounting and financial officer from 2008 to 2011 and as Miller Energy's Director of Risk Management from 2011 until 2014.  Boyd has been a licensed CPA in Tennessee since 1993.

27.     The defendants named in ¶¶19-26 above are all liable under the Securities Act and are referred to herein as the "Individual Defendants."  The Individual Defendants named in ¶¶19-24

above each signed the Registration Statement used to conduct the Offerings. The Individual Defendants named in ¶¶19-23 above are sometimes referred to as the "Officer Defendants."

### D. The Underwriter Defendants

28. Defendants MLV & Co. LLC ("MLV"), headquartered in Arlington, Virginia, is a self-proclaimed "capital market expert" providing comprehensive investment banking service and creative advisory and capital market solutions. MLV acted as an Underwriter of Miller Energy's Preferred Stock Offerings, helping to draft and disseminate the Offering materials. FBR & Co. publically announced its acquisition of MLV on September 1, 2015.

29. Williams Financial Group ("WFG") is a privately held financial services firm based in Dallas, Texas, providing a broad range of advisory, brokerage, and wealth management services to independent Financial Professionals. WFG acted as a Co-Manager and Underwriter of Miller Energy's Preferred Stock Offerings.

30. Maxim Group LLC ("MXG"), founded in 2002, is a leading full-service investment banking, securities, and wealth management firm headquartered in New York, New York. MXG acted as an Underwriter of Miller Energy's Preferred Stock Offerings, helping to draft and disseminate the Offering materials.

31. National Securities Corporation ("NSC") offers investment banking and corporate services providing customized solutions, financial advice, strategic counsel, mergers and acquisitions services, primary and secondary offerings, and private placements for emerging companies. NSC, a wholly owned subsidiary of National Holdings, Inc., acted as Lead Manager and Underwriter of Miller Energy's Preferred Stock Offerings.

32. Aegis Capital Corp. ("ACC"), founded in 1984, is a full service retail and institutional broker-dealer located in New York, New York. ACC acted as a Co- Manager and Underwriter of Miller Energy's Preferred Stock Offerings.

33. Northland Capital Markets ("NCM") is the trade name for certain capital markets and investment banking services of Northland Securities, Inc. NCM provides financing solutions to companies nationwide, partnering with vendors and manufacturers in various industries. NCM acted as a Co- Manager and Underwriter of Miller Energy's Preferred Stock Offerings.

34. Dominick & Dominick, LLC ("D&D") is a division of Wunderlich Wealth Management that, among other things, provides various services to small and mid-cap companies. D&D acted as a Co-Manager and Underwriter of Miller Energy's Preferred Stock Offerings.

35. Ladenburg Thalmann & Co. Inc. ("LTC") is the investment bank for Ladenburg Thalmann and has been a member of the New York Stock Exchange for 135 years. LTC offers a full suite of investment banking, equity research, and capital markets products and services. LTC acted as a Co-Manager and Underwriter of Miller Energy's Preferred Stock Offerings.

36. I-Bankers Securities, Inc. ("IBS"), a boutique international investment banking firm with offices in New York, Switzerland, Italy, and California, offers initial public, secondary, follow-on, private investment in public equity, and private equity offerings; as well as mergers and acquisitions advisory services. IBS acted as a Co-Manager and Underwriter of Miller Energy's Preferred Stock Offerings.

37. The defendants named in ¶¶28-36 above are all liable under the Securities Act and are referred to herein as the "Underwriter Defendants."

38. Underwriters thus play a crucial role in securities offerings:

No greater reliance in our self-regulatory system is placed on any single participant in the issuance of securities than upon the underwriter. He is most heavily relied upon to verify published materials because of his expertise in appraising the securities issue and the issuer, and because of his incentive to do so. He is familiar with the process investigating the business condition of a company and possesses extensive resources for doing so . . . Prospective investors look to the underwriter – a fact well known to all concerned and especially to the underwriter – to pass on the

soundness of the security and the correctness of the registration statement and the prospectus.[1]

39. The Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters and were negligent in failing to ensure that the Registration Statement was prepared properly and accurately, and was free from misstatements or omissions of material fact. The Underwriter Defendants are liable for the misstatements in the Registration Statement as follows:

(a) The Underwriter Defendants are investment banking houses that specialize, *inter alia*, in underwriting public offerings of securities. They served as the underwriters of the Offerings and shared upwards of $7.5 million in fees collectively. The Underwriter Defendants determined that in return for their share of the proceeds of the Offerings, they were willing to merchandize Miller Energy preferred shares in the Offerings. The Underwriter Defendants arranged multi-city roadshows prior to the Offerings during which they, and representatives from Miller Energy, met with potential investors and presented highly favorable information about the Company, its operation, and its financial prospects.

(b) The Underwriter Defendants also demanded and obtained agreements from Miller Energy that Miller Energy would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also made certain that Miller Energy had purchased millions of dollars in directors' and officers' liability insurance.

(c) Representatives of the Underwriter Defendants also assisted Miller Energy and the Individual Defendants in planning the Offerings, and purportedly conducted adequate and reasonable investigations into the business and operations of Miller Energy, an undertaking known

_____

[1] *Chris-Craft Indus. v. Piper Aircraft Corp.*, 480 F.2d 341, 370 (2d Cir. 1973), *rev'd and vacated in part*, 516 F.2d 172 (2d Cir. 1975).

as a "due diligence" investigation. The due diligence investigations were required of the Underwriter Defendants in order to engage in each of the Offerings. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Miller Energy's operations and financial prospects.

(d) In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with Miller Energy's lawyers, management, and top executives and engaged in "drafting sessions" between September 2012 and August 2014. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the Offerings; (ii) the terms of the Offerings, including the price at which Miller Energy preferred shares would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Miller Energy would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Miller Energy's management and top executives, the Underwriter Defendants knew, or should have known, of Miller Energy's existing problems as detailed herein.

(e) The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with offers and sales thereof, including to Plaintiffs and the Class (as defined below).

## IV. SUBSTANTIVE ALLEGATIONS

40. Miller Energy is an independent oil and natural gas exploration, production, and drilling company operating in multiple exploration and production basins in North America that was founded in 1967. The Company, whose focus was originally on Tennessee's Appalachian Basin, first became a publicly traded company in connection with a reverse merger in 1996.

41.     Between early 2002 and December 2009, Miller Energy's stock price regularly traded below one dollar per share, falling to a low of $0.04 per share in December 2007. In August 2008, Miller Energy named a new Director and CEO Boruff. Soon thereafter, the Company began acquiring additional oil and gas properties.

42.     In the fall of 2009, Miller Energy became aware of certain oil and gas properties in Alaska that were in the process of being "abandoned" as part of the bankruptcy proceedings of California-based PER. PER had been unable to service its heavy debt and pay the significant monthly costs required to operate its operating assets and had unsuccessfully sought for almost a year to sell them.

43.     Beginning in December 2008, months before it filed for bankruptcy, PER, with the help of one of the world's leading financial advisory and asset management firms, marketed PER's operating assets in Alaska to 40 potential buyers. This process failed to attract any bidders, and the assets were auctioned by the bankruptcy court in July 2009, with the winning bidder agreeing to a total purchase price of $8 million for the assets. A second entity, who had bid $7 million, was designated as the back-up purchaser. Neither of these bids ultimately closed.

44.     As a result, PER sought in August 2009, and was granted in September 2009, an order from the bankruptcy court allowing it to abandon title to the assets due to a lack of interest.

45.     Due to renewed interest in the assets shown by Miller Energy following their abandonment, the bankruptcy court permitted PER to reacquire its Alaska assets and sell them to Miller Energy's operating subsidiary, CIE, in a competitive auction for $2.25 million in cash and the assumption of certain limited liabilities. The transaction closed on December 10, 2009.

46.     The Company valued the Alaska Assets, based upon a reserve estimates report prepared for it by an engineering firm, Ralph E. Davis & Associates ("Reserve Report"). On March

22, 2010, Miller Energy claimed in its quarterly report filed on Form 10-Q for its fiscal third quarter ended January 31, 2010 a reported value for the Alaska Assets of approximately $480 million, which amount was comprised of approximately $368 million for oil and gas properties and approximately $110 million for fixed assets. Miller Energy also reported an after-tax $277 million "bargain purchase gain," which boosted its reported net income for the quarter to $272 million – an enormous increase over the $556,097 loss reported for the same period the year before. Miller Energy subsequently repeated the overstated value of the Alaska Assets in numerous filings with the SEC through August 2015.

47.     As a result of the incorrect valuation, Miller Energy filed the following false and misleading financial reports with the SEC that materially misstated the value of its assets: Forms 10-Q for the third quarter of fiscal year 2010 as well as all three quarters of fiscal years 2011 through 2015; Forms 10- K for fiscal years ended 2010 through 2014; the Form S-1 filed on August 8, 2010; the Forms S-3 filed on September 6, 2012 and October 5, 2012; and Prospectuses filed between August 25, 2010 through August 21, 2014 pursuant to Rule 424, as well as 15 Forms 8-K filed between March 2010 through at least December 2014.

48.     The aforesaid false valuation also resulted in Miller Energy filing with the SEC financial reports that materially misstated its net income, as follows: Forms 10-Q for the third quarter of fiscal year 2010, all three quarters of fiscal 2011, as well as the first two quarters of 2012; Forms 10-K for fiscal years ended 2010 through 2012; the Form S-1 filed on August 8, 2010; the Forms S-3 filed on September 6, 2012 and October 5, 2012; and Prospectuses filed between August 25, 2010 through August 21, 2014 pursuant to Rule 424.

49.     In fact, the Company repeatedly overstated the value of the Alaska Assets in its SEC filings, despite settling the Securities Fraud Litigation which pursued remedies against Miller Energy for, among other things, fraudulently valuing the Alaska Assets.

50.     In addition to repeating the overstated valuation of the Alaska Assets in SEC filings, the Company publicly defended its valuations and financial reports as to the Alaska Assets.  For example, on August 1, 2011, in an open letter to the Company's shareholders penned by Boruff, the Company disputed the accuracy of a July 28, 2011 report published on a website called TheStreetSweeper, which stated the Alaska Assets were actually worth between $25 million and $30 million and were offset by $40 million worth of liabilities.[2]  In the letter, Boruff stated that Miller Energy "consulted extensively with independent third parties in order to fairly and reliably value" the Alaskan subsidiary.  According to Boruff, the Company took a "conservative approach" to this valuation.

51.     The acquisition of the Alaska Assets was the single most important event in Miller Energy's nearly forty-year history, transforming it from a company long mired in the penny-stock arena to one traded on a national exchange.  The newly booked value of the Alaska Assets resulted in a nearly 5,000% increase in Miller Energy's total assets, and had a significant impact on the market price of Miller Energy common stock.  On December 10, 2009, the date of the transaction, Miller Energy common stock closed at $0.61 per share.  Following the acquisition of the Alaska Assets, by March 31, 2010, Miller Energy common stock closed 982% higher at $6.60 per share. Weeks later, the listing of Miller Energy stock was moved to the NASDAQ and, after moving to the NYSE a year later, reached an all-time high price on December 9, 2013 of $8.83 per share and achieved in 2013 a market capitalization of $393 million.

---

[2]     Melissa Davis & Janice Shell, *Miller Energy: This Hot 'Alaska' Stock May Be About to Melt (Part 1)*, SEEKING ALPHA: THE STREET SWEEPER (July 28, 2011).

## V. THE FALSE AND MISLEADING REGISTRATION STATEMENT

52.     On or about September 6, 2012, Miller Energy filed with the SEC a Form S-3 registration statement and prospectus using a "shelf" registration, or continuous offering process. Under the shelf registration, Miller Energy would sell securities described in various future prospectus supplements in one or more offerings. The prospectus supplements would form part of the registration statement for each Offering. The securities were to be issued by Miller Energy. This Form S-3, which would later be utilized for all of the Offerings, expressly incorporated by reference certain filings Miller Energy had previously made with the SEC, as well as all future filings until any offering conducted under the shelf registration statement was completed.

53.     The SEC declared the shelf registration statement effective on September 18, 2012.

54.     On or about the date of each of the following Offerings, Miller Energy and the following Underwriter Defendants priced the Offerings and filed the final Prospectuses for those Offerings, which formed part of the Registration Statement. The Offerings were successful for the Company and the Underwriter Defendants who sold upwards of 6.21 million Series C and Series D shares, raising an estimated $151.015 million in gross proceeds from the Offerings, as follows:

| OFFERING | UNDERWRITERS | PRICE | SHARES | GROSS PROCEEDS[3] |
|---|---|---|---|---|
| 2/13/13-Series C | MLV, MXG, NSC, ACC, WFG | $22.90 | 625,000 | $14,312,500 |
| 5/8/13-Series C | MLV, MXG, NSC, ACC | $22.25 | 500,000 | $11,125,000 |
| 6/28/13-Series C | MLV, ACC, MXG, NSC, NCM | $21.50 | 335,000 | $7,202,500 |
| 9/26/13-Series D | MLV, MXG, NSC, ACC, D&D, LTC, NCM | $25.00 | 1,000,000 | $25,000,000 |
| 10/17/13-Series D | MLV | Market | 3,000,000 | $75,000,000 |
| 8/21/14-Series D | MLV, MXG, ACC, IBS, LTC, NSC, NCM | $24.50 | 750,000 | $18,375,000 |

---

[3]     Where an Offering was conducted "at market" price and/or on a "best efforts" basis and the dates, prices and number of shares sold were not disclosed in the Prospectus, gross proceeds were estimated using the total shares that could have been sold at $25 each.

55.     The Registration Statement, including the materials incorporated therein by reference (which expressly incorporated Miller Energy's Annual Report on Form 10-K for the year ended April 30, 2012, as well as various Current Reports on Form 8-K), and the final Prospectuses, which would include the Forms 10-K, 10-Q, and 8-K filed prior to each Offering, were negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to render the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation.

56.     All of the Company's interim and annual financial reports issued between 2010 and 2015, relying upon the Reserve Report, overstated the value of the Alaska Assets by hundreds of millions of dollars by failing to record the Alaska Assets at fair value as required by Accounting Standards Codification ("ASC") 805, *Business Combinations*, and the federal securities laws, because they "used as fair value a reserve report that was prepared by a petroleum engineer firm using the rules for supplemental oil and gas disclosures," "the reserve report . . . expressly disclaimed that the numbers therein represented the engineer firm's opinion of fair value," "[t]he reserve report . . . also contained expense numbers that were knowingly understated," and the Reserve Report "double counted $110 million of certain fixed assets that were already included in the reserve report."  As a result, all of Miller Energy's interim and fiscal financial reports issued between 2010 and 2015, the Form S-3 filed on September 6, 2012, and each of the final Prospectuses used to conduct the Offerings were false and misleading.

### A.     Under Generally Accepted Accounting Principles, Miller Energy Was Required to Record the Alaska Assets Acquisition at Fair Value

57.     ASC 805, *Business Combinations* – formerly Statement of Financial Accounting Standards ("SFAS") 141(R) – became effective in December 2008.  Among its principal revisions, ASC 805 requires acquisitions that result in a "bargain purchase," *e.g.*, entities purchased at fire sales

prices in non-orderly transactions, to be measured at fair value, with any resulting gain recorded on the income statement.

58. ASC 820, *Fair Value Measurements* (formerly SFAS 157), provides the framework for measuring fair value. "Fair value" is defined in ASC 820 as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." A reporting entity must determine an appropriate fair value using one or more of the valuation techniques described in accounting literature.

59. ASC 820 outlines three broad approaches to measuring fair value: the market approach, income approach, and cost approach. Under the market approach, prices and other relevant information generated by market transactions involving identical or comparable assets or liabilities are used to measure fair value. The income approach utilizes valuation techniques to convert future amounts to a single discounted present value amount. Finally, the cost approach is based on the amount that currently would be required to replace the assets in service, *i.e.*, current replacement cost.

60. ASC 820 emphasizes that fair value is a market-based measurement, not an entity specific measurement, and should be determined based on the assumptions market participants would use in pricing the asset or liability.

61. ASC 820 emphasizes that when a price for an identical asset or liability is not observable, entities should use a "valuation technique that maximizes the use of relevant observable inputs and minimizes the use of unobservable inputs" and entities may not ignore assumptions market participants would use.[4]

---

[4] ASC 820 defines "unobservable inputs" as "inputs that reflect the reporting entity's own assumptions about the assumptions market participants would use in pricing the asset or liability developed based on the best information available in the circumstances," and "observable inputs" as

62.     When computing their estimate of fair value, Miller Energy and Boyd failed to consider the existence of numerous, readily available data points strongly indicating that the Alaska Assets were worth substantially less than the approximate $480 million value Miller Energy recorded.  In failing to do so, Miller Energy and Boyd materially overstated the value of the newly acquired Alaska Assets.  As described detailed below, Miller Energy purported to value the Alaska Assets using the income approach for the oil and gas reserves and the cost approach for certain fixed assets.

### B.    The Valuation of the Acquired Oil and Gas Properties Was Based Upon a Reserve Report that Does Not Represent Fair Value

63.     To record the value of the acquired oil and gas properties, Miller Energy and Boyd requested and improperly used the Reserve Report prepared by an independent petroleum engineering firm.[5]

---

"inputs that reflect the assumptions market participants would use in pricing the asset or liability developed based on market data obtained from sources independent of the reporting entity."

[5]    Oil and gas reporting companies are subject to two principal authoritative pronouncements governing financial accounting and reporting for oil and gas activities: Rule 4-10 of Regulation S-X (17 C.F.R. 210.4-10), *Financial Accounting and Reporting for Oil and Gas Producing Activities Pursuant to the Federal Securities Laws and the Energy Policy and Conservation Act of 1975*; and ASC 932-235-50-29 through 33 (formerly SFAS 19, *Financial Accounting and Reporting by Oil and Gas Producing Companies*, and SFAS 69, *Disclosures About Oil and Gas Producing Activities*). ASC 932 establishes disclosure requirements for significant oil and gas activities, including disclosure of the "standardized measure," which is the future after-tax net cash flows discounted at 10%.

A non-U.S. GAAP measure, known as "PV-10," is similar to the standardized measure but is typically presented on a pretax basis.  The Financial Accounting Standards Board has noted that the standardized measure supplies investors with useful information, however, they also noted their concern "that users of financial statements understand that it is neither fair market value nor the present value of future cash flows.  It is a rough surrogate for such measures, a tool to allow for a reasonable comparison of mineral reserves and changes through the use of a standardized method that recognizes qualitative, quantitative, geographic, and temporal characteristics." FASB, SFAS 69, *Disclosures About Oil and Gas Producing Activities*, Appendix C, *Basis for Conclusions*, ¶83.

64.     Reserve reports are commonly used in the oil and gas industry to estimate quantities of oil and gas (the reserves) expected to be recovered from existing properties. Generally, these reports list reserves in categories based on a minimum estimated percentage probability of eventual recovery and production, *i.e.*, proved, probable and possible. Information in reserve reports that are prepared in accordance with SEC regulations is frequently used, among other purposes, to satisfy supplemental accounting disclosure requirements concerning estimates of future oil and gas production. However, the numbers used in reserve reports for this purpose are expressly not considered "an estimate of fair market value."[6]

65.     Shortly after the acquisition, Boyd asked Hall – a non-accountant with no formal accounting training – to obtain a reserve report for the Alaska Assets in order to determine the fair value of the acquired assets to be reported on Miller Energy's Form 10-Q for the quarter ended January 31, 2010.

66.     On January 5, 2010, Hall hired a petroleum engineering firm to prepare a reserve report using a pretax present value of net cash flows discounted at 10% ("PV-10"), which, while appropriate with further adjustments for SEC supplemental disclosures, was not indicative of fair value.

67.     The petroleum engineering firm did not know Miller Energy intended to use the report for fair value purposes and believed that the purpose of the report was for use as supplemental data in the Company's SEC disclosures. Indeed, the two-page engagement letter with the

---

[6]     *See* FASB, SFAS 69, *Disclosures About Oil and Gas Producing Activities*, Appendix C, *Basis for Conclusions*, ¶77 ("Although it cannot be considered an estimate of fair market value, the standardized measure of discounted net cash flows should be responsive to some of the key variables that affect fair market value, namely, changes in reserve quantities, selling prices, production costs, and tax rates.").

engineering firm included no language about "fair value," "fair market value," or authoritative accounting literature.

68.     The Reserve Report was finalized in February 2010 and reflected PV-10 of $368 million.

69.     Upon receiving the Reserve Report, Boyd, without undertaking any additional analysis, merely recorded as the fair value of the acquired oil and gas properties the sum of the PV-10 estimates for 100% of the proved, probable, and possible reserves, which increased the book value of Miller Energy's oil and gas properties on its balance sheet by approximately $368 million.

70.     The Reserve Report itself clearly stated that the numbers stated therein were not an estimate of fair market value.  Specifically, on page three of the report, it stated that "[t]he discounted values shown are for your information and should not be construed as our estimate of fair market value."

71.     Boyd never reviewed or questioned any of the Reserve Report's assumptions or calculations, nor did he communicate with the engineering firm about the Reserve Report.

72.     The use of the PV-10 numbers as being fair value conflicted with contemporaneous representations Miller Energy made to investors in its filings with the SEC, including those incorporated by reference into the Registration Statement used to conduct the Offerings. Specifically, in its fiscal 2010 Form 10-K, which was the first annual report that included the inflated values, and as would be repeated in all filings through August 2015, Miller Energy expressly told investors that "[o]ur PV-10 measure and the standardized measure of discounted future net cash flows do not purport to present the fair value of our natural gas and oil reserves."  Despite that disclosure, Miller Energy had actually used its PV-10 measure in that very same report as the fair value of its acquired properties.

73.     As detailed herein, the approximate $368 million Reserve Report value did not represent fair market value for several reasons.

74.     Despite showing years of net profit that market participants would expect to be taxable, the Reserve Report did not make any adjustments for income taxes.

75.     At Miller Energy's request, the Reserve Report used a 10% discount rate that was inappropriate under GAAP for determining fair market value. In a discounted cash flow model, a discount rate is used to account for the uncertainties associated with risk and the time value of money. A discount rate is the required rate of return that an investor would demand – based on the risks associated with the benefit stream under consideration – to induce the investor to make an investment. By failing to consider the discount rate using assumptions that market participants would use, Miller Energy materially overstated the market value of the acquired oil and gas properties.

76.     The valuation also overstated cash flows from certain categories of reserve estimates (*e.g.*, "probable" and "possible" reserves) by failing to apply any risk weight to such reserves and the resulting cash flows. Given the high degree of uncertainty associated with cash flows from these reserve estimate categories, they are required to be risk weighted in order to reflect an appropriate market valuation.

77.     Pursuant to 17 C.F.R. 211, Release No. FR-78, *Modernization of Oil and Gas Reporting*, as amended, reporting companies may classify undeveloped reserves as "proved" only if the development plan for those reserves provides for drilling within five years of being booked, unless justified by "specific" circumstances. In violation of this specific oil and gas reporting disclosures rule, Miller Energy improperly included estimated values of reserves that it was not to develop within the requisite five-year period.

78.     The Reserve Report also did not include amounts for certain asset retirement obligations, *i.e.*, the legal obligations associated with the retirement of tangible long-lived assets.

79.     Finally, the $237 million of projected operating and capital expenses in the Reserve Report, which were provided by Miller Energy and Hall, were intentionally understated, resulting in an overstated valuation.

80.     In fact, one petroleum engineering firm contacted but not used by Miller Energy thought that the expected level of expenses made a significant portion of the acquisition unprofitable. Initially, Hall contacted the petroleum engineering firm who had previously provided the past two owners of the properties with reserve reports, and thus had unfettered access to past operating data, and requested a quote for "updating" a prior reserve report. That firm told Hall that it would not assign any value to one of the largest fields acquired, the Redoubt Shoal field, because it was uneconomical – *i.e.*, expected future expenses exceeded expected future cash flows – and explained that it would not put its "name on a report that implies value exists where it likely does not."[7]

81.     Boyd was aware that Miller Energy chose the new firm because the prior firm would not assign any value to the Redoubt Shoal field. The Redoubt Shoal field – which represented $291 million of the $368 million in fair market value recorded by Miller Energy – showed positive future cash flows in the Reserve Report primarily because Hall gave the new engineering firm understated and unsubstantiated expense numbers. Boyd had previously been advised by Vogt that the lack of any controls over Hall's expense estimates was a "concerning void."

82.     Miller Energy and Hall provided expense projections that, in many cases, were significantly lower than past actual experience. For example, internal documents maintained by Hall

_____

[7]     Unique among the oil and gas properties purchased by Miller Energy, Redoubt Shoal is an offshore field in Cook Inlet, Alaska, which requires the use of an offshore platform that sits in 70 feet of water, is accessible only by boat or helicopter, and drills to depths in excess of 12,000 feet. Offshore drilling presents risks and costs not associated with onshore operations.

indicated that the cost to drill a new well in the Redoubt Shoal field was roughly $13 million. However, Hall told the engineering firm to use a cost of $4.6 million per well in its reserve report. Instead of using recent expense data, Hall gave the engineering firm nearly three-year-old operating expense data, which he revised downward on the pretext that Miller Energy could run a leaner operation than the former operators of the properties. By way of example, Hall told the engineering firm that the offshore Redoubt Shoal field would cost $399,000 per month to operate when it actually cost the seller more than $600,000 per month, and internal estimates that showed that Miller Energy and Hall expected the field to cost more than $800,000 per month once it was fully operational. Additionally, in some years, the Reserve Report included zero expenses for operating the facilities in the Redoubt Shoal and another field.

83.     The expense projections Hall provided to the petroleum engineer for use in the Reserve Report were also, in many cases, significantly lower than recent expense information and projections he had used in his own internal models and budgets.

84.     Overall, the Reserve Report implied operating expenses of $4 per barrel of oil equivalent ("boe") for all categories of reserves. That level of operating expenses was unreasonable in light of the previous owner's actual operating expenses of $32.50/boe in 2008 and $55.42/boe in the first half of 2009 before the wells were shut-in.

85.     By understating the expense numbers, Miller Energy overvalued the oil and gas properties by tens of millions of dollars.

C.     **The Fair Value of the Acquired Fixed Assets Was Double Counted and Overstated**

86.     In addition to the approximate $368 million value recorded for the oil and gas properties, Miller Energy also erroneously recorded a separate value of $110 million for acquired fixed assets, such as facilities and pipelines ancillary to the oil and gas reserves.

87.     In a February 8, 2010 email, Boyd informed Hall that he needed an amount to use as fair value for the fixed assets obtained as part of the Alaska Assets acquisition.  He noted that, ideally, the value should be what a willing buyer would pay for the assets, but "[i]n the absence of that, replacement values or something similar would probably work."  Two days later, Boyd was sent an "asset replacement cost study," purportedly provided by an independent insurance broker, which appeared to list the replacement cost for the assets as $110 million.  The "study" was dated September 5, 2008, but "revised" on February 9, 2010.

88.     Without any additional analysis, Boyd recorded the amount received from Hall in the revised insurance study on Miller Energy's balance sheet.

89.     As detailed herein, the recording of assets at a value of approximately $110 million was improper for several reasons.

90.     Miller Energy's use of the aforesaid values in the insurance study resulted in counting the value of the fixed assets twice, thereby overstating the value of such assets.  The Reserve Report, which Miller Energy relied on to value the acquired oil and gas properties, used a discounted cash flow model.  Valuation specialists use such models to estimate the value of an enterprise's "operating assets" – *i.e.*, the assets employed to generate future cash flows – by converting future benefit streams into a net present value.  In Miller Energy's case, the fixed assets in the insurance study were the very same operating assets that were expected to generate the future cash flows in the Reserve Report.  Accordingly, they should not have been separately valued.

91.     Prior to the acquisition, all of the production from the offshore Redoubt Shoal field ran through the Osprey platform, which had no processing facilities or power generating capability of its own.  Power was sent to the Redoubt Shoal field from generators housed within the Kustatan Production Facility to the platform via a subsea line, which was connected to an underground power

grid that ran throughout all of the acquired properties. Moreover, production from the offshore platform was sent onshore for processing through pipes to the Kustatan Production Facility. Absent the platform, there would have been no way to obtain oil and gas from the Redoubt Shoal field without incurring upfront capital expenditures to replace the platform and its related infrastructure. Similarly, without the other production facilities, the platform would have lacked power and a facility to process its oil and gas.

92.     The Reserve Report that Miller Energy used for the market valuation recognized the interconnectedness of the properties, as it expressly listed the facilities and the offshore platform as assets used to generate the future cash flows.

93.     In short, because the fixed assets were integral to the operations of the acquired properties, their values were captured in the Reserve Report's cash flows. Consequently, by separately valuing the same operating assets, Miller Energy overstated the value of the Alaska Assets by as much as $110 million.

94.     The insurance study also did not reflect fair market value because the version of the insurance study used by Boyd purported to show "asset replacement cost." Absent further adjustments, replacement cost does not qualify as fair market value under GAAP.

95.     Miller Energy, at the direction of Boyd and Hall, also refashioned a preexisting insurance study to make it appear that its own value of $110 million was derived from a third party. The numbers in the fixed asset study were given to the insurance broker, and its predecessor, by its clients (*i.e.*, Miller Energy and the previous owners of the fixed assets) as far back as 2007 and were used as starting points for other types of estimates, such as estimates for possible losses resulting from fire or natural disasters. The two employees at the insurance broker who were most familiar

with the original "Loss Estimates Study," including the engineer who authored it, confirmed to the SEC that no one at the broker ever tested or in any way double checked the values given to them.

96.     Boyd and Hall disregarded the fact that the insurance study did not reflect fair value or any analysis undertaken by the insurance broker.

97.     On February 8, 2010, Hall directed the Company's Alaska personnel to contact the insurance broker and another oil and gas consulting company to ask them for a report reflecting fair market value or replacement cost.  The insurance broker responded on February 9, 2010, and told Miller Energy in an email copied to Hall that it could not provide a report showing replacement costs.

98.     Miller Energy also contacted a separate consulting firm and sent it the insurance broker's original 2008 insurance report.  Late on February 8, 2010, the consulting firm informed Miller Energy that the insurance study it sent was a "good reference" but that the report did not state "value or replacement cost."  The firm offered to conduct its own analysis, but advised that the estimate would take "approximately 2-3 weeks to complete" and "cost around $15,000-$18,000."

99.     Upon hearing the news that a new report might take two to three weeks to complete, the Company's Alaska personnel, including Hall, called Boyd.  According to one participant on this call, Boyd said he could not wait weeks for a new report.  He "needed it quickly and he needed to base it on something . . . a professional had to sign off on it, not us, some third party."  During the call, Boyd and Hall decided to rely on numbers in the insurance report as replacement costs, despite Hall having been told by the broker that it could not provide Miller Energy with replacement costs.

100.     With the aim of making the report appear as though it reflected replacement costs, Hall provided a subordinate with edits to the 2008 insurance report that significantly altered its appearance, including changing its name from "Loss Estimates Study" to "Asset replacement cost

study." The revised report, which Miller Energy gave to Sherb & Co., omitted the insurance broker's methodology and analysis. As a result, the only numbers reflected in the revised report were the ones specifically provided to the broker by Miller Energy and its predecessors.

101. As a result of the foregoing, Miller Energy overvalued the Alaska Assets by more than $400 million.

102. As a result of the incorrect valuation, Miller Energy filed with the SEC financial reports that materially misstated the value of its assets, including the SEC filings incorporated by reference in the Registration Statement used to conduct the Offerings.

103. Under the rules and regulations governing the preparation of the Registration Statement, Miller Energy was required to disclose at the time of the Offerings that the value of the Alaska Assets was materially overstated in its financial statements. The Registration Statement, however, contained no such disclosures. Pursuant to Item 303 of Regulation S-K (17 C.F.R. 229.303) and the SEC's related interpretive releases thereto, issuers are required to disclose events or uncertainties, including any known trends, that have had or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results. This is particularly important for issuers utilizing shelf registration statements, which require continuous updating and incorporate those continuous disclosures into the registration statement.

104. At the time of each of the Offerings, the Alaska Assets were materially overstated in the Company's financial statements, which materially understated the Alaska Assets' true expenses and materially overstated its profits. The adverse events and uncertainties associated with these declining trends were reasonably likely to have a material impact on Miller Energy's profitability, and, therefore, were required to be disclosed in the Registration Statement.

## VI.  MILLER ENERGY WRITES DOWN THE VALUE OF THE ALASKA ASSETS

105.  Following the Offerings, a series of disclosures made by the Company revealed that the Registration Statement was false and misleading in that it overstated the value of the Alaska Assets on the Company's books by hundreds of millions of dollars at the time each of the Offerings was conducted.

106.  On December 10, 2014, in a quarterly report filed with the SEC on Form 10-Q, Miller Energy disclosed that it was taking a $265.3 million impairment charge on the Alaska Assets, specifically the Redoubt Shoal field.

107.  On March 12, 2015, in its subsequent quarterly report, Miller Energy disclosed that it was taking another $150 million impairment charge on the Alaska Assets.

108.  On April 29, 2015, Miller Energy disclosed it had received a "Wells Notice"[8] from the SEC, indicating that the agency staff had made a preliminary determination to recommend civil action against the Company related to its accounting for the 2009 acquisition of the Alaska Assets. In response, the Company "welcome[d] the opportunity to respond before any action [was] taken" and further "assert[ed] that it does not believe that an enforcement action was warranted in this case", thereby causing concealment of the defendants' violations of federal securities laws, as alleged herein, to continue.  On April 29, 2015, Boruff, Gower, Hannahs, Richardson, and Stivers were directors of the Company.

---

[8]  "A Wells notice is a communication from the staff to a person involved in an investigation that: (1) informs the person the staff has made a preliminary determination to recommend that the [SEC] file an action or institute a proceeding against them; (2) identifies the securities law violations that the staff has preliminarily determined to include in the recommendation; and (3) provides notice that the person may make a submission to the Division and the [SEC] concerning the proposed recommendation."  SEC Division of Enforcement, *Enforcement Manual* (October 28, 2016), https://www.sec.gov/divisions/enforcementmanual.pdf.

109.     On May 6, 2015, Miller Energy disclosed that it would "defer" the dividend payments on the Series C and Series D shares and that the amount of deferred cash payments of quarterly dividends would accrue, such that any future cash payments made to the holders of Series C and Series D would first go to retire the amount of the accrued but unpaid quarterly dividends. At the time of the filing of this Complaint, Plaintiffs and the Class had received no deferred and accrued quarterly dividends since May 6, 2015.

110.     On May 12, 2015, Miller Energy disclosed that the NYSE had notified the Company that its shares were subject to delisting due to its having failed to maintain listing requirements.

111.     On July 14, 2015, Miller Energy filed a Notification of Late Filing of its Form 10-K for the period ended April 30, 2015 on Form 12b-25 with the SEC, requesting an extension of time within which to file its annual report noting that "due to the constraining structure of the registrant's current debt, its continued capital repositioning process as well as potential factors not under the registrant's control, there is, from an accounting perspective, substantial doubt about its ability to continue as a going concern."

112.     On July 31, 2015, Miller Energy filed Form 8-K with the SEC reporting that on that day it had received formal written notice from the NYSE that trading in the Company's common stock, as well as Series C stocks, and Series D stocks will be suspended before the market opens on July 31, 2015.

113.     Then, on August 6, 2015, the Company filed a Form 8-K with the SEC reporting, among other things, that the SEC initiated civil administrative proceedings ("SEC Enforcement Action") against Miller Energy, Boyd and Hall, alleging that the Company overvalued oil and gas properties it had acquired in Alaska in late 2009 and that, as a result, the Company's financial reports

were materially misstated for the ensuing five-plus year period through and including July 2015. Vogt was also charged in the SEC Enforcement Action.

114.     In its Order Instituting Public Administrative and Cease-and-Desist Proceedings pursuant to Section 8A of the Securities Act of 1933, Sections 4C and 21C of the Securities Exchange Act of 1934, and Rule 102(e) of the Commission's Rules of Practice filed that day ("August 6, 2015 Order"), the SEC's Division of Enforcement alleged that after acquiring the Alaska Assets in late 2009, Miller Energy overstated their value by more than $400 million, boosting the Company's net income and total assets. According to the SEC, the allegedly inflated valuation had a significant impact, turning a penny-stock company into one that was eventually listed on the NYSE, where the Company's common stock had reached a 2013 high of nearly $9 per share.

115.     In a statement issued that day, William P. Hicks, Associate Regional Director of the SEC's Atlanta office, stated in pertinent part as follows:

> "Financial statement information is the cornerstone of investment decisions. We've charged that Miller Energy falsified financial statement information and grossly overstated the value of its Alaska assets and that the company's independent auditor failed to conduct an audit that complied with professional standards . . . . The SEC will aggressively prosecute such conduct."

116.     According to the SEC, Miller Energy had paid $2.25 million and assumed certain liabilities to purchase the Alaska Assets. The Company later reported them at a value of approximately $480 million. While accounting standards required the Company to record the properties at "fair value," then-CFO Boyd allegedly relied on the Reserve Report, which did not reflect fair market value for the assets, and he was also alleged to have double counted $110 million of fixed assets already included in the Reserve Report. The Reserve Report allegedly contained expense numbers that were knowingly understated by Hall, then serving as the CEO of Miller Energy's Alaska subsidiary, CIE, as well as Miller Energy's COO since July 2013. Hall was also

alleged to have altered a second report to make it appear as though the report reflected an outside party's estimate of value.

117. The SEC alleged that the fiscal 2010 audit of Miller Energy's financial statements was deficient due to the failure of Vogt and the Sherb & Co. partner in charge of the Miller Energy audits who issued an unqualified opinion of Miller Energy's 2010 annual report, were alleged to have falsely stated that the audit was conducted in accordance with the standards of the PCAOB, and that Miller Energy's financial statements were presented fairly and conformed with GAAP.

118. As a result of the forgoing misconduct, the SEC alleged that:

- Miller Energy violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, which prohibit fraudulent conduct in the offer or sale of securities and in connection with the purchase or sale of securities;

- Boyd willfully aided and abetted and caused, and Hall caused, Miller Energy's violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder;

- Boyd willfully violated, and Hall violated, Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, which prohibit fraudulent conduct in the offer or sale of securities and in connection with the purchase or sale of securities;

- Miller Energy violated Section 13(a) of the Exchange Act and Rules 13a-1, 13a-11 and 13a-13 thereunder, which require that every issuer of a security registered pursuant to Exchange Act Section 12 file with the [SEC], among other things, annual, current, and quarterly reports as the [SEC] may require;

- Boyd willfully aided and abetted and caused, and Hall caused, Miller Energy's violations of Section 13(a) of the Exchange Act and Rules 13a-1, 13a-11 and 13a-13 thereunder;

- Miller Energy violated Section 13(b)(2)(A) of the Exchange Act, which requires reporting companies to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect their transactions and dispositions of their assets;

- Boyd willfully aided and abetted and caused, and Hall caused, Miller Energy's violations of Section 13(b)(2)(A) of the Exchange Act;

- Miller Energy violated Section 13(b)(2)(B) of the Exchange Act, which requires all reporting companies to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP;

- Boyd willfully aided and abetted and caused, and defendant Hall caused, Miller Energy's violations of Section 13(b)(2)(B) of the Exchange Act;

- Boyd willfully violated, and Hall violated, Section 13(b)(5) of the Exchange Act which prohibits any person from knowingly circumventing or knowingly failing to implement a system of internal accounting controls or knowingly falsifying any book, record, or account described in Section 13(b)(2) of the Exchange Act;

- Miller Energy violated Rule 12b-20 under the Exchange Act which requires that, in addition to the information expressly required to be included in a statement or report filed with the [SEC], there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made not misleading;

- Boyd willfully aided and abetted and caused, and Hall caused, Miller Energy's violations of violated [*sic*] Rule 12b-20 under the Exchange Act;

- Boyd willfully violated Rule 13a-14 of the Exchange Act which requires that an issuer's principal executive and principal financial officers certify each periodic report; and

- Vogt engaged in improper professional conduct within the meaning of Section 4C(a)(2) of the Exchange Act and Rule 102(e)(1)(ii) of the [SEC's] Rules of Practice.

119. The SEC sought, among other things, cease-and-desist orders, civil monetary penalties, and return of alleged ill-gotten gains from Miller, Boyd, and Hall.

120. During August 2015, many of Miller Energy's creditors called for the Company to file bankruptcy.

121. On August 20, 2015, Miller Energy filed a Form 8-K with the SEC which disclosed that on August 14, 2015, within eight days of the SEC having initiated the SEC Enforcement Action, the Company had reached an agreement in principle with the Enforcement Division of the SEC to settle the proceeding, subject to approval by the SEC. Under the terms of the proposed settlement, the Company had agreed to pay a $5 million penalty and to review and, where appropriate, restate its

financial statements containing financial information related to the valuation of the 2009 acquisition of the Alaska Assets, and the subsequent financial results derived from that information.

122.    In September 2015, Miller Energy Series C and Series D shares were delisted after the market price of each had plummeted to approximately $0.30 per share, a more than 98% decline from the prices the shares were marketed at in the Offerings.

123.    On October 1, 2015, Miller Energy filed for protection under Chapter 11 of the federal bankruptcy statutes, citing in large part the filing of the SEC Enforcement Action, which Miller Energy's senior executives stated had torpedoed its ability to obtain $165 million in outside financing, along with the filing of an involuntary bankruptcy petition against its subsidiary CIE in August 2015 by creditors Baker Hughes Oilfield Operations, Inc. and Schlumberger Technology Corp., with total claims of $2.79 million, which filing Miller said was precipitated by the SEC Enforcement Action.

124.    On January 12, 2016, the SEC entered an Order Making Findings and Imposing a Cease-and-Desist Order and Penalties Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934 as to Miller Energy Resources, Inc. ("January Order"). The January Order confirmed a majority of the violations alleged in the August 6, 2015 Order and held as follows:

- Miller Energy violated Section 17(a)(2)and (3) of the Securities Act which prohibit fraudulent conduct in the offer or sale of securities;

- Miller Energy violated Section 13(a) of the Exchange Act, and Rules 13a-1, 13a-11, and 13a-13 thereunder, which require that every issuer of a security registered pursuant to Exchange Act Section 12 file with the [SEC], among other things, annual, current, and quarterly reports as the [SEC] may require;

- Miller Energy violated Section 13(b)(2)(A) of the Exchange Act, which requires reporting companies to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect their transactions and dispositions of their assets;

- Miller Energy violated Section 13(b)(2)(B) of the Exchange Act, which requires all reporting companies to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP; and

- Miller Energy violated Rule 12b-20 under the Exchange Act which requires that, in addition to the information expressly required to be included in a statement or report filed with the [SEC], there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made not misleading.

125.    The Order included a cease-and-desist order and civil monetary penalties of $5 million to be paid consistent with general unsecured claims under the Joint Plan of Reorganization of Miller Energy Resources, Inc. and its Subsidiaries under Chapter 11 of the Bankruptcy Code (as amended and supplemented, "Plan").

126.    On January 28, 2016, the Bankruptcy Court confirmed the Plan and on March 29, 2016 ("Effective Date"), the Plan became effective and the debtors emerged from their Chapter 11 proceedings.

127.    The Company disclosed in its Form 8-K filed with the SEC on March 29, 2016, that under the Plan, equity interests in Miller were not entitled to any distributions.  Therefore, on the Effective Date, all equity interests in Miller were cancelled, including outstanding shares of common stock, approximately 25,750 outstanding shares of Series B Redeemable Preferred Stock with a redemption value of $100 per share, approximately 3,250,000 outstanding shares of 10.75% Series C Cumulative Redeemable Preferred Stock with a redemption value of $25.00 per share, and approximately 3,499,723 outstanding shares of 10.5% Series D Fixed Rate/Floating Rate Cumulative Redeemable Preferred Stock with a redemption value of $25.00 per share.

128.    In the Form 8-K, Miller Energy also disclosed that the Company conducted an asset impairment analysis on certain of its assets and that "[i]n view of the Company's bankruptcy, and

after further review of financial information related to the valuation of the oil and gas properties acquired by the Company in Alaska in late 2009 and other accounting matters, the Company has concluded that its financial statements from prior years beginning in fiscal year 2010 should no longer be relied upon."

129.    The Company also disclosed that it had consented on January 12, 2016 to the January Order with respect to the SEC Enforcement Action and the Order included a cease-and-desist order and civil monetary penalties of $5 million to be paid consistent with general unsecured claims under the Plan.

130.    Also on March 29, 2016, pursuant to the Plan, the Company reorganized into separate entities represented by its 11 subsidiaries, all existing equity interests in Miller Energy were cancelled and a plan was in place to issue new common stock. The company established a new board of directors empowered to adopt any agreements or documents, or take any actions outlined in the Plan. Miller Energy also voluntarily deregistered its common stock.

131.    In connection with Miller Energy's emergence from Chapter 11 proceedings on the aforesaid March 29th date, Boruff, Gower, and Hannahs, departed the Company's board of directors.

132.    Then, on June 7, 2016, the SEC made findings and imposed remedial sanctions as to Boyd, Hall, and Vogt.

133.    In the Order Making Findings and Imposing Remedial Sanctions Pursuant to Section 8A of the Securities Act of 1933, Sections 4C and 21C of the Securities Exchange Act of 1934 and Rule 102(e) of the Securities Exchange Act of 1934 and Rule 102(e) of the [SEC's] Rules of Practices as to Paul W. Boyd, CPA, the SEC found the following violations:

- Boyd willfully violated Section 17(a) of the Securities Act, which prohibits fraudulent conduct in the offer or sale of securities;

- Boyd willfully aided and abetted and caused Miller Energy to violate Section 13(a) of the Exchange Act, and Rules 13a-1, 13a-11, and 13a-13 thereunder, which require that every issuer of a security registered pursuant to Exchange Act Section 12 to file with the [SEC], among other things, annual, current, and quarterly reports as the [SEC] may require;

- Boyd willfully aided and abetted and caused Miller Energy to violate Section 13(b)(2)(A) of the Exchange Act, which requires reporting companies to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect their transactions and dispositions of their assets;

- Boyd willfully aided and abetted and caused Miller Energy to violate Section 13(b)(2)(B) of the Exchange Act, which requires all reporting companies to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP;

- Boyd willfully violated Section 13(b)(5) of the Exchange Act and Rule 13b2-1 thereunder, which prohibit any person from knowingly circumventing or knowingly failing to implement a system of internal accounting controls or knowingly falsifying any book, record, or account described in Section 13(b)(2) of the Exchange Act;

- Boyd willfully aided and abetted and caused Miller Energy to violate Rule 12b-20 under the Exchange Act, which requires that, in addition to the information expressly required to be included in a statement or report filed with the [SEC], there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made not misleading; and

- Boyd willfully violated Rule 13a-14 of the Exchange Act which requires that an issuer's principal executive and principal financial officers certify each periodic report.

134. In the Order Making Findings and Imposing Remedial Sanctions Pursuant to Section 8A of the Securities Act of 1933, and Section 21C of the Securities Exchange Act of 1934 as to David M. Hall, the SEC found the following violations:

- Hall violated Sections 17(a)(2) and (3) of the Securities Act, which prohibit fraudulent conduct in the offer or sale of securities;

- Hall caused Miller Energy to violate Section 13(a) of the Exchange Act, and Rules 13a-1, 13a-11, and 13a-13 thereunder, which require that every issuer of a security registered pursuant to Exchange Act Section 12 file with the

[SEC], among other things, annual, current, and quarterly reports as the [SEC] may require;

- Hall caused Miller Energy to violate Section 13(b)(2)(A) of the Exchange Act, which requires reporting companies to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect their transactions and dispositions of their assets;

- Hall caused Miller Energy to violate Section 13(b)(2)(B) of the Exchange Act, which requires all reporting companies to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP;

- Hall violated Section 13(b)(5) of the Exchange Act, which prohibits any person from knowingly circumventing or knowingly failing to implement a system of internal accounting controls or knowingly falsifying any book, record, or account described in Section 13(b)(2) of the Exchange Act;

- Hall violated Rule 13b2-1 under the Exchange Act, which prohibits any person from, directly or indirectly, falsifying or causing to be falsified any book, record or account described in Section 13(b)(2) of the Exchange Act; and

- Hall caused Miller Energy to violate Rule 12b-20 under the Exchange Act, which requires that, in addition to the information expressly required to be included in a statement or report filed with the [SEC], there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made not misleading.

135.    The SEC also entered an Order Making Findings and Imposing Remedial Sanctions Pursuant to Sections 4C and 21C of the Securities Exchange Act of 1934 and Rule 102(e) of the [SEC's] Rules of Practices as to Carlton W. Vogt, III, CPA, finding that Vogt "engaged in a single instance of highly unreasonable conduct in circumstances for which heightened scrutiny was warranted within the meaning of Section 4C(a)(2) of the Exchange Act and Rule 102(e)(1)(ii) of the [SEC's] Rules of Practice."

## VII.   CLASS ACTION ALLEGATIONS

136.    Plaintiffs bring this action as a class action on behalf of a class consisting of all those who purchased Miller Energy preferred shares traceable to the Registration Statement issued in connection with the Offerings ("Class").  Excluded from the Class are defendants and their families, the officers and directors and affiliates of defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

137.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of members of the Class is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Miller Energy or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

138.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

139.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

140.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

      (a)    whether defendants violated the Securities Act;

(b)     whether the Registration Statement was negligently prepared and contained inaccurate statements of material fact and omitted material information required to be stated therein; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

141.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of Section 11 of the Securities Act
### Against All Defendants (Except Boyd)

142.     Plaintiffs repeat and reallege each and every allegation contained above, as though fully set forth herein.

143.     This Cause of Action is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants except Boyd.

144.     The Registration Statement for the Offerings was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary in order to make the statements made not misleading, and omitted to state material facts required to be stated therein.

145.     The defendants named in the Cause of Action are strictly liable to Plaintiffs and the other members of the Class for the misstatements and omissions.

146.    None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

147.    By reason of the conduct herein alleged, each of these defendants violated, and/or controlled a person who violated, Section 11 of the Securities Act.

148.    Plaintiffs acquired Miller Energy preferred shares traceable to the Offerings.

149.    Plaintiffs and the other members of the Class have sustained damages.

150.    At the time of their purchases of Miller Energy preferred shares, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiffs commenced this action. Less than three years has elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time Plaintiffs commenced this action.

## COUNT II

### For Violation of Section 12(a)(2) of the Securities Act
### Against Officer and Underwriter Defendants

151.    Plaintiffs repeat and reallege each and every allegation contained above, as though fully set forth herein.

152.    This Cause of Action is brought pursuant to Section 12(a)2 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against the Officer and Underwriter Defendants.

153.    By means of the defective Prospectuses, the Officer and Underwriter Defendants promoted and sold Miller Energy preferred shares to Plaintiffs and the other members of the Class.

154.     The Prospectuses contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above.  The Officer and Underwriter Defendants owed Plaintiffs and the other members of the Class who purchased Miller Energy preferred shares pursuant to the Prospectuses the duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  The Officer and Underwriter Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectuses as set forth above.

155.     Plaintiffs did not know, nor in the exercise of reasonable diligence could Plaintiffs have known, of the untruths and omissions contained in the Prospectuses at the time Plaintiffs acquired Miller Energy preferred shares.

156.     By reason of the conduct alleged herein, the Officer and Underwriter Defendants violated Section 12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Plaintiffs and the other members of the Class who purchased Miller Energy preferred shares pursuant to the Prospectuses sustained substantial damages in connection with their purchases of the preferred shares.  Accordingly, Plaintiffs and the other members of the Class who hold the preferred shares issued pursuant to the Prospectuses have the right to rescind and recover the consideration paid for their shares, and hereby tender their preferred shares to the defendants sued herein. Members of the Class who have sold their preferred shares seek damages to the extent permitted by law.

157.    Less than three years have elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time Plaintiffs commenced this action.

## COUNT III

**For Violation of Section 15 of the Securities Act**
**Against the Individual Defendants**

158.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

159.    This Cause of Action is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §78o, against the Individual Defendants.

160.    The Individual Defendants each were control persons of Miller Energy by virtue of their positions as directors and/or senior officers of Miller Energy.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Miller Energy.

161.    The Individual Defendants each were participants in the violations of  Section 11 and/or 12 of the Securities Act alleged in the Cause of Action above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the Offerings to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Declaring that this action is a proper class action and certifying Plaintiffs as Class representatives pursuant to Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel for the proposed Class;

B. Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D. Granting such equitable/injunctive or other relief as deemed appropriate by the Court.

## **JURY TRIAL DEMAND**

Plaintiffs hereby demand a trial by jury.

DATED: January 5, 2017

ROBBINS GELLER RUDMAN
  & DOWD LLP
JACK REISE (*pro hac vice*)
STEPHEN R. ASTLEY (*pro hac vice*)

*s/ Jack Reise*
JACK REISE

120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHRISTOPHER M. WOOD, #032977
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)

*Lead Counsel for Plaintiffs*

BARRETT JOHNSTON MARTIN
  & GARRISON, LLC
DOUGLAS S. JOHNSTON, JR., #5782
JERRY E. MARTIN, #20193
TIMOTHY L. MILES, #21605
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2202
615/252-3798 (fax)

*Local Counsel for Plaintiffs*

- 42 -

LAW OFFICES OF CURTIS V. TRINKO, LLP
CURTIS V. TRINKO (*pro hac vice*)
16 West 46th Street, 7th Floor
New York, NY 10036
Telephone: 212/490-9550
212/986-0158 (fax)

KRANENBURG
WERNER R. KRANENBURG (*pro hac vice*)
80-83 Long Lane
London EC1A 9ET
United Kingdom
Telephone: +44 20 3174 0365

*Additional Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing has been filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system. All others below will also be served by depositing a copy thereof in the United States mail, first-class, postage prepaid:

David J. Voyticky
2652 Midvale Avenue
Los Angeles, CA 90064

Gerald Hannahs
17710 Leatha Lane
Little Rock, AR 72223

William B. Richardson
1058 Encantado Drive
Santa Fe, NM 87501

Paul W. Boyd
8125 Ainsworth Drive
Knoxville, TN 37909

Charles M. Stivers
118 Richmond Road
Manchester, KY 40962

Scott Boruff
5628 Lyons View Pike
Knoxville, TN 37919

*Defendants*

                                       *s/Jack Reise*
                                       JACK REISE