**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| KENNETH GAYNOR, et al., Individually and on Behalf of All Others Similarly Situated, | ) | Case No. 3:15-cv-00545-TAV-CCS |
| | ) | **(Consolidated)** |
| Plaintiff, | ) | |
| v. | ) | |
| DELOY MILLER, et al., | ) | CLASS ACTION |
| Defendants. | ) | |

---

**MEMORANDUM IN SUPPORT OF THE UNDERWRITER DEFENDANTS' MOTION TO DISMISS THE MASTER CONSOLIDATED COMPLAINT**

---

## TABLE OF CONTENTS

INTRODUCTION ....1

RELEVANT BACKGROUND ....3

I. Miller's Purchase and Valuation of the Alaska Assets. ....3

II. *In re Miller Energy*. ....4

III. Series C and D Offerings. ....7

IV. Alleged Revelation of the "Truth." ....8

V. Plaintiffs' Claims. ....12

ARGUMENT AND AUTHORITY ....13

I. Plaintiff Fails To State a Claim Against the Underwriter Defendants Under Either Section 11 or Section 12(a)(2) Because Lack of Loss Causation Is Apparent from the Face of the Complaint. ....14

A. Lack of Loss Causation Is an Affirmative Defense that Can Provide a Basis for a Motion To Dismiss. ....15

B. Lack of Loss Causation Is Evident on the Face of the Complaint. ....16

1. Plaintiffs' Alleged Revelations Are Not "New" Because Information Correcting the Alleged Misrepresentations Was Known to the Market Both Before and During the Entire Class Period. ....18

2. Plaintiffs' Alleged Revelations Establish a Lack of Loss Causation. ....19

a. Disclosures that Are Not Corrective. ....20

b. The Wells Notice Disclosure. ....22

c. Disclosures after the Majority of Plaintiffs' Losses Had Occurred. ....24

II. Plaintiffs' Section 12(a)(2) Claim Against the Underwriter Defendants Should Be Dismissed Because No Plaintiff Has Established Privity with Any Underwriter. ....26

III. Plaintiffs' Section 11 Claim Against the Underwriter Defendants Should Be Dismissed Under Section 11(b)(3)(C) Because the Underwriter Defendants Reasonably Relied on the Expertise of Miller's Auditors. ....28

IV. Plaintiffs Lack Standing To Pursue Their Section 11 Claims. ....31

CONCLUSION....33

**FEDERAL CASES**

*Amorosa v. Ernst & Young LLP*, 682 F. Supp. 2d 351 (S.D.N.Y. 2010) ...............................11, 14

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...........................................................................13

*Azzolini v. Corts Trust II for Provident Financial Trust I*, 2005 WL 3448053 (E.D. Tenn. Dec. 14, 2005) ..............................................................................15, 19

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .................................................................13, 14

*Brown v. Ambow Educ. Holding Ltd.*, 2014 WL 523166 (C.D. Cal. Feb. 6, 2014) ...............16, 17

*Catogas v. Cyberonics, Inc.*, 292 F. App'x 311 (5th Cir. 2008) (per curiam)..............................16

*Directv, Inc. v. Treesh*, 487 F.3d 471 (6th Cir. 2007)......................................................................3

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005)...........................................................6, 16, 20

*Feyko v. Yuhe Int'l., Inc.*, 2013 WL 816409 (C.D. Cal. Mar. 5, 2013) ............................28, 29, 30

*Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995)..................................................................26

*In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp. 2d 404 (S.D.N.Y. 2009) .........................................................................................................15, 24

*In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104 (9th Cir. 2013).....................................31

*In re Century Aluminum Co. Sec. Litig.*, 749 F. Supp. 2d 964 (N.D. Cal. 2010) ..........................27

*In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132 (C.D. Cal. 2008)................28, 30

*In re Empyrean Biosci., Inc. Sec. Litig.*, 255 F. Supp. 2d 751 (N.D. Ohio 2003) .........................31

*In re Friedman's, Inc. Sec. Litig.*, 385 F. Supp. 2d 1345 (N.D. Ga. 2005) ..................................31

*In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258 (S.D.N.Y. 2011).........................27

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d 429 (S.D.N.Y. 2003) ...........................................................................................................24

*In re Merrill Lynch & Co. Research Reports Secs. Litig.*, 272 F. Supp. 2d 243 (S.D.N.Y. 2003) ......................................................................................................15, 25

*In re Metropolitan Sec. Litig.*, 2010 WL 424625 (E.D. Wash. Jan. 28, 2010)..............................28

*In re MF Global Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277 (S.D.N.Y. 2013)........................27

*In re Miller Energy Res. Sec. Litig.*, 2014 WL 415730 (E.D. Tenn. Feb. 4, 2014) (Varlan, C.J.)........................ passim

*In re Regions Morgan Keegan Sec., Derivative & ERISA Litig.*, 166 F. Supp. 3d 948, 968 (W.D. Tenn. 2014)........................27

*In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334 (D. Md. 2004)........................27

*In re Shoretel Inc. Sec. Litig.*, 2009 WL 248326 (N.D. Cal. Feb. 2, 2009)........................21

*In re STEC Inc. Sec. Litig.*, 2011 WL 2669217 (C.D. Cal. June 17, 2011)........................31

*In re WorldCom, Inc. Sec. Litig.*, 2005 WL 375314 (S.D.N.Y. Feb. 17, 2005)........................16

*In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628 (S.D.N.Y. 2004)........................26, 27, 29

*Indiana State Dist. Council of Laborers v. Omnicare, Inc.*, 2011 WL 2786301 (E.D. Ky. July 14, 2011)........................15, 17

*Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462 (4th Cir. 2011)........................16

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005)........................17, 20

*Local 295/Local 851 IBT Empl'r Grp. Pension Tr. & Welfare Fund v. Fifth Third Bancorp.*, 731 F. Supp. 2d 689 (S.D. Ohio 2010)........................ passim

*McMahan & Co. v. Wherehouse Entm't, Inc.*, 65 F.3d 1044 (2d Cir. 1995)........................24

*Meyer v. St. Joe Co.*, 2011 WL 3750324 (N.D. Fla. Aug. 24, 2011)........................6, 23

*Norfolk Cty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 2016 WL 4098584 (M.D. Tenn. June 16, 2016)........................24

*Ong ex rel. Ong IRA v. Sears, Roebuck & Co.*, 388 F. Supp. 2d 871 (N.D. Ill. 2004)........................31

*Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 714 F. Supp. 2d 475 (S.D.N.Y. 2010)........................27

*New Orleans Emps.' Ret. Sys. v. Omnicom Grp., Inc.*, 597 F.3d 501 (2d Cir. 2010)........................17

*Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505 (6th Cir. 2010)........................14

*Sapssov v. Health Mgmt. Assocs., Inc.*, 608 F. App'x 855 (11th Cir. 2015) (per curiam)........................24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)........................14

*Waterford Township Gen. Emps. Ret. Sys. v. SunTrust Banks, Inc.*, 2010 WL 3368922 (N.D. Ga. Aug. 19, 2010)....................25

*Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938 (D. Ariz. 2007)....................16

## OTHER AUTHORITIES

17 C.F.R. 230.430B ....................31

17 C.F.R. 230.415(a)(4)....................32

15 U.S.C. § 77k(a)(5)....................31

15 U.S.C. § 77k(b)(3) ....................2, 28, 29, 30

15 U.S.C. § 77k(e) ....................15

15 U.S.C.§ 77l....................26

15 U.S.C. § 77l(b) ....................15

15 U.S.C. § 77m....................7, 32

Federal Rules of Civil Procedure Rule 12(b)(6) .................... passim

Federal Rules of Civil Procedure Rule 12(c) ....................15

Securities Act of 1933 §§ 11 and 12(a)(2).................... passim

Securities Exchange Act of 1934 § 10(b) ....................6, 16

Defendants MLV & Co. LLC ("MLV"), Williams Financial Group ("Williams"), Maxim Group LLC ("Maxim"), National Securities Corp. ("National"), Aegis Capital Corp. ("Aegis"), Northland Capital Markets ("Northland"), Dominick & Dominick LLC ("D&D"),[1] Ladenburg Thalmann & Co. Inc. ("Ladenburg Thalmann"), and I-Bankers Securities, Inc. ("I-Bankers") (collectively, the "Underwriter Defendants") respectfully submit this Memorandum of Law in support of their Motion To Dismiss the Master Consolidated Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## INTRODUCTION

In October 2015, Miller Energy Resources, Inc. ("Miller" or the "Company") went into bankruptcy after several years of shaky financial health. Doubts about the Company's viability had already surfaced in the media at least four-and-a-half years prior, when an article questioned Miller's valuation of oil assets located in Alaska (the "Alaska Assets"), leading to a class action lawsuit in this Court alleging securities fraud. *See In re Miller Energy Res. Sec. Litig.*, 2014 WL 415730, at *1 (E.D. Tenn. Feb. 4, 2014) (Varlan, C.J.). The following years also saw an industry-wide decline in oil and gas prices, and Miller did not recover.

Plaintiffs in this case are disappointed investors who, in 2013 and 2014, purchased shares of Miller's Series C Cumulative Redeemable Preferred Stock ("Series C") and Series D Cumulative Redeemable Preferred Stock ("Series D"). These purchases were made two full years after issues with Miller's valuation of the Alaska Assets had surfaced and were being actively discussed in the public domain. Plaintiffs assert claims under Sections 11 and 12(a)(2) of the Securities Act of 1933 (the "Securities Act") against the Underwriter Defendants, among others, alleging that the Registration Statement and Prospectuses used in connection with

---

[1] Now known as Dominick & Dickerman LLC.

preferred stock offerings misstated the value of the Alaska Assets—*i.e.*, the same misstatement at issue in *In re Miller Energy*, 2014 WL 415730, at *5. Plaintiffs in this case do little more than rehash the claims from the prior litigation in this Court.

Plaintiffs' claims against the Underwriter Defendants fail as a matter of law and must be dismissed. *First*, it is evident from the face of the Complaint that Plaintiffs' losses were caused by factors other than the alleged misstatements and omissions. Indeed, while Plaintiffs identify a series of events that they allege "revealed the truth" (and which were accompanied by falling stock prices), these events reveal nothing about the alleged misstatements and omissions and, therefore, could not have been "caused" by those misstatements and omissions. Rather, these losses were caused by other undeniable factors, including an industry-wide decline in oil prices. By the time Plaintiffs identify a revelation related to the alleged overvaluation of the Alaska Assets, Plaintiffs had already experienced the bulk of their stock losses. The affirmative defense of negative loss causation is thus apparent from the face of the Complaint, defeating Plaintiffs' Section 11 and 12(a)(2) claims in their entirety.

*Second*, Plaintiffs lack standing to pursue their Section 12(a)(2) claims because they have not pled, and cannot establish as a matter of law, privity with any particular underwriter.

*Third*, Plaintiffs cannot maintain their Section 11 claim against Underwriter Defendants because all of the alleged misstatements were contained in financial statements certified by Miller's expert auditors, and Plaintiffs fail to allege any reason why Underwriter Defendants could not reasonably rely on them. Their Section 11 claim must be dismissed under the reasonable reliance defense of Section 11(b)(3). 15 U.S.C. § 77k(b)(3).

*Fourth*, and finally, Plaintiffs lack standing to pursue their Section 11 claims because they have not and cannot trace their shares to any one of the specific offerings at issue.

## RELEVANT BACKGROUND

For purposes of this motion only, the facts pled in the Master Consolidated Complaint (the "Complaint" or "Compl.") are taken as true. *See Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).

### I. Miller's Purchase and Valuation of the Alaska Assets.

From its founding in 1967 until its October 2015 bankruptcy, Miller operated as an independent oil and natural gas exploration, production and drilling company based in Tennessee. Compl. ¶ 40. In 2009, Miller became aware of oil and gas properties in Alaska embroiled in the bankruptcy proceedings of Pacific Energy Resources ("PER"). *Id.* ¶ 42. PER had acquired numerous assets in Alaska—including the Alaska Assets and others—for $463.2 million in August 2007. *In re Miller Energy*, 2014 WL 415730, at *2. Miller ultimately purchased the Alaska Assets on December 10, 2009 through an operating subsidiary, Cook Inlet Energy ("CIE"), for $2.25 million and the assumption of certain liabilities. Compl. ¶ 45.

Beginning with a quarterly report filed on Form 10-Q for the fiscal quarter ending January 31, 2010, up until August 2015, Miller "claimed . . . a reported value for the Alaska Assets of approximately $480 million, which amount was comprised of approximately $368 million for oil and gas properties and approximately $110 million for fixed assets." *Id.* ¶ 46. This valuation was based on reserve estimate reports prepared by an independent petroleum engineering firm, Ralph E. Davis & Associates (the "Reserve Reports"). *Id.* ¶ 46.[2] Reserve reports, which estimate the "reserves" of resources that can be recovered from a property, are

[2] Beginning in April 2014, Miller relied on reserve reports by Ryder Scott Company, L.P. *See* Ex. A, Cook Inlet Energy, LLC Estimated Future Reserves and Income Attributable to Leasehold Interests (Apr. 30, 2014). The change in engineering firms did not result in a change in the valuation of the Alaska Assets. *See* Compl. ¶ 46.

commonly used to value oil and gas assets. *Id.* ¶ 64. The Reserve Reports in this case estimated the probability of eventual recovery and production of oil and gas using a pretax present value of net cash flows discounted at 10%. *Id.* ¶ 66. "PV-10" is an accepted accounting measure under Generally Accepted Accounting Principles ("GAAP"). *Id.* ¶ 63 n.5. Although the PV-10 measure does not represent fair market value or the post-tax present value of future cash flows, the Financial Accounting Standards Board has noted that "'[i]t is a rough surrogate for such measures[.]'" *Id.* (quoting FASB, SFAS 69, *Disclosures About Oil and Gas Producing Activities*, App. C, *Basis for Conclusions*, ¶ 83). Plaintiffs allege that Miller improperly used PV-10 measures as the basis for the stated value of the Alaska Assets. Compl. ¶ 72.

During this time period, Miller's valuation of the Alaska Assets based on the Reserve Reports was repeatedly audited by independent auditors with expertise in GAAP accounting. Beginning in February 2011, accounting industry leader KPMG LLP ("KPMG") audited Miller's financial statements. KPMG consulted with Miller's prior accounting firm, Sherb & Co., LLP ("Sherb"), before certifying Miller's subsequent financial statements. *See* Ex. B (Form 10-Q filed Mar. 22, 2011 (excerpted)) at ii. KPMG issued unqualified reports on Miller's financial statements for the years ending in April 2011, 2012, 2013 and 2014. Every KPMG report on Miller was a "clean opinion," meaning that KPMG certified that Miller's financial statements were fairly presented in all material respects.

## II. *In re Miller Energy.*

By the summer of 2011—just a year and a half after Miller's purchase of the Alaska Assets—public doubts about the Company's valuation of the Alaska Assets began to surface. On July 28, 2011, two journalists published the first of two investigative reports in an online publication called *TheStreetSweeper* calling into question Miller's financials. Compl. ¶ 50; *see also* Ex. C, Melissa Davis & Janice Shell, *Miller Energy: Is This Hot 'Alaska' Stock about to*

*Melt?*, THESTREETSWEEPER (July 28, 2011). Citing independent research and interviews with industry veterans, *TheStreetSweeper* asserted that Miller had vastly overstated the value of the Alaska Assets. *See id.*; *In re Miller Energy*, 2014 WL 415730, at *5. Specifically, the article quoted an industry executive who suggested that the Alaska Assets were worth just $25–30 million minus $40 million worth in liabilities, rather than the $480 million that Miller was reporting in its financials. Ex. C.

Miller disclosed the contents of the July 28 *StreetSweeper* report to its investors in an open letter from then-CEO Scott Boruff on August 1, 2011. Compl. ¶ 50. In the letter, Miller disputed *TheStreetSweeper*'s claim that the Alaska Assets were actually worth between $25–30 million minus $40 million in liabilities, stating that Miller had "consulted extensively with independent third parties in order to fairly and reliably value" the Alaska Assets using a "conservative approach." *Id.*

On August 16, 2011, plaintiff Steven Arlow filed a class action complaint in this Court on behalf of himself and other investors in Miller's common stock, alleging, *inter alia*, that Miller had overstated the value of the Alaska Assets. No. 3:11-cv-386, *In re Miller Energy Res., Inc. Sec. Litig.*, Dkt. 1, Class Action Complaint. The Consolidated Amended Class Action Complaint in *In re Miller Energy* was filed in May 2012. No. 3:11-cv-386, *In re Miller Energy*, Dkt. 47, Corrected Consolidated Class Action Complaint. It alleged that while Miller had reported "that the Alaska Assets were . . . worth more than $479 million," the actual fair value of the Alaska Assets was only $34 million. *Id.* ¶¶ 85, 114. Specifically, the lead plaintiff alleged that among other things, Miller had understated operating costs for extracting oil from the Alaska Assets, *id.* ¶¶ 89, 92–106, and had ascribed a fictional value of $110 million to fixed assets that it had acquired, including pipelines and drilling stations, *id.* ¶ 91.

According to the *In re Miller Energy* plaintiffs, the July 28, 2011 *StreetSweeper* report questioning the value of the Alaska Assets and the accuracy of Miller's finances "caus[ed] the price of Miller's stock to fall by $1.64 per share, or 23.3%, and then by $0.99, or 18.33%, the following day." 2014 WL 415730, at *21. Based in part on these losses, the class of plaintiffs asserted claims under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") against the Company and some of its directors and officers. *See generally id.*

Several of the defendants, including the Company, filed motions to dismiss in July 2012. On February 4, 2014, this Court denied the motion by the Company and several of its directors. *In re Miller Energy*, 2014 WL 415730, at *1. The Court held, in relevant part, that the plaintiff had sufficiently pled loss causation based on the *StreetSweeper* report. *See id.* at *21–23. The Court considered whether the article "'contain[ed] genuinely new information beyond a mere re-characterization of previously disclosed facts,'" *id.* at *22 (quoting *Meyer v. St. Joe Co.*, 2011 WL 3750324, at *6 (N.D. Fla. Aug. 24, 2011)), and decided that it satisfied that standard because it "included some 'new' information from what plaintiff call[ed] 'an oil industry veteran with first-hand knowledge of the true costs and difficulties involved in pumping those wells' forming the Alaska Assets," *id.* (quoting Dkt. 47 ¶¶ 150–58). The Court concluded that the *StreetSweeper* report, along with other disclosures regarding other alleged misstatements not at issue here, "support[ed] the finding that plaintiff ha[d] met its burden" to plead "'a causal connection between the material misrepresentation and the loss.'" *Id.* at *22–23 (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005)).

After this Court denied Miller's motion to dismiss, the Company and its directors and officers reached a settlement with the lead plaintiff, which the Court approved on February 3,

2015. *See* No. 3:11-cv-386, *In re Miller Energy*, Dkt. 105, Judgment Approving Class Action Settlement.

Miller repeatedly disclosed in public SEC filings the existence of the *In re Miller Energy* lawsuits.[3]

### III. Series C and D Offerings.

On September 6, 2012, Miller filed with the SEC a Form S-3 "shelf" registration that would allow it to issue securities through a number of separate offerings, each with its own prospectus supplement. *See* Compl. ¶ 52. The SEC declared the shelf registration statement effective September 18, 2012. *Id.* ¶ 53. The registration statement incorporated by reference all future filings until any offering conducted under the shelf registration statement was completed. *Id.* ¶ 52. The shelf registration statement formed the basis for the following offerings of Miller preferred stock, of which all but the first two are at issue in this case:[4]

| DATE | PREFERRED SHARES | UNDERWRITERS | PRICE PER SHARE | SHARES | AT ISSUE (YES/NO) |
|---|---|---|---|---|---|
| 9/28/12 | Series C | MLV, Maxim, National Securities, Williams | N/A | 625,000 | No |
| 10/12/12 | Series C | MLV | N/A | 2,565,000 | No |
| 2/13/13 | Series C | MLV, Maxim, National Securities, Aegis, Williams | $22.90 | 625,000 | Yes |
| 5/8/13 | Series C | MLV, Maxim, National Securities, Aegis | $22.50 | 500,000 | Yes |
| 6/28/13 | Series C | MLV, Aegis, Maxim, National Securities, Northland | $21.50 | 335,000 | Yes |
| 9/26/13 | Series D | MLV, Maxim, National Securities, Aegis, D&D, | $25.00 | 1,000,000 | Yes |

3 *See, e.g.*, Ex. D (Form 10-K filed Aug. 29, 2011 (excerpted)) at 28; Ex. E (Form 10-Q filed Dec. 10, 2014) (excerpted) at 44.

4 The first two offerings of Series C stock undisputedly lie outside the three-year statute of repose for Securities Act claims against the underwriters, whether measured from the date of the shelf registration or the date of the supplemental prospectuses. *See* 15 U.S.C. § 77m.

| | | | | | |
|---|---|---|---|---|---|
| | | Ladenburg Thalmann, Northland | | | |
| 10/17/13 | Series D | MLV | Market | 3,000,000 | Yes |
| 8/24/14 | Series D | MLV, Maxim, Aegis, I-Bankers, Ladenburg Thalmann, Northland | $24.50 | 750,000 | Yes |

## IV. Alleged Revelation of the "Truth."

According to the Complaint, "[f]ollowing the Offerings, a series of disclosures made by the Company revealed that the Registration Statement was false and misleading in that it overstated the value of the Alaska Assets on the Company's books by hundreds of millions of dollars at the time each of the Offerings was conducted." Compl. ¶ 105. Most of these purported "revelations" have nothing to do with any alleged misstatements or omissions, however, and thus any associated losses could not have been caused by them.

On December 10, 2014, Miller disclosed in a Form 10-Q filed with the SEC that it was taking a $265.3 million impairment charge on the Redoubt Shoal field, one of the Alaska Assets. *Id.* ¶ 106. The SEC filing announcing the impairment charge specifically attributed it to the industry-wide fall in oil prices in the autumn of 2014. Ex. E (Form 10-Q filed Dec. 10, 2014 (excerpted)) at 9. The filing did not indicate in any way that Miller's prior valuation of the Alaska Assets was incorrect. *See id.*

On March 12, 2015, Miller disclosed that it was taking another $150 million impairment charge on the Alaska Assets. Compl. ¶ 107. Again, the SEC filing attributed the impairment to the continuing drop in oil prices, and it did not implicate Miller's prior valuation of the Alaska Assets. Ex. F (Form 10-Q filed Mar. 12, 2015 (excerpted)) at 10.

On April 29, 2015, Miller disclosed in a Form 8-K that it had received a "Wells Notice" from the SEC indicating that agency staff had made a preliminary determination to recommend civil action against the Company. Compl. ¶ 108. The disclosure was brief and did not include

factual detail about the basis for the SEC's potential action, though it did state that "[t]he Company believe[d] the proposed action would relate to the reported valuation of certain Alaskan assets acquired by the Company from Pacific Energy in 2009 and subsequently reported by the Company." Ex. G (Form 8-K filed Apr. 29, 2015). Miller also stated that it "welcome[d] the opportunity to respond before any action [was] taken" and "assert[ed] that it [did] not believe that an enforcement action [was] warranted in this case." *Id.*; Compl. ¶ 108. The Form 8-K attached a press release announcing the Wells Notice which included no further detail. *See* Ex. G.

On May 6, 2015, Miller disclosed that it would "defer" dividend payments on the Series C and D shares. Compl. ¶ 109. The announcement of the deferral stated that it would "facilitate the Company's capital repositioning efforts and help ensure sufficient liquidity and maximize asset value." Ex. H, *Miller Energy Defers Cash Dividends on Its Series C and Series D Preferred Stock* (May 6, 2015). The announcement said nothing about the value of the Alaska Assets. *Id.*

On May 12, 2015, Miller disclosed that the New York Stock Exchange ("NYSE") had notified the Company that "its shares were subject to delisting due to its having failed to maintain listing requirements." Compl. ¶ 110. The Company's Form 8-K stated that "[s]uch noncompliance [was] based on the Company's failure to maintain an average market capitalization and stockholders' equity greater than $50 million over a 30 trading day period." Ex. I (Form 8-K filed May 12, 2015). Again, the disclosure said nothing about the value of the Alaska Assets. *Id.*

On July 14, 2015, Miller filed a Notification of Late Filing of its Form 10-K on a Form 12b-25 with the SEC. Compl. ¶ 111. Miller requested an extension of time within which to file

its annual report "in light of, among other factors, the substantial drop in oil prices, drilling results during the year[,] and the registrant's on-going capital repositioning process." Ex. J (Form 12b-25 filed July 14, 2015). The Form 12b-25 noted that "[i]n addition to those issues, the registrant believe[d] that, due to the constraining structure of the registrant's current debt, its continued capital repositioning process as well as potential factors not under the registrant's control, there is, from an accounting perspective, substantial doubt about its ability to continue as a going concern." *Id.*; Compl. ¶ 111.

On July 31, 2015, Miller disclosed in a Form 8-K filed with the SEC that it had received formal written notice from the NYSE that its Series C and Series D shares were being delisted from that exchange. Compl. ¶ 112. Miller had issued a press release the previous day attributing the event to "the Company's failing to maintain an average market capitalization of $15 million or more over the preceding thirty trading days." Ex. K, *Miller Energy Responds to Notice of Delisting of Its Securities on the New York Stock Exchange* (July 30, 2015). Yet again, the announcement made no reference to the value of the Alaska Assets. *Id.*

On August 6, 2015, Miller filed a Form 8-K reporting that the SEC had initiated a civil action (the "Enforcement Action") against the Company, accusing the Company and two of its directors of artificially inflating the value of the Alaska Assets and then misstating Miller's financial statements through July 2015. Compl. ¶ 113. The SEC Enforcement Action also charged Carton W. Vogt, III, the audit team leader at Miller's former auditing firm, Sherb. *Id.* It did not name KPMG or any individuals associated with it. The SEC alleged that Miller had overstated the value of the Alaska Assets by more than $400 million, including by relying on the Reserve Report to state fair market value; by double-counting $110 million in fixed assets; and by understating expense numbers. *Id.* ¶¶ 114, 116.

On August 20, 2015, Miller disclosed that it had reached an agreement in principle with the SEC to settle the Enforcement Action and had agreed to restate its financial reports back to 2010. *Id.* ¶ 121.

In September 2015, Miller's Series C and D shares were "delisted" all together after the market price of each had declined to approximately $0.30 per share. *Id.* ¶ 123.

On October 1, 2015, the Company filed for Chapter 11 bankruptcy protection. *Id.* ¶ 123.

On January 12, 2016, the SEC issued a case-and-desist order "confirm[ing] a majority of the violations alleged" in the SEC Enforcement Action. *Id.* ¶¶ 124-25

On March 29, 2016, Miller disclosed that it had consented to an order finalizing its settlement with the SEC and announced that its financial statements beginning in fiscal year 2010 should no longer be relied upon. *Id.* ¶ 128-29. On that same date, all equity interests in Miller were cancelled. *Id.* ¶ 130.

Throughout this entire period of time, the price of Miller's Series C and D shares was consistently dropping in near-synchronicity with the contemporaneous collapse in oil prices. *See* Ex. L, Miller Energy Series C Prices (Dec. 10, 2012 through Dec. 31, 2015) (Bloomberg 2017); Ex. M, Miller Energy Series D Prices (Oct. 1, 2013 through Dec. 31, 2015) (Bloomberg 2017).[5] For example, when Miller disclosed its "Wells Notice" on April 29, 2015, the price of Miller Series C shares had dropped from a high of $27.30 in July 2014 to $11.86—a 57% drop. *See* Ex. L. Series D shares had dropped from a high of $26.32 in July 2014 to $9.50, or 64%. *See* Ex. M. Again, these drops roughly track the decline in oil prices during the same time period, which

[5] This Court may take judicial notice of stock prices in deciding this Motion to Dismiss. *See, e.g.*, *Amorosa v. Ernst & Young LLP*, 682 F. Supp. 2d 351, 371 (S.D.N.Y. 2010).

fell 45% from a high of $107.26 to $58.58 per barrel. *See* Ex. N, Global Commodity Crude Oil Prices (Dec. 10, 2012 through Dec. 31, 2015) (CL1 Comdty) (Bloomberg 2017).

## V. Plaintiffs' Claims.

Lead Plaintiffs in this action are four purchasers of Miller Series C and D stock, suing "on behalf of a class consisting of all those who purchased Miller Energy preferred shares traceable to the Registration Statement issued in connection with the Offerings," beginning with the Series C offering on February 13, 2013. Compl. ¶ 136. Plaintiffs' claims under Sections 11 and 12(a)(2) of the Securities Act against the Underwriter Defendants rest on one key, repeated alleged misstatement in the Registration Statement and Prospectuses for the offerings at issue: the value of the Alaska Assets, which Plaintiffs allege was overstated "by more than $400 million." *Id.* ¶ 101.

In addition to repeating the earlier lawsuit's allegation that Miller violated GAAP principles by relying on the Reserve Report to represent fair market value, *id.* ¶¶ 63, 72, the Plaintiffs rehash several of the central allegations from the earlier *In re Miller Energy* litigation:

| CURRENT CLASS ACTION COMPLAINT | PREVIOUSLY SETTLED CLASS ACTION COMPLAINT |
|---|---|
| "All of the Company's interim and annual financial reports issued between 2010 and 2015 . . . overstated the value of the Alaska Assets by hundreds of millions of dollars . . . ." ¶ 56. | "Defendants reported that the Alaska Assets were actually worth more than $479 million . . . . However, these valuations were false, and the Alaska Assets were in fact worth hundreds of millions of dollars less." ¶ 85. |
| The Reserve Reports relied on "expense projections that, in many cases, were significantly lower than past actual experience." ¶ 82. | "[T]o properly value oil and gas reserves, companies are required to reflect the costs anticipated to be required to extract the oil and gas. Defendants used a cost extraction amount of just 11% of net revenues that was artificially low and not based on any experience or history. In fact, it was approximately half of what Miller's more efficient competitors could achieve and a fifth of what Miller itself was capable of." ¶ 89. |
| "Miller also erroneously recorded a separate value of $110 million for acquired fixed | "Furthermore, Miller's financial statements represented that Miller acquired $110.5 million of |

| | |
|---|---|
| assets, such as facilities and pipelines ancillary to the oil and gas reserves." ¶ 86. | fixed assets in the Acquisition, and listed and valued the specific components of this $110 million. These amounts were enormously inflated and had no support." ¶ 91. |

Plaintiffs Kenneth Gaynor and Marcia Goldberg initially filed their complaints in state court in Tennessee on November 9, 2015—*more than four years* after the initial complaint in *In re Miller Energy* was filed in this Court. Underwriter Defendants removed the Goldberg and Gaynor actions to this Court. *See* No. 3:15-cv-545, *Gaynor v. Miller et al.*, Dkt. 1, Notice of Removal; No. 3:16-cv-546, *Goldberg v. Miller et al.*, Dkt. 1, Notice of Removal. Plaintiff Gabriel Hull first filed his complaint with this Court on May 12, 2016. *See* No. 3:16-cv-232, *Hull v. Miller et al.*, Dkt. 1, Class Action Complaint. Plaintiff Christopher R. Vorrath was added as a named plaintiff during the selection process for lead plaintiff in November 2016. *See* Dkt. 86, Mot. for Appt. as Lead Pl. & Approval of Selection of Counsel.

The specific purchases on which Plaintiffs base their claims are laid out in their purchase disclosures. *See* Ex. P (Dkt. 88-1, Decl. of J. Reise in Supp. of Mot. of the Miller Energy Investors for Appt. as Lead Pl. & Approval of Selection of Counsel, Ex. A, Movant's Purchases and Losses ("Movants' Purchases")) at 3.

## <u>ARGUMENT AND AUTHORITY</u>

Under Rule 12(b)(6), a motion to dismiss should be granted where a cause of action fails "to state a claim [for] relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to

raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555 (alteration, citation, and internal quotation marks omitted). "[A] motion for dismissal pursuant to Rule 12(b)(6) will be granted if the facts as alleged are insufficient to make a valid claim or if the claim shows on its face that relief is barred by an affirmative defense." *Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 512 (6th Cir. 2010).

"[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, . . . matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Such matters include materials that "are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice," including SEC filings, *In re Miller Energy*, 2014 WL 415730, at *13–14, and stock prices, *see Amorosa v. Ernst & Young LLP*, 682 F. Supp. 2d 351, 371 (S.D.N.Y. 2010).

## I. Plaintiff Fails To State a Claim Against the Underwriter Defendants Under Either Section 11 or Section 12(a)(2) Because Lack of Loss Causation Is Apparent from the Face of the Complaint.

Plaintiffs' claims rest entirely on their allegation that Miller overstated the value of the Alaska Assets. That contention was first publicly reported and litigated in this Court beginning in 2011—nearly two years before the class of Plaintiffs began purchasing their shares, three-and-a-half years before the first alleged "revelation" in this case, and four-and-a-half years before Plaintiffs brought their claims. Common sense dictates that Plaintiffs' losses were not caused by any revelations correcting the alleged misstatements; on the contrary, they were the result of the industry-wide, precipitous decline in oil prices, which started in the fall of 2014 and which the Company specifically told investors was to account for loss events about which Plaintiffs now complain. Because lack of loss causation is apparent from the face of the complaint, Plaintiffs' Section 11 and 12(a)(2) claims should be dismissed.

### A. Lack of Loss Causation Is an Affirmative Defense that Can Provide a Basis for a Motion To Dismiss.

Lack of loss causation—also called "negative loss causation"—provides a defense from liability under both Section 11 and 12(a)(2) "if the depreciation in the value of the security did not result from any nondisclosure or false statement made in the prospectus or registration statement." *Azzolini v. Corts Trust II for Provident Financial Trust I*, 2005 WL 3448053, at *5 (E.D. Tenn. Dec. 14, 2005) (regarding both Section 11 and 12(a)(2) claims). *See also, e.g.*, *In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp. 2d 404, 418 (S.D.N.Y. 2009); 15 U.S.C. § 77k(e); 15 U.S.C. § 77l(b).

Although lack of loss causation is an affirmative defense, "[i]f it is apparent on the face of the complaint the decline in share value is not related to any material misstatement and/or omission, dismissal is appropriate." *Azzolini*, 2005 WL 3448053, at *5; *accord In re Merrill Lynch & Co. Research Reports Secs. Litig.*, 272 F. Supp. 2d 243, 254–55 (S.D.N.Y. 2003) (dismissing Section 11 and 12(a)(2) claims on a Rule 12(b)(6) motion where "[t]he decline in the [security's] price per share . . . cannot be attributed to the non-disclosures underlying Plaintiff[s'] claims").

Courts in this Circuit routinely dismiss Securities Act claims for lack of loss causation where the defense is readily ascertainable from the complaint itself. *See, e.g.*, *Azzolini*, 2005 WL 3448053, at *5 (Rule 12(c) motion for judgment on the pleadings); *Indiana State Dist. Council of Laborers v. Omnicare, Inc.*, 2011 WL 2786301, at *1–2 (E.D. Ky. July 14, 2011) (Rule 12(b)(6) motion); *Local 295/Local 851 IBT Empl'r Grp. Pension Tr. & Welfare Fund v. Fifth Third Bancorp.*, 731 F. Supp. 2d 689, 710–11 (S.D. Ohio 2010) (Rule 12(b)(6) motion).

### B. Lack of Loss Causation Is Evident on the Face of the Complaint.

This case presents a perfect example of a complaint that should be dismissed at the pleading stage because lack of loss causation is apparent from its face. Plaintiffs actually identify a number of events that purportedly "revealed the truth," and which occurred during the time that Miller's stock prices were falling precipitously. However, almost none of these "revelations" has any relationship with the alleged misstated value of the Alaska Assets or Plaintiffs' losses. To the contrary, as publicly available market information confirms, Plaintiffs' losses were attributable to the widespread downturn in the oil and gas industry in 2014 and 2015.

Under *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), and its progeny, loss causation exists when the stock price falls "after the truth of a misrepresentation about the stocks was revealed." *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 946 (D. Ariz. 2007) (collecting cases).[6] Also known as a "corrective disclosure," the revelation must disclose information that is both *new* and *corrective*. *First*, "[c]orrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time." *Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 473 (4th Cir. 2011). "[C]onfirmatory information—that information already known to the market—may *not* constitute such a corrective disclosure." *Catogas v. Cyberonics, Inc.*, 292 F. App'x 311, 314 (5th Cir. 2008) (per curiam) (emphasis in original). This Court noted in *In re Miller Energy* that "the apparent key [to determining when a report becomes a corrective disclosure] is whether the report contains *genuinely new information* beyond a mere re-

---

[6] Although the Supreme Court in *Dura Pharmaceuticals* reviewed loss causation in the context of Exchange Act claims, courts use its reasoning to analyze loss causation in Securities Act claims as well. *See Brown v. Ambow Educ. Holding Ltd.*, 2014 WL 523166, at *15 n.1 (C.D. Cal. Feb. 6, 2014); *see also In re WorldCom, Inc. Sec. Litig.*, 2005 WL 375314, at *6 (S.D.N.Y. Feb. 17, 2005) ("[T]he negative causation defense in Section 11 [and the identical defense in Section 12(a)(2)] and the loss causation element in Section 10(b) are mirror images[.]").

characterization of previously disclosed facts." 2014 WL 415730, at *22 (emphasis added) (internal quotation marks omitted); *see also New Orleans Emps.' Ret. Sys. v. Omnicom Grp., Inc.*, 597 F.3d 501, 511–12 (2d Cir. 2010) (drawing a distinction between "then-undisclosed fact[s]"—whose revelation can amount to a corrective disclosure—and later opinions and "negative characterization"—which cannot).

*Second*, an alleged corrective disclosure must "reveal to the market the falsity of the prior" statements by and about the Company. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 n.4 (2d Cir. 2005). Courts in this Circuit dismiss Securities Act claims when the alleged corrective disclosure does not contain corrections addressed to the alleged misstatements. Thus, in *Fifth Third*, the District Court for the Southern District of Ohio dismissed claims under Sections 11 and 12(a)(2) where the complaint "only show[ed] that the price of Fifth Third stock declined after the revelation of bad news, which is insufficient to show loss causation." 731 F. Supp. 2d at 710. In that case, plaintiffs alleged a number of misstatements relating to the origination of risky loans, the overstatement of income and the need to raise capital, but the only corrective disclosure they identified was a press release announcing that Fifth Third was planning a number of actions "to strengthen its capital position in light of deteriorating credit trends." *Id.* The court dismissed the complaint for lack of loss causation because the press release "did not contain any disclosures or corrections addressed to" the alleged misstatements and omissions. *Id.* Similarly, in *Omnicare*, the District Court for the Eastern District of Kentucky dismissed a Section 11 claim based on GAAP violations where the complaint "specifically allege[d] disclosures—the announcements of the government investigations—which did not reveal to the market the 'truth' regarding the alleged GAAP violations." 2011 WL 2786301, at *2 (citation omitted); *see also, e.g.*, *Brown v. Ambow Educ. Holding Ltd.*, 2014 WL

523166, at *15 (C.D. Cal. Feb. 6, 2014) (dismissing a Section 11 claim where the announcements alleged to be corrective disclosures "d[id] not reasonably reveal anything about the purported misrepresentations alleged in the [Complaint], so they [were] not corrective disclosures for purposes of demonstrating loss causation").

The events Plaintiffs allege "revealed the truth" in this case are neither new nor corrective, as the law requires. This Court should dismiss their claims for lack of loss causation.

### 1. Plaintiffs' Alleged Revelations Are Not "New" Because Information Correcting the Alleged Misrepresentations Was Known to the Market Both Before and During the Entire Class Period.

As a threshold matter, none of Plaintiffs' alleged revelations revealed "genuinely new information" because information correcting the alleged misrepresentations about the value of the Alaska Assets was publicly available both before the class of Plaintiffs bought shares and throughout the entire class period. *In re Miller Energy*, 2014 WL 415730, at *22.

To state a claim under Section 11 or 12(a)(2), a "plaintiff must show that an economic loss occurred *after the truth* behind the misrepresentation or omission *became known to the market*." *Fifth Third*, 731 F. Supp. 2d at 710 (emphases added) (internal quotation marks omitted). Plaintiff cannot make that showing here because the "truth"—that Miller's valuation of the Alaska Assets was questionable—was already known to the market before the class period began. The *StreetSweeper* articles and the pleadings in *In re Miller Energy* alleged precisely the same misrepresentations that Plaintiffs' Complaint describes in this case.

*First*, the July 28, 2011 *StreetSweeper* article quoted an industry executive who claimed that the value of the Alaska Assets was worth only $25–30 million. Ex. C. The consolidated complaint in *In re Miller Energy* similarly alleged that the Alaska Assets were worth $34 million. 2014 WL 415730, at *5. Plaintiffs' Complaint here alleges that Miller's financial statements, which valued the Alaska Assets at $480 million, Compl. ¶ 46, "overvalued the

Alaska Assets by over $400 million," *id.* ¶ 74. *Second*, the complaint in *In re Miller Energy* alleged that Miller overstated the assumed cost of extracting oil from the reserves of the Alaska Assets. 2014 WL 415730, at *5. So, too, does the Complaint in this case. Compl. ¶¶ 82–85. *Third*, both the *In re Miller Energy* complaint and the Complaint in this case attacked Miller's recording of $110 million in value for acquired fixed assets that were part of the Alaska Assets purchase. *Compare* 2014 WL 415730, at *5, *with* Compl. ¶¶ 86–93.

Notably, this Court found in 2014 that the *StreetSweeper* report, among other alleged corrective disclosures, caused a sufficient drop in Miller's stock price to give rise to an inference of loss causation in that case. *In re Miller Energy*, 2014 WL 415730, at *21–23. In other words, plaintiffs in that case had adequately alleged that the public became aware of questions about the valuation of the Alaska Assets, and that these questions had caused Miller's stock price to drop, as early as July 2011. Yet the entire class in this case did not even begin purchasing their shares of Miller stock until February 2013, nearly two years *after* the *StreetSweeper* report. The distance in time between the first public alarm about the Alaska Assets and Plaintiffs' alleged losses suggests that their losses were caused by other factors and not by the alleged overstatement of the Alaska Assets' value. *See Azzolini*, 2005 WL 3448053, at *6.

### 2. Plaintiffs' Alleged Revelations Establish a Lack of Loss Causation.

Plaintiffs' alleged "revelations" also establish that there is no loss causation on the face of the complaint. Even though these "revelations" were accompanied by declining stock prices, each falls into at least one of three categories that negate loss causation: (a) it is not corrective of the alleged misstatements; (b) it fails to introduce new information to the market about the valuation of the Alaska Assets; or (c) it took place after the majority of Plaintiffs' losses had already occurred.

#### a. Disclosures that Are Not Corrective.

Because loss causation requires "a causal connection between the material misrepresentation and the loss," *Dura Pharm.*, 544 U.S. at 342, a complaint cannot state a claim under Section 11 or Section 12(a)(2) if the revelation "[does] not contain any disclosures or corrections addressed to" the alleged misrepresentation, *Fifth Third*, 731 F. Supp. 2d at 710. The alleged misrepresentations in this case all rest on the purported over-valuation of the Alaska Assets. Accordingly, to support loss causation, a corrective disclosure must "reveal to the market the falsity of the prior" valuation of the Alaska Assets in Miller's financial statements. *Lentell*, 396 F.3d at 175 n.4.

Plaintiffs allege seven "revelations" before the SEC Enforcement Action on August 6, 2015. Of these, six have nothing to do with the historical valuation of the Alaska Assets and thus cannot support loss causation.

*First* and *second*, Miller's disclosures that it was taking impairment charges on the Alaska Assets in December 2014 and March 2015, Compl. ¶¶ 106–107, stated nothing about the assets' prior valuation, much less that it was incorrect. Instead, Miller attributed the impairment charges to the industry-wide decline in oil prices. *See* Ex. E (Form 10-Q filed Dec. 10, 2014 (excerpted)) at 9 (pointing to "the significant decline in crude oil prices during the second quarter of fiscal 2015"); Ex. F (Form 10-Q filed Mar. 12, 2015 (excerpted)) at 10 ("the significant and continued decline in crude oil prices during the third quarter of fiscal 2015").

Publicly available information confirms that oil prices were falling precipitously in late 2014 and early 2015. From August 2014 through January 2015—the time period covered by the December 2014 and March 2015 Form 10-Q quarterly financial statements—oil prices fell over 50% from $97.88 to $48.24 per barrel. *See* Ex. N. As Plaintiffs acknowledge, "'selling prices'" are among "'the key variables that affect fair market value'" of oil and gas assets. Compl. ¶ 64

n.6 (quoting FASB, SFAS No. 69, *Disclosures About Oil and Gas Producing Activities*, App. C, *Basis for Conclusions*, ¶ 77). It was entirely proper—and certainly not corrective of any prior misstatement—for Miller to write down the value of the Alaska Assets in response to falling oil prices.

*Third*, the May 6, 2015 disclosure that Miller would defer dividend payments on Series C and D shares, Compl. ¶ 109, did not mention the Alaska Assets, much less "correct" their prior valuation. *See* Ex. H. To the contrary, the press release reiterated that "Miller Energy believes that it has substantial asset value." *Id.* It did not tie the need for deferred dividend payments to any reduced value in assets, but to "[t]he structure of the Company's current debt." *Id.* This sort of general announcement, without reference to prior misstatements, cannot constitute a corrective disclosure. *See Fifth Third*, 731 F. Supp. 2d at 710 (dismissing Section 11 and 12(a)(2) claims based on disclosure of "deteriorating credit trends" causing the company to "cut its dividend[s]").

*Fourth* and *fifth*, the same can be said of the Company's disclosures on May 12 and July 31, 2015: that the NYSE made the Company's shares subject to delisting and did, in fact, later delist them. *See* Compl. ¶¶ 110, 112. The disclosures did not address the valuation of the Alaska Assets or attribute the delisting to asset value at all. Exs. I, K. They connected the delisting from the NYSE to the Company's failure to meet average market capitalization and shareholder equity requirements—in other words, to "defendant's poor financial health (or not as robust as expected financial health) rather than to a disclosure of the Registration Statement's allegedly false and misleading representations." *In re Shoretel Inc. Sec. Litig.*, 2009 WL 248326, at *5 (N.D. Cal. Feb. 2, 2009) (granting motion to dismiss Section 11 claim).

*Sixth*, and finally, Miller's request for an extension of time to file its financial statements on July 14, 2015, Compl. ¶ 111, was silent as to the valuation of the Alaska Assets. *See* Ex. J. And, like Miller's disclosures of the impairment charges, the Form 12b-25 through which Miller requested its extension of time attributed that development to the decline in oil prices rather than any prior misstatement by the Company:

> The registrant believes the extension is required to complete our accounting *in light of, among other factors, the substantial drop in oil prices*, drilling results during the year and the registrant's on-going capital repositioning process. In addition to those issues, the registrant believes that, due to the constraining structure of the registrant's current debt, its continued capital repositioning process as well as potential factors not under the registrant's control, there is, from an accounting perspective, substantial doubt about its ability to continue as a going concern.

Ex. J (Form 12b-25 filed July 14, 2015) (emphasis added). It is notable and telling that Plaintiffs' Complaint quotes the second sentence but glaringly omits the first, which makes clear that Miller's financial difficulties—and Plaintiffs' losses—were attributable to the industry-wide fall in oil prices. *See* Compl. ¶ 111.

All of these disclosures amount to no more than "revelation[s] of bad news" that are "insufficient to show loss causation" because they do not relate to the alleged misstatements. *Fifth Third*, 731 F. Supp. 2d at 710.

**b. The Wells Notice Disclosure.**

The first revelation alleged in the Complaint that has anything to do with Miller's historical valuation of the Alaska Assets occurred on April 29, 2015, when "Miller Energy disclosed that it had received a 'Wells Notice' from the SEC indicating that the agency staff had made a preliminary determination to recommend civil action against the Company related to its accounting for the 2009 acquisition of the Alaska Assets." Compl. ¶ 108. This disclosure cannot

support loss causation because it did not introduce *new* information about the valuation of the Alaska Assets to the public.

The disclosure in Miller's Form 8-K was limited and did not include any detail about the nature of the alleged accounting misstatements. The full text of the disclosure stated:

> On April 28, 2015, the Commission issued a notice to the Company indicating that *the Commission had made a preliminary determination to recommend a civil action against the Company in connection with its public filings and material weakness over financial reporting*. The notice invites the Company to file a response showing why no such action should be taken. *The Company believes the proposed action would relate to the reported valuation of certain Alaskan assets acquired by the Company from Pacific Energy in 2009 and subsequently reported by the Company.* On the same date, the Commission issued similar notices to persons employed by the Company at the time the acquisition was initially reported.
>
> The Company is still seeking additional information on the proposed action before determining its response. Were the Commission to bring such an action, the Company cannot determine the amount of any potential monetary penalties or any other impact as a result of the proposed enforcement action.

Ex. G (Form 8-K filed Apr. 29, 2015) (emphases added). The accompanying press release was almost identical to the disclosure in the Form 8-K itself, except that it stated more definitively that "[t]he recommendation relates to the reported valuation" of the Alaska Assets. *Id.*

This disclosure cannot support loss causation because it did not "'contain[] genuinely new information beyond a mere re-characterization of previously disclosed facts.'" *In re Miller Energy*, 2014 WL 415730, at *22 (quoting *Meyer v. St. Joe Co.*, 2011 WL 3750324, at *6 (N.D. Fla. Aug. 24, 2011). At that point, the public had been aware for several years that commentators, investors, and this Court openly questioned the valuation of the Alaska Assets. The disclosure did not add anything new, such as stating *how* the Company's financial statements were alleged to have misstated the value of the Alaska Assets, or even whether their

value had been overstated or understated. The only "new" information in the April 29 disclosure was the fact that the SEC had made a preliminary determination to recommend a civil action.

"[M]any courts have held that loss causation . . . cannot be based on the filing of a civil complaint or the commencement of an investigation." *Norfolk Cty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 2016 WL 4098584, at *18 (M.D. Tenn. June 16, 2016); *see also Sapssov v. Health Mgmt. Assocs., Inc.*, 608 F. App'x 855, 863 (11th Cir. 2015) (per curiam) ("Revelation of the OIG investigation, including issuance of subpoenas, does not show any actual wrongdoing and cannot qualify as a corrective disclosure."), *petition for cert. filed*, 85 U.S.L.W. 3280 (U.S. Nov. 21, 2016) (No 16-685). Applied here, Miller's announcement of the SEC Wells Notice on April 29 cannot serve as a corrective disclosure because it did not notify the public of any new information about the valuation of the Alaska Assets.

**c. Disclosures after the Majority of Plaintiffs' Losses Had Occurred.**

In any case, the April 29, 2015 disclosure—and any disclosure thereafter—cannot support loss causation because the majority of the Plaintiffs' losses occurred before then and were clearly attributable to the industry-wide decline in oil prices.

"[A]s a general rule, a price decline before disclosure may not be charged to defendants." *McMahan & Co. v. Wherehouse Entm't, Inc.*, 65 F.3d 1044, 1049 (2d Cir. 1995) (internal quotation marks omitted). Courts dismiss Securities Act claims for lack of loss causation when a significant portion of the decline in the stock price occurred before the alleged corrective disclosure. *See, e.g.*, *In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp. 2d 404, 418-19 (S.D.N.Y. 2009); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d 429, 437 (S.D.N.Y. 2003).

In this case, the majority of Plaintiffs' losses occurred before the first of the alleged revelations that even arguably had anything to do with the Alaska Assets. By April 29, 2015, the price of Miller Series C shares had dropped 57% and Series D shares had dropped 64%. *See* Exs. L & M. This drop roughly tracks the decline in oil prices during the same time period, which fell 45%—from a high of $107.26 to $58.58 per barrel. *See* Ex. N.

Other small-capital oil companies suffered significant losses during this time as well. For example, the price of Miller's Series C and Series D shares roughly tracks the decline of the S&P Small Cap Energy Index during the same time period, which fell 43% from a high of $2068.217 to $1189.065. *See* Ex. O, S&P Small Cap Energy Index Prices (Dec. 10, 2012 through Dec. 31, 2015) (Bloomberg 2017). *See In re Merrill Lynch*, 272 F. Supp. 2d at 254 (granting motion to dismiss Section 11 and 12(a)(2) claims where the security depreciated in value by 76% before the alleged corrective disclosure and noting "[t]his decline is an amount proportional to the decline in the entire technology sector. . . . [T]he Dow Jones World Technology Index declined during the same period, by -69.3%"); *Waterford Township Gen. Emps. Ret. Sys. v. SunTrust Banks, Inc.*, 2010 WL 3368922, at *5 (N.D. Ga. Aug. 19, 2010) (finding no loss causation where the stock price "had already lost most of its value prior to the . . . corrective disclosure," which occurred "during a financial crisis that hit the financial services industry particularly hard").

By the time of the next alleged revelation involving the Alaska Assets—the August 6, 2015 initiation of the SEC Enforcement Action—Plaintiffs had already suffered almost all of the losses of which they now complain. Series C and D shares were then trading at $0.66 and $0.65, respectively. *See* Exs. L, M. These prices represent a 97.5% drop from the high in July 2014. *See id.*; *see also* Compl. ¶ 122 (admitting that by September 2015, Miller Series C and Series D

shares "each had plummeted to approximately $0.30 per share, a more than 98% decline from the prices the shares were marketed at in the Offerings").

* * *

In sum, nearly all of the revelations Plaintiffs have pled have nothing to do with the alleged over-valuation of the Alaska Assets. By the time Plaintiffs allege a revelation actually related to the Alaska Assets, their stocks had already lost most of their value because of other undeniable factors—primarily, the industry-wide drop in oil prices. It is clear from the face of the Complaint that there is no loss causation. Plaintiffs' Section 11 and 12(a)(2) claims against the Underwriter Defendants should be dismissed in their entirety.

## II. Plaintiffs' Section 12(a)(2) Claim Against the Underwriter Defendants Should Be Dismissed Because the No Plaintiff Has Established Privity with Any Underwriter.

Plaintiffs' claims under Section 12(a)(2) must be dismissed in any case because Plaintiffs do not have standing to pursue them.

"Section 12(a)(2) only imposes liability on 'statutory sellers' of securities, i.e., those who have (1) passed title, or other interest in the security, to the buyer for value, or (2) successfully solicited the purchase of a security, motivated at least in part by a desire to serve his own financial interests or those of the securities' owner." *Fifth Third*, 731 F. Supp. 2d at 704–05 (citation omitted); *see* 15 U.S.C. § 77l. It is undisputed that statutory standing under Section 12(a)(2) is restricted to initial purchasers who purchased their shares from statutory sellers. *See Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995); *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 659 (S.D.N.Y. 2004) ("To be liable as a seller, the defendant must be the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers." (internal quotation marks omitted)).

"'In order to state a claim under § 12(a)(2), the complaint must allege by whom the plaintiffs were solicited and from whom they purchased shares; these assertions must be supported by specific factual allegations demonstrating a direct relationship between the defendant and the plaintiff-purchaser.'" *Fifth Third*, 731 F. Supp. 2d at 712 (quoting *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 406 (D. Md. 2004)). Plaintiffs in this case have not alleged from whom they purchased their shares at all, much less provided specific factual allegations about their relationship with the sellers.

The most Plaintiffs allege is that they purchased their shares "pursuant to," Compl. ¶ 156, or "traceable to," *id.* ¶ 148, the Offerings. Courts have consistently held such cursory allegations to be inadequate to establish Section 12(a)(2) standing. *See In re Regions Morgan Keegan Sec., Derivative & ERISA Litig.*, 166 F. Supp. 3d 948, 968 (W.D. Tenn. 2014); *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 310–11 (S.D.N.Y. 2011); *In re Century Aluminum Co. Sec. Litig.*, 749 F. Supp. 2d 964, 976 (N.D. Cal. 2010); *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 714 F. Supp. 2d 475, 484 (S.D.N.Y. 2010).

Regardless of the adequacy of Plaintiffs' pleading, as a factual matter, it is almost certain that Plaintiffs are all "remote purchasers" with no standing to assert Section 12(a)(2) claims. *In re WorldCom, Inc.*, 346 F. Supp. 2d at 659. The Plaintiffs' disclosures of their purchases make clear that none of the Plaintiffs purchased on an offering date, or even within a week of an offering date. *See* Ex. P.

Because Plaintiffs have not, and cannot, make "allegations of direct purchase" from any one of the Underwriter Defendants, their Section 12(a)(2) claims against them must be dismissed. *In re MF Global Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 323 (S.D.N.Y. 2013).

## III. Plaintiffs' Section 11 Claim Against the Underwriter Defendants Should Be Dismissed Under Section 11(b)(3)(C) Because the Underwriter Defendants Reasonably Relied on the Expertise of Miller's Auditors.

The Complaint also makes clear that Underwriter Defendants reasonably relied on the expertise of Miller's auditors and engineering experts, which bars any claim under Section 11. Section 11(b)(3)(C) provides an affirmative defense to underwriters facing liability for misstatements in registration statements—like those at issue here—that are "expertised" by accountants:

> *[N]o person*, other than the issuer, *shall be liable* as provided therein *who shall sustain the burden of proof . . . that . . . as regards any part of the registration statement purporting to be made on the authority of an expert (other than himself)* or purporting to be a copy of or extract from a report or valuation of an expert (other than himself), *he had no reasonable ground to believe and did not believe, at the time such part of the registration statement became effective, that the statements therein were untrue* . . . .

15 U.S.C. § 77k(b)(3)(C) (emphases added). "An underwriter need not conduct due diligence into the 'expertised' parts of a prospectus, such as certified financial statements." *Feyko v. Yuhe Int'l., Inc.*, 2013 WL 816409, at *8 (C.D. Cal. Mar. 5, 2013) (citation and internal quotation marks omitted). For those portions of a registration statement, "underwriters may reasonably rely on auditors' statements, absent red flags that the underwriters were in a position to see." *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1175 (C.D. Cal. 2008). "[A] red flag is a circumstance that would cause a layman to question an expert's determinations." *In re Metropolitan Sec. Litig.*, 2010 WL 424625, at *3-4 (E.D. Wash. Jan. 28, 2010).

Although reasonable reliance on experts is an affirmative defense, a district court may dismiss a complaint based on this defense if it is apparent from the face of the complaint. *See, e.g.*, *In re Countrywide*, 588 F. Supp. 2d at 1182; *Feyko*, 2013 WL 816409, at *8. This is just such a case.

Plaintiffs allege that the Underwriter Defendants violated Section 11 of the Securities Act because the "Registration Statement for the Offerings was inaccurate and misleading . . . ." Compl. ¶ 144. All of the valuations that Plaintiff alleges were false, however, were audited by KPMG, whose audit opinions were incorporated into the registration statement. Thus, all of the alleged misstatement are subject to underwriters' Section 11(b)(3)(C) defense. *See In re WorldCom, Inc.*, 346 F. Supp. 2d at 666 ("[U]nderwriters can rely on an accountant's audit opinion incorporated into a registration statement in presenting a defense under Section 11(b)(3)(C).").

To maintain a Section 11 claim against the Underwriter Defendants based on the alleged accounting misstatements, Plaintiffs would have to identify red flags that should have caused the Underwriter Defendants to question KPMG's accounting. *See Feyko*, 2013 WL 816409, at *8 ("Although an underwriter must prove the due diligence defense, courts look to plaintiffs to point to red flags that should have indicated to the underwriter that the financial statements were not trustworthy."). Plaintiffs have not done so. The most they allege is that "[t]he Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters." Compl. ¶ 39. This general allegation is not sufficient to withstand a motion to dismiss.

Indeed, courts have dismissed Section 11 claims over much lesser pleading failures. In *Feyko*, for instance, the court granted a motion to dismiss based on Section 11(b)(3) where plaintiffs had alleged that the issuer's prior auditor had resigned, and that the new auditor produced its audit opinion only 22 days later. 2013 WL 816409, at *9. The court found those "red flags" insufficient because nothing in the disclosure about the prior auditor's resignation would have alerted the underwriters that the deal at issue was fraudulent, and the plaintiffs did

not explain why 22 days was not sufficient time to conduct a valid audit. *Id.* Similarly, in *Countrywide*, the court granted a motion to dismiss a Section 11 claim based on marked negative amortization that plaintiffs claimed should have prompted closer inquiry of loan-related items on the issuer's balance sheets. 588 F. Supp. 2d at 1174-82. As the court explained, "In hindsight, it is appealing to say the same red flags could have put Underwriter Defendants on notice that the accounting-related statements were false or misleading. But the present [complaint] does not adequately allege that Underwriter Defendants' reliance on KPMG and Countrywide management's accounting-related statements during this period was unreasonable." *Id.* at 1181–82.

If the claims in *Feyko* and *Countrywide* warranted dismissal, there is no question that Plaintiffs' Section 11 claim here cannot survive. Plaintiff alleges that Miller's reliance on its engineering Reserve Reports for the valuation of the Alaska Assets violated GAAP accounting principles. Underwriter Defendants are not in a position to know how GAAP requires oil and gas assets to be valued, or how Reserve Reports are to be used in accounting for energy companies. The Underwriter Defendants were entitled to rely on financial statements in which expert accountants relied on valuations provided by expert engineers.

What is more, over the time period from the acquisition of the Alaska Assets to the end of the class period, Miller's financial statements were based upon Reserve Reports from two separate engineering firms, and signed off on by two separate accounting firms. *See, e.g.*, Ex. B (Form 10-Q filed Mar. 22, 2011 (excerpted)) at ii; Compl. ¶ 46; Ex. A (Cook Inlet Energy, LLC Estimated Future Reserves and Income Attributable to Leasehold Interests (Apr. 30, 2014)). Underwriter Defendants simply had no reason to question Miller's audited financial statements in these circumstances. Section 11(b)(3) mandates dismissal.

## IV. Plaintiffs Lack Standing To Pursue Their Section 11 Claims.

"To have standing to bring a claim under section 11 of the Securities Act, a plaintiff must have purchased stock in the offering or be able to trace its later-purchased stock to the offering." *In re STEC Inc. Sec. Litig.*, 2011 WL 2669217, at *13 (C.D. Cal. June 17, 2011); *accord In re Empyrean Biosci., Inc. Sec. Litig.*, 255 F. Supp. 2d 751, 766 (N.D. Ohio 2003). *See also* 15 U.S.C. § 77k(a)(5). "While Section 11's liability provisions are expansive—creating virtually absolute liability for corporate issuers for even innocent material misstatements—its standing provisions limit putative plaintiffs to the narrow class of persons consisting of those who purchase securities that are the direct subject of the prospectus and registration statement." *In re Friedman's, Inc. Sec. Litig.*, 385 F. Supp. 2d 1345, 1371 (N.D. Ga. 2005) (internal quotation marks omitted); *see also Ong ex rel. Ong IRA v. Sears, Roebuck & Co.*, 388 F. Supp. 2d 871, 891–92 (N.D. Ill. 2004). In the case of multiple offerings from a single shelf registration statement, Plaintiffs must trace their purchases to specific offerings: "The clear import of the statute is that Plaintiffs may only sue the underwriter of the offering to which they trace their shares. That both offerings originated from the same . . . Shelf Registration Statement is not determinative." *In re Friedman's*, 385 F. Supp. 2d at 1371; *see also* 17 C.F.R. 230.430B.

Plaintiffs bear "[t]he burden of tracing shares to a particular public offering." *In re STEC Inc.*, 2011 WL 2669217, at *13. If they cannot establish standing, dismissal under Rule 12(b)(6) is warranted. *See In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1109-10 (9th Cir. 2013).

The factual details of this case illustrate precisely why plaintiffs should be required to trace their shares to particular offerings. *First*, two of Miller's Series C offerings undisputedly lie outside the statute of repose for Section 11, which provides that "in no event shall any [Section 11] action be brought . . . more than three years after the security was bona fide offered

to the public." 15 U.S.C. § 77m; *see* Ex. Q (Prospectus filed Sept. 28, 2012 (excerpted)); Ex. R (Prospectus filed Oct. 12, 2012 (excerpted)). Absent evidence that one or more plaintiffs purchased from a later-in-time offering of Series C, Plaintiffs cannot demonstrate that their claims are timely because all of their shares could have issued pursuant to these offerings barred by the statute of repose. The Complaint pleads no such evidence.

*Second*, for both Series C and Series D offerings, a slightly different set of underwriters participated in each offering. This Court has no way of knowing whether, for instance, Williams, which underwrote only the first of the Series C offerings at issue, should actually be held liable, because it is impossible to tell whether any of Plaintiffs' purchases can be traced back to the single offering in which Williams participated. The same problem applies to I-Bankers, which participated in only the last of the Series D offerings.

*Third*, with regard to MLV's offering of Series D shares "at the market" in October 2013, MLV cannot be held liable for its participation in an at-the-market offering because it would be impossible for any plaintiff to trace his or her shares back to that offering. Unlike in a conventional offering, where a new batch of a company's shares are sold for a fixed price to initial purchasers, an "at-the-market" offering occurs on the market for secondary purchasers. *See, e.g.*, 17 C.F.R. 230.415(a)(4). An underwriter in an at-the-market offering will gradually introduce new shares of a company's stock into the marketplace. In this case, there was a standard Series D offering in September 2013 before the October 2013 at-the-market offering began. Any purchaser who bought shares from the at-the-market offering would have bought them from a publicly available pool of shares that contained shares from two different offerings. Both Series D purchasers here bought their shares after the at-the-market offering. *See* Movants'

Purchases at 3. As a result, they cannot possibly know whether their shares originated from the September 2013 standard offering or the October 2013 at-the-market offering.

Plaintiffs have not—and, at least with respect to the at-the-market offering of Series D shares, cannot—trace their shares back to a particular offering. None of their purchases occurred on an offering date or even within a week of an offering date. *See* Ex. P (Movants' Purchases) at 2–3. Accordingly, their Section 11 claims should be dismissed for lack of standing.

## CONCLUSION

For the foregoing reasons, Underwriter Defendants respectfully request that Plaintiffs' Master Consolidated Complaint be dismissed with prejudice insofar as it asserts claims against the Underwriter Defendants.

Dated: February 21, 2017.

Respectfully submitted,

*/s/ Margaret A. Keeley*
Steven M. Farina (admitted *pro hac vice*)
Margaret A. Keeley (admitted *pro hac vice*)
Amanda M. MacDonald (admitted *pro hac vice*)
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000
sfarina@wc.com
mkeeley@wc.com
amacdonald@wc.com

W. Brantley Phillips, Jr. (BPR # 018844)
Jeffrey P. Yarbro (BPR # 024207)
**BASS, BERRY & SIMS PLC**
150 Third Avenue South, Suite 2800
Nashville, TN 37201
(615) 742-7793
bphillips@bassberry.com
jyarbro@bassberry.com

Shayne R. Clinton (BPR # 026245)
**BASS, BERRY & SIMS PLC**

1700 Riverview Tower
900 S. Gay Street
Knoxville, TN 37902
(865) 521-6200
sclinton@bassberry.com

*Attorneys for Underwriter Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on February 21, 2017, a copy of the foregoing was filed electronically. Notice of the filing will be sent by operation of the Court's electronic filing system to all persons indicated on the electronic filing receipt. In addition, we have mailed copies of the foregoing to the following:

Scott M. Boruff
5628 Lyons View Pike
Knoxville, TN 37919

Gerald Hannahs
17710 Leatha Lane
Little Rock, AR 72223

David J. Voyticky
2652 Midvale Avenue
Los Angeles, CA 90064

William B. Richardson
1058 Encantado Dr.
Santa Fe, NM 87501

Paul W. Boyd
8125 Ainsworth Dr.
Knoxville, TN 37909

*Defendants*

/s/ *Margaret A. Keeley*