UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

AT KNOXVILLE

| | | |
|---|---|---|
| KENNETH GAYNOR, *et al.*, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>DELOY MILLER, *et al.*,<br><br>Defendants. | § § § § § § § § § § § | Civil Action No. 3:15-CV-545-TAV-CCS<br><br>(Consolidated)<br><br><u>CLASS ACTION</u><br><br><u>JURY DEMAND</u> |

**LEAD PLAINTIFFS' OMNIBUS OPPOSITION TO**
**<u>DEFENDANTS' MOTIONS TO DISMISS</u>**

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ....... 1

II. STATEMENT OF FACTS ....... 3

A. Miller Energy and the Alaska Assets ....... 3

B. The Offerings ....... 5

C. The Disclosures ....... 6

III. LEGAL STANDARDS ....... 6

A. Motion to Dismiss Under Rule 12(b)(6) ....... 6

B. Sections 11 and 12 of the Securities Act of 1933 ....... 7

IV. ARGUMENTS ....... 8

A. Plaintiffs Have Standing to Pursue Their Section 11 Claims ....... 9

B. Plaintiffs Have Standing to Pursue Their Section 12(a)(2) Claims Against the Underwriter Defendants and Officer Defendants ....... 13

1. Plaintiffs Have Adequately Alleged That They Purchased Shares Pursuant to the Offerings ....... 13

2. Plaintiffs Have Adequately Alleged That the Officer Defendants Are Statutory Sellers ....... 16

C. The Underwriter and Individual Defendants Have Failed to Prove Their Negative Loss Causation Affirmative Defense ....... 18

1. Defendants Concede That Some Stock Losses Followed a Disclosure Related to the Alaska Assets ....... 19

2. Although Plaintiffs Do Not Have the Burden of Alleging Any Facts Showing Loss Causation, Plaintiffs' Allegations Nonetheless Establish That Plaintiffs Suffered Losses After Defendants' Disclosures as to the Alaska Assets ....... 20

D. The Underwriter Defendants Have Failed to Prove Their Reasonable Reliance Affirmative Defense ....... 22

E. The Statute of Limitations Does Not Bar Plaintiffs' Claims Against the Individual Defendants ....... 25

F. The Statute of Repose Does Not Bar Plaintiffs' Section 11 and 15 Claims Against the Individual Defendants ....... 27

## TABLE OF CONTENTS

**Page**


1. The Current Record Establishes that the February 13, 2013 Prospectus Supplement, at a Minimum, Presented Fundamental Changes to the Registration Statement and Triggered the Three-Year Statute of Repose ....................30

2. In the Alternative, Defendants' Annual Form 10-K Filed on July 15, 2013, Automatically Triggered a New Bona Fide Offering Date for the Offerings ....................33

G. Defendants Schlumberger, Gower, Leary, and Richardson Are Liable Under Section 11 Because They Signed a Misleading Registration Statement and They Were Directors at the Time that Miller Energy Filed a Misleading Registration Statement ....................34

1. Under Section 77k(a)(1), These Defendants Are Deemed to Have Signed the Registration Statement ....................34

2. Additionally, under Section 77k(a)(2), These Defendants Were Directors When a Misleading Part of the Registration Statement Was Signed ....................35

H. Even if Defendants' Valuation of the Alaska Assets Was an Opinion, That Opinion Is Actionable Under *Omnicare* ....................36

1. Plaintiffs' Allegations Demonstrate that Defendants Did Not Honestly Hold the Opinion that the Alaska Assets' Fair Market Value Was Approximately $480 Million ....................37

2. Even if Defendants Subjectively Believed the Reported Fair Market Value of the Alaska Assets, Defendants Omitted Material Facts Going to the Basis of that Calculation ....................38

I. Plaintiffs Have Adequately Stated a Claim Under Section 15 ....................40

V. CONCLUSION ....................40

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Allen v. McCurry*,
449 U.S. 90 (1980)....................................................................................................26

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)......................................................................................................7

*Booth v. Strategic Realty Tr., Inc.*,
No. 13-04921-JST, 2014 U.S. Dist. LEXIS 104184 (N.D. Cal. July 29, 2014)..........28, 29, 33

*Erickson v. Pardus*,
551 U.S. 89 (2007) (*per curiam*) ..................................................................................7

*Fallick v. Nationwide Mut. Ins. Co.*,
162 F.3d 410 (6th Cir. 1998) ......................................................................................12

*Fed. Hous. Fin. Agency v. HSBC N. Am. Holdings Inc.*,
987 F. Supp. 2d 369 (S.D.N.Y. 2013)..........................................................................35

*Fed. Hous. Fin. Agency v. UBS Ams., Inc.*,
No. 11 Civ. 5201 (DLC), 2012 U.S. Dist. LEXIS 88471 (S.D.N.Y. June 26, 2012) ..10, 28, 29

*Feyko v. Yuhe Int'l, Inc.*,
No. 11-05511 DDP, 2013 U.S. Dist. LEXIS 29905 (C.D. Cal. Mar. 5, 2013)........................25

*Helwig v. Vencor, Inc.*,
251 F.3d 540 (6th Cir. 2001) ........................................................................................7

*Herman & Maclean v. Huddleston*,
459 U.S. 375 (1983)......................................................................................................7

*In re Adams Golf, Inc. Sec. Litig.*,
381 F.3d 267 (3d Cir. 2004).........................................................................................18

*In re BP P.L.C. Sec. Litig.*,
No. 4:10-MD-2185, 2016 U.S. Dist. LEXIS 73721 (S.D. Tex. May 31, 2016)......................39

*In re CitiGroup Bond Litig.*,
723 F. Supp. 2d 568 (S.D.N.Y. 2010)..........................................................................10

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2009) .................................................................10, 25

*In re Deutsche Bank AG Sec. Litig.*,
No. 09 CV 1714 (DAB), 2016 U.S. Dist. LEXIS 96741 (S.D.N.Y. July 25, 2016)................14

## TABLE OF AUTHORITIES


**Page**

*In re Direxion Shares ETF Tr.*,
279 F.R.D. 221 (S.D.N.Y. 2012) ....................................................................................20

*In re Enron Corp. Sec.*,
No. H-01-3624, 2005 U.S. Dist. LEXIS 39927 (S.D. Tex. Dec. 5, 2005)..............................24

*In re EveryWare Glob., Inc. Sec. Litig.*,
175 F. Supp. 3d 837 (S.D. Ohio 2016), *aff'd sub nom. IBEW Local No. 58 Annuity Fund v. EveryWare Glob., Inc.*, 849 F.3d 325 (6th Cir. 2017)........................9, 25, 26

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
986 F. Supp. 2d 487 (S.D.N.Y. 2013).......................................................................................18

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
352 F. Supp. 2d 429 (S.D.N.Y. 2005).......................................................................................16

*In re Friedman's, Inc. Sec. Litig.*,
385 F. Supp. 2d 1345 (N.D. Ga. 2005) ....................................................................................13

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
643 F. Supp. 2d 562 (S.D.N.Y. 2009).......................................................................................19

*In re Glob. Crossing, Ltd. Sec. Litig.*,
313 F. Supp. 2d 189 (S.D.N.Y. 2003).......................................................................................23

*In re IPO Sec. Litig.*,
341 F. Supp. 2d 328 (S.D.N.Y. 2004).......................................................................................27

*In re Iso Ray, Inc. Sec. Litig.*,
189 F. Supp. 3d 1057 (E.D. Wash. 2016) .................................................................................36

*In re Lehman Bros. Sec. & ERISA Litig.*,
799 F. Supp. 2d 258 (S.D.N.Y. 2011)...............................................................................14, 34

*In re Majesco Sec. Litig.*,
No. 05-3557 (PGS), 2006 U.S. Dist. LEXIS 73563 (D.N.J. Sept. 29, 2006) ..........................23

*In re Metro. Sec. Litig.*,
532 F. Supp. 2d 1260 (E.D. Wash. 2007) .................................................................................29

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
982 F. Supp. 2d 277 (S.D.N.Y. 2013).......................................................................................23

*In re Molycorp, Inc. Sec. Litig.*,
157 F. Supp. 3d 987 (D. Colo. 2016).........................................................................................15

## TABLE OF AUTHORITIES

**Page**

*In re Nat'l Century Fin. Enters., Inc.*,
504 F. Supp. 2d 287 (S.D. Ohio 2007) ....................................................................40

*In re OSG Sec. Litig.*,
971 F. Supp. 2d 387 (S.D.N.Y. 2013).......................................................................17

*In re Ply Gem Holdings, Inc., Sec. Litig.*,
No. 14-CV-3577 (JPO), 2016 U.S. Dist. LEXIS 130588 (S.D.N.Y. Sept. 23, 2016) .............16

*In re Prison Realty Sec. Litig.*,
117 F. Supp. 2d 681 (M.D. Tenn. 2000)...........................................................11, 18

*In re Regions Morgan Keegan Sec., Derivative, & ERISA Litig.*,
743 F. Supp. 2d 744 (W.D. Tenn. 2010)....................................................................18

*In re Regions Morgan Keegan Sec., Derivative*,
No. 07-2784, 2010 U.S. Dist. LEXIS 137853 (W.D. Tenn. Dec. 30, 2010) ...........................19

*In re Regions Morgan Keegan Sec.*,
No. 2:09-2009 SMH V, 2012 WL 12875982 (W.D. Tenn. Mar. 30, 2012) ......................16, 33

*In re Sirrom Capital Corp. Sec. Litig.*,
84 F. Supp. 2d 933 (M.D. Tenn. 1999)........................................................................7

*In re Suprema Specialties, Inc. Sec. Litig.*,
438 F.3d 256 (3d Cir. 2006)...............................................................................14, 15

*Ind. State Dist. Council of Laborers v. Omnicare, Inc.*,
583 F.3d 935 (6th Cir. 2009) ...................................................................................18

*J&R Mktg. v. GMC*,
549 F.3d 384 (6th Cir. 2008) .....................................................................................7

*Johnson v. CBD Energy Ltd.*,
No. H-15-1668, 2016 U.S. Dist. LEXIS 87174 (S.D. Tex. July 6, 2016) ...............................23

*Linares v. McLaughlin*,
423 F. App'x 84 (2d Cir. 2011) ................................................................................26

*Local 295/Local 851 IBT Employer Grp. Pension Trust & Welfare Fund v. Fifth Third Bancorp.*,
731 F. Supp. 2d 689 (S.D. Ohio 2010) ........................................................................8

*LULAC v. Bredesen*,
500 F.3d 523 (6th Cir. 2007) .....................................................................................7

*Me. State Ret. Sys. v. Countrywide Fin. Corp.*,
No. 2:10-CV-0302 MRP, 2011 U.S. Dist. LEXIS 125203 (C.D. Cal. May 5, 2011)........12, 14

## TABLE OF AUTHORITIES

**Page**

*Moran v. A/C Fin., Inc.*,
No. CV-3-05-071, 2007 WL 2769664 (S.D. Ohio Sept. 18, 2007) ........................................30

*Murray Energy Holdings Co. v. Mergermarket USA, Inc*,
No. 2:15-CV-2844, 2016 U.S. Dist. LEXIS 79183 (S.D. Ohio June 17, 2016) ......................11

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*,
709 F.3d 109 (2d Cir. 2013)..........................................................................................35

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
135 S. Ct. 1318 (2015)..........................................................................................7, 36, 39, 40

*Panther Partners Inc. v. Ikanos Communs., Inc.*,
681 F.3d 114 (2d Cir. 2012)..........................................................................................8, 36

*Pinter v. Dahl*,
486 U.S. 622 (1988)..........................................................................................18

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
632 F.3d 762 (1st Cir. 2011)..........................................................................................14

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
894 F. Supp. 2d 144 (D. Mass. 2012)..........................................................................................20

*Pullins v. Klimley*,
No. 3:05-CV-082, 2008 U.S. Dist. LEXIS 3467 (S.D. Ohio Jan. 7, 2008) .............................40

*Rosenzweig v. Azurix Corp.*,
332 F.3d 854 (5th Cir. 2003) ..........................................................................................11

*Smith v. Sterling Infosystems–Ohio, Inc.*,
No. 1:16 CV 714, 2016 U.S. Dist. LEXIS 144793 (N.D. Ohio Oct. 19, 2016).......................12

*Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*,
No. 2:14-cv-02571-MCE-KJN, 2017 U.S. Dist. LEXIS 40835 (E.D. Cal. Mar. 21, 2017) ....36

*Tripoint, LLC v. Rhein Chemie Corp.*,
No. 1:14 CV 360, 2014 U.S. Dist. LEXIS 104853 (N.D. Ohio July 31, 2014).......................30

*W. & S. Life Ins. Co. v. JPMorgan Chase Bank, N.A.*,
54 F. Supp. 3d 888 (S.D. Ohio 2014) ..........................................................................................26

*Yates v. Mun. Mortg. & Equity, LLC*,
744 F.3d 874 (4th Cir. 2014) ..........................................................................................28

## TABLE OF AUTHORITIES

**Page**

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
§77 ... *passim*
§77k ... 1, 7, 18, 19, 23
§77k(a)(1) ... 34, 36
§77k(a)(2) ... 34, 35, 36
§77l ... 1, 7, 18, 19
§77l(b) ... 18
§77l(a)(2) ... *passim*
§77m ... 25, 27, 33
§77o ... 27, 33, 34
§78j(b) ... 26
§78m ... 34
§78n ... 34

Federal Rules of Civil Procedure
Rule 8 ... 15, 40
Rule 8(a) ... 7
Rule 8(a)(2) ... 7
Rule 12(b)(2)-(5) ... 9
Rule 12(b)(6) ... *passim*
Rule 12(h) ... 9
Rule 23 ... 12

17 C.F.R.
§229.512(a)(1)(ii) ... 29
§229.512(b) ... 33
§230.415(a)(4) ... 13
§230.430B(f)(1) ... 35

Plaintiffs respectfully submit this memorandum of law in opposition to the Underwriter Defendants' Motion to Dismiss the Master Consolidated Complaint [Dkt. No. 96] and Memorandum Submitted in Support of that Motion [Dkt. No. 97] ("Und. Def. Mot.") and the Individual Defendants' Motion to Dismiss Plaintiff's Master Consolidated Complaint [Dkt. No. 99] ("Ind. Def. Mot.") (together, "Motions").[1]

## I. INTRODUCTION

Defendants have not disputed the sufficiency of Plaintiffs' core allegation, namely that Miller Energy sold securities pursuant to a shelf registration statement and prospectuses that included untrue statements of material fact as to Defendants' Alaska Assets. Indeed, Miller Energy purchased the Alaska Assets from a bankrupt entity for $2.25 million; reported to the market that the same assets were worth approximately $480 million – or 21,333% of the purchase price; vehemently denied any suggestion that the assets were overvalued; and years later, took several hundreds of millions of dollars in impairments as to those assets prior to the eventual eradication of virtually all value in Miller Energy's stock. Defendants would be hard-pressed to suggest that those allegations, when taken as true, do not state claims under Sections 11 and 12 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §77k-l.

Tacitly conceding that the alleged conduct is generally actionable, Defendants attempt to erect a series of procedural roadblocks to Plaintiffs' well-pled causes of action. As demonstrated below, however, this tactic fails. Most of Defendants' hyper-technical arguments require detailed factual inquiries that are inappropriate on a motion to dismiss. The remaining arguments ignore

[1] All defined terms herein have the same definitions as in the Master Consolidated Complaint ("Complaint") [Dkt. No. 92]. Citations to "¶" refer to paragraphs in the Complaint. Additionally, internal citations and footnotes are omitted and emphasis is added unless noted otherwise.

Plaintiffs' allegations and/or misapply the law. Thus, dismissal is not warranted, and Defendants must answer the Complaint.

First, Defendants claim that Plaintiffs lack standing under Sections 11 ("Section 11") and 12 ("Section 12") of the Securities Act yet ignore multiple cases where the courts found substantively similar – if not identical – allegations of standing to suffice at the pleading stage.

Next, Defendants claim to have met their burden of proving the affirmative defenses of negative loss causation, reasonable reliance, statute of limitations, and statute of repose but disregard that these affirmative defenses require fact-specific inquiries that cannot be completed before they answer the Complaint and engage in discovery. Defendants' attempt to litigate the facts of this case at the pleading stage is improper.

Additionally, Defendants contend that various directors of Miller Energy cannot be liable because they did not make false statements. But every Defendant either signed a registration statement/prospectus containing a false statement or acted as a director when Miller Energy filed those registration statements/prospectuses. Liability under Section 11 does not require any additional involvement by a defendant.

Finally, Defendants seek to establish that their valuation of the Alaska Assets was nothing more than an opinion from which no liability can arise. However, the Complaint contains numerous facts establishing the subjective falsity of that valuation and the omission of material facts about Defendants' inquiry into, and knowledge concerning, that valuation. As such, Defendants' valuation of the Alaska Assets is actionable, regardless of whether that valuation was a pure opinion.

Thus, Plaintiffs' allegations establish each element under Sections 11, 12, and 15 ("Section 15") of the Securities Act. The Court need not accept Defendants' strategic invitation to litigate all

factual issues at this motion to dismiss stage. Rather, for the reasons set forth below, the Motions should be denied, and Defendants should respond to Plaintiffs' well-pled allegations.

## II. STATEMENT OF FACTS

### A. <u>Miller Energy and the Alaska Assets</u>

Miller Energy is an independent oil and natural gas exploration, production, and drilling company operating in multiple exploration and production basins in North America. ¶40. Between early 2002 and December 2009, the Company stock price regularly traded below one dollar per share, falling to a low of $0.04 per share in December 2007. ¶¶40-41.

In the fall of 2009, Miller Energy became aware of certain oil and gas properties in Alaska ("Alaska Assets") that were in the process of being "abandoned" as part of the bankruptcy proceedings of California-based PER. ¶42. On December 10, 2009, Miller Energy's operating subsidiary, CIE – with the bankruptcy court's permission – closed a transaction to purchase the Alaska Assets for $2.25 million in cash and the assumption of certain limited liabilities. ¶45. On that same date, the Company's common stock closed at $0.61 per share. ¶51.

Miller Energy subsequently submitted SEC filings that drastically overstated the fair value of the Alaska Assets. ¶46. When computing that fair value, Miller Energy improperly relied on a reserve report ("Reserve Report") prepared by an independent petroleum engineering firm. ¶63. The Reserve Report calculated the pretax present value of net cash flows discounted at 10% ("PV-10") for the Alaska Assets, concluding that the PV-10 was $368 million. ¶¶66, 68. Although PV-10 calculations are frequently used to satisfy supplemental accounting disclosure requirements concerning estimates of future oil and gas production, those calculations are not considered "an estimate of fair market value." ¶¶64, 73-85. Accordingly, the Reserve Report was not a basis to calculate an estimate of fair market value of the Alaska Assets and explicitly stated that "[t]he discounted values shown are for your information and should not be construed as our estimate of fair

market value." ¶70. Moreover, the engineering firm that drafted the Reserve Report did not expect that Miller Energy would use the Reserve Report to calculate fair market value for the Alaska Assets. ¶67.

Nevertheless, Miller Energy improperly used the Reserve Report's PV-10 calculation as the estimated fair market value of the acquired oil and gas properties in the Alaska Assets. ¶69. On March 22, 2010, Miller Energy filed its quarterly report on Form 10-Q claiming a value for the Alaska Assets of approximately $480 million, comprised of approximately $368 million for oil and gas properties and approximately $110 million for fixed assets. ¶46. Miller Energy also reported an after-tax $277 million "bargain purchase gain," which boosted its reported net income for the quarter to $272 million, as compared to a $556,097 loss for the same period in the prior year. ¶46.

The use of the Reserve Report's PV-10 calculation of $368 million as the estimated fair market value of the oil and gas properties within the Alaska Assets was inaccurate for numerous reasons. ¶¶73-85. The Reserve Report did not make adjustments for income taxes, used an improper discount rate of 10%, failed to apply any risk weight to cash flows from oil reserves, omitted amounts for certain asset retirement obligations, and understated projected operating and capital expenses. ¶¶73-85. Additionally, the $110 million value for fixed assets was improper, as that value was already incorporated into the Reserve Report and, therefore, was double counted; the Redoubt Shoal Field could not generate cash flow without incurring upfront capital expenditures, which were not accounted for; and the value reflected an "asset replacement cost," which cannot qualify as fair market value under GAAP absent further adjustments. ¶¶89-94.

This drastic overvaluation of the Alaska Assets resulted in a nearly 5,000% increase in Miller Energy's total assets and had a significant impact on the market price of Miller Energy common stock. ¶51. By March 31, 2010 – less than two weeks after the Company reported the inflated

valuation of the Alaska Assets – Miller Energy's common stock closed at $6.60 per share, 982% higher than its $0.61 closing price when the Alaska Assets were purchased. ¶51. Weeks later, the listing of Miller Energy stock was moved to the NASDAQ, and a year later, the listing was moved to the NYSE, where the stock reached an all-time high of $8.83 per share and achieved a market capitalization of $393 million on December 9, 2013. *Id.*

## B. <u>The Offerings</u>

On or about September 6, 2012, Miller Energy filed with the SEC a Form S-3 registration statement and prospectus ("Registration Statement") as the first step to sell certain classes of securities. ¶52. The Registration Statement expressly incorporated by reference certain filings Miller Energy had previously made with the SEC. ¶52. Miller Energy used a "shelf" registration process, or continuing registration process, through which the Company would first file the Registration Statement and would subsequently sell classes of securities on an ongoing basis. Under that process, Miller Energy would file a prospectus supplement ("Prospectus Supplement(s)") each time a class of securities was actually offered for sale, and that Prospectus Supplement would provide the necessary information about that particular offering of securities. ¶52.

On September 18, 2012, the SEC declared the Registration Statement to be effective. From February 13, 2013 to August 21, 2014, Miller Energy issued three offerings of 10.75% Series C Cumulative Redeemable Preferred Stock ("Series C") and three offerings of 10.5% Series D Fixed Rate/Floating Rate Cumulative Redeemable Preferred Stock ("Series D") (collectively, "Offerings"). ¶54. For each of those six Offerings, Miller Energy issued a separate Prospectus Supplement, each of which incorporated specific financial forms that Miller Energy had filed with the SEC and overstated the value of the Alaska Assets. ¶¶54-56. Plaintiffs purchased both Series C and Series D shares pursuant and/or traceable to the Offerings. ¶¶12-15.

## C. The Disclosures

Following the Offerings, a series of disclosures made by the Company revealed that the Registration Statement and Prospectus Supplements were false and misleading in that they overstated the value of the Alaska Assets. On December 10, 2014, Miller Energy disclosed in a Form 10-Q that it was taking a $265.3 million impairment charge on the Alaska Assets, specifically the Redoubt Shoal Field. ¶106. On March 12, 2015, Miller Energy disclosed that it was taking another $150 million impairment charge on the Alaska Assets. ¶107.

From April 29, 2015 through June 7, 2016, moreover, the Company made additional disclosures regarding an SEC civil administrative action against Miller Energy, Boyd, and Hall; Miller Energy's settlement with the SEC; the SEC's order finding that Miller Energy violated the Securities Act and Exchange Act; the SEC's imposition of sanctions as to Boyd, Hall, and Vogt; the delisting of Miller Energy's common stock, Series C stock, and Series D stock from the NYSE; Miller Energy's filing for Chapter 11 bankruptcy protection; the confirmation of Miller Energy's bankruptcy plan; Miller Energy's cancellation of all equity interests, including the Series C and Series D securities; and Miller Energy's statement that all financial statements from fiscal 2010 to March 2016 could not be relied upon. ¶¶108-135.

Because of Defendants' conduct, Plaintiffs suffered damages from their purchases of the Series C and D Offerings. Accordingly, Plaintiffs have brought the following claims against Defendants: (1) Count I for Violation of Section 11; (2) Count II for Violation of Section 12(a)(2); and (3) Count III for Violation of Section 15.

# III. LEGAL STANDARDS

## A. Motion to Dismiss Under Rule 12(b)(6)

In addressing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rules"), a court must construe the complaint in the light most favorable to the plaintiff

and accept all well-pled factual allegations as true. *LULAC v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007). Because Plaintiffs' claims are based on theories of strict liability and negligence under the Securities Act, they are governed by the notice pleading standard set forth in Rule 8(a). *See In re Sirrom Capital Corp. Sec. Litig*., 84 F. Supp. 2d 933, 938 (M.D. Tenn. 1999). Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (*per curiam*). "[T]he statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Id*. (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Engaging in fact finding or weighing the evidence for and against a plaintiff's claims is not appropriate. *See Helwig v. Vencor, Inc.*, 251 F.3d 540, 553, 558 (6th Cir. 2001). As detailed herein, the Complaint more than satisfies these liberal notice pleading requirements.

## B. Sections 11 and 12 of the Securities Act of 1933

"The Securities Act of 1933 protects investors by ensuring that companies issuing securities . . . make a 'full and fair disclosure of information' relevant to a public offering." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1323 (2015) ("*Omnicare*"). Section 11, therefore, imposes a "duty to disclose additional facts when a statement of material fact made by the issuer is misleading" and imposes "liability for failing to fulfill that duty of disclosure as well as for misstating a material fact." *J&R Mktg. v. GMC*, 549 F.3d 384, 390 (6th Cir. 2008). "Liability against the issuer of a security is virtually absolute, ***even for innocent misstatements***." *Herman & Maclean v. Huddleston*, 459 U.S. 375, 382 (1983).

Accordingly, to state a claim under Section 11, the plaintiff need only allege that:

> (1) he purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under Section 11; and (3) the registration statement contained an untrue statement of a material fact or omitted to state a

> material fact required to be stated therein or necessary to make the statements therein not misleading."

*Local 295/Local 851 IBT Emp'r Grp. Pension Trust & Welfare Fund v. Fifth Third Bancorp.*, 731 F. Supp. 2d 689, 704 (S.D. Ohio 2010). Thus, "Section 11 imposes strict liability on issuers and signatories, and negligence liability on underwriters . . . Neither scienter, reliance, nor loss causation is an element of § 11 . . . claims." *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012). Similarly, to establish a claim under Section 12(a)(2), a plaintiff need only show that:

> (1) the defendant is a 'statutory seller'; (2) the sale was effectuated by means of a prospectus or oral communication; and (3) the prospectus or oral communication included an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

*Fifth Third Bancorp*, 731 F. Supp. 2d at 705. Section 12(a)(2) does not require that a plaintiff allege or prove scienter, reliance, or loss causation. *Panther Partners*, 681 F.3d at 120.

## IV. ARGUMENTS

The Underwriter Defendants and Individual Defendants raise ten arguments seeking dismissal of the Complaint: (1) Plaintiffs lack standing to bring their Section 11 claim, *see* Und. Def. Mot. at 31-33; Ind. Def. Mot. at 13-15; (2) Plaintiffs lack standing to bring their Section 12 claim, *see* Und. Def. Mot. at 26-27; Ind. Def. Mot. at 18-21; (3) the negative loss causation affirmative defense is apparent on the face of the Complaint and bars Plaintiffs' Section 11 and Section 12 claims, *see* Und. Def. Mot. at 14-26; Ind. Def. Mot. at 17-18; (4) the reasonable reliance affirmative defense is apparent on the face of the Complaint and bars Plaintiffs' Section 11 claim, *see* Und. Def. Mot. at 28-30; (5) the one-year statute of limitations bars all of Plaintiffs' claims, *see* Ind. Def. Mot. at 10-12; (6) the three-year statute of repose bars Plaintiffs' Section 11 claim against the Individual Defendants, *see* Ind. Def. Mot. at 9-10; (7) Plaintiffs' Section 11 claim fails against Schlumberger,

Gower, Leary, and Richardson because they did not sign the registration statement, *see* Ind. Def. Mot. at 9-10; (8) Plaintiffs fail to allege that the Individual Defendants made false statements, *see* Ind. Def. Mot. at 16-17; (9) the oil and gas reserve estimates are statements of opinion that Plaintiffs fail to allege were subjectively false; *see* Ind. Def. Mot. at 15-16; and (10) Plaintiffs have failed to state a Section 15 claim, *see* Ind. Def. Mot. at 21-22.[2] Plaintiffs will address each argument in turn.[3]

**A. Plaintiffs Have Standing to Pursue Their Section 11 Claims**

The Underwriter and Individual Defendants contend that Plaintiffs lack standing to pursue the Section 11 claims. More specifically, they claim that Plaintiffs are required to trace their stock purchases to each of Defendants' six Offerings of the Series C and Series D shares. *See* Und. Def. Mot. at 31-33; Ind. Def. Mot. at 13-15. Defendants are wrong.

"To have standing under Section 11, a plaintiff who has purchased a security must plead 'traceability,' meaning that she must show that the securities she purchased were registered under, or traceable to, the false and misleading registration statement at issue. This Court and others have interpreted this as a requirement that a plaintiff 'show that he purchased a security issued pursuant to a registration statement.'" *In re EveryWare Glob., Inc. Sec. Litig*., 175 F. Supp. 3d 837, 864 (S.D.

[2] The Underwriter Defendants have joined in the Individual Defendants' arguments that the one-year statute of limitations bars all of Plaintiffs' claims, Plaintiffs lack standing under Section 11 and Section 12, the oil and gas reserve estimates are statements of opinion that Plaintiffs fail to allege were subjectively false, and negative loss causation is apparent on the face of the Complaint. *See* Dkt. No. 101.

[3] Defendant Gerald Hannahs filed a document styled "Motion to Dismiss and Answer." *See* Dkt. No. 97. That filing is deficient as a motion to dismiss, as there are no citations to legal authorities or explanations of the grounds for dismissal. Because Hannahs has filed an answer, moreover, he has waived any defenses under Rule 12(b)(2)-(5) that were not raised in that answer. *See* Fed. R. Civ. P. 12(h). Additionally, because Hannahs' counsel previously accepted service of process on his behalf, [*see* Dkt. No. 83], Hannahs cannot legitimately raise arguments as to improper process, improper service of process, or lack of personal jurisdiction arising from a lack of service of process.

Ohio 2016), *aff'd sub nom.*, *IBEW Local No. 58 Annuity Fund v. EveryWare Glob., Inc*., 849 F.3d 325 (6th Cir. 2017).

Where securities are offered pursuant to a shelf registration, moreover, " if any part of the registration statement . . . contained an untrue statement of a material fact or omitted to state a material fact, then any person acquiring a security pursuant to that registration statement has standing to sue a variety of participants in the security's issuance." *In re CitiGroup Bond Litig.*, 723 F. Supp. 2d 568, 584 (S.D.N.Y. 2010).[4] "Accordingly, where the actionable part of the registration statement is alleged to be common to all purchasers from the same shelf, then a plaintiff has standing to represent them because they have all suffered from the same alleged injury." *Id.*; *see also In re Countrywide Fin. Corp. Sec. Litig*., 588 F. Supp. 2d 1132, 1166 (C.D. Cal. 2009) ("[I]t is not necessarily the case that someone who purchased securities that were first registered on the same form and prospectus, but that were issued with different prospectus or pricing supplements, lacks standing to represent prior purchasers. So long as (1) the securities are traceable to the same initial shelf registration and (2) the registration statements share common 'parts' that (3) were false and misleading at each effective date, there is § 11 standing."). Thus, a named plaintiff who purchased securities arising from a misleading registration statement has standing to bring claims on behalf of purchasers of other offerings emanating from that registration statement. *See Citigroup*, 723 F. Supp. 2d at 585 ("[T]he complaint alleges that at least one named plaintiff purchased securities pursuant to each of those allegedly actionable shelf registration statements. That is sufficient, at this stage, to establish plaintiffs' standing to raise claims on behalf of all those who purchased pursuant

[4] Under the shelf registration process, a company can file an initial registration statement before issuing the securities and then, at the time of issuing the securities, file an amendment or prospectus supplement providing more detailed information as to those securities. *See Fed. Hous. Fin. Agency v. UBS Ams., Inc.*, No. 11 Civ. 5201 (DLC), 2012 U.S. Dist. LEXIS 88471, at *5 (S.D.N.Y. June 26, 2012). This process is described in more detail in Section IV.F., *infra*.

to those shelf registration statements and thus to challenge all forty eight offerings."); *see also In re Prison Realty Sec. Litig.*, 117 F. Supp. 2d 681, 690–91 (M.D. Tenn. 2000) ("[A] § 11 cause of action can be brought by anyone who purchased stock under a registration statement, regardless of when the purchase was made. . . . [T]he Court finds that the Plaintiffs who obtained shares issued pursuant to and traceable to the Joint Proxy have standing to assert § 11 claims.").

In light of this precedent, Defendants' challenges to Plaintiffs' standing should be rejected. The Registration Statement incorporated false statements regarding the Alaska Assets, therefore, dismissal for lack of standing would be permissible only if none of the named Plaintiffs had purchased securities that were traceable to that Registration Statement. However, the record confirms that all Series C and Series D shares originated with – and are traceable to – the Registration Statement. *See* Exhibit A, Sept. 28, 2012 Prospectus Supplement, at 1 (specifying that the *first* Series C shares were issued pursuant to the Registration Statement after its effective date); Exhibit B, Sept. 26, 2013 Prospectus Supplement, at 1 (specifying that the *first* Series D shares were issued pursuant to the Registration Statement after its effective date).[5] Indeed, Miller Energy never issued any Series C or Series D stock pursuant to any other Registration Statement. Plaintiffs' shares, therefore, are necessarily traceable to that Registration Statement, regardless of which specific Offering issued those shares. As such, Plaintiffs have standing to assert their Section 11 claims arising from misrepresentations in that Registration Statement. *See, e.g.*, *Rosenzweig v. Azurix Corp*., 332 F.3d 854, 873 (5th Cir. 2003) (holding that "[t]he district court erred in

[5] "Where, as here, the documents are offered to establish their contents rather than the truth of the statements therein, the Court may properly take judicial notice of public records such as SEC filings in a Rule 12(b)(6) motion." *Murray Energy Holdings Co. v. Mergermarket USA, Inc.*, No. 2:15-CV-2844, 2016 U.S. Dist. LEXIS 79183, at *17 n.5 (S.D. Ohio June 17, 2016).

concluding that plaintiffs did not have standing on the mere fact that they were aftermarket purchasers" where "all the plaintiffs' stock is traceable to the challenged registration statement").[6]

Furthermore, Defendants remaining arguments are inapposite. Defendants contend that Plaintiffs lack standing because two offerings – one from September 28, 2012, and one from October 12, 2012 – lie outside the statute of repose. They suggest that all purchases of Series C stock may have arisen from those two offerings. However, Plaintiffs have not alleged any claims based on those offerings, nor is there any evidence that all of Plaintiffs' Series C purchases – including those as late as May 2015 – arose from those 2012 offerings. Rather, Plaintiffs have alleged that they "purchased Miller Energy Series C and Series D preferred shares pursuant and/or traceable to the Offerings." ¶¶12-15. Those allegations are sufficient to establish that Plaintiffs purchased from the Offerings, all of which are within the statute of repose period and arise from the same misleading Registration Statement. *See Me. State Ret. Sys. v. Countrywide Fin. Corp.*, No. 2:10-CV-0302 MRP (MANx), 2011 U.S. Dist. LEXIS 125203, at *41–*42 (C.D. Cal. May 5, 2011) ("[T]he language 'pursuant or traceable to' . . . is sufficient for Section 11 claims, which require only an allegation that the plaintiff purchased pursuant to or traceable to a false registration statement").[7]

---

[6] To the extent Defendants are challenging Plaintiffs' "class standing" – *i.e.*, standing to assert absent class members' claims – that challenge is premature at this pleading stage. A plaintiff "need not establish standing on behalf of the absent class members. Rather, the fact that she unquestionably has standing is sufficient to invoke th[e] Court's jurisdiction." *See Smith v. Sterling Infosystems–Ohio, Inc.*, No. 1:16 CV 714, 2016 U.S. Dist. LEXIS 144793, at *6-*7 (N.D. Ohio Oct. 19, 2016) (declining "to dismiss the claims of the absent class members due to lack of standing"). Indeed, "the Sixth Circuit expressly ruled that once the representative plaintiff establishes standing, whether she 'will be able to represent the putative class, including absent class members, depends solely on whether she is able to meet the additional criteria encompassed in Rule 23 of the Federal Rules of Civil Procedure.'" *Id.* at *9 (quoting *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 422–23 (6th Cir. 1998)).

[7] Defendants similarly contend that Williams participated in only the February 13, 2013 Offering; that I-Bankers participated in only the August 21, 2014 Offering; and that neither Williams nor I-Bankers can be sued unless Plaintiffs purchased from those specific Offerings. This argument fails

Defendants additionally contend that MLV cannot be liable for participating in an "at the market" Offering in October 2013 because it is impossible to trace shares to that Offering. This reasoning fails. Because it participated in every Offering – each of which arose from the same misleading Registration Statement – MLV is liable regardless of whether it could negate traceability as to the "at the market" Offering.[8] In any case, the allegations establish that at least some shares are traceable to each Offering, including the "at the market" Offering.[9] Thus, Plaintiffs' allegations are sufficient to establish standing under Section 11, and the Motions should be denied.[10]

### B. <u>Plaintiffs Have Standing to Pursue Their Section 12(a)(2) Claims Against the Underwriter Defendants and Officer Defendants</u>

#### 1. <u>Plaintiffs Have Adequately Alleged That They Purchased Shares Pursuant to the Offerings</u>

Defendants argue the Section 12(a)(2) claim should be dismissed because Plaintiffs have not made "allegations of direct purchase" from any one of the Underwriter Defendants. *See* Und. Def. Mot. at 27; Ind. Def. Mot. at 20. The crux of Defendants' argument is that Plaintiffs should have

---

for the same reason stated above. Plaintiffs have adequately alleged that their Securities are traceable to each of the Offerings, and no additional allegations or evidence of tracing is required.

[8] "[T]he term 'at the market offering' means an offering of equity securities into an existing trading market for outstanding shares of the same class at other than a fixed price." 17 C.F.R. §230.415(a)(4).

[9] Under Defendants' reasoning, moreover, shares could never be traced to an at-the-market offering, meaning such offerings would *per se* foreclose any liability under Section 11. Defendants fail to provide any legal support for that extreme assertion.

[10] Defendants' reliance on *In re Friedman's, Inc. Sec. Litig*., 385 F. Supp. 2d 1345, 1371 (N.D. Ga. 2005), is misplaced, as that decision is internally inconsistent. The court first stated that "Section 11 does not require the securities be purchased directly in the offering; rather, to have standing under section 11, one must simply be able to trace the purchase of his securities to the registration statement that allegedly violated section 11 by containing a material misrepresentation or omission." *Id*. at 1371. Despite those statements, however, the court reached the contrary conclusion that "Plaintiffs' standing [ ] depends on whether it can trace the purchase of securities to the offering underwritten by Defendant." *Id*. It is unclear, therefore, whether the court intentionally or mistakenly contradicted the established precedent that a plaintiff need only trace his shares to a misleading registration statement rather than to a specific offering. Consequently, the Court should not accord any weight to the internally inconsistent opinion in *Friedman's*.

alleged that they purchased the shares "pursuant to the Offerings" but instead alleged that they purchased the shares "pursuant and/or traceable to the Offerings." This argument fails.

Allegations that a plaintiff purchased securities "pursuant to" the subject registration statement, prospectus, or offering are sufficient to establish standing at the motion to dismiss stage. *See Me. State Ret. Sys.*, 2011 U.S. Dist. LEXIS 125203, at *41 ("Plaintiffs have alleged they purchased Certificates 'pursuant to the Offering Documents.' The Court concludes these allegations are sufficient to state a claim against the Section 12 Underwriter Defendants."); *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 311 (S.D.N.Y. 2011) ("Allegations that a plaintiff purchased securities 'pursuant to' the pertinent offering documents [ ] have been construed to permit proof that the plaintiff purchased his or her security 'in the offering.'").

While some courts, however, have found it insufficient if a plaintiff uses the phrase "pursuant and/or traceable to" as opposed to "pursuant to," *see In re Deutsche Bank AG Sec. Litig.*, No. 09 CV 1714 (DAB), 2016 U.S. Dist. LEXIS 96741, at *35 (S.D.N.Y. July 25, 2016), other courts have disregarded that distinction and held that the "pursuant and/or traceable to" language is sufficient. *See, e.g., Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 776 (1st Cir. 2011) (finding that district court erred in dismissing Section 12 claim where "the complaint used a more ambiguous phrase – that plaintiffs 'acquired the [c]ertificates pursuant and/or traceable to' the offering documents" but also alleged that plaintiffs 'acquired . . . [c]ertificates from defendant Nomura Securities' and that the '[d]efendants promoted and sold the [c]ertificates to [the p]laintiffs and other members of the [c]lass'"); *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 274 n.7 (3d Cir. 2006) ("At the pleading stage [ ] we accept as true plaintiffs' allegations that they made their stock purchases in or traceable to the Suprema public offerings.").

In any case, the inquiry at the pleading stage is whether the allegations are sufficient and not whether Plaintiffs will ultimately prevail on all elements of the Section 12 claim. *See, e.g., In re Molycorp, Inc. Sec. Litig*., 157 F. Supp. 3d 987, 1017 (D. Colo. 2016), as amended (Jan. 28, 2016) ("While Plaintiffs may not be able to ultimately prove a Section 12(a)(2) claim against each Section 12(a)(2) Defendant with respect to the February and/or June Offerings, Plaintiffs have sufficiently pled a Section 12(a)(2) claim for purposes of establishing standing under Rule 8."); *Suprema Specialties*, 438 F.3d at 274 n.7 (holding that allegations of standing were sufficient and that "[i]f defendants were eventually to prove that the shares came from the secondary market, § 12(a)(2) would not apply, and judgment would be entered for them.").

Here, the Court need not determine the import of the phraseological nuance upon which Defendants rely, as Plaintiffs allegations are sufficient under either line of cases. Plaintiffs allege the following:

- Plaintiffs "purchased Miller Energy Series C [or D] preferred shares pursuant and/or traceable to the Offerings, and w[ere] damaged thereby";
- "The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with offers and sales thereof, including to Plaintiffs and the Class";
- "By means of the defective Prospectuses, ***the Officer and Underwriter Defendants promoted and sold Miller Energy preferred shares to Plaintiffs*** and the other members of the Class";
- By reason of the conduct alleged herein, the Officer and Underwriter Defendants violated Section 12(a)(2) of the Securities Act. As a direct and proximate result of such violations, ***Plaintiffs*** and the other members of the Class ***who purchased Miller Energy preferred shares pursuant to the Prospectuses*** sustained substantial damages in connection with their purchases of the preferred shares.

¶¶153, 156. These allegations – including all permissible inferences – show that Plaintiffs purchased the shares from Defendants. Indeed, the allegations are more detailed than the stock "pursuant to" allegation that is frequently upheld by Courts. Thus, the Complaint has sufficiently alleged standing as to the Section 12 claims.

2. Plaintiffs Have Adequately Alleged That the Officer Defendants Are Statutory Sellers[11]

Despite the Officer Defendants' assertion to the contrary, Plaintiffs do sufficiently allege that the Officer Defendants are "statutory sellers" under Section 12. "An individual is a 'statutory seller'—and therefore a potential section 12(a)(2) defendant—if he: (1) passed title, or other interest in the security, to the buyer for value, or (2) successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve his own financial interests or those of the securities['] owner.'" *In re Ply Gem Holdings, Inc., Sec. Litig.*, No. 14-CV-3577 (JPO), 2016 U.S. Dist. LEXIS 130588, at *19 (S.D.N.Y. Sept. 23, 2016). "[W]hether someone 'solicits' a purchase is a fact-bound inquiry unsuited for a Rule 12(b)(6) motion." *In re Regions Morgan Keegan Sec*., No. 2:09-2009 SMH V, 2012 WL 12875982, at *9 (W.D. Tenn. Mar. 30, 2012). Accordingly, it is sufficient to allege that an officer or director defendant signed the misleading registration statement. *See Ply Gem Holdings*, 2016 U.S. Dist. LEXIS 130588, at *20 (denying motion to dismiss Section 12(a)(2) claim and holding that "Plaintiff has alleged that it purchased Ply Gem shares in the IPO, that each individual defendant was an officer or director of Ply Gem at the time of the IPO. . . . [a]t this stage, that is enough"); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 454 (S.D.N.Y. 2005) ("An officer or director who signs a Registration Statement containing materially false or misleading statements or omissions is deemed, for pleading purposes, to have solicited a purchase within the meaning of [§12(a)(2) ].").

Exceeding this standard, Plaintiffs' allegations reveal that the Officer Defendants not only signed the Registration Statement but also assisted in planning the Offerings, determining the terms of the Offerings, drafting the relevant documents, selecting disclosures for the Registration

[11] Plaintiffs' Section 12 claim is against the "Officer Defendants," which includes Deloy Miller, Scott M. Boruff, David J. Voyticky, Catherine A. Rector, and David M. Hall. *See* ¶¶19-23, 27.

Statement, communicating with the SEC as to the Registration Statement, and promoting the shares. Plaintiffs allege that:

- By means of the defective Prospectuses, ***the Officer*** and Underwriter ***Defendants promoted and sold*** Miller Energy preferred shares to Plaintiffs and the other members of the Class;
- Representatives of the Underwriter Defendants also assisted Miller Energy and the Individual Defendants in planning the Offerings;
- "[A]gents of the Underwriter Defendants met with Miller Energy's lawyers, ***management, and top executives*** and engaged in "drafting sessions" between September 2012 and August 2014. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the Offerings; (ii) the terms of the Offerings, including the price at which Miller Energy preferred shares would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Miller Energy would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and ***Miller Energy's management and top executives***, the Underwriter Defendants knew, or should have known, of Miller Energy's existing problems as detailed herein.

¶¶39, 153 – 154. Accordingly, the allegations – and all inferences in Plaintiffs' favor – demonstrate that the Officer Defendants participated significantly in developing and selling the Offerings.

Additionally, Plaintiffs allege that [t]he Offerings were successful for the Company and the Underwriter Defendants who sold upwards of 6.21 million Series C and Series D shares, raising an estimated $151.015 million in gross proceeds from the Offerings." ¶54. This allegation demonstrates that the Officer Defendants – each of whom was a shareholder of Miller Energy and stood to gain from the company's performance[12] – had a financial interest in the Offerings. *See In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 404 (S.D.N.Y. 2013) ("Plaintiffs allege that the Individual Defendants stood to gain personally from the Offering by virtue of their continued positions and

---

[12] *See* Exhibit P, June 13, 2011 Shareholders' Agreement between Deloy Miller, Scott M. Boruff, David J. Voyticky, David M. Hall, Paul W. Boyd, and Miller Energy Resources, Inc. (incorporated into 2012 10-K, which in turn, was incorporated by reference into the Registration Statement) (evidencing that the Officer Defendants were shareholders with significant financial interests in the Miller Energy's financial dealings and performance); *see also* Exhibit Q, July 30, 2012 Employment Agreement by and between Miller Energy and Catherine A. Rector (evidencing Ms. Rector's status as a shareholder).

salaries, since the survival of the Company was at stake. Such benefits are sufficient to constitute the Individual Defendants' 'own financial interests' under *Pinter*."); *see also Pinter v. Dahl*, 486 U.S. 622, 655 (1988) (remanding to the district court to determine whether defendant, who had not received a commission for the subject transaction, nonetheless had a financial interest in that transaction). At this pleading stage, therefore, Plaintiffs' allegations are sufficient to state a Section 12 claim against the Officer Defendants.[13]

## C. <u>The Underwriter and Individual Defendants Have Failed to Prove Their Negative Loss Causation Affirmative Defense</u>

"Loss causation is not an element of a § 11 claim; it is an affirmative defense unsuitable for adjudication in a motion to dismiss."[14] *In re Regions Morgan Keegan Sec., Derivative, & ERISA Litig.*, 743 F. Supp. 2d 744, 760 (W.D. Tenn. 2010) (citing *Ind. State Dist. Council of Laborers v. Omnicare, Inc.*, 583 F.3d 935, 947 (6th Cir. 2009); 15 U.S.C. §77l(b)); *see also In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 277 (3d Cir. 2004) ("While a defendant may be able to prove this 'negative causation' theory, an affirmative defense may not be used to dismiss a plaintiff's complaint under Rule 12(b)(6)."); *Facebook, Inc.*, 986 F. Supp. 2d at 523 ("Whether the May 19 and May 22 Reuters reports constituted corrective disclosures that revealed [Defendant]'s alleged omissions or

[13] Some courts have required allegations that the involvement of officers or directors exceeded the signing of the registration statement. *See Prison Realty*, 117 F. Supp. 2d at 691 (denying motion to dismiss where plaintiffs alleged "that the acts of solicitation by the [ ] Defendants included jointly preparing and/or signing the allegedly false and misleading Joint Proxy and conducting a 'road show' to promote it" and that the "Defendants were motivated by a desire to serve their own financial interests by soliciting the issuance of New PZN stock"). As stated above, Plaintiffs allege that the Officer Defendants coordinated with the Underwriter Defendants as to the planning, drafting, promotion, and sale of all aspects of the Offerings. Accordingly, Plaintiffs allegations are sufficient, regardless of which standard the Court ultimately applies.

[14] This analysis applies to the Section 12 claim as well. *See, e..g., In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 523 (S.D.N.Y. 2013) ("The absence of loss causation is an affirmative defense under both Section 11 and 12 of the Securities Act rather than an element of Plaintiff's prima facie case.").

misrepresentations and whether such disclosures actually caused the drop in [Defendant's] stock prices are issues of fact and are not appropriate for resolution in the motion to dismiss stage.").

Accordingly, dismissal based on the negative loss causation affirmative defense is warranted only in the rare circumstance where the complaint demonstrates that loss causation is impossible. *See In re Regions Morgan Keegan Sec., Derivative*, No. 07-2784, 2010 U.S. Dist. LEXIS 137853, at *19 (W.D. Tenn. Dec. 30, 2010) ("Lead Plaintiffs have not pled themselves out of court by demonstrating that it is impossible for them to demonstrate loss causation – the only way Defendants could succeed on this affirmative defense at the motion-to-dismiss stage."); *see also In re Giant Interactive Grp., Inc. Sec. Litig*., 643 F. Supp. 2d 562, 572 (S.D.N.Y. 2009) (noting that "courts have, on occasion, found dismissal of Section 11 and 12 claims based on a negative causation defense proper in light of the allegations pleaded in the complaint" where "the drop in stock price occurred prior to the disclosure of negative information to the public" such that "there could be no question that the drop in stock price was not [ ] attributable to defendants' alleged misconduct").

For two primary reasons, Defendants have not met their heavy burden of establishing the impossibility of loss causation. First, Defendants concede that some stock losses followed a disclosure related to the Alaska Assets. Second, although Plaintiffs do not have the burden of alleging any facts showing loss causation, Plaintiffs' allegations establish that they suffered losses after Defendants disclosed an impairment as to the Alaska Assets. Plaintiffs will address each argument in turn.

1. Defendants Concede That Some Stock Losses Followed a Disclosure Related to the Alaska Assets

Defendants contend that "nearly all of the revelations Plaintiffs have pled have nothing to do with the alleged over-valuation of the Alaska Assets" and that "[b]y the time Plaintiffs allege a revelation actually related to the Alaska Assets, their stocks had already lost most of their value

because of other undeniable factors—primarily, the industry-wide drop in oil prices." Und. Def. Mot. at 26; *see also* Ind. Def. Mot. at 17-18.

These arguments are facially flawed. Defendants must establish an ***impossibility*** of loss causation, meaning they must demonstrate that there is no possible disclosure that could have caused a loss. Yet Defendants concede that some of Plaintiffs' losses followed a disclosure that related to the Alaska Assets; Defendants do not state that the stocks had lost ***all*** of their value because of other factors. *See* Und. Def. Mot. at 26 ("[N]early all of the revelations Plaintiffs have pled have nothing to do with the alleged over-valuation of the Alaska Assets. By the time Plaintiffs allege a revelation actually related to the Alaska Assets, their stocks had already lost most of their value because of other undeniable factors."). Because Defendants concede that there was some loss after a disclosure related to the Alaska Assets, Defendants cannot meet their burden to establish the impossibility of loss causation. Any amount of loss can give rise to a Section 11 claim, and at this stage, it is impermissible to resolve factual questions as to which losses are attributable to which disclosures. *See Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp*., 894 F. Supp. 2d 144, 153 n.17 (D. Mass. 2012) (denying defendants' argument "that because the alleged loss was only $2,000, it cannot have been as a matter of law materially 'caused' by defendants' misrepresentations or omissions" and holding that "Section 11 does not include a floor for defining loss"); *In re Direxion Shares ETF Tr.*, 279 F.R.D. 221, 233 (S.D.N.Y. 2012) ("[R]esolution of what (if any) of plaintiffs' losses are attributable to the alleged misrepresentations requires wading into the facts to an extent that likewise is inappropriate on a motion to dismiss.").

2. <u>Although Plaintiffs Do Not Have the Burden of Alleging Any Facts Showing Loss Causation, Plaintiffs' Allegations Nonetheless Establish That Plaintiffs Suffered Losses After Defendants' Disclosures as to the Alaska Assets</u>

Plaintiffs allege, *inter alia*, that:

- “a series of disclosures made by the Company revealed that the Registration Statement was false and misleading in that it overstated the value of the Alaska Assets on the Company’s books by hundreds of millions of dollars”;

- “[o]n December 10, 2014, in a quarterly report filed with the SEC on Form 10-Q, Miller Energy disclosed that it was taking a $265.3 million impairment charge on the Alaska Assets, specifically the Redoubt Shoal field”; and

- “[o]n March 12, 2015, in its subsequent quarterly report, Miller Energy disclosed that it was taking another $150 million impairment charge on the Alaska Assets.”

¶¶106-107.[15] After Defendants disclosed that the Alaska Assets were impaired, the Class C shares dropped from a $14.45 closing price on December 10, 2014, to an $8.90 closing price on December 16th, and the Class D shares dropped from a $12.02 closing price on December 10, 2014, to an $8.10 closing price on December 16th. *See* [Dkt. No. 98-12 at 16]; [Dkt. No. 98-13 at 16]. Accordingly, loss causation is possible, and Defendants cannot conclusively establish otherwise.

Attempting to bypass these allegations, Defendants contend that “Miller’s disclosures that it was taking impairment charges on the Alaska Assets in December 2014 and March 2015 stated nothing about the assets’ prior valuation, much less that it was incorrect” and that “[i]nstead, Miller attributed the impairment charges to the industry-wide decline in oil prices.” Und. Def. Mot. at 20. This argument raises a factual issue that is unsuitable on a motion to dismiss. Nevertheless, Defendants mischaracterize Miller’s actual disclosures, which confirmed that the impairment arose from many of the misrepresentations underlying Defendants’ original overvaluation of the Alaska Assets:

> When circumstances indicate that proved properties may be impaired, the Company compares expected undiscounted future net cash flows, calculated using the Company’s estimate of future oil and natural gas prices, ***operating expenses and production***, to the net book value of the proved properties on a field by field basis. If the sum of the expected undiscounted future net cash flows is less than the net book

[15] Plaintiffs allege additional disclosures, *see* Section II.C, *supra*, but highlight the impairment disclosure as an example that alone disposes of Defendants’ loss causation arguments.

> value of the proved properties, an impairment loss is recognized for the excess, if any, of the net book value over its estimated fair value.
>
> * * *
>
> The step 2 analysis resulted in an impairment to proved and unproved properties of $112,414 and $152,887, respectively. The factors used to estimate the fair value of the Redoubt Unit include, but are not limited to, ***estimates of reserve quantities***, future commodity prices, the timing of future production, ***operating costs***, ***capital expenditures*** and a risk adjusted discount rate. Because these significant fair value inputs are typically not observable, we have categorized the amounts as Level 3 inputs. As of October 31, 2014, the proved and unproved properties of the Redoubt Unit were written down to their estimated fair value of $122,587.
>
> * * *
>
> Continuing crude oil price declines and ***the results of drilling efforts or changes in reserve estimates*** could trigger future impairments.

*See* Exhibit C, Miller Energy's Dec. 10, 2014 Form 10-Q, at 13, 18, 46. Thus, Defendants disclosed that the Alaska Assets suffered from lower reserve quantities, increased operating costs, and increased capital expenditures—all problems that the industry-wide downturn in oil prices would not have caused. Moreover, Plaintiffs specifically alleged that Defendants based their inflated valuation of the Alaska Assets on overstated cash flows from reserves and understated operating and capital expenses. ¶¶76-77, 79-85.

In sum, the current record shows that Defendants overstated the amount of oil available in the Alaska Assets; they understated the costs to obtain that oil; they subsequently disclosed those misrepresentations when taking an impairment; and Plaintiffs suffered losses when Defendants' stock subsequently dropped. Consequently, Defendants cannot meet the heavy burden of establishing the impossibility of loss causation.

## D. <u>The Underwriter Defendants Have Failed to Prove Their Reasonable Reliance Affirmative Defense</u>

The Underwriter Defendants contend that the reasonable reliance affirmative defense is apparent on the face of the Complaint. More specifically, they argue that "[a]ll of the valuations that Plaintiffs allege were false [ ] were audited by KPMG, whose audit opinions were incorporated into

the registration statement"; that "Plaintiffs would have to identify red flags that should have caused the Underwriter Defendants to question KPMG's accounting"; and that "Plaintiffs have not done so" because "[t]he most they allege is that '[t]he Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters.'" Und. Def. Mot. at 29. These premature arguments fail.

The reasonable reliance affirmative defense under Section 11(b)(3)(C) '"is not a question properly resolved on a motion to dismiss.'" *Johnson v. CBD Energy Ltd.*, No. H-15-1668, 2016 U.S. Dist. LEXIS 87174, at *25 (S.D. Tex. July 6, 2016) (collecting cases); *see also In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 322–23 (S.D.N.Y. 2013) ("Because the affirmative defense turns on an evaluation of reasonableness, whether the defense is available is 'generally a fact issue, rarely suitable for summary judgment, let alone a motion to dismiss.'"); *In re Majesco Sec. Litig.*, No. 05-3557 (PGS), 2006 U.S. Dist. LEXIS 73563, at *16-*17 (D.N.J. Sept. 29, 2006) ("[S]uch an inquiry is not one for a motion to dismiss. The underwriters['] and outside directors['] contention that it performed all necessary due diligence and had no reasonable ground to believe that an omission or misstatement was made is nothing more than an affirmative defense that defendants can assert and establish through discovery.").

Under this precedent, Defendants cannot obtain dismissal of the Complaint. First, as a threshold matter, Defendants are attempting to place a burden on Plaintiffs to negate this fact-specific defense. *See* Und. Def. Mot. at 29 ("Plaintiffs would have to identify red flags" and "Plaintiffs have not done so"). Plaintiffs, however, have no burden to plead or negate any facts relating to this affirmative defense. *See In re Glob. Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 211 (S.D.N.Y. 2003) ("[T]he statute expressly provides that the burden of proof is on defendants to

establish this defense, []and the plaintiffs need not negate such an affirmative defense in their pleading.").

Second, Defendants' factual assertions regarding KPMG's audits – which are wholly inappropriate on a motion to dismiss – are inaccurate. The Registration Statement and Prospectus Supplements incorporated multiple ***unaudited*** interim financial statements which contained misrepresentations as to the Alaska Assets. *See, e.g.*, Exhibit D, Feb. 13, 2013 Prospectus Supplement, at 57 (incorporating Miller Energy's December 10, 2012 Form 10-Q); ¶56 ("All of the Company's interim . . . financial reports issued between 2010 and 2015 . . . overstated the value of the Alaska Assets by hundreds of millions of dollars"). Consequently, the affirmative defense fails because Defendants do not have an expert opinion on which to rely as to those unaudited and misleading financials. *See In re Enron Corp. Sec.*, No. H-01-3624, 2005 U.S. Dist. LEXIS 39927, at *79-*80 (S.D. Tex. Dec. 5, 2005) ("Reviews of unaudited interim financial statements . . . are not considered to be expertised statements for purposes of a reliance defense.").

Third, the Complaint contains numerous allegations of red flags that negate Defendants' reasonable reliance as to audited financial statements:

- Miller Energy's $480 million valuation of the Alaska Assets was 21,333% of the $2.25 million purchase price;
- In response to Miller Energy's $480 million valuation of the Alaska Assets, TheStreetSweeper website published a report stating that "the Alaska Assets were actually worth between $25 million and $30 million and were offset by $40 million worth of liabilities";
- Defendants' valuation of the Alaska Assets relied on a projected cost of $4.6 million to drill a new well in the Redoubt Shoal Filed but Defendants' internal documents indicated that the cost would be $13 million;
- Defendants' valuation of the Alaska Assets was based on an estimated cost of $399,000 per month to operate the Redoubt Shoal Filed but the actual cost to the seller was over $600,000 and Miller Energy's internal estimates showed a cost of $800,000 per month; and
- Defendants' valuation of the Alaska Assets was based on estimated operating expenses of $4 per barrel of oil equivalent ("boe") whereas the previous owner's actual operating expenses were $32.50/boe in 2008 and $55.42/boe in the first half of 2009.

*See* ¶¶45-46, 50, 82, 84. Defendants are free to present evidence that they were not in a position to see those red flags, but those factual questions must be resolved by a fact finder only after Defendants have answered the Complaint and engaged in discovery.

Defendants' reasonable reliance affirmative defense is not apparent on the face of the Complaint. Consequently, Plaintiffs' well-pled Section 11 claim is not subject to dismissal.[16]

## E. The Statute of Limitations Does Not Bar Plaintiffs' Claims Against the Individual Defendants

The Individual Defendants argue that the one-year statute of limitations under 15 U.S.C. §77m bars all of Plaintiffs' claims. *See* Ind. Def. Mot. at 10-12. Under that provision, "[n]o action shall be maintained to enforce any liability created under. . . this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. §77m. According to the Individual Defendants, Plaintiffs should have known about Defendants' liability on February 4, 2014, when this Court issued an order denying a motion to dismiss in a fraud action against Miller Energy. *See* Ind. Def. Mot. at 11-12. Their argument is not well taken.

"District courts in this circuit have found that a dispute over whether plaintiffs' claims are barred by the one-year statute of limitations is factual in nature and cannot be decided on a motion to dismiss." *EveryWare*, 175 F. Supp. 3d at 863. Indeed, "on a motion to dismiss, a claim is barred by the statute of limitations based on inquiry notice 'only when uncontroverted evidence irrefutably

---

[16] The cases relied upon by Defendants are inapposite. In *Feyko*, the complaint was "essentially silent about the underwriters, other than identifying them." *See Feyko v. Yuhe Int'l, Inc.*, No. 11-05511 DDP (PJWX), 2013 U.S. Dist. LEXIS 29905, at *27 (C.D. Cal. Mar. 5, 2013). In *Countrywide*, the complaint lacked facts indicating that it was "unreasonable" for the underwriters to rely on the auditor's and corporation's "accounting-related statements." *Countrywide*, 588 F. Supp. 2d at 1182. Here, in contrast, the Complaint alleges misrepresentations in unaudited financial statements, alleges facts that constitute red flags, and alleges that the Underwriter Defendants had "constant contacts and communications" with Miller Energy's management and top executives" and "knew, or should have known, of Miller Energy's existing problems." ¶39.

demonstrates when plaintiff discovered or should have discovered' the violation." *Id.* Furthermore, "complaint allegations from earlier-filed lawsuits [are not] . . . adjudicative facts because they are subject to reasonable dispute," and "[w]hile such allegations may constitute 'storm warnings' triggering a duty to investigate, the statute of limitations does not begin to run until the plaintiff knows of the facts underlying the fraud." *W. & S. Life Ins. Co. v. JPMorgan Chase Bank, N.A.*, 54 F. Supp. 3d 888, 903–04 (S.D. Ohio 2014). Accordingly, "earlier filed lawsuits do not constitute a sufficient bases at the Rule 12(b)(6) stage to conclude as a matter of law that the limitations period was triggered on or before a date certain." *Id.* at 903.[17]

Thus, Defendants' reliance on an order denying a motion to dismiss from previous litigation is misplaced. The previous litigation involved different claims brought by a different plaintiff on behalf of a different class that purchased different securities during a different time period. *See* Exhibit E, *In re Miller Energy Resources, Inc. Sec. Litig*., No. 3:11-CV-00386-TAV-CCS, Corrected Consolidated Amended Class Action Complaint (E.D. Tenn. May 14, 2012) (Dkt. No. 47) (showing that Oklahoma Firefighters Pension & Retirement System brought claims under Section 10(b) and Rule 10b-5 and Section 20(a) on behalf of purchasers of Miller Energy's common stock from December 16, 2009 through August 8, 2011). Miller Energy's Answer, moreover, denied all allegations that the Company had overvalued the Alaska Assets. *Compare* Exhibit E ¶¶7-10 *with* Exhibit F, *In re Miller Energy Resources, Inc. Sec. Litig*., No. 3:11-CV-00386-TAV-CCS, Answer to Plaintiff's Corrected Consolidated Amended Class Action Complaint (E.D. Tenn. Mar. 21, 2014) (Dkt. No. 78). Defendants disclosed in their 2014 10-K that they were settling that litigation and that "[t]he proposed agreement . . . would not be an admission of wrongdoing or acceptance of fault by

[17] "The denial of a defendant's motion to dismiss [under Rule 12(b)(6)] is not a final determination on the merits barring further litigation of the claims in question under the doctrine of res judicata." *Linares v. McLaughlin*, 423 F. App'x 84, 85 (2d Cir. 2011) (citing *Allen v. McCurry*, 449 U.S. 90, 94 (1980).

us or any of the individual defendants named in the complaint." *See* Exhibit G, July 14, 2014 10-K. Indeed, Defendants continued to report their misleading valuation of the Alaska Assets, and it was not until December 10, 2014 that Miller Energy disclosed an impairment of those overvalued assets. ¶106. On March 29, 2016, moreover, Miller Energy ***for the first time*** stated that its financial statements beginning in fiscal 2010 could not be relied upon. ¶128.

Given Defendants' ongoing denial until 2016 of any impropriety as to the Alaska Assets, there is no uncontroverted evidence irrefutably demonstrating that Plaintiffs should have discovered the violations more than one year prior to the filing of this action. Thus, dismissal is not warranted at this pleading stage. *See*, *In re IPO Sec. Litig*., 341 F. Supp. 2d 328, 350 (S.D.N.Y. 2004) ("This argument [ ] depends on a finding that the news articles, court filings or Disclosing Events individually or collectively constituted storm warnings sufficient to put Plaintiffs on inquiry notice. Because Defendants have not met their burden to establish such sufficiency as a matter of law, the Court cannot conclude, at this stage of the proceedings, that Plaintiffs shirked their duty of reasonable diligence.").

**F. <u>The Statute of Repose Does Not Bar Plaintiffs' Section 11 and 15 Claims Against the Individual Defendants</u>**

The Individual Defendants contend that the three-year statute of repose under 15 U.S.C. §77m bars Plaintiffs' Section 11 and Section 15 claims. *See* Ind. Def. Mot. at 16-17. Under that provision, an action must be brought within "three years after the security was bona fide offered to the public." *See* 15 U.S.C. §77m. The Individual Defendants submit that the subject securities were "bona fide offered to the public" on September 18, 2012, when the Registration Statement became effective. Accordingly, the Individual Defendants claim that the three-year period expired on September 18, 2015, prior to the filing of this action on November 9, 2015. However, as described

below, the subject securities were not "bona fide offered to the public" until the Supplemental Prospectuses were filed, beginning on February 13, 2013.

Defendants implemented a "shelf registration process" to sell the subject securities. Through that process, an issuer of securities (*i.e.*, the company) can "file a generic registration statement with the SEC that omits the type of detailed information that must generally be disclosed to purchasers," but the issuer must "commit[ ] that, at the time of any offering, it will have made the omitted disclosures in some form or another, including by filing a post-effective amendment to the registration statement, filing a prospectus supplement with the SEC, or filing an annual report." *UBS Ams.*, 2012 U.S. Dist. LEXIS 88471, at *5; *see also Booth v. Strategic Realty Tr., Inc.*, No. 13-04921-JST, 2014 U.S. Dist. LEXIS 104184, at *7 (N.D. Cal. July 29, 2014) (describing issuance of stocks pursuant to shelf registration statements). In other words, "[o]nce this 'shelf registration statement' becomes effective, the issuer can take the registration statement 'off the shelf,' make the required supplemental disclosures [through an amended registration statement or a prospectus supplement], and use the shelf registration statement to issue securities whenever it chooses, without the need for further SEC action." *UBS Ams.*, 2012 U.S. Dist. LEXIS 88471, at *5. Accordingly, the shelf registration process "provide[s] the issuer with the flexibility to vary the structure and terms of the securities on short notice and to take advantage of changing market conditions." *Booth*, 2014 U.S. Dist. LEXIS 104184, at *21.

When the shelf-registration process is employed, "securities will ***generally*** be bona fide offered to the public on the date the SEC declares the registration statement effective" and not when the supplemental prospectus is filed. *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 898 (4th Cir. 2014). Accordingly, "the ***general*** rule is that the Securities Act's three-year repose period is

triggered by the effective date of the (allegedly false) registration statement." *UBS Ams.*, 2012 U.S. Dist. LEXIS 88471, at *6.

This general rule, however, has exceptions. "[S]ecurities issued pursuant to a shelf registration statement that omits critical disclosures are not bona fide offered to the public until the omitted information is disclosed." *Id.* at *7. Consequently, "***[a] filing that represents 'a fundamental change in the information set forth in the registration statement' has always been deemed to restart the clock on Section 11 claims.***" *Id.* at *11. (quoting 17 C.F.R. §229.512(a)(1)(ii)); *see also In re Metro. Sec. Litig.*, 532 F. Supp. 2d 1260, 1285 (E.D. Wash. 2007) ("[W]hen the registration is a 'shelf registration' under SEC Rule 415, the filing of a 'post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein[.]' In such cases, the post effective amendment is treated as an 'initial bona fide offering,' and the period of repose commences on the date of the post-effective amendment.").[18]

Thus, the triggering date for the statute of repose depends on whether Defendants' post-registration Prospectus Supplements created any fundamental changes to the information set forth in Defendants' Registration Statement. At this stage, moreover, the Court need only decide if it is plausible to infer that the Prospectuses presented fundamental changes to the Registration Statement. *See Booth*, 2014 U.S. Dist. LEXIS 104184, at *24 ("For the purpose of considering this motion to dismiss, the inquiry is whether it is plausible to infer, from the facts alleged, that [Defendant]'s post-effective amendments [ ] were made in response to a fundamental change pursuant to 17 C.F.R.

---

[18] Moreover, "the fact that such a change may now be made through a prospectus supplement as opposed to a post effective amendment does not alter that rule." *UBS Ams.*, 2012 U.S. Dist. LEXIS 88471, at *11. "The SEC release that accompanied [the applicable rule] makes this clear, emphasizing that for non-issuers such as 'directors, signing officers, and experts' . . . 'the filing of a form of prospectus . . . reflecting fundamental changes in the information in the registration statement' would continue to trigger a new offering date." *Id.* (quoting SEC Rel. 33–8591, 2005 SEC LEXIS 1789, at *341 (SEC July, 19, 2005)).

§229.512(a)(1)(ii). Given the apparent financial turbulence that [Defendants] experienced over the course of the offering, such an inference is plausible.").

Under these standards, Defendants fail to establish that the statute of repose bars Plaintiffs' Section 11 claims.[19] First, the current record establishes that the February 3, 2013 Prospectus, at a minimum, presented fundamental changes to the Registration Statement and triggered the three-year statute of repose. Second, and in the alternative, Defendants' annual Form 10-K filed July 15, 2013, automatically triggered a new bona fide offering date for the Offerings.

1. <u>The Current Record Establishes that the February 13, 2013 Prospectus Supplement, at a Minimum, Presented Fundamental Changes to the Registration Statement and Triggered the Three-Year Statute of Repose</u>

The Complaint and attachments to the Motions demonstrate that the Prospectuses represented a fundamental change to the Registration Statement and constituted the first time the securities were "bona fide offered to the public." As demonstrated in the following excerpts, Defendants explicitly specified that the Registration Statement lacked fundamental information and should ***not*** be considered an offer:

- "The information in this prospectus is not complete and may be changed. We may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities and we are not soliciting offers to buy these securities in any state where the offer or sale is not permitted."

---

[19] As a threshold matter, Defendants failed to address the "fundamental change" test. Their Motions contain no facts, authority, or arguments regarding whether any of the six Prospectus Supplements caused fundamental changes to the Registration Statement. Defendants, therefore, have failed to meet their burden of establishing the statute of repose affirmative defense, and Defendants' forthcoming reply briefs cannot raise new facts, authority, or arguments to meet that burden. *See, e.g., Moran v. A/C Fin., Inc.*, No. CV-3-05-071, 2007 WL 2769664, at *2 (S.D. Ohio Sept. 18, 2007) ("[F]ailure to comply with an applicable statute of limitations/statute of repose are clearly affirmative defenses which must be raised" by the defendants.); *see also Tripoint, LLC v. Rhein Chemie Corp*., No. 1:14 CV 360, 2014 U.S. Dist. LEXIS 104853, at *17 (N.D. Ohio July 31, 2014) ("Having addressed the arguments asserted by defendant in its motion to dismiss, the Court will not reach the additional arguments raised by defendant for the first time in its reply brief. Accordingly, the motion to strike those arguments is well-taken.").

- “We may offer common stock, preferred stock, warrants, and or any combination of those securities at an aggregate initial offering price not to exceed $500,000,000.”
- “A prospectus supplement that will set forth the terms of the offering of any securities will accompany this prospectus. You should read this prospectus and any supplement carefully before you invest.”
- “This prospectus may not be used to consummate the sale of any securities unless accompanied by a prospectus supplement relating to the securities offered.”
- “If there is any inconsistency between the information in this prospectus and the applicable prospectus supplement, you should rely on the information in the prospectus supplement.”

*See* Exhibit H, Sept. 6, 2012 Registration Statement, at 4, 6.

These repeated disclaimers confirm that the Registration Statement did not constitute a bona fide offering of the Securities. Defendants explicitly warned that the Registration Statement was incomplete, that the supplements would include material information that purchasers must read before purchasing the Securities, and that the Registration Statement “is not an offer to sell these securities.” Defendants cannot now claim the exact opposite, namely that the Registration Statement was a bona fide offer to sell the securities. Nor can Defendants establish that all relevant information was included in the Registration Statement and that there were no fundamental changes in the subsequent Prospectuses.

Furthermore, the Prospectuses contained new misrepresentations. Each false valuation of the Alaska Assets for each new financial period – as reported in Miller Energy’s ongoing quarterly and annual filings with the SEC – was a new false statement. *See* ¶47 (“As a result of the incorrect valuation, Miller Energy filed the following false and misleading financial reports with the SEC that materially misstated the value of its assets: Forms 10-Q for the third quarter of fiscal year 2010 as well as all three quarters of fiscal years 2011 through 2015; Forms 10- K for fiscal years ended 2010 through 2014”). And each Prospectus Supplement incorporated Defendants’ latest quarterly and annual filings containing those new false statements:

- Sept. 10, 2012 10-Q (first incorporated into Feb. 13, 2013 Prospectus Supp.) falsely reported "Oil and Gas Properties, Net" of $478,131,000 for the quarterly period ended July 31, 2012;
- Dec. 10, 2012 10-Q (first incorporated into Feb. 13, 2013 Prospectus Supp.) falsely reported "Oil and Gas Properties, Net" of $481,055,000 for the quarterly period ended Oct. 31, 2012;
- Mar. 12, 2013 10-Q (first incorporated into May 8, 2013 Prospectus Supp.) falsely reported "Oil and Gas Properties, Net" of $490,790,000 for the quarterly period ended Jan. 31, 2013;
- July 15, 2013 10-K (first incorporated into Sept. 26, 2013 Prospectus Supp.) falsely reported "Oil and Gas Properties, Net" of $486,009,000 for the fiscal year ended April 30, 2013;
- Sept. 9, 2013 10-Q (first incorporated into Sept. 26, 2013 Prospectus Supp.) falsely reported "Oil and Gas Properties, Net" of $503,822,000 for the quarterly period ended Jan. 31, 2013; and
- July 14, 2014 10-K (first incorporated into Aug. 21, 2014, Prospectus Supp.) false reported "Oil and Gas Properties, Net" of $644,827,000 for the fiscal year ended April 30, 2014.

*See* Exhibit B at 48; Exhibit D at 58; Exhibit G at 126; Exhibit I, Sept. 10, 2012 10-Q at 3; Exhibit J, Dec. 10, 2012 10-Q at 3; Exhibit K, Mar. 12, 2013 10-Q at 3; Exhibit L, July 15, 2013 10-K at 106; Exhibit M, Sept. 9, 2013 10-Q at 3; Exhibit N, May 8, 2013 Prospectus Supplement at 59; Exhibit O, Aug. 21, 2014 Prospectus Supplement at 47.[20]

The Prospectus Supplements, therefore, contained new false statements regarding a fundamental component of Miller Energy's financial condition.[21] Accordingly, the February 13, 2013 Prospectus, at a minimum, triggered a new three-year statute of repose period, which did not expire until February 13, 2016, after this action was filed on November 6, 2015.

Defendants' cursory statute of repose defense cannot negate Plaintiffs' well-pled allegations and the record before the Court. The allegations and record demonstrate that this action is timely, and the Court need not delve into a fact-intensive inquiry that cannot be completed at this stage. *See*

---

[20] The June 28, 2013 Prospectus Supplement and October 17, 2013 Prospectus Supplement did not incorporate any quarterly or annual financial filings that had not been incorporated into previous Prospectuses. Those facts, however, are immaterial to the statute of repose analysis. At the earliest, the February 13, 2013 Prospectus triggered the three-year statute of repose period, and this case was filed less than three years later on November 6, 2015.

[21] Notably, Defendants have raised no arguments challenging the falsity or materiality of these alleged misrepresentations. *See* Ind. Def. Mot.; Und. Def. Mot.

*Booth*, 2014 U.S. Dist. LEXIS 104184, at *24-*25 (holding that it was "plausible to infer, from the facts alleged, that [Defendant]'s post-effective amendments [ ] were made in response to a fundamental change" and that "resolving whether the statute of repose bars Plaintiffs' claim must also await the development of the factual record"); *Regions Morgan Keegan Sec.*, 2012 WL 12875982, at *8 ("[A]rguments about the application of statutes of repose 'should await factual development of the claims.'").

2. In the Alternative, Defendants' Annual Form 10-K Filed on July 15, 2013, Automatically Triggered a New Bona Fide Offering Date for the Offerings

Even if the Court found that Defendants had established the application of the statute of repose – despite the fundamental change test and corresponding factual inquiries – the statute of repose still could not bar liability for the Offerings. As required by statute, Defendants' Registration Statement stated:

> The undersigned registrant hereby undertakes that, for purposes of determining any liability under the Securities Act of 1933, each filing of the registrant's annual report pursuant to Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934 . . . that is incorporated by reference in the registration statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

*See* Ex. H at 28-30; *see also* 17 C.F.R. §229.512(b) (requiring that language for shelf registrations). The Registration Statement, moreover, explicitly "incorporate[d] by reference . . . any future filings with the Securities and Exchange Commission under Section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 until the termination of the offering of securities covered by this prospectus." *See* Ex. H at 21.

After the Registration Statement became effective on September 18, 2012, Defendants filed their annual report on Form 10-K on July 15, 2013. Pursuant to statute and the explicit terms of the Registration Statement, therefore, that filing created a new registration statement and a new bona

fide offering date for the Offerings. Thus, irrespective of Defendants' arguments, the statute of repose cannot bar liability. *See Lehman Bros.*, 799 F. Supp. 2d at 316 (holding that 10-K filed after registration statement was a "new registration statement" for purposes of liability under Section 11).

## G. Defendants Schlumberger, Gower, Leary, and Richardson Are Liable Under Section 11 Because They Signed a Misleading Registration Statement and They Were Directors at the Time that Miller Energy Filed a Misleading Registration Statement

Defendants Schlumberger, Gower, Leary, and Richardson claim that they did not join Miller Energy's board until after the filing of the Registration Statement and, therefore, cannot be held liable under Section 11. Ind. Def. Mot. at 12. These Defendants, however, misinterpret the applicable law.

Section 11 liability applies to the following:

> (1) every person who signed the registration statement; [and]
>
> (2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted; "every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted."

15 U.S. Code §77k(a)(1),(2). Defendants Schlumberger, Gower, Leary, and Richardson are liable under either prong.

### 1. Under Section 77k(a)(1), These Defendants Are Deemed to Have Signed the Registration Statement

When a registration statement incorporates by reference future annual filings with the SEC, then each of those future filings constitutes a new registration statement for the purposes of liability, and any signatory to those future filings is deemed to have signed the new registration statement. *Lehman Bros*., 799 F. Supp. 2d at 316 ("The base prospectus filed with the Registration Statement incorporated by reference Lehman's 'future filings made with the SEC under Section 13(a), 13(c), 14, or 15(d) of the Securities Exchange Act of 1934,' which included the 2007 10–K and the other

SEC filings that [Director] Callan signed. Consequently, 'for purposes of determining any liability under the Securities Act', each of those filings is 'deemed a new registration statement'. [Director] Callan therefore became a signer of 'new' registration statements by virtue of her having signed those filings.").

As stated in Section IV.F.2., *supra*, the Registration Statement incorporated Miller Energy's future annual filings and stated that "for purposes of determining any liability under the Securities Act of 1933" each of those filings "shall be deemed to be a new registration statement." *See* Exhibit H. Accordingly, Miller Energy's Form 10-K, as filed on July 14, 2014, was a new registration statement. Because that Form 10-K was signed by Defendants Schlumberger, Gower, Leary, and Richardson and contained a material misrepresentation (*e.g.*, "Oil and Gas Properties, Net" of $644,827,000), those directors are liable under §77k(a)(1) as individuals "who signed the registration statement."

2. Additionally, under Section 77k(a)(2), These Defendants Were Directors When a Misleading Part of the Registration Statement Was Signed

"Because [17 C.F.R.] §230.430B(f)(1) deems newly disclosed information to be included in the registration statement, plaintiffs may base claims under § 11 of the '33 Act on a supplemental prospectus's material misstatements or omissions." *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 114 n.2 (2d Cir. 2013); *see also Fed. Hous. Fin. Agency v. HSBC N. Am. Holdings Inc.*, 987 F. Supp. 2d 369, 375 (S.D.N.Y. 2013) ("[A] prospectus supplement containing information representing a fundamental change in the information provided in the registration statement creates Section 11 liability for directors based on that new information.").

As stated above, the August 21, 2014 Prospectus incorporated the misleading July 14, 2014 10-K, and Defendants Schlumberger, Gower, Leary, and Richardson were all directors of Miller Energy when that Prospectus was filed. Consequently, these Defendants are liable under §77k(a)(2)

as "director[s] of . . . the issuer at the time of the filing of the part of the registration statement with respect to which [their] liability is asserted."[22]

## H. **<u>Even if Defendants' Valuation of the Alaska Assets Was an Opinion, That Opinion Is Actionable Under *Omnicare*</u>**

The Individual Defendants assert that their statements of the Alaska Assets' value were statements of opinion not actionable under *Omnicare*. Ind. Def. Mot. at 15-17. This argument ignores the key holdings in *Omnicare* and disregards Plaintiffs' well-pled allegations.

"Under *Omnicare*, liability can attach to opinions when (1) the speaker did not honestly hold the stated opinion when he or she said it, (2) the opinion contains 'embedded statements of fact' that are untrue, or (3) there are 'particular (and material) facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.'" *Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*, No. 2:14-cv-02571-MCE-KJN, 2017 U.S. Dist. LEXIS 40835, at *14 (E.D. Cal. Mar. 21, 2017) (quoting *Omnicare*, 135 S. Ct. at 1326-27, 1332); *see also In re Iso Ray, Inc. Sec. Litig.*, 189 F. Supp. 3d 1057, 1071 (E.D. Wash. 2016) ("In *Omnicare* . . . the U.S. Supreme Court stated that 'if a registration statement omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself, then § 11's omissions clause creates liability.'"). Even

[22] For the same reasons, Defendants McPeak, Stivers, and Turkleson are liable under §§77k(a)(1) and (2). They signed the Registration Statement and were directors when it was filed. *See* ¶¶24, 27. No further allegations are required to impose liability on those Defendants. *See Panther Partners*, 681 F.3d at 120 ("Section 11 imposes strict liability on issuers and signatories . . . [i]n case any part of the registration statement . . . contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading. . . . Neither scienter, reliance, nor loss causation is an element of §11 . . . claims.") Accordingly, Defendants' argument that "[t]he Complaint fails to allege that individual defendants made false statements" – an argument containing no supporting authority – is inapposite and does not warrant a further response. *See* Ind. Def. Mot. at 17.

if Defendants' misleading statements regarding the Alaska Assets were opinions, then those statements are still actionable for two reasons. First, Plaintiffs' allegations demonstrate that Defendants did not honestly hold the opinion that the Alaska Assets' fair market value was approximately $480 million. Second, Plaintiffs' allegations demonstrate the existence and omission of particular and material facts going to the basis of the fair value "opinion."

1. Plaintiffs' Allegations Demonstrate that Defendants Did Not Honestly Hold the Opinion that the Alaska Assets' Fair Market Value Was Approximately $480 Million

The Complaint contains multiple allegations that, if true, demonstrate that Defendants did not believe the grossly inflated valuation of the Alaska Assets. Plaintiffs allege that:

- Miller Energy improperly used the engineering firm's Reserve Report, even though reserve reports "are expressly not considered an estimate of fair market value";
- The Reserve Report used a PV-10 value "which . . . was not indicative of fair value";
- The engineering firm that authored the Reserve Report "did not know Miller Energy intended to use the report for fair value purposes";
- "***The Reserve Report itself clearly stated that . . . '[t]he discounted values shown are for your information and should not be construed as our estimate of fair market value***.'"
- Miller Energy told investors that the PV-10 measure did not "present the fair value of our natural gas and oil reserves";
- "At Miller Energy's request, the Reserve Report used a 10% discount rate that was inappropriate under GAAP for determining fair market value";
- Another engineering firm told Miller Energy that it "would not assign any value to one of the largest fields acquired, the Redoubt Shoal field, because it was uneconomical – *i.e.*, expected future expenses exceeded expected future cash flows – and explained that it would not put its 'name on a report that implies value exists where it likely does not'";
- "Miller Energy chose the new engineering firm because the prior firm would not assign any value to the Redoubt Shoal field" and "Hall gave the new engineering firm understated and unsubstantiated expense numbers";
- "[I]nternal documents maintained by Hall indicated that the cost to drill a new well in the Redoubt Shoal field was roughly $13 million. However, Hall told the engineering firm to use a cost of $4.6 million per well in its reserve report";
- "Hall told the engineering firm that the offshore Redoubt Shoal field would cost $399,000 per month to operate when it actually cost the seller more than $600,000 per month, and internal estimates that showed that Miller Energy and Hall expected the field to cost more than $800,000

per month once it was fully operational. Additionally, in some years, the Reserve Report included zero expenses for operating the facilities in the Redoubt Shoal and another field";

- "[T]he Reserve Report implied operating expenses of $4 per barrel of oil equivalent ("boe") for all categories of reserves" but "the previous owner's actual operating expenses [were] $32.50/boe in 2008 and $55.42/boe in the first half of 2009";
- "Boyd was sent an 'asset replacement cost study,' purportedly provided by an independent insurance broker, which appeared to list the replacement cost for the [fixed] assets [within the Alaska Assets] as $110 million";
- "Boyd and Hall decided to rely on numbers in the insurance report as replacement costs, despite Hall having been told by the broker that it could not provide Miller Energy with replacement costs. With the aim of making the report appear as though it reflected replacement costs, Hall provided a subordinate with edits to the 2008 insurance report that significantly altered its appearance, including changing its name from 'Loss Estimates Study' to 'Asset replacement cost study.' The revised report, which Miller Energy gave to Sherb & Co., omitted the insurance broker's methodology and analysis. As a result, the only numbers reflected in the revised report were the ones specifically provided to the broker by Miller Energy and its predecessors."
- "Miller Energy's use of the aforesaid values in the insurance study resulted in counting the value of the fixed assets twice, thereby overstating the value of such assets."

¶¶63-64, 66-67, 70, 72, 80-83, 84, 87-88, 90, 99-100.

When taken as true, these allegations demonstrate that Defendants knew that the authors of the Reserve Report did not intend or purport to calculate a fair market value for the Alaska Assets, that the fair market value reported by Miller Energy arose from grossly understated operating expenses that were unsupported by the available data, that the value of fixed assets was based on a doctored insurance report, and that the value of fixed assets was counted twice. Thus, these well-pled facts establish that Defendants' statements were actionable, even if the fair market value of the Alaska Assets constitutes an "opinion."

2. <u>Even if Defendants Subjectively Believed the Reported Fair Market Value of the Alaska Assets, Defendants Omitted Material Facts Going to the Basis of that Calculation</u>

"In the context of opinions, reasonable investors 'understand [such statements] to convey facts about . . . the speaker's basis for holding that view." Thus, although a speaker's opinion may be sincerely held, the statement may nonetheless be actionable . . . if: (i) the speaker 'omits material

facts about the issuer's inquiry into or knowledge concerning a statement of opinion,' and (ii) 'those facts conflict with what a reasonable investor would take from the statement itself.'" *In re BP P.L.C. Sec. Litig.*, No. 4:10-MD-2185, 2016 U.S. Dist. LEXIS 73721, at *78 (S.D. Tex. May 31, 2016) (quoting *Omnicare*, 135 S. Ct. at 1328-29).

Defendants omitted the following facts about their inquiry and knowledge concerning their "opinion" of the Alaska Assets' fair value:

- Defendants used the Reserve Report, without further analysis, as the basis for the reported fair value of the Alaska Assets, despite the fact that the Reserve Report was not intended to calculate fair value;
- The reported $110 million value of the fixed assets within the Alaska Assets was based on a doctored "Loss Estimates Study" and was double-counted in the total reported fair value of the Alaska Assets;
- The "petroleum engineering firm who had previously provided the past two owners of the properties with reserve reports . . . told Hall that it would not assign any value to . . . the Redoubt Shoal field, because it was uneconomical – *i.e.*, expected future expenses exceeded expected future cash flows";
- "internal documents maintained by Hall indicated that the cost to drill a new well in the Redoubt Shoal field was roughly $13 million" but Hall told the engineering firm to use a cost of $4.6 million per well" in the Reserve Report;
- Miller Energy's and Hall's internal estimates showed an expected cost of "more than $800,000 per month" for the Redoubt Shoal Field once it was fully operational and the seller's cost had been more than $600,000 per month but the fair market value reported by Miller Energy relied on an estimated cost of $399,000 per month;
- The previous owner's actual operating expenses for all of the reserves in the Alaska Assets were $32.50 per barrel of oil equivalent ("boe") in 2008 and $55.42/boe in the first half of 2009 before the wells were shut-in but the fair market value reported by Miller Energy relied on $4/boe.

¶¶63-101. Accordingly, Defendants knew, but failed to disclose, that there was substantial data contradicting, at a minimum, the cost estimates underlying the reported fair value of the Alaska Assets. A reasonable investor would have viewed the reported fair value as reflecting informed entities' cost and productivity estimates based on accurate data, yet Defendants ignored the available data and disregarded the statements of the engineering firm that had provided reserve reports to the past two owners of the properties. In sum, it was misleading for Defendants to report the Alaska

Assets' fair value without disclosing that the calculation incorporated unsupported cost estimates while ignoring historical cost data. Defendants' "opinion" is actionable under *Omnicare*.

## I. <u>Plaintiffs Have Adequately Stated a Claim Under Section 15</u>

Under Section 15, if the defendant exercised only "some indirect means of discipline or influence, even if short of actual direction, over the corporation," the court may find the controlling person liable. *Pullins v. Klimley*, No. 3:05-CV-082, 2008 U.S. Dist. LEXIS 3467, at *77 (S.D. Ohio Jan. 7, 2008). Additionally, "[a]llegations of control . . . need not be pleaded with particularity. They need satisfy only the less stringent requirements of Fed. R. Civ. P. 8." *In re Nat'l Century Fin. Enters., Inc.*, 504 F. Supp. 2d 287, 300 (S.D. Ohio 2007).

Satisfying this standard, Plaintiffs allege that:

- "[T]he Individual Defendants each were control persons of Miller Energy by virtue of their positions as directors and/or senior officers";
- "[E]ach had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Miller Energy"; and
- "[E]ach were participants in the violations of Section 11 and/or 12 of the Securities Act alleged in the Cause of Action above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the Offerings to be successfully completed."

¶¶160-161. Contrary to Defendants' assertion, nothing more is required. Thus, Plaintiffs have adequately pled their Section 15 claim against the Individual Defendants.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the Motions in their entirety and grant any other relief that the Court deems proper.

DATED: April 7, 2017

ROBBINS GELLER RUDMAN
& DOWD LLP
JACK REISE (*pro hac vice*)
STEPHEN R. ASTLEY (*pro hac vice*)

*s/ Jack Reise*

JACK REISE

120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)

ROBBINS GELLER RUDMAN
& DOWD LLP
CHRISTOPHER M. WOOD, #032977
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)

*Lead Counsel for Plaintiffs*

BARRETT JOHNSTON MARTIN
& GARRISON, LLC
DOUGLAS S. JOHNSTON, JR., #5782
JERRY E. MARTIN, #20193
TIMOTHY L. MILES, #21605
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2202
615/252-3798 (fax)

*Local Counsel for Plaintiffs*

LAW OFFICES OF CURTIS V. TRINKO, LLP
CURTIS V. TRINKO (*pro hac vice*)
16 West 46th Street, 7th Floor
New York, NY 10036
Telephone: 212/490-9550
212/986-0158 (fax)

KRANENBURG
WERNER R. KRANENBURG (*pro hac vice*)
80-83 Long Lane
London EC1A 9ET
United Kingdom
Telephone: +44 20 3174 0365

*Additional Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing has been filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system. All others below will also be served by depositing a copy thereof in the United States mail, first-class, postage prepaid:

David J. Voyticky
2652 Midvale Avenue
Los Angeles, CA 90064

Gerald Hannahs
17710 Leatha Lane
Little Rock, AR 72223

William B. Richardson
1058 Encantado Drive
Santa Fe, NM 87501

Paul W. Boyd
8125 Ainsworth Drive
Knoxville, TN 37909

Charles M. Stivers
118 Richmond Road
Manchester, KY 40962

*Defendants*

*s/Jack Reise*
JACK REISE