UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| KENNETH GAYNOR, *et al.*, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br>v.<br><br>DELOY MILLER, *et al.*,<br><br>Defendants. | ) | No.: 3:15-CV-545-TAV-CCS<br><br>*Lead Case Consolidated with* |
| MARCIA GOLDBERG, *et al.*, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br>v.<br><br>DELOY MILLER, *et al.*,<br><br>Defendants. | ) | No.: 3:15-CV-546-TAV-CCS<br><br>*as consolidated with* |
| GABRIEL R. HULL, *et al.*,<br><br>Plaintiffs,<br>v.<br><br>DELOY MILLER, *et al.*,<br><br>Defendants. | ) | No.: 3:16-CV-232-TAV-CCS |

**MEMORANDUM OPINION AND ORDER**

This civil matter is before the Court on defendant Gerald Hannahs's Motion to Dismiss [Doc. 95],[1] Underwriter Defendants' Motion to Dismiss [Doc. 96],[2] and individual defendants McPeak, Turkleson, Schlumberger, Gower, Leary, Stivers, Hall, Richardson, and Rector's Motion to Dismiss [Doc. 99]. Plaintiffs filed a response in opposition to defendants' motions to dismiss [Doc. 102], and underwriter defendants and individual defendants replied [Docs. 104, 105]. For the reasons stated herein, the Court will grant in part and deny in part defendants' motions to dismiss.

## I. Background[3]

This case is a combined, securities class action, whereby plaintiffs allege claims pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. § 77a [Doc. 92 ¶ 1]. Plaintiffs represent a class of individuals who purchased Miller Energy Series C and Series D preferred shares that were offered between February 13, 2013, and August 21, 2014, allegedly traceable to the Securities and Exchange Commission ("SEC") Form S-3 filed on September 6, 2012 (the "registration statement") [*Id.*]. Specifically, plaintiff Kenneth Gaynor purchased Series D shares on April 28, 2015, plaintiff Marcia

[1] Because the cases have been consolidated, the Court refers to the docket entries in the lead case, No. 3:15-CV-545, unless otherwise indicated.

[2] Underwriter defendants include MLV & Co. LLC, Williams Financial Group, Maxim Group LLC, National Securities Corp., Aegis Capital Corp., Northland Capital Markets, Dominick & Dominick LLC (now known as Dominick & Dickerman LLC), Ladenburg Thalmann & Co. Inc., and I-Bankers Securities, Inc.

[3] For the purposes of the motions to dismiss, the Court takes plaintiffs' factual allegations as true. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (noting that "when ruling on a defendant's motion to dismiss, a judge must accept as true all factual allegations contained in the complaint" (citations omitted)).

Goldberg purchased Series D shares on August 20, 2014, plaintiff Gabriel Hull purchased Series D shares between August 20, 2014, and May 6, 2015, and Hull also purchased Series C shares on dates between November 25, 2014, and May 6, 2015, and plaintiff Christopher Vorrath purchased Series C shares between July 29, 2013, and February 4, 2015 [Doc. 88-2]. Plaintiffs claim that they purchased these shares "pursuant and/or traceable to" the offerings [Doc. 92 ¶¶ 12–15]. Series C shares were offered on February 13, 2013, May 8, 2013, and June 28, 2013, and Series D shares were offered on September 26, 2013, October 17, 2013, and August 21, 2014 [*Id.* ¶ 1].

**A. Defendants**

Defendants are numerous current and former executive officers and directors of Miller Energy ("individual defendants"), as well as the investment banking firms that underwrote the relevant offerings ("underwriter defendants") [*Id.* ¶ 2].

Defendant Deloy Miller ("Miller") founded Miller Energy, served as the Chief Executive Officer ("CEO") from 1967, through August 2008, served as the Chief Operating Officer ("COO") for some time, and served as the Chairman of the Board of Directors ("Board") from December 1996, until September 14, 2014 [*Id.* ¶ 19]. Defendant Scott Boruff served on the Board from August 6, 2008, through March 29, 2016, acted as CEO from August 6, 2008, to September 14, 2014, and served as the President of Miller Energy from June 26, 2010, until June 14, 2011 [*Id.* ¶ 20]. Defendant David Voyticky served as the President of Miller Energy from June 9, 2011, until August 12, 2014, as its Acting Chief Financial Officer ("CFO") from September 2011, until February 2014, and

as a director from April 2010, to April 2014 [*Id.* ¶ 21]. Defendant Catherine Rector served as the Vice President and Chief Accounting Officer of Miller Energy between July 2012, and October 2013 [*Id.* ¶ 22]. Defendant David Hall served as the COO from July 18, 2013, until August 6, 2015, and he served on the Board from December 10, 2009, until April 16, 2015 [*Id.* ¶ 23]. Defendants Merrill McPeak, Gerald Hannahs, Charles Stivers, and Don Turkleson served as directors of Miller Energy beginning September 6, 2012, and they signed the registration statement used to conduct the Offerings [*Id.* ¶ 24]. Defendants Bob Gower, Joseph Leary, William Richardson, and Marceau Schlumberger served as directors of Miller Energy at the time of certain offerings [*Id.* ¶ 25]. Defendant Paul Boyd served as the CFO and Treasurer of Miller Energy from 2008 to 2011, and as Director of Risk Management from 2011 until 2014 [*Id.* ¶ 26].

Defendant MLV acted as an underwriter of Miller Energy's preferred stocks with regard to all relevant offerings [*Id.* ¶ 54]. Defendant Williams Financial Group ("WFG") underwrote the February Series C offering [*Id.*]. Maxim Group LLC ("Maxim"), Aegis Capital Corp. ("ACC"), and National Securities Corporation ("NSC") served as underwriters on all relevant offerings other than the October 2013, Series D offering [*Id.*]. Defendant Northland Capital Markets ("NCM") underwrote the June 2013, Series C offering, the September 2013, Series D offering, and the August 2014, Series D offering [*Id.*]. Defendant Dominick & Dominick, LLC ("D&D") acted as underwriter on the September 2013, Series D offering [*Id.*]. Defendant Ladenburg Thalmann & Co. ("LTC") served as underwriter on the September 2013, and the August 2014, Series D offerings

[*Id.*]. Finally, I-Bankers Securities, Inc. ("IBS") underwrote the August 2014, Series D offering [*Id.*].

**B. Substantive Allegations[4]**

Plaintiffs claim that Miller Energy made "false and misleading financial accounting and reporting" statements related to its valuation of oil and gas assets in Alaska purchased in 2009 ("Alaska Assets") [*Id.* ¶¶ 3, 45]. Miller Energy reported that the Alaska Assets valued approximately $480 million, which plaintiffs contend overstated the value of the assets by "hundreds of millions of dollars" [*Id.* ¶¶ 47–48, 56].

Plaintiffs allege that Miller Energy set forth these false and misleading valuations in its Form S-3 registration statement, filed September 6, 2012, utilizing a "shelf" registration or continuous offering process [*Id.* ¶ 52]. The registration statement became

[4] Defendants urge the Court to take judicial notice of Miller Energy's SEC filings, Pacific Energy's System for Electronic Document Analysis and Retrieval ("SEDAR") filings, and historical stock prices and oil prices [Doc. 99-4]. "A court may consider other materials . . . if those matters are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice under Rule 201 of the Federal Rules of Evidence." *In re Miller Energy Res. Sec. Litig.*, No. 3:11–CV–386–TAV–CCS, 2014 WL 415730, at *13 (E.D. Tenn. Feb. 4, 2014). The determination of whether a document is "integral" to the complaint is within a court's discretion and is guided by the judicial notice standards of Federal Rule of Evidence 201. *In re Cardinal Health, Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 712 (S.D. Ohio 2006). Rule 201 permits the Court to take judicial notice of facts that are "not subject to reasonable dispute in that [they are] either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

The Court finds it appropriate to judicially notice the documents submitted by defendants in support of their motions to dismiss [Docs. 98, 99, 103], and the Court will, therefore, consider these documents in deciding the current motions to dismiss. *See Murray Energy Holdings Co. v. Mergermarket USA, Inc.*, No. 2:15-CV-2844, 2016 WL 3365422, at *6 n.5 (S.D. Ohio June 17, 2016) (finding that courts may take judicial notice of SEC filings when considering Rule 12(b)(6) motions).

effective of September 18, 2012, and it was utilized for all relevant offerings [*Id.* ¶¶ 52–53]. Plaintiffs contend that Miller Energy repeated this false valuation in various financial reports with the SEC between 2010 and 2015, including prospectuses and Forms 10-K, 10-Q, and 8-K [*Id.* ¶ 48, 55].

Plaintiffs state in their Complaint that Miller Energy publically defended the accuracy of its Alaska Assets valuations on multiple occasions, in spite of events that cast doubt on the company's calculations [*Id.* ¶ 50]. For instance, a report published by *The Street Sweeper* in 2011, asserted that the Alaska Assets were actually worth between $25 million and $30 million, offset by $40 million in liabilities [*Id.* (citing Melissa Davis & Janice Shell, *Miller Energy: This Hot 'Alaska' Stock May Be About To Melt*, Seeking Alpha: The Street Sweeper (July 28, 2011)]. Miller Energy responded to this report by claiming it took a "conservative approach" to valuation of the Alaska Assets [*Id.*].

Acquisition of the Alaska Assets resulted in a 5,000% increase in Miller Energy's assets, along with a 982% increase in stock value [*Id.* ¶ 51]. On December 10, 2009, Miller Energy stock closed at $0.61 per share, and on March 31, 2010, following acquisition of the Alaska Assets, Miller Energy stock closed at $6.60 per share [*Id.*]. Miller Energy shares reached an all-time high in December 2013, at a price of $8.83 per share [*Id.*].

Plaintiffs list multiple disclosures that they contend, "revealed that the Registration Statement was false and misleading in that it overstated the value of the Alaska Assets" [*Id.* ¶ 105]. These disclosures include, in chronological order: (1) quarterly reports in 2014 and 2015, which disclose that Miller Energy was taking impairment charges on the Alaska

Assets [*Id.* ¶¶ 106–07], (2) a Wells Notice in April 2015, which indicated that the SEC had made an initial determination to recommend civil action against Miller Energy with regard to its acquisition of the Alaska Assets [*Id.* ¶ 108], (3) a decision by Miller Energy, in May 2015, to defer dividend payments on Series C and Series D preferred shares [*Id.* ¶ 109], (4) a report by Miller Energy that the NYSE had notified the company its shares were subject to delisting [*Id.* ¶ 110], (5) a notification of late filing, in July 2015 [*Id.* ¶ 111], (6) a notice of suspension of Series C stocks [*Id.* ¶ 112], and (7) a August 6, 2015, disclosure by Miller Energy that the SEC initiated civil proceedings against the company, alleging that Miller Energy overvalued the Alaska Assets [*Id.* ¶ 113]. Plaintiffs then set forth information with regard to the SEC enforcement action, including the SEC's specific allegations [*Id.* ¶¶ 114–18], the settlement terms agreed upon by Miller Energy and the SEC's Enforcement Division on August 20, 2015 [*Id.* ¶ 121], and the SEC's official findings [*Id.* ¶ 124].

In September 2015, Miller Energy's Series C and Series D preferred shares were delisted, after the price had dropped to $0.30 per share [*Id.* ¶ 122]. Miller Energy filed Chapter 11 bankruptcy on October 1, 2015, in large part due to the SEC enforcement action [*Id.* ¶ 123].[5] In accordance with the SEC Order, all equity interests in Miller Energy were cancelled [*Id.* ¶ 127]. Miller Energy disclosed on March 29, 2016, in a Form 8-K, that its "financial statements from prior years beginning in fiscal year 2010 should no longer be relied upon," in light of the SEC findings and the bankruptcy proceeding [*Id.* ¶ 128].

[5] Plaintiffs also provide an overview of the SEC's findings with regard to Paul Boyd, David Hall, and Carlton Vogt [Doc. 92 ¶¶ 132–35].

### C. Prior Litigation

This Court previously presided over a set of consolidated securities class actions filed against Miller Energy and certain of its officers and directors in 2014. *In re Miller Energy Res. Sec. Litig.*, No. 3:11–CV–386–TAV–CCS, 2014 WL 415730 (E.D. Tenn. Feb. 4, 2014). The plaintiffs brought claims on behalf of all persons who purchased common stock of Miller Energy between December 16, 2009, and August 8, 2011. *Id.* at *1. They stated causes of action under Sections 10(b) and 20(a) of the Exchange Act, based on Miller Energy's "false and misleading statements" with regard to the value of the Alaska Assets, "which artificially inflated the price of Miller's common stock." *Id.* at *1, *4–5. The plaintiffs cited *The Street Sweeper* article as corrective disclosure for loss causation purposes. *Id.* at *5.

On February 4, 2014, the Court denied the majority of the defendants' motions to dismiss, determining that the plaintiffs' allegations regarding the value of the Alaska Assets were sufficient to state a cause of action for securities fraud. It specifically found that "a reasonable person could conclude that the Miller Defendants knew . . . that the 'true value' of these assets was less than represented in statements to the public." *Id.* at *15, *21–22.

In the current suit, plaintiffs also allege that they suffered injury because of Miller Energy's overvaluation of the Alaska Assets, and they assert that underwriter defendants and individual defendants are liable for their losses resulting from Miller Energy's false and misleading valuations. They bring a Section 11 claim against all defendants except Boyd [Doc. 92 ¶¶ 142–50], a Section 12(a)(2) claim against the officer and underwriter

defendants [*Id.* ¶¶ 151–57], and a Section 15 claim against the individual defendants [*Id.* ¶¶ 158–61]. Defendant Hannahs, underwriter defendants, and the other individual defendants now bring motions to dismiss plaintiffs' Complaint pursuant to Rule 12(b)(6) [Docs. 95, 96, 99].

## II. Standard of Review

Rule 8(a)(2) of the Federal Rules of Civil Procedure sets forth a liberal pleading standard. *Smith v. City of Salem*, 378 F.3d 566, 576 n.1 (6th Cir. 2004). It requires only "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Detailed factual allegations are not required, but a party's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557)).

In deciding a Rule 12(b)(6) motion to dismiss, the Court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. In doing so, the Court "construe[s] the complaint in the light most favorable to the plaintiff, accept[s] its allegations as true, and draw[s] all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir.

2007) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted).

**III. Analysis**

Plaintiffs bring claims pursuant to Sections 11, 12, and 15 of the Securities Act, 15 U.S.C. § 77a [Doc. 92 ¶ 1]. Section 11 prohibits making "untrue statement[s] of material fact" or omitting statements of material fact in a security's registration statement. *Id.* § 77k(a). It imposes liability on persons who sign securities registration statements containing such untrue statements of material fact or omissions of material fact. *J & R Mktg. v. Gen. Motors Corp.*, 549 F.3d 384, 390 (6th Cir. 2008).

In order to state a claim for relief under Section 11, the plaintiff must allege facts showing that: (1) he purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under Section 11; and (3) the registration statement contained an untrue statement of a material fact or omitted either a material fact required to be stated therein or a material fact necessary to make the statements therein not misleading. *Local 295/Local 851 IBT Emp'r Grp. Pension Tr. & Welfare Fund v. Fifth*

*Third Bancorp.*, 731 F. Supp. 2d 689, 704 (S.D. Ohio 2010) (citing *In re Morgan Stanley Info. Fund Sec. Lit.*, 592 F.3d 347, 358–59 (2d Cir. 2010)).

Similarly, Section 12(a)(2) creates a cause of action based on "misleading statements, misstatements, or omissions in a prospectus." *J & R Mktg.*, 549 F.3d at 389. In order to state a claim for relief under Section 12(a)(2), the plaintiff must allege that: (1) the defendant is a "statutory seller"; (2) the sale was effectuated by means of a prospectus or oral communication; and (3) the prospectus or oral communication included an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading. *Morgan Stanley*, 592 F.3d at 360.

Finally, Section 15 places liability "jointly and severally" on any person who "controls any person liable under section 11 or 12." 15 U.S.C. § 77o(a). In order to state a claim under Section 15, the plaintiff must plead sufficient facts to establish: (1) a primary securities law violation; (2) power to control the specific transaction or activity upon which the primary violation is predicated; and (3) actual participation in the operations of the primary violator in general. *In re Prison Realty Sec. Litig.*, 117 F. Supp. 2d 681, 692 (M.D. Tenn. 2000).

Defendants move to dismiss plaintiffs' Section 11 and Section 12 claims on the bases of—among other reasons—standing, untimeliness, negative loss causation, and reasonable reliance. Individual defendants argue for dismissal of plaintiffs' Section 15

claim based on dismissal of the Section 11 and Section 12 claims, as well as due to a lack of requisite control. The Court will evaluate each of these arguments in turn.

### A. Standing

Although the standing requirements for Sections 11 and 12 are similar in some respects, the standards vary significantly enough that the Court finds it advantageous to address the law of each separately. The Court will then apply the law for each and determine whether plaintiffs have standing to bring their Section 11 and Section 12 claims.

#### 1. Section 11 Standing Law

"[B]ecause no scienter is required for liability under Section 11 and thus defendants are liable for innocent or negligent material misstatements or omissions, its standing provision is narrow." *In re Century Aluminum Co. Sec. Litig.*, 749 F. Supp. 2d 964, 978 (N.D. Cal. 2010). "To have standing to bring suit under Section 11, a plaintiff must have purchased stock in the offering at issue, or trace later-purchased stock back to that offering." *Id.* at 977; *see 7547 Corp. v. Parker & Parsley Dev. Partners*, 38 F.3d 211, 223 (5th Cir. 1994) (asserting that, in order to have standing to assert a violation of Section 11, a plaintiff must have "acquired" the security, and courts limit the term "acquiring such security" to "purchasers of shares issued and sold pursuant to the challenged registration statement"); *In re Prison Realty Sec. Litig.*, 117 F. Supp. 2d at 690 (stating that "a § 11 cause of action can be brought by anyone who purchased stock under a registration statement, regardless of when the purchase was made," including aftermarket purchasers).

Thus, "[t]o have standing under Section 11, a plaintiff who has purchased a security must plead traceability, meaning that she must show that the securities she purchased were registered under, or traceable to, the false and misleading registration statement at issue." *In re EveryWare Glob., Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 864 (S.D. Ohio 2016) (internal citations and quotation marks omitted); *see Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 495–96 (5th Cir. 2005) ("[A]ftermarket purchasers seeking standing must demonstrate the ability to trace their shares to the faulty registration" (internal citations and quotation marks omitted)); *Joseph v. Wiles*, 223 F.3d 1155, 1159 (10th Cir. 2000) ("[A]n aftermarket purchaser has standing to pursue a claim under section 11 so long as he can prove the securities he bought were sold in an offering covered by the false registration statement."); *In re Empyrean Bioscience, Inc. Sec. Litig.*, 255 F. Supp. 2d 751, 766 (N.D. Ohio 2003) (submitting that "an aftermarket purchaser has standing to assert a Section 11 violation, provided the stock is traceable to the effective registration statement").

Plaintiffs must, therefore, "allege the dates and establish that they purchased stock pursuant to the offering to satisfy the standing requirement for a section 11 claim." *Lilley v. Charren*, 936 F. Supp. 708, 718 (N.D. Cal. 1996); *see also Lee v. Ernst & Young, LLP*, 294 F.3d 969, 978 (8th Cir. 2002) (submitting that plaintiffs who are aftermarket purchasers must "make a prima facie showing that the . . . shares they purchased can be traced to the registration statement alleged to be false and misleading" in order to have standing under Section 11).

### 2. Section 12 Standing Law

The standard for Section 12 standing proves even more stringent than Section 11's requirements. Section 12(a)(2) only imposes liability on "statutory sellers" of securities—those who have (1) passed title, or other interest in the security, to the buyer for value, or (2) successfully solicited the purchase of a security, motivated at least in part by a desire to serve his own financial interests or those of the securities' owner. *In re Regions Morgan Keegan Sec., Derivative & ERISA Litig.*, Nos. 2:09-2009 SMH V, 2:07-cv-02830-SHM-dkv, 2:07-cv-02830-SHM-dkv, 2012 WL 12875982, at *9 (W.D. Tenn. Mar. 30, 2012) (citing *Pinter v. Dahl*, 486 U.S. 622, 647 (1988)); *Morgan Stanley*, 592 F.3d at 360; *see Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995) ("Section 12(a)(2) applies only to purchases made through initial offerings and not to aftermarket trading.").

To be liable as a seller, the defendant must be the "buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers. Thus, a buyer cannot recover against his seller's seller." *Pinter*, 486 U.S. at 644 n.21; *see In re Century Aluminum Co.*, 749 F. Supp. 2d at 976 ("Section 12(a)(2) requires a plaintiff to plead and prove that it purchased a security directly from the issuer as part of the initial offering, rather than in the secondary market."); *see also In re Royal Ahold N.V. Sec. & ERISA Lit.*, 351 F. Supp. 2d 334, 406 (D. Md. 2004) ("In order to state a claim under § 12(a)(2), the complaint must allege by whom the plaintiffs were solicited and from whom they purchased shares; these assertions must be supported by specific factual allegations demonstrating a direct relationship between the defendant and the plaintiff-purchaser.").

A complaint that alleges that the plaintiff purchased securities "pursuant and/or traceable to" the offering documents that contain falsities is not sufficient to establish Section 12 standing. *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 310–11 (S.D.N.Y. 2011); *see Me. State Ret. Sys. v. Countrywide Fin. Corp.*, No. 2:10–CV–0302 MRP, 2011 WL 4389689, at *11 (C.D. Cal. May 5, 2011) ("Plaintiffs must allege they purchased the securities 'pursuant to' the allegedly misleading offering documents instead of 'pursuant and/or traceable to' those documents."); *In re Century Aluminum Co.*, 749 F. Supp. 2d at 976–77 (finding the plaintiffs' allegations that they purchased shares "pursuant and/or traceable to the offering" insufficient to establish standing).

**3. Application**

Here, named plaintiffs allege that they purchased Series C and Series D preferred shares "pursuant and/or traceable to the Offerings," which incorporated the registration statement containing material misrepresentations [Doc. 92 ¶¶ 12–15]. As outlined herein, plaintiffs' Complaint alleges the dates on which named plaintiffs purchased preferred shares [Doc. 88-2], as well as the dates on which the relevant Series C and Series D shares were offered [Doc. 92 p. 16]. The purchase dates and offering dates do not match as to any named plaintiff. Thus, plaintiffs have not alleged that they purchased shares directly from the relevant offerings, and it is evident from the face of the Complaint that named plaintiffs purchased their shares through aftermarket trading. *See In re CitiGroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 585 (S.D.N.Y. 2010) (stating that "even a cursory review of the information provided makes clear that many of the listed purchases must have been made

in the secondary market because they were not made on dates on which any initial offering was being made").

Furthermore, plaintiffs' allegation that they purchased shares "pursuant and/or traceable to the Offerings" is insufficient to establish Section 12 standing. *See In re Century*, 749 F. Supp. 2d at 976 ("Plaintiffs allege that they purchased 'pursuant and/or traceable to the offering,' . . . [and] courts have dismissed Section 12(a)(2) allegations stated in precisely such terms. Moreover, . . . the plaintiffs' certifications of their stock purchases . . . show that none of the named plaintiffs purchased any shares on the date of the secondary offering."); *Pub. Emp's Ret. Sys. v. Merrill Lynch & Co.*, 714 F. Supp. 2d 475, 484 (S.D.N.Y. 2010) (finding plaintiffs' allegations that they purchased shares "pursuant and/or traceable to the defective Prospectus Supplements" insufficient to allege standing for purposes of a Section 12(a)(2) claim "because it is ambiguous whether the plaintiff is alleging they were a direct or indirect purchaser" (internal citation omitted)).

Thus, the Court finds that plaintiffs do not have standing to bring claims pursuant to Section 12(a)(2), and the Court will accordingly grant defendants' motion on this ground and dismiss that cause of action as to all defendants.[6] *See Local 295*, 731 F. Supp. 2d at 713 ("Section 12(a)(2) applies only to purchases made through initial offerings and not to aftermarket trading.").

---

[6] Although defendant Hannahs does not provide the Court with legal support for his motion to dismiss [Doc. 95], the Court may raise standing at any time *sua sponte*. *See Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 983 (6th Cir. 2012) ("The issue of standing . . . may be raised sua sponte." (citation omitted)). Thus, the Court will also dismiss plaintiffs' Section 12 claim against Hannahs.

With regard to plaintiffs' Section 11 standing, however, the Court finds that plaintiffs have sufficiently alleged standing to withstand defendants' motion to dismiss. Named plaintiffs contend that they purchased shares "pursuant and/or traceable to the Offerings" that incorporated the allegedly false registration statement [Doc. 92 ¶¶ 12–15]. Unlike with Section 12 standing, this statement adequately alleges standing for the purposes of Section 11. *See Me. State Ret. Sys.*, 2011 WL 4389689, at *11 n.21 (explaining that, unlike Section 12, "the language 'pursuant or traceable to' . . . is sufficient for Section 11 claims, which require only an allegation that the plaintiff purchased pursuant to or traceable to a false registration statement").

Furthermore, plaintiffs have set forth facts that adequately demonstrate traceability, and they need not state "conclusory allegations of standing" in order to proceed at this stage. *See EveryWare Glob.*, 175 F. Supp. 3d at 866. Plaintiffs allege that all Series C and Series D preferred stocks incorporated the challenged registration statement [Docs. 102-1, 102-2]. Thus, plaintiffs sufficiently allege that their shares are necessarily traceable to the registration statement, and plaintiffs, therefore, have standing to pursue their Section 11 claim. *See In re Empyrean Bioscience*, 255 F. Supp. 2d at 766 (asserting that "an aftermarket purchaser has standing to assert a Section 11 violation, provided the stock is traceable to the effective registration statement"). Consequently, the Court will deny defendants' motion to dismiss plaintiffs' Section 11 claim on this ground.

### B. Timeliness

Seeing as plaintiffs have standing to bring their Section 11 claim, the Court will now examine whether they have timely brought this cause of action. Defendants contend that plaintiffs' Section 11 claim violates both the three-year statute of repose and the one-year statute of limitations. The Court will first evaluate the statute of repose and then, if necessary, the statute of limitations.

#### 1. Statute of Repose

The Securities Act provides a three-year statute of repose, which applies to causes of action brought under Section 11. *See* 15 U.S.C. § 77m ("In no event shall any such action be brought to enforce a liability created under section 77k or 77l(a)(1) of this title more than three years after the security was bona fide offered to the public."). The statute of repose for Section 11 claims commences once the security was "bona fide offered to the public." 15 U.S.C. § 77m.

Section 13's statute of repose applies to plaintiffs' Section 11 claim, and plaintiffs bear the burden of pleading facts that show compliance with that provision. *In re Nat'l Mortg. Equity Corp. Mortg. Pool Cert. Sec. Litig.*, 636 F. Supp. 1138, 1166 (C.D. Cal. 1986). In their Complaint, plaintiffs allege, "Less than three years has elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time Plaintiffs commenced this action" [Doc. 92 p. 41].

The parties here disagree as to when the securities at issue were "bona fide offered to the public." Defendants contend that the securities were "offered" on September 18,

2012, when the registration statement became effective [Doc. 99-1 p. 17], while plaintiffs argue that the securities were not bona fide offered until the supplemental prospectuses were filed, beginning on February 13, 2013 [Doc. 102 pp. 35–36]. Because plaintiffs filed the current action on November 9, 2015, if the Court adopts defendants' position, then the statute of repose bars plaintiffs' Section 11 claim.

When the shelf-registration process is employed, as in this case, "securities will generally be bona fide offered to the public on the date the SEC declares the registration statement effective," rather than when the supplemental prospectus is filed. *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 989 (4th Cir. 2014); *P. Stolz Family P'ship v. Daum*, 355 F.3d 92, 104 (2d Cir. 2004) (asserting that the Securities Act's three-year repose period "is triggered by the effective date of the (allegedly false) registration statement").

In 2005, the SEC modified "the registration, communications, and offering processes under the Securities Act of 1933" in a manner that altered the law on statute of repose commencement. Securities Offering Reform, Exchange Act Release No. 33–8591 (Dec. 1, 2005). One of the SEC's new rules, Rule 430B, expanded the meaning of the "initial bona fide offering date" from the date of a post-effective registration statement amendment, to the date of a post-effective registration statement supplement, with regard to issuer and underwriter liability. 17 C.F.R. § 230.430B(f)(2). Furthermore, the SEC amended Rule 512 to encompass post-effective prospectuses as well. 17 C.F.R. § 229.512(a); *In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig.*, 876 F. Supp. 2d 616, 655 (D. Md. 2012).

Thus, the "offering" date for statute of repose purposes is now: (i) the date of the prospectus supplement for issuers and underwriters, and (ii) the date of the registration statement for directors and signing officers. 17 C.F.R. § 230.430B(f)(2); *see Footbridge Ltd. Tr. v. Countrywide Finan. Corp.*, 770 F. Supp. 2d 618, 623 (S.D.N.Y. 2011) ("For issuers and underwriters, but not as to directors and officers, Rule 430B of the Securities Offering Reform ('SOR') changed the bona fide offering date for shelf offerings issued pursuant to registration statements filed on or after December 1, 2005 to the date of the prospectus supplement."); *see also Me. State Ret. Sys. v. Countrywide Finan. Corp.*, 722 F. Supp. 2d 1157, 1165 n.8 (C.D. Cal. 2010) ("The Securities Offering Reform, adopted by the SEC effective December 1, 2005, changed the rules regarding the statute of repose trigger date for shelf offerings as they relate to Section 11 liability for issuers and underwriters, but not as they relate to directors and officers.").

An exception exists, however, by which a new bona fide offering date may apply to signing officers and directors. Rule 430B(f)(4)(ii) states that new prospectuses shall not stand as a new effective dates with regard to directors and signing officers, "except for such a report or document incorporated by reference for purposes of including information required by section 10(a)(3) of the Act or pursuant to Item 512(a)(1)(ii) of Regulation S–K." 17 C.F.R. § 230.430B(f)(4)(ii). Thus, if the prospectus encompasses a "fundamental change in the information set forth in the registration statement," as addressed in § 512(a)(1)(ii), then the prospectus is deemed to be the initial bona fide offering of those shares as to the directors and signatory officers as well. 17 C.F.R. § 229.512(a)(1)(ii); *see*

*In re Metro. Sec. Litig.*, No. CV–04–25–FVS, 2010 WL 537740, at *2 (E.D. Wash. Feb. 8, 2010) (stating that a "mandatory post-effective amendment—e.g., a post-effective amendment that is covered by Item 512(a)(1)(ii)—triggers a new period of repose").

When evaluating whether a supplemental prospectus represents a fundamental change on a motion to dismiss, courts must determine "whether it is plausible to infer" that the amendments were made in response to a fundamental change. *Booth v. Strategic Realty Trust, Inc.*, No. 13–cv–04921, 2014 WL 3749759, at *8 (N.D. Cal. July 29, 2014). The SEC has noted that "[w]hile many variations in matters such as operating results, properties, business, product development, backlog, management and litigation ordinarily would not be fundamental, major changes in the issuer's operations, such as significant acquisitions or dispositions, would require the filing of a post-effective amendment." *Delayed or Continuous Offering and Sale of Securities*, 46 Fed. Reg. 42001, 1981 WL 119423, at *42007–08 (Aug. 18, 1981). "[M]ateriality is not the test. The test is fundamental change; and the latter is more demanding than the former. A change may be material without being fundamental." *In re Metro. Sec. Litig.*, 2010 WL 537740, at *2.

Plaintiffs contend that the February 13, 2013 prospectus presented fundamental changes to the registration statement and therefore re-triggered the statute of repose as to the individual defendants [Doc. 102 p. 38]. Alternatively, plaintiffs argue that defendants' Form 10-K, which was filed on July 15, 2013, was also a new bona fide offering [*Id.*]. Plaintiffs do not explain, however, in what manner these prospectuses fundamentally modified the registration statement and incorporated documents.

The registration statement's cautionary language and exclusion of some relevant information cited by plaintiffs [Doc. 102 pp. 38–39] merely defines a shelf registration. *See Fed. Hous. Fin. Agency v. UBS Ams., Inc.*, No. 11 Civ. 5201, 2012 WL 2400263, at *2 ("The shelf registration process allows certain would-be issuers to file a generic registration statement with the SEC that omits the type of detailed information that must generally be disclosed to purchasers." (citing 17 C.F.R. §§ 230.409, 230.415, 230.430A)). Registration statements used for shelf offerings still presumptively commence the statute of repose period as to individual defendants. *Yates*, 744 F.3d at 989. Thus, the disclaimers noted by plaintiffs do not "confirm that the Registration Statement did not constitute a bona fide offering of the Securities" [Doc. 102 p. 39]. *See Metro.*, 2010 WL 537740, at *2 ("The plaintiffs argue [the issuer's] November 14th registration statement was materially incomplete because it contained only a summary of investor rights rather than a full statement of rights. . . . [The issuer's] decision to add a full statement of rights to a registration statement that already contained a summary of rights was not a fundamental change.").

Furthermore, plaintiffs' contention that the prospectuses "contained new misrepresentations" does not plausibly infer that the prospectuses contained fundamental changes to the registration statement [Doc. 102 pp. 38–39]. Plaintiffs fail to explain how the repeated, allegedly false valuations of the Alaska assets amounts to "fundamental changes" [*Id.* at 39–40]. Rather, incorporation of the same false valuation into later-filed financial documents by definition does not reflect a fundamental change. The Complaint

alleges that Miller Energy did not disclose fundamental changes, but instead contends that Miller Energy continued to utilize the same allegedly incorrect valuation as it first reported in 2010.

Plaintiffs claim that the registration statement was inaccurate and misleading in that it significantly overstated the value of the Alaska Assets [Doc. 92 pp. 29, 40]. They bring claims on behalf of all those who purchased shares traceable to the registration statement [*Id.* at 39, 41]. It appears, therefore, that plaintiffs base their claims upon the false valuations contained in the registration statement, and it would be implausible to infer, based on plaintiffs' allegations, that later-filed prospectuses fundamentally altered the registration statement as to this alleged misevaluation. *See Booth*, 2014 WL 3749759, at *7 ("Any claims founded upon alleged misrepresentations or omissions in the initial offering materials on that date would normally be barred by Section 13.").

Thus, based on plaintiffs' allegations, the Court does not find that it is plausible to infer that the prospectuses fundamentally changed the registration statement, and the § 512 exception to the individual defendants' inclusion in 17 C.F.R. § 230.430B(f) does not apply in this case. The Court finds that the securities at issue were bona fide offered to the public, as to individual defendants, on the date the registration statement became effective: September 18, 2012. *See Yates*, 744 F.3d at 989. Consequently, the statute of repose expired on September 18, 2015, and plaintiffs' Section 11 claim against individual defendants, including defendant Hannahs, is time-barred [*See* Doc. 1-1 (reflecting that plaintiffs filed the current lawsuit on November 9, 2015)]; *see also* 15 U.S.C. § 77m. The

Court, therefore, will grant Hannahs's and individual defendants' motions to dismiss the Section 11 claim against them on this ground.

Based on the language of § 230.430B(f)(2) and interpreting case law, however, the Court finds that the statute of repose does not bar plaintiffs' Section 11 claim against underwriter defendants. *See* 17 C.F.R. § 230.430B(f)(2) (expanding the meaning of the "initial bona fide offering date" from the date of a post-effective registration statement amendment, to the date of a post-effective registration statement supplement, with regard to issuer and underwriter liability); *Footbridge*, 770 F. Supp. 2d at 623 ("For issuers and underwriters[,] . . . Rule 430B of the Securities Offering Reform ('SOR') changed the bona fide offering date for shelf offerings issued pursuant to registration statements filed on or after December 1, 2005 to the date of the prospectus supplement."); *In re Countrywide Finan. Corp. Sec. Litig.*, No. CV–07–05295–MRP, 2009 WL 943271, at *7 (C.D. Cal. Apr. 6, 2009) ("The Rule states that some types of post-effective amendments will create a new effective date and initial bona fide offering date only for the issuer and for a person that is at the time an underwriter." (internal quotation marks and citations omitted)).

Consequently, the Court will deny underwriter defendants' motion to dismiss on this ground and will proceed with its analysis as to plaintiffs' Section 11 claim against underwriters.

**2. Statute of Limitations**

Section 11 claims are also subject to a one-year statute of limitations. *See* 15 U.S.C. § 77m ("No action shall be maintained to enforce any liability created under section

77k or 77l(a)(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence."); *In re IndyMac Mortg.–Backed Sec. Litig.*, 793 F. Supp. 2d 637, 645 (S.D.N.Y. 2011). The statute of limitation period commences when the plaintiff had either actual notice or inquiry notice. *New England Health Care Emps. Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 500–01 (6th Cir. 2003); *EveryWare Glob.*, 175 F. Supp. 3d at 862.

Inquiry notice means that the plaintiff has "knowledge of the facts that would lead a reasonable person to begin investigating the possibility that his legal rights had been infringed." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004) (internal quotation marks omitted). A plaintiff "need not have fully discovered the nature and extent of the fraud before he was on notice that something may have been amiss. Inquiry notice is triggered by evidence of the possibility of fraud, not full exposition of the scam itself." *Id.* at 846. Mere "storm warnings," or the "knowledge of suspicious facts," however, do not commence the statute of limitations period. *New England Health Care*, 336 F.3d at 501. Rather, they trigger "a duty to investigate," and "the limitation period begins to run only when a reasonably diligent investigation would have discovered the fraud." *Id.* (internal citation and quotation marks omitted).

Compliance with the statute of limitations section "is an essential substantive ingredient of a private cause of action under section 11." *Bresson v. Thomson McKinnon Sec., Inc.*, 641 F. Supp. 338, 343 (S.D.N.Y. 1986). It is an affirmative defense, however,

and the Court may only dismiss plaintiffs' claim on this ground "if it is apparent from the face of the complaint that the claim is time-barred." *Davidco Inv'rs, LLC v. Anchor Glass Container Corp.*, No. 8:04CV2561T-24EAJ, 2006 WL 547989, at *24 (M.D. Fl. Mar. 6, 2006); *see Ma. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 88 n.4 (2d Cir. 2010) (asserting that the one-year statute of limitations "creates an affirmative defense where plaintiff failed to bring suit within a specified period of time after his cause of action accrued, often subject to tolling principles").

Thus, on a motion to dismiss, a claim is barred by the statute of limitations based on inquiry notice "only when uncontroverted evidence irrefutably demonstrates when plaintiff discovered or should have discovered" the violation. *Newman v. Warnaco Grp., Inc.*, 335 F.3d 187, 194–95 (2d Cir. 2003); *see also EveryWare Glob.*, 175 F. Supp. 3d at 863 ("District courts in this circuit have found that a dispute over whether plaintiffs' claims are barred by the one-year statute of limitations is factual in nature and cannot be decided on a motion to dismiss." (citing *In re Direct Gen. Corp., Sec. Litig.*, 398 F. Supp. 2d 888, 897 (M.D. Tenn. 2005); *Bovee v. Coopers & Lybrand*, 320 F. Supp. 2d 646, 656 (S.D. Ohio 2004); *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 601–02 (N.D. Ohio 2004)).

Here, defendants assert that all of plaintiffs' claims are barred by the statute of limitations because they had inquiry notice of the alleged violations more than a year prior to initiation of this suit [Doc. 99-1 p. 17; Doc. 105 p. 13].[7] Specifically, defendants suggest

[7] Underwriter defendants did not directly make this argument, but they joined and incorporated individual defendants' memorandum in support of their motion to dismiss [Doc. 101].

that an investor of ordinary intelligence would have been aware of a potential cause of action following the disclosure of previous litigation in this Court [Doc. 99-1 p. 18]. According to defendants, the prior lawsuits "were brought against the same defendants named here, alleging that the same Alaska Assets valuation and accompanying financial statements were false and misleading," and disclosures of ongoing litigation involving identical representations "has been held to place plaintiffs in the later lawsuit on inquiry notice" [*Id.* (citing *Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp., N.V.*, 941 F. Supp. 1369, 1375 (S.D.N.Y. 1996) (stating that "if the prior lawsuits specifically concerned the very misrepresentations alleged in the present complaint, then the prior lawsuits constitute inquiry notice" (internal quotation marks and citation omitted))]. According to defendants, the prior litigation concerned "precisely the same thing" as this lawsuit [Doc. 105 p. 13]. As this Court issued its Order denying defendants' motion to dismiss in the prior case more than one year before plaintiffs filed their complaint, defendants contend that plaintiffs' claims are barred by the statute of limitations [*Id.*].

In response, plaintiffs assert that, while complaint allegations may constitute "storm warnings," "earlier filed lawsuits do not constitute a sufficient bases at the Rule 12(b)(6) stage to conclude as a matter of law that the limitations period was triggered on or before a certain date" [Doc. 102 p. 34 (quoting *W&S Life Ins. Co. v. JPMorgan Chase Bank, N.A.*, 54 F. Supp. 3d 888, 903–04 (S.D. Ohio 2014))]. Moreover, plaintiffs note that Miller Energy denied all allegations that it had overvalued the Alaska Assets during that litigation. "Given Defendants' ongoing denial until 2016 of any impropriety as to the Alaska Assets,"

claim plaintiffs, "there is no uncontroverted evidence irrefutably demonstrating that Plaintiffs should have discovered the violations more than one year prior to the filing of this action" [Doc. 102 p. 35]. Thus, according to plaintiffs, the Court may not rely on its Order in the prior litigation to find that plaintiffs had inquiry notice of the alleged violations.

The Court agrees with plaintiffs that it cannot say with certainty, based on the facts before it, that the prior litigation provided more than a "storm warning," prompting plaintiffs to investigate, rather than inquiry notice. Thus, the Court finds that it is not apparent from the face of plaintiffs' Complaint that their Section 11 claim against underwriter defendants is time-barred because "uncontroverted evidence" does not "irrefutably demonstrate" when plaintiffs discovered,, or should have discovered, the violation. *Davidco*, 2006 WL 547989, at *24; *Newman*, 335 F.3d at 194–95. Consequently, the Court will deny underwriter defendants' motion to dismiss plaintiffs' Section 11 claim based on the statute of limitations.[8]

**C. Negative Loss Causation**

Underwriter defendants next argue that the Court should dismiss plaintiffs' Section 11 claim because "lack of loss causation is apparent on the face of the complaint" [Doc. 104 p. 5].

[8] The Court notes, however, that, "at this stage, the Court's ruling for Plaintiffs on the question of the statute of limitations does not, of course, definitively mean that the amended complaint was timely filed." *EveryWare Glob.*, 175 F. Supp. 3d at 864.

### 1. Law

Loss causation is "a causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 342 (2005). The Securities Act of 1933 "restricts damages to those depreciations . . . that actually result from the . . . the material misstatement, not to those that are somehow connected with the misstatement or even those that are simply 'within the zone of risk' of the misstatement." *In re State St. Bank & Tr. Co. Fixed Income Funds Invest. Litig.*, 774 F. Supp. 2d 584, 595 (S.D.N.Y. 2011). Thus, negative loss causation provides a defense from liability under Section 11 "if the depreciation in the value of the security did not result from any nondisclosure or false statement made in the . . . registration statement." *See Azzolini v. Corts Trust II*, No. 103CV1003, 2005 WL 3448053, at *5 (E.D. Tenn. Dec. 14, 2005); *see also Fifth Third*, 731 F. Supp. 2d at 710 (asserting that "a plaintiff must show that an economic loss occurred after the truth behind the misrepresentation or omission became known to the market").

In order for a revelation of information to support loss causation, the filing must "reveal to the market the falsity of the prior" alleged misrepresentations. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005). "Corrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time." *Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 473 (4th Cir. 2011); *see Catogas v. Cyberonics, Inc.*, 292 F. App'x 311, 314 (5th Cir. 2008) (stating that "confirmatory information—that information already known to the market—may *not* constitute such a corrective disclosure"). There is no "bright-line test of when a report based on publically released data becomes a corrective

disclosure," and the apparent key "is whether the report contains genuinely new information beyond a mere re-characterization of previously disclosed facts." *In re Miller*, 2014 WL 415730, at *22 (quoting *Meyer v. St. Joe Co.*, No. 11–cv–27, 2011 WL 3750324, at *6 (N.D. Fla. Aug. 24, 2011)).

Consequently, "to establish loss causation, a plaintiff must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell*, 396 F.3d at 173 (internal quotation marks and citation omitted). Courts may consider the gap in time between the revealing of material misstatements and the alleged loss when determining whether the two are causally connected. *See Azzolini*, 2005 WL 3448053, at *6. If the majority of the price drop occurs before a disclosure, this may "indicate that the loss in value was caused by other factors." *Waterford Twp. Gen. Emps. Ret. Sys. v. SunTrust Banks, Inc.*, No. 1:09–CV–617–TWT, 2010 WL 3368922, at *5 (N.D. Ga. Aug. 19, 2010). Thus, a price decline before disclosure generally cannot establish loss causation. *McMahan & Co. v. Wherehouse Entm't, Inc.*, 65 F. 3d 1044, 1049 (2d Cir. 1995). In addition, negative loss causation may exist where a significant portion of the stock price decline occurred before the disclosure. *In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp. 2d 404, 418–19 (S.D.N.Y. 2009).

Loss causation is not an element of a Section 11 claim, however, but an affirmative defense to it. 15 U.S.C. § 77l (b); *Ind. State Dist. Council Laborers v. Omnicare, Inc.*, 583

F.3d 935, 947 (6th Cir. 2009). "Where a Rule 12(b)(6) motion is based on an affirmative defense, the complaint must show on its face that the claim is barred by the defense." *Local 295*, 731 F. Supp. 2d at 710 (citation omitted); *see Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998) (asserting that an "affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of the complaint"); *Azzolini*, 2005 WL 3448053, at *5–6 ("If it is apparent on the face of the complaint the decline in share value is not related to any material misstatement and/or omission, dismissal is appropriate."). Plaintiffs may plead "themselves out of court by demonstrating that it is impossible for them to demonstrate loss causation." *In re Regions Morgan Keegan Sec., Derivative*, Nos. 07–2784, MDL 2009, 2010 WL 5464792, at *5 (W.D. Tenn. Dec. 30, 2010).

**2. Application**

Plaintiffs set forth a series of disclosures that they claim revealed "the Registration Statement was false and misleading in that it overstated the value of the Alaska Assets" [Doc. 92]. Defendants argue that these events cited by plaintiffs did not amount to new or corrective disclosures [Doc. 97 p. 24]. Furthermore, defendants contend that even if some of the disclosures revealed new information, "the majority of [plaintiffs'] losses occurred before then and were clearly attributable to the industry-wide decline in oil prices" because, as noted by defendants, stock prices had dropped 97.5% from their highest price by the initiation of the SEC Action in August 2015 [*Id.* at 30–31].

Indeed, several of the disclosures noted by plaintiffs—including most disclosures between December 2014, and August 2015—did not so much as reference the Alaska Assets valuation [*Id.* ¶¶ 106–07, 109–12]. The Wells Notice, disclosed on April 29, 2015, set forth information regarding acquisition of the Alaska Assets, but it did not reveal "genuinely new information" from that which was made public via the *The Street Sweeper* report [*Id.* ¶ 108]. Thus, these disclosures either did not contain new information, or did not "reveal to the market the falsity of the prior" statements or omissions, and they consequently cannot demonstrate loss causation as a matter of law. *Lentell*, 396 F.3d at 175 n.4.

Underwriter defendants admit, however, that the disclosures cited by plaintiff occurring after initiation of the SEC enforcement action, on August 6, 2015 [Doc. 92 ¶¶ 113–35], reveal potentially new information about the valuation of the Alaska Assets [Doc. 104 p. 10 n.2]. Defendants argue that the vast majority of plaintiffs' losses had already occurred by then, which demonstrates that plaintiffs' losses occurred due to "the industry-wide precipitous decline in oil prices," rather than corrective disclosures regarding the Alaska Assets [Doc. 97 p. 20].[9]

The Court finds that these disclosures, following the SEC's initiation of its enforcement action, potentially revealed new information "addressed to," and "revealing to the market the truth regarding," the alleged misstatements and omissions. *Katyle*, 637

[9] If the Court does not dismiss plaintiffs' Section 11 claim due to lack of loss causation, underwriter defendants ask the Court to limit any potential damages to those arising after this date [Doc. 97 p. 20].

F.3d at 473. Thus, the current matter differs from cases cited by defendants, *Fifth Third*, 731 F. Supp. 2d at 710, and *Omnicare*, 2011 WL 2786301, at *2, in which the plaintiffs failed to set forth any disclosures that could support loss causation [Doc. 97 p. 23]. While the post-SEC initiation disclosures contained some information previously disclosed to the public, they also appear to have included some "new" information, which is sufficient at the motion-to-dismiss stage. *See In re Miller*, 2014 WL 415730, at *22. The Court acknowledges that the stock price had significantly dropped prior to August 2015, but this is merely one factor to consider in examining whether loss causation exists, and the Court does not find it appropriate to grapple with the facts in this manner while deciding a Rule 12(b)(6) motion. *See Azzolini*, 2005 WL 3448053, at *6 (noting that "the lapse of time between the behavior complained of and the loss is *a factor* to consider in determining whether the loss causation requirement has been met" (emphasis added) (internal citation omitted)); *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 444 (S.D.N.Y. 2009) (concluding that an assessment of defendants' negative causation arguments was best left for summary judgment); *see also Local 295*, 731 F. Supp. 2d at 710 ("Where a Rule 12(b)(6) motion is based on an affirmative defense, the complaint must show on its face that the claim is barred by the defense.").

Plaintiffs "have not pled themselves out of court by demonstrating that it is impossible for them to demonstrate loss causation," *In re Regions Morgan Keegan*, 2010 WL 5464792, at *5, and the Court will, therefore, deny underwriter defendants' motion to dismiss plaintiffs' Section 11 claim on this ground. *See id.* ("Affirmative defenses are best

left for adjudication on motions for summary judgment or at trial."); *In re Direxion Shares ETF Tr.*, 279 F.R.D. 221, 233 (S.D.N.Y. 2012) ("[R]esolution of what (if any) of plaintiffs' losses are attributable to the alleged misrepresentations requires wading into the facts to an extent that likewise is inappropriate on a motion to dismiss.").[10]

**D. Reasonable Reliance**

Finally, underwriter defendants argue that the Court should dismiss plaintiffs' Section 11 claim based on the affirmative defense of reasonable reliance [Doc. 97 p. 34; Doc. 104 p. 11].

With regard to "any part of the registration statement purporting to be made on the authority of an expert," a defendant other than the expert will not be liable if he demonstrates that "he had no reasonable ground to believe and did not believe . . . that the statements therein were untrue or that there was an omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(b)(3)(C). "In order for an accountant's opinion to qualify as an expert opinion under Section 11(b)(3)(C), . . . it must be reported in the Registration Statement [and] be an audit opinion." *In re WorldCom*, 346 F. Supp. 2d. at 664–65. In addition, "the accountant must consent to inclusion of the audit opinion in the registration statement." *Id.* For these "expertised" portions of the registration statement, such as financial statements, "underwriters may reasonably rely on auditors' statements, absent red flags that the

[10] The Court will also decline to limit damages to those arising after August 6, 2015, as requested by underwriter defendants [Doc. 104 p. 10 n.2], finding limitation of damages on a surviving claim to be inappropriate at this stage of litigation.

underwriters were in a position to see." *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1175 (C.D. Cal. 2008). Like negative loss causation, reasonable reliance is an affirmative defense, and a court may only dismiss a claim on this ground if the defense is apparent from the face of the complaint. *See id.* at 1182.

Here, underwriter defendants claim that all of the allegedly false valuations were audited by KPMG, whose audits were incorporated into the registration statement [Doc. 97 p. 35]. Furthermore, defendants contend that plaintiffs have not identified any red flags that would have caused underwriters to question KPMG's calculations [*Id.*]. Thus, underwriter defendants argue that they are entitled to the Section 11(b)(3)(C) reasonable reliance defense.

These arguments by underwriter defendants do not prove that plaintiffs' Section 11 claim is undoubtedly barred by the defense of reasonable reliance, however, which is required in order for the Court to dismiss plaintiffs' claim on this ground in the context of a Rule 12(b)(6) motion. *See In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 322–23 (S.D.N.Y. 2013) ("Because the affirmative defense turns on an evaluation of reasonableness, whether the defense is available is generally a fact issue, rarely suitable for summary judgment, let alone a motion to dismiss."); *In re Glob. Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 211 (S.D.N.Y. 2003) (stating that Section 11 "expressly provides that the burden of proof is on defendants to establish this defense," and "plaintiffs need not negate such an affirmative defense in their pleading"). Although "courts look to plaintiffs to point to red flags that should have indicated to the underwriter that the financial

statements were not trustworthy," *Feyko v. Yuhe Int'l, Inc.*, No. CV 11–05511 DDP, 2013 WL 816409, at *8 (C.D. Cal. Mar. 5, 2013), plaintiffs have noted several potential red flags set forth in their complaint [Doc. 102 pp. 32–33]. The Court finds it inappropriate to weigh the sufficiency of those warning signs at the current juncture. Accordingly, the Court will deny underwriter defendants' motion to dismiss plaintiffs' Section 11 claim on this ground.

**E. Section 15**

Section 15 liability attaches to every person who "controls any person liable under Section 11 or 12." 15 U.S.C. § 77o(a). Liability under Section 15 is derivative, so where a plaintiff fails to allege a Section 11 or 12 claim that will survive dismissal and, therefore, fails to state a primary violation, the plaintiff's control person allegation must also be dismissed. *J & R Mktg.*, 549 F.3d at 398. A Section 15 claimant must first establish his standing to sue under Sections 11, 12(a)(1), or 12(a)(2). *DeMaria v. Andersen*, 153 F. Supp. 2d 300, 314 (S.D.N.Y. 2001). Thus, because the Court will dismiss plaintiffs' Section 12 claim for lack of standing, it will also dismiss plaintiffs' Section 15 claim against all individual defendants predicated upon a primary violation of Section 12.

With regard to plaintiffs' Section 15 claim based on defendants' alleged primary violation of Section 11, as stated herein, the Court will allow plaintiffs' Section 11 claim against underwriter defendants to survive. Plaintiffs allege derivative liability against officers and directors of Miller Energy, however, rather than against controllers of the underwriters. While plaintiffs must establish individual defendants' Section 15(a) control with respect to the primary violator and prove that the controlled person, Miller Energy,

violated Section 11, plaintiffs need not join Miller Energy as a party to the lawsuit in order to maintain its Section 15 claim against individual defendants who controlled Miller Energy. *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 285 (3d Cir. 2006) (finding that the "controlling persons should not escape liability under Section 15 and Section 20(a) merely because [the controlled person's] underlying liability cannot be formally adjudicated due to its insolvency"); *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, No. 2:03-MD-1565, 2006 WL 469468, at *23 (S.D. Ohio Feb. 27, 2006) ("Where the primary offender is insolvent or otherwise unavailable, the courts have proceeded to adjudicate the underlying liability of that offender regardless of its presence as a party-defendant." (internal citation and quotation marks omitted)).

Here, the Complaint alleges that: (1) plaintiffs purchased registered securities traceable to the offerings; (2) Miller Energy issued the shares; and (3) the registration statement contained untrue statements of material facts with regard to Miller Energy's valuation of the Alaska Assets [Doc. 92 ¶¶ 144, 148]. Thus, plaintiffs have sufficiently stated a Section 11 claim against Miller Energy as primary violator, *Local 295*, 731 F. Supp. 2d at 704, although not a party to this action. They have, therefore, stated a Section 15 derivative claim against individual defendants as alleged controllers of Miller Energy, so long as the statute of repose does not bar this claim and plaintiffs have sufficiently alleged control of Miller Energy by individual defendants. The Court will examine these two remaining issues in turn.

As to the applicable state of repose, because Section 15 does not specify its own statute of repose period and imposes vicarious liability for persons controlling violators of Sections 11 and 12, claims brought under Section 15 are subject to the statute of repose period governing the primary violation. *In re IndyMac*, 793 F. Supp. 2d at 642; *Herm v. Stafford*, 663 F.2d 669, 679 (6th Cir. 1981) ("Since the liability of the controlling person is joint and several with the controlled person, the same limitations period logically applies to the controlling person."). Thus, because the primary violator/controlled person here is the issuer of the shares, the applicable statute of repose "bona fide offering date" for Section 15 purposes is the date of the post-effective registration statement supplements. 17 C.F.R. § 230.430B(f)(2). Based on the statute of repose analysis set forth herein with regard to underwriter defendants, plaintiffs' Section 15 claims against individual defendants are not barred by the statue of repose [*See* Doc. 102 at 35–36 (noting that the supplemental prospectuses were filed beginning on February 13, 2013, and the current action was brought on November 9, 2015, which is, therefore, within three years of the bona fide offering)].

As to individual defendants' Section 15(a) control of the primary violator, Miller Energy, the Court finds that plaintiffs have alleged sufficient control to withstand individual defendants' Rule 12(b)(6) motion. In order to plead control person liability under Section 15, a plaintiff must establish that the defendant actually exercised control over operations of the primary violator and that the defendant "possessed the power to control the specific transaction or activity upon which the primary violation is predicated."

*Sanders Confectionary Prods. v. Heller Fin., Inc.*, 973 F.2d 474, 486 (6th Cir. 1992) (internal citation omitted).

Section 15 claims survive motions to dismiss "as long as it is at least plausible that plaintiff could develop some set of facts that would pass muster." *In re Glob. Crossing, Ltd. Sec. Litig.*, No. 02 Civ. 910(GEL), 2005 WL 2990646, at *8 (S.D.N.Y. Nov. 7, 2005). Even if the facts alleged in the complaint are alone insufficient to establish control, the control inquiry is highly fact-based, and Section 15 claims should only be dismissed on this ground where it is "implausible or mere unlikely speculation that plaintiffs can develop a record that would support a finding of control." *Id.* (internal citation and quotation marks omitted).

Here, plaintiffs have alleged that individual defendants "each were control persons of Miller Energy by virtue of their positions as directors and/or senior officers of Miller Energy" [Doc. 92 ¶ 160]. Plaintiffs further allege that they "each were participants in the violations of Section 11," having "signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the Offerings to be successfully completed" [*Id.* ¶ 161]. The Court finds that these facts are sufficient for it to be not implausible that a developed record will support a finding of control. Consequently, the Court will deny Hannahs's and individual defendants' motions to dismiss plaintiffs' Section 15 claim based on the alleged, primary Section 11 violation.

## IV. Conclusion

Accordingly, for the reasons stated herein, defendant Hannahs's Motion to Dismiss [Doc. 95], Underwriter Defendants' Motion to Dismiss [Doc. 96], and individual defendants McPeak, Turkleson, Schlumberger, Gower, Leary, Stivers, Hall, Richardson, and Rector's Motion to Dismiss [Doc. 99] are hereby **GRANTED in part** and **DENIED in part**.

Plaintiffs' Section 11 claim, Section 12 claim, and Section 15 claim predicated on its Section 12 claim against defendants Hannahs, McPeak, Turkleson, Schlumberger, Gower, Leary, Stivers, Hall, Richardson, and Rector are hereby **DISMISSED**, and plaintiffs' Section 15 claim based on its Section 11 claim survives. Plaintiffs' Section 12 claim against underwriter defendants is hereby **DISMISSED**, and plaintiffs' Section 11 claim against underwriter defendants survives.

IT IS SO ORDERED.

s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE